# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305**

      *Plaintiffs,*

      **v.**

**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and**

**DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs**

      *Defendants.*

**Case No. 25-cv-00583-MRD-PAS**

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3379461

1.      Plaintiffs the American Federation of Government Employees National Veterans Affairs Council (NVAC) and American Federation of Government Employees Local 2305 bring this lawsuit to challenge the unlawful actions of the United States Department of Veterans Affairs (VA) and its Secretary Douglas A. Collins.[1]  NVAC is an autonomous labor organization affiliated with the American Federation of Government Employees that represents, and bargains on behalf of, more than 300,000 bargaining unit employees at the VA.

2.      Since August 8, 2023, the VA and NVAC have been parties to the 2023 Master Collective Bargaining Agreement (Master Agreement) that recognizes NVAC's right as the sole and exclusive representative of the VA bargaining unit employees that it represents and that provides those employees with a variety of workplace rights.  *Master Agreement between the Dep't of Veterans Affairs and the Am. Fed. of Gov't Emps.,* U.S. Dep't of Veterans Affairs (August 8, 2023).  The Master Agreement is attached hereto as **Exhibit A**.

3.      On August 6, 2025, Secretary Collins terminated the Master Agreement and informed NVAC that the VA would no longer recognize NVAC as the exclusive representative of over 300,000 bargaining unit employees.  This action, which Secretary Collins stated was based on President Donald J. Trump's March 27, 2025 Executive Order 14251 (EO 14251), was arbitrary and capricious, in excess of statutory authority, and contrary to NVAC's constitutional rights.

4.      Since 1978, federal employees have been granted the right to bargain collectively by the Federal Service Labor-Management Relations Statute, which is codified at Chapter 71 of Title 5 of the United States Code (hereinafter, Chapter 71).  Pursuant to this right, the VA and NVAC entered into the Master Agreement, which governs the collective bargaining relationship

---

[1] As used in this Complaint, "NVAC" refers to Plaintiff the American Federation of Government Employees National Veterans Affairs Council; "AFGE Local 2305" refers to Plaintiff American Federation of Government Employees Local 2305; and "AFGE" refers to the American Federation of Government Employees, which is the AFL-CIO-affiliated international federation with over 900 local AFGE unions and which is not a party to this action.  "VA" refers to Defendant the United States Department of Veterans Affairs, and "The Secretary" or "Secretary Collins" refers to Defendant Douglas A. Collins.  "Master Agreement" refers to the 2023 Master Collective Bargaining Agreement between NVAC and the VA.

between them and confers critical rights and workplace protections on bargaining unit employees. Previous nationwide term agreements were executed in 1982, 1997, and 2011.

5.    Chapter 71 allows the President to "issue an order excluding any agency or subdivision thereof from coverage under this chapter," *i.e.*, from Chapter 71's obligation to engage in collective bargaining, if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1) (hereinafter, Section 7103).

6.    On March 27, 2025, President Trump invoked Section 7103 when he issued EO 14251.  Section 2 of EO 14251 excluded the entire VA (except for "the immediate, local employing offices of any agency police officers, security guards, or firefighters") from coverage under Chapter 71 on the claimed basis that the VA has "as a primary function intelligence, counterintelligence, investigative, or national security work" and that Chapter 71 "cannot be applied to [the VA] in a manner consistent with national security requirements and considerations."  In this way, EO 14251 excluded all VA employees (other than "the immediate, local employing offices of any [VA] police officers, security guards, and firefighters") from coverage under Chapter 71, thereby eliminating their right to engage in collective bargaining unless they were later exempted from the EO's coverage by the Secretary as described below.

7.    Section 4 of EO 14251 provides that "the Secretar[y] of . . . Veterans Affairs [is] delegated authority under 5 U.S.C. § 7103(b)(1) to issue orders suspending the application of . . . Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute."  In other words, Section 4 authorized Secretary Collins to exempt certain "subdivisions" of the VA from the reach of EO 14251 and return them to coverage under Chapter 71.

8.    On April 11, 2025, Secretary Collins issued an order (April 11 Order) exempting seven entities, which are one international union and six additional union affiliates, from EO

14251, thereby bringing these bargaining units back "under the coverage" of Chapter 71 and restoring their rights to collective bargaining. In his April 11 Order, Secretary Collins did not exempt any AFGE affiliates, including NVAC, AFGE Local 2305, or any other Local on behalf of which NVAC acts. The April 11 Order did not provide any explanation for why Secretary Collins chose to exempt non-AFGE affiliates or why he chose not to exempt AFGE affiliates. The April 11 Order is attached hereto as **Exhibit B**.

9.      Notwithstanding the April 11 Order, the VA took no action to formally terminate the Master Agreement until August 6, 2025.

10.     On August 6, 2025, in letters to NVAC leadership and without any advance warning, the Secretary announced that he was unilaterally terminating NVAC's Master Agreement effective immediately ("August 6 Termination" or "Termination"), including "any amendments, local supplemental agreements, and memoranda of understanding at all levels with NVAC/AFGE for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by NVAC/AFGE, effective August 6, 2025." Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025). The letters effectuating the August 6 Termination are attached hereto as **Exhibit C**.

11.     The Secretary's August 6 Termination was unlawful under the Administrative Procedure Act (APA) and the Constitution.

12.     First, under the APA the Termination was arbitrary and capricious, an abuse of discretion, and contrary to law. Both the Termination and the related April 11 Order were issued without any rationale or justification. Secretary Collins had the authority to determine that Chapter 71 could be applied to certain "subdivisions" of the VA consistent with national security concerns, but the Secretary did not make any such determination. He instead arbitrarily terminated collective bargaining rights on a union-by-union basis, which is inconsistent with Section 7103 and EO 14251.

13.     Further, the Termination does not comply with the plain text of EO 14251's language prohibiting its application to the "immediate, local employing offices of any agency police officers, security guards, or firefighters" because it has the effect of denying Chapter 71 coverage and contractual protections from bargaining unit employees who are employed by such offices.

14.     Finally, the VA admitted that its decisions to exclude NVAC members and represented employees from Chapter 71's coverage and to terminate the Master Agreement were premised on union political activity as opposed to statutorily prescribed national security considerations.  And because they were based on political animus and other impermissible reasons, these decisions granted some VA employees Chapter 71 rights while depriving others who work at the same facility or in nearly identical roles of those same rights.  These kinds of classifications are inconsistent with the limitations that Congress wrote into Section 7103, which permits the Executive to act only where the Executive determines that Chapter 71 "cannot be applied to [an] agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1)(B)

15.     The Termination was also inconsistent with a memorandum issued on March 27, 2025, by the Acting Director of the Office of Personnel Management (OPM), Charles Ezell, who released guidance (OPM Guidance) to agency leadership on how to implement EO 14251.  *See* Memo. of Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, Office of Pers. Mgmt. (March 27, 2025), https://www.opm.gov/chcoc/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs/.  The OPM Guidance in effect at the time of the Termination instructed agencies not to terminate collective bargaining agreements during the pendency of litigation over EO 14251.

16.     As if to highlight the Secretary's capriciousness, three days after AFGE initiated this lawsuit challenging the VA's implementation of the Executive Order, the Secretary acted to take away Chapter 71 rights from even the few unions that benefitted from his April 11 Order.

The entire premise of the April 11 Order was that the Secretary was to identify where the VA could continue to apply Chapter 71 "consistent with national security requirements and considerations." Executive Order 14251, § 4(b)(i).  So, as of April 11, 2025, the Secretary believed that the VA could continue recognizing those unions without endangering national security.  et, on November 7, the Secretary rescinded the April 11 Order (November 7 Rescission). The Secretary offered no explanation for why, in April, he thought that the VA could continue to work with some unions in a manner "consistent with national security" but, in November, he reached the opposite conclusion. Indeed, the timing of the November 7 Rescission confirms the pretextual nature of the Secretary's actions—the Secretary is motivated by political animus and defending against litigation, not protecting national security.

17.    Second, the Termination violates the APA's prohibition on agency action contrary to the Constitution as it violates the First Amendment.  By terminating NVAC's collective bargaining rights, the Secretary retaliated against NVAC for its political and legal advocacy and affiliation with AFGE; discriminated against NVAC based on NVAC's viewpoints "hostile" to the Trump Administration's policies; infringed on the right to petition by chilling NVAC's and bargaining unit employees' participation in grievances, arbitration, and litigation; and infringed on the right to free association by impinging NVAC's ability to organize and advocate with its bargaining unit employees, all in violation of the First Amendment.

18.    Third, the Secretary acted in excess of his statutory authority when he issued both the Termination and the April 11 Order on which it was based.  A Section 7103 order can be issued only where an "agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and [] the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  But, neither the VA nor any identifiable subdivision has such a primary function, and the Secretary failed to demonstrate that the provisions of Chapter 71 cannot be applied to the VA in a manner consistent with national security requirements and considerations.  Further, both Section 7103 and EO 14251 authorize determinations as to Chapter 71's applicability only for

5

agency or agency subdivisions; neither permits the union-by-union determinations the Secretary imposed.

19.     The Termination independently violates the First Amendment to the Constitution for the same reasons discussed above.

20.     Because the Termination violates the APA and the Constitution and exceeds the Secretary's authority under EO 14251, the Court should vacate the Termination and declare it unlawful.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States.  This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) and 5 U.S.C. § 702 because Defendants are a United States official and agency.

22.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

23.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because NVAC represents federal employees in this District, AFGE Local 2305 resides within this District, and because a substantial part of the events or omissions giving rise to the claim occurred within this District.

## PARTIES

24.     Plaintiff NVAC is a labor organization and unincorporated association headquartered in Salem, Virginia.  NVAC represents more than 300,000 professional and non-professional employees who work in nearly every division of the United States Department of Veterans Affairs, including the Veterans Health Administration, Veterans Benefits Administration, National Cemetery Administration, and operational components such as, but not limited to, the Office of Information and Technology, Board of Veterans' Appeals, Office of

3379461

Acquisition, Logistics, and Construction, and Office of Finance. Approximately 30% of VA employees are themselves veterans, and they include nurses, physicians, dentists, pharmacists, physical and occupational therapists, housekeepers, engineers, custodians, cooks, numerous other healthcare and support staff, cemetery workers, gardeners, archivists, security officers, claim processors, clerical workers, firefighters, IT professionals, bookkeepers, and numerous other civil servants all dedicated to the mission of ensuring high quality care and service for our nation's veterans, as well as their caregivers and beneficiaries. NVAC brings this action on behalf of itself as an organization and on behalf of its members and represented employees, who have been deprived of constitutional protections and lost statutory and contractual protections at work due to the termination of the Master Agreement.

25. Plaintiff AFGE Local 2305 is a labor organization and unincorporated association headquartered in Providence, Rhode Island. In this District, AFGE Local 2305 represents more than 450 professional and nonprofessional employees who work at the Providence VA Regional Benefit Office and the Providence Veterans Center. AFGE Local 2305 also represents professional and nonprofessional employees in VA facilities outside this District. AFGE Local 2305-represented employees include psychologists, program support assistants, social workers, program specialists, vocation rehabilitation counselors, veterans service representatives, and others. AFGE Local 2305 brings this action on behalf of itself as an organization and on behalf of AFGE Local 2305-represented employees, who have been deprived of constitutional protections and lost statutory and contractual protections at work due to the termination of the Master Agreement.

26. Defendant Department of Veterans Affairs is a federal agency headquartered in Washington, D.C. It is a party and signatory to the Master Agreement, which it is no longer honoring except as applied to police officers, firefighters, and security guards.

27. Defendant Douglas A. Collins is the Secretary of Veterans Affairs and is sued in his official capacity. He ordered the Termination.

3379461

## FACTUAL BACKGROUND

A.     **Congress codifies collective bargaining rights for federal workers.**

28.     Almost fifty years ago, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), Pub. L. No. 95-454, 92 Stat. 1111 (1978), granting federal employees the right to organize and bargain collectively.  The FSLMRS is contained in Title VII of the Civil Service Reform Act of 1978 (CSRA) and codified at Chapter 71 of title 5 of the U.S. Code.

29.     The FSLMRS establishes a comprehensive framework governing collective bargaining for federal government employees based on Congress's determination that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business."  5 U.S.C. § 7101(a)(1)(A), § 7101(a)(1)(B).

30.     Chapter 71 grants employees "the right to form, join, or assist any labor organization, or to refrain from any such activity."  5 U.S.C. § 7102.  The FSLMRS also guarantees employees the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter."  5 U.S.C. § 7102(2).

31.     Pursuant to Chapter 71, agencies must "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election."  5 U.S.C. § 7111(a).

32.     The labor organization that has been selected as the exclusive representative "is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit" and "is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership."  5 U.S.C.

8

§ 7114(a)(1).  Chapter 71 mandates that agencies and federal sector labor organizations "meet and negotiate in good faith" to arrive at a collective bargaining agreement.  5 U.S.C. § 7114(a)(4).

33.    Under Chapter 71, federal employees may voluntarily choose to pay membership dues to their representative labor organization.  5 U.S.C. § 7115.  If an employee provides written authorization to an agency to deduct membership dues from the employee's pay, agencies are required to honor the request.  *Id*.

34.    The FSLMRS also prohibits labor organizations and federal employees from calling for or participating in labor strikes, work stoppages, and slowdowns.  5 U.S.C. § 7116(b)(7)(A), § 7311.

35.    Congress excluded, by statute, several agencies from Chapter 71's scope, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division.  5 U.S.C. § 7103(a)(3).

36.    Chapter 71 also grants the President limited authority to order additional agencies or subdivisions thereof excluded from Chapter 71's coverage.  The President may do so only after making a determination that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).

37.    In 1979, shortly after the enactment of the CSRA, President Carter invoked the narrow exclusion power in Section 7103(b)(1) by issuing an executive order excluding specific intelligence and national security agency subdivisions from Chapter 71.  *See* EO 12171, *Exclusions from the Federal Labor-Management Relations Program*, 44 Fed. Reg. 66565 (Nov. 20, 1979).

38.    While every president after President Carter, except for President Biden, has used Section 7103(b)(1) to exclude agency subdivisions and organizational subcomponents from Chapter 71, prior exclusions had been surgically narrow, with the excluded subdivision having an

obvious, bona fide link to national security. For example, President Reagan excluded subdivisions under the Joint Chiefs of Staff and subdivisions of the Department of Energy. *See* EO 12338, 47 Fed. Reg. 1369 (Jan. 11, 1982). President George H.W. Bush excluded the Defense Mapping Agency Reston Center, a subdivision of the Department of Defense. *See* EO 12693, 54 Fed. Reg. 40629 (Sep. 29, 1989). President Clinton excluded the Naval Special Warfare Development Group. *See* EO 13039, 62 Fed. Reg. 12529 (Mar. 11, 1997). President George W. Bush excluded subdivisions of the Department of Justice, such as the National Drug Intelligence Center and Office of Intelligence Policy and Review. *See* EO 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002). President Obama excluded subdivisions of the Departments of the Army, Navy, and Air Force, as well as other subdivisions of the Department of Defense. *See* EO 13760, 82 Fed. Reg. 5325 (Jan. 12, 2017). And President Trump, in his first term, excluded the Defense Counterintelligence and Security Agency within the Department of Defense. *See* EO 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017).

39.    However, until this year, no president had invoked Section 7103 to exclude entire Cabinet departments from Chapter 71's coverage. And no president had invoked Section 7103 to make union-by-union classifications.

**B.    Prior to the issuance of EO 14251, AFGE and NVAC persistently sought to protect its hundreds of thousands of members and represented employees from the Trump Administration's assault on federal employees and their unions.**

40.    AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. It is the largest union of federal workers, representing approximately 820,000 federal civilian and D.C. Government employees across more than 900 local unions. AFGE is also comprised of over 70 agency-based Councils, including NVAC, in addition to its 900 local unions. AFGE members work across the federal government; the departments and agencies with the highest memberships are the VA, the Social Security Administration, the Department of Defense, and the Department of Homeland Security.

41.     More than 40 years ago, VA employees began organizing under the NVAC umbrella.  Today, NVAC is an independent bargaining council of AFGE that represents more than 300,000 VA employees.  Within the VA, the Veterans Health Administration's hospitals and clinics employ the largest number of NVAC-represented workers.  AFGE Local 2305 is an independent affiliate of AFGE that represents more than 450 VA employees at the Providence VA Regional Benefit Office in Providence, the Providence Veterans Center in Warwick, and other VA facilities.

42.     Out of the 300,000 NVAC-represented employees, roughly 3,000 are employed as firefighters, police officers, and security guards.  There are approximately 2,500 VA police officers, most of whom work within the Veterans Health Administration, protecting patients, visitors, and staff at VA medical centers and community clinics around the country.  *See* Testimony of Bryan J. Hunt, *Ensuring VA's Security: How Can Congress Best Support VA's Law Enforcement?*, House Comm. on Veterans' Affairs Subcomm. on Oversight and Investigations, Congress.gov                (May                16,                2024), https://www.congress.gov/118/meeting/house/117298/witnesses/HHRG-118-VR08-Wstate-HuntB-20240516.pdf; *see also* Dep't of Veterans Affairs, VA Directive 0731, Police Staffing Policy            (May            6,            2022),            at            2, https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=1378&FType=2.

43.     NVAC's core functions are to secure fair and reasonable collective bargaining agreements with the VA; to negotiate the implementation of new policies and changes to working conditions during the term of that agreement; to file and prosecute grievances against the VA to enforce the agreements; to file and pursue unfair labor practices against the VA to enforce the FSLMRS; to represent bargaining unit employees in arbitration, administrative appeals, and statutory appeals; to participate in safety inspections and abatements; and to provide support to members and represented employees navigating a variety of federal processes.

44.     The current Master Agreement went into effect on August 8, 2023.  The Master Agreement has a term of three years followed by automatic one-year renewals absent a timely

notice to reopen.  The Master Agreement is the product of comprehensive negotiations to safeguard essential rights for NVAC-represented workers.  Renegotiations commenced in December 2017, during President Trump's first term, and resulted in NVAC filing more than a dozen national level grievances and unfair labor practices against the VA for engaging in bad faith bargaining.  For example, in 2019, the VA attempted to force upon NVAC certain provisions that would weaken worker protections like employee due process rights.  Negotiations came to a standstill when NVAC vigorously opposed, and ultimately succeeded in defeating, these harmful proposals after multiple arbitrators found that the VA's negotiators violated their duty to bargain in good faith. After renewed negotiations began in 2022, the VA's continued intransigence led a federal arbitrator to determine that it was, yet again, bargaining in bad faith.  Following this finding, the parties finally reached agreement on the current Master Agreement in August 2023.  *See* Jory Heckman, *VA Signs New Labor Agreement with AFGE, its First Update in More than a Decade*, Fed. News Network (Aug. 8, 2023), https://federalnewsnetwork.com/workforce/2023/08/va-signs-new-labor-agreement-with-afge-its-first-update-in-more-than-a-decade/.

45.    Article 1 of the Master Agreement recognizes AFGE "as the sole and exclusive representative" for all "previously certified nonprofessional and professional employees, full-time, part-time, and temporary[.]"  AFGE has delegated authority to NVAC to act as the representative of such employees in negotiations, grievances, and other matters.

46.    The Master Agreement includes provisions that contain critical worker protections, such as, for example:

i)    **Hiring Procedures**: The Master Agreement establishes fair application and selection procedures, as well as guidance related to the use of personnel records.

ii)    **Working Hours**: The Master Agreement mandates rest breaks, guaranteed compensation for and equitable limitations on overtime work, protocols for alternative work schedules, and robust leave protections (*e.g.*, sick leave, bereavement leave, jury duty, etc.).

iii)    **Health and Safety Requirements**: The Master Agreement sets forth clear and detailed requirements for the VA to maintain safe and healthful workplaces.  It also provides

for safety trainings, mandatory reporting of unsafe working conditions, protections against retaliation for such reporting, institutional transparency and accountability with respect to workplace safety documentation (*e.g.*, injury logs), and mandatory facility level violence prevention plans.

iv)     **Due Process Rights**: The Master Agreement sets forth detailed and efficient procedures and disciplinary protocols, including for example a requirement that employees be provided with advance notice and an opportunity to review evidence and respond to proposed disciplinary action, a 90-day opportunity for employees to address performance concerns using a performance improvement plan developed in consultation with local unions before the VA can take adverse action based on unacceptable performance, and a guarantee that disciplinary action be timely and based only on just and sufficient cause.

v)     **Grievance and Arbitration Rights**: The Master Agreement contains a negotiated grievance procedure including the right to proceed to binding arbitration before a neutral third party in matters affecting conditions of employment, including for example disciplinary action, pay, leave, overtime, work schedules, and more.

vi)     **Family Leave Benefits**: The Master Agreement grants employees with certain benefits that are more generous than those required by law, including for example an additional four weeks of unpaid maternity and paternity leave and the ability to invoke benefits under the Family and Medical Leave Act to care for the parents of a spouse with a serious health condition.

47.     In addition to bargaining for improved working conditions and benefits for bargaining unit employees, NVAC advocates against legislation harmful to NVAC-represented employees and against the interest of the public at large.  It also works to protect the rights of its bargaining unit employees by filing grievances against agency initiatives that violate NVAC-represented employees' rights, including more than 20 such national level grievances in 2025.  Six of these 2025 grievances pre-dated the Secretary's April 11 Order exempting certain favored unions from EO 14251's scope.

48.     For example, NVAC vocally opposed the Veterans Affairs Accountability and Whistleblower Protection Act (VA Accountability Act), signed into law by President Trump in June 2017, which created a new disciplinary authority to take adverse actions against VA employees, weakened due process protections, and expedited appeal deadlines to challenge unlawful firings.

49.     As part of its advocacy against the VA Accountability Act, NVAC filed two grievances against the VA after it unilaterally implemented the Act without meeting its bargaining obligations and in breach of its contractual obligation to provide performance improvement plans. NVAC prevailed in both matters, and the VA was found to have violated myriad legal obligations.

50.     Following extensive litigation in administrative forums and federal court, former VA Secretary Denis McDonough announced that the VA would not utilize its disciplinary authority under the VA Accountability Act due, in large part, to NVAC's successful challenges to the Act.  In July 2023, NVAC and the VA settled the second of two disputes over the VA's implementation of the VA Accountability Act, resulting in thousands of former VA employees being offered monetary relief, and in some cases, reinstatement.  *See* Drew Friedman, *VA, AFGE Reach 'Historic' Settlement to Reinstate, Compensate Thousands of Wrongfully Fired Feds*, Fed. News Network (Jul. 31, 2023), https://federalnewsnetwork.com/veterans-affairs/2023/07/va-afge-reach-historic-settlement-to-reinstate-compensate-thousands-of-wrongfully-fired-feds/.   NVAC, the VA, the FLRA, and members of Congress all issued statements announcing the historic settlement agreement, with the VA announcing the "total cost . . . expected to be in the hundreds of millions of dollars."  *See VA and AFGE reach settlement agreement resolving litigation over discipline taken under the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017*, U.S. Dep't of Veterans Affairs (July 28, 2023), https://news.va.gov/press-room/va-and-afge-agreement-uaccountability-and-whistleblower/.

51.     On August 8, 2023, then-candidate Trump spoke at a campaign event in Windham, New Hampshire and vowed, "[I will] direct my Secretary of Veterans Affairs to fire every corrupt VA bureaucrat who Joe Biden has outrageously refused to remove from the job or

14

put back in the job," and speaking of the settlement funds, "to take every penny of those funds to finally build a brand-new state-of-the art VA hospital right here in the great state of New Hampshire." *See Former President Trump Speaks in Windham, New Hampshire*, CSPAN (Aug. 8, 2023), https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-in-windham-new-hampshire/630830.

52.     Additionally, NVAC opposed the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act of 2018 (VA MISSION Act), signed into law by President Trump in June 2018, which privatized large segments of Veterans Affairs healthcare services and thus undermined the quality and accessibility of care available to veterans. AFGE and NVAC lobbied against the legislation, including participating in legislative hearings and submitting testimony to Congress on numerous occasions. Moreover, AFGE, along with 16 other labor organizations, urged the Senate to reject the bill because it "does nothing to help build up the internal capacity at the VA" and instead "outsources primary care to the private sector[.]" Joint Letter to Senate from AFGE, et al. opposing VA MISSION Act (May 22, 2018), https://www.afge.org/globalassets/documents/generalreports/2018/5-22-18-joint-letter-to-senate-opposing-s-2372-the-va-mission-act.pdf.

53.     In 2025 alone, NVAC submitted more than 20 demands to engage in mid-term bargaining of the Master Agreement, including on topics like employee classification consistency, deferred resignation for federal employees, changes to employee performance standards, and realignment of VA departments.

54.     As discussed below, not only did Secretary Collins and the VA target NVAC for its own advocacy but also for its affiliation with AFGE and its advocacy. For instance, AFGE and other organizations have created an online clearing house called "Civil Service Strong" that provides best practices and resources for federal workers trying to understand and exercise their rights. It has also held town halls, rallies, and engaged in educational and legislative efforts in Congress.

55.     Finally, AFGE engages in litigation to protect its members' and represented employees' interests, particularly in light of the Trump Administration's assault on the federal workforce.  For example, AFGE initiated several prominent lawsuits in the weeks before President Trump issued EO 14251 and before Secretary Collins issued the April 11 Order.  On February 4, 2025, AFGE sued to stop the infamous "Fork in the Road" initiative as arbitrary and capricious.[2]  On February 6, 2025, AFGE sued to stop the administration from shutting down the U.S. Agency for International Development.[3]  On February 19, 2025, AFGE sued to stop a government directive for mass termination of probationary employees at six agencies, including the VA.[4]  Through these suits and other public advocacy, AFGE had thus prominently positioned itself as a litigation adversary of the Trump Administration in the weeks prior to the President's decision to issue EO 14251.

**C.     President Trump issues Executive Order 14251 to retaliate against unions that oppose him politically.**

56.     On March 27, 2025, President Trump issued EO 14251, which invoked Section 7103(b)(1) to exclude numerous agencies and agency subdivisions from coverage under Chapter 71 of Title 5.  A copy of EO 14251 is attached hereto as **Exhibit D**.

57.     EO 14251 is unprecedented in its scope.  It excludes about two-thirds of the federal workforce from coverage under Chapter 71 of title 5, including six Cabinet departments (the Departments of Defense, State, Treasury, Justice, Veterans Affairs, and Energy), as well as numerous independent agencies and subdivisions.  The government has admitted that EO 14251 goes far beyond the scope of any prior executive order invoking Section 7103(b)(1).  *Am. Fed. of Gov. Emps., AFL-CIO v. Trump*, No. 25-CV-03070-JD, 2025 WL 1755442, at \*5 (N.D. Cal. June 24, 2025).

---

[2] *Am. Fed. of Gov't Emps., et al., v. Ezell, et al.*, No. 1:25-cv-10276 (D. Mass.)

[3] *Am. Fed. of Gov't Emps., et al. v. Trump, et al.*, No. 1:25-cv-00352 (D.D.C.)

[4] *Am. Fed. of Gov't Emps., et al., v. U.S. Office of Personnel Management, et al.*, No. 3:25-cv-01780 (N.D. Cal.)

58.    EO 14251 purports to justify its unprecedented exclusion of swaths of the federal workforce from collective bargaining rights on the ground that they "have as a primary function intelligence, counterintelligence, investigative, or national security work."  EO 14251, § 1.  But, in addition to the inclusion of the VA, the addition of agencies such as the National Institute of Allergy and Infectious Diseases, the National Institutes of Health, the Bureau of Land Management, the Bureau of Ocean Energy Management, the Animal and Plant Health Inspection Service, the National Science Foundation, and the International Trade Commission to the list of agencies excluded from Chapter 71 coverage lays bare the pretextual nature of the President's conclusory "determination."

59.    The President made some efforts to protect unions or professions that he favors from the effect of his order.  EO 14251 purports to contain two mechanisms that exempt, or that may exempt, certain bargaining unit employees from the Executive Order's exclusion from Chapter 71 coverage.  *First*, Section 2 of EO 14251 exempts from exclusion "the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons[.]"  *Id.* at § 2 (b).  *Second*, Section 4 of EO 14251 authorizes the Secretaries of Defense and Veterans Affairs to further exempt from the Section 2 exclusion "any subdivisions of the departments they supervise" thereby restoring collective bargaining rights to those select subdivisions, if they certify that Chapter 71 "can be applied to [specific subdivisions] in a manner consistent with national security requirements and considerations."  *Id.* at § 4.  EO 14251 provides that, to exempt a subdivision from the Order's scope, the Secretary must make the required certification in the Federal Register within 15 days from the date of the Order. *Id*. at § 4(b)(ii).

60.    The White House published a "Fact Sheet" about EO 14251 that made the President's purpose plain.  The Fact Sheet called out "hostile Federal unions" as "dangerous."  The Fact Sheet proclaimed that "[c]ertain Federal unions have declared war on President Trump's agenda" citing as an example the fact that "VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration."   The Fact Sheet warns that while

17

"President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements*, The White House (March 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

61.    On the same day EO 14251 was issued, March 27, 2025, Acting OPM Director Ezell released the OPM Guidance which informed agencies that they could (and should) take certain actions forbidden by collective bargaining agreements—such as ceasing to participate in grievance procedures, conducting reduction in force articles, or using non-contractual protocols for underperforming workers—only after such agreements were terminated.

62.    On April 8, 2025, OPM published a "Frequently Asked Questions" document on EO 14251 (OPM FAQ), which instructed agencies not to "terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination." *See* Frequently Asked Questions, *Executive Order 14251: Exclusions from Federal Labor-Management Relations Programs*, OPM.gov (Apr. 8, 2025), at 11 https://www.opm.gov/labor-management-relations/labor-management-relations/faqs-eo-14251-exclusions-from-federal-labor-management-relations-programs.pdf.  OPM later reversed this guidance; on August 14, 2025—eight days ***after*** the August 6 Termination—the DOJ submitted a letter to the Ninth Circuit indicating the OPM FAQ had been revised to read that "[a]gencies may choose to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess the next steps regarding those CBAs." *Am. Fed. of Gov't Emps. v. Trump*, No. 25-4014, Dkt. No. 34.1 at 2 (9th Cir. Aug. 14, 2025).

**D.    The status of litigation over EO 14251.**

63.    On March 27, 2025, the same day EO 14251 was issued, federal agencies pre-emptively filed lawsuits in Kentucky (Kentucky Action) and Texas (Texas Action) seeking

3379461

declaratory judgments that they could lawfully terminate collective bargaining agreements pursuant to the Order and to OPM's Guidance.[5]  In the Texas Action, the VA sought declaratory judgment against AFGE's Councils and Affiliates, including NVAC.  The government alleged that the VA should be permitted to terminate collective bargaining agreements, including the Master Agreement, because they were "[r]estrictive and [o]nerous," and it again noted the government's concern about "[u]nions hostile to the President's agenda."  *U.S. Dep't of Def. v. Am. Fed of Gov. Emps, AFL-CIO, District 10*, No. 6:25-cv-00119, Dkt. No. 1 ¶ 83 (W.D. Tex. Mar. 27, 2025).  In particular, the VA viewed as "hostile" several initiatives by AFGE to advocate for the rights of union members and represented employees including such activities as filing lawsuits, drafting grievances, establishing an online clearing house with AFGE supporters, petitioning and educating members of Congress, educating the public about anti-worker policies, holding and participating in town halls, and staging rallies.  *See id.* ¶ 172.  Both the Kentucky and Texas Actions have been dismissed for lack of standing.

64.    Several other union associations, unions, and their affiliates also brought various suits challenging EO 14251.  In total, five injunctions have been issued against the operation of EO 14251 itself.[6]  The government has appealed the issuance of four injunctions, and it moved to stay those injunctions pending appeal.  The Courts of Appeals stayed three of the four injunctions pending appeal.[7]  In *Fed. Educ. Assoc. v. Trump*, No. 25-5303 (D.C. Cir.), the United States Court of Appeals for the District of Columbia Circuit denied the government's motion for a stay pending

---

[5] *See U.S. Dep't of Treasury v. Nat. Treasury Emps. Union Chapter 73*, No. 2:25-cv-00049, Dkt. No. 1 (E.D. Ky. Mar. 28, 2025); *U.S. Dep't of Def. v. Am. Fed of Gov. Emps, AFL-CIO, District 10*, No. 6:25-cv-00119, Dkt. No. 1 (W.D. Tex. Mar. 27, 2025).

[6] Injunctions have issued in: *Nat. Treasury Emps. Union v. Trump*, No. 1:25-cv-00935, Dkt. No. 32 (D.D.C. Apr. 25, 2025); *Am. Foreign Serv. Assoc. v. Trump*, No. 1:25-cv-01030, Dkt. No. 36 (D.D.C. May 14, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25-cv-01362, Dkt. No. 34 (D.D.C. Aug. 14, 2025); *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-03070, Dkt. No. 60 (N.D. Cal. June 24, 2025); *Am. Fed. of Labor & Congress of Indus Orgs v. Trump*, No. 1:25-cv-2445, Dkt. No. 44 (D.D.C. Oct. 1, 2025).  AFGE is a party to the case in the Northern District of California.

[7] *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, Dkt. No. 2116273 (D.C. Cir. May 16, 2025); *Am. Foreign Serv. Assoc v. Trump*, No. 25-5184, Dkt. No. 2121647 (D.C. Cir. June 20, 2025); *Am Fed. of Gov't Emps.*, No. 25-4014, Dkt. No. 32 (9th Cir. Aug. 1, 2025).

appeal, and the District Court's injunction in that case is currently in effect.  None of these cases addressed the Secretary's April 11 Order or the August 6 Termination.

E.    **Secretary Collins's April 11 Order comes in close proximity to AFGE-initiated litigation.**

65.    Section 4 of EO 14251 contains a "delegation" of authority to the Secretaries of Defense and Veterans Affairs "to issue orders suspending the application of section 1-402 or 1-404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute."[8]  Under EO 14251's plain terms, the Secretary had to "certif[y] to the President that the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations" and "such certification [had to be] submitted for publication in the *Federal Register* within 15 days of the date of" EO 14251.  EO 14251 was issued on March 27, 2025, meaning that Secretary Collins had until April 11 to exercise the authority granted to him by Section 4.

66.    On April 3, 2025, six major unions sued in the Northern District of California to enjoin EO 14251.  AFGE is the lead plaintiff in that case.[9]  Thus, AFGE initiated suit over EO 14251 during the 15-day period that EO 14251 gave Secretary Collins to suspend the effect of the Executive Order to VA subdivisions.

67.    In the run-up to Secretary Collins's April 11 deadline, AFGE and NVAC sent letters to Secretary Collins urging him to exempt the entire VA from EO 14251's scope and explaining how VA employees, including housekeepers, food service workers, mental health professional, and cemetery workers, do not perform national security work as a primary function

---

[8] EO 14251's limitation of exemptions only to agency *subdivisions* aligns with Section 7103(b), which authorizes exclusions from Chapter 71's coverage only at the level of an agency or agency subdivision.

[9] *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-03070 (N.D. Cal. April 4, 2025).

of their jobs within the meaning of Section 7103(b).  Secretary Collins also faced heavy congressional pressure to use this authority to exempt the entire VA from the scope of EO 14251.[10]

68.    On April 11, a mere eight days after AFGE sued to challenge the EO, Secretary Collins issued his order.  The April 11 Order purports to exempt from the EO's scope seven *unions*, thereby restoring statutory bargaining rights only to those unions and the VA employees they represent, while simultaneously leaving outside of Chapter 71 coverage other unions whose members and represented employees work within the same VA subdivisions.

69.    The Secretary did not include the certification required by Section 4(b) of the Executive Order when he issued the April 11 Order, and so no such certification was ever published in the Federal Register.  Similarly, the April 11 Order provided no explanation for why the Secretary chose to exempt some unions from the exclusionary effect of EO 14251.

70.    Instead, the Secretary merely parroted the Order and "agree[d] the Department of Veterans Affairs has as a primary function national security work[.]"  This conclusory statement lacks any reasonable basis, particularly given that the employees stripped of bargaining rights, purportedly on national security grounds, include NVAC-represented employees serving in the same or similar positions exempted by the April 11 Order, such as administrative assistants, nurses, dieticians, inventory management specialists, pharmacists, program analysts, physical therapists, social workers, and psychologists.

71.    VA press secretary Pete Kasperowicz, however, did explain the Secretary's arbitrary and retaliatory motive by stating that "[t]he unions in the exempted units have posed no

---

[10] For example, 22 Senators and 107 Members of the House of Representatives signed a letter explaining that "[t]he destruction of workforce protections at VA discourages employees from speaking up and pushes key information on waste, fraud, and abuse into the shadows" and that "the [O]rder specifically calls out dedicated VA employees and the unions representing them for their pushback on this Administration's shameful and illegal attacks on federal employees and VA."  The congressional letter further warned that the Order and any corresponding action by Secretary Collins other than wholesale restoration of collective bargaining rights would be "retaliatory in nature."  Richard Blumenthal, Mark Takano, et al. Letter to the Honorable Doug Collins, Congress of the United States (Apr. 2, 2025) at 1-2, https://juliabrownley.house.gov/wp-content/uploads/2025/04/2025-04-02-Letter-to-SecVA-on-Collective-Bargaining-EO-Impacts-vF.pdf.

or minimal hindrance to VA operations" as "[t]hey have filed no or few grievances against VA and they have not proved an impediment to the department's ability to carry out its mission." Eric Wagner, *VA is selectively enforcing Trump's order stripping workers of union rights*, Government Executive (April 18, 2024), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/. Mr. Kasperowicz further stated that "AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the [Trump] administration's ability to manage the agency." *Id*. These statements made clear that the Secretary's April 11 Order was not meant to meaningfully determine whether Chapter 71 could be applied to the VA as they articulated no bases as to why the "ability to manage the [VA]" implicates national security requirements and considerations. *See id*. Rather, the statements demonstrate that the April 11 Order was intended to reward unions that acquiesce to the Trump Administration's agenda for the VA and to punish unions that oppose it.

### F.     Secretary Collins terminates the Master Agreement.

72.     The VA did not terminate the Master Agreement in April 2025. Following issuance of EO 14251, NVAC's Master Agreement remained in place and continued to obligate the VA to provide safeguards and protections to NVAC-represented employees.

73.     On August 6, 2025, the Secretary announced that he was unilaterally terminating the Master Agreement, including "any amendments, local supplemental agreements, and memoranda of understanding at all levels with NVAC/AFGE for all VA bargaining unit employees." Exhibit C. The August 6 Termination Letters stated that "VA no longer recognize[d] NVAC/AFGE as the exclusive representative" for the nearly 300,000 VA bargaining unit employees "effective August 6, 2025." *Id*. On that same date, the Secretary also took action to terminate collective bargaining agreements between the VA and the National Association of Government Employees; National Federation of Federal Employees; National Nurses Organizing Committee/National Nurses United; and the Service Employees International Union. [11]

---

[11] *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6,

74.     At that time, the VA did not terminate collective bargaining agreements or rights for those unions listed in the April 11 Order.

75.     The VA's implementation of EO 14251 was arbitrary and capricious.  Section 7103 permits the President to issue orders excluding an "agency" or "subdivision thereof" from the coverage of Chapter 71, and Section 4 of EO 14251 grants the Secretary delegated authority to exempt agency "subdivisions."  Yet, in combination, the August 6 Termination, the related actions that the Secretary took on August 6, 2025, against other unions, and the April 11 Order, did not make classifications about the VA as a whole or about any "subdivision" of the agency. For example, the VA's hospitals and medical centers are organized within the Veterans Health Administration, which is an agency subdivision.  But rather than granting Chapter 71 coverage to all (or no) employees within a particular subdivision, such as the Veterans Health Administration, the VA implemented EO 14251 in a manner that arbitrarily treats similarly situated VA workers differently based on their union affiliation.

76.     The agency's initial focus on specific unions, rather than agency subdivisions, arbitrarily and impermissibly denied collective bargaining rights to certain VA employees, while other VA employees with similar job descriptions and responsibilities retained their bargaining rights.  Take, for example, the Providence Veterans Center and Providence VA Medical Center, which are located less than 10 miles apart and which are both within the Providence VA Health Care System, part of the Veterans Health Administration subdivision.  Psychologists and program support analysts at the Providence Veterans Center are represented by Local 2035, which was not exempted by the April 11 Order.  However, psychology technicians – who provide support services to psychologists – and program support assistants, registered nurses,

_____

2025 https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/,  (announcing termination of collective bargaining agreements for: National Veterans Affairs Council (AFGE/NVAC); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU)).

nursing assistants, medical technologists, and others at the Providence VA Medical Center are represented by the Laborers International Union of North America (LiUNA), which was exempted by the April 11 Order.  Thus, as of August 6, when the Secretary ordered the Termination, VA psychology technicians in Rhode Island continued to enjoy Chapter 71 rights while VA psychologists in Rhode Island did not.

77.    Even within the same medical center, bargaining unit employees performing similar work were treated differently by the VA.  For example, at the Coatesville VA Medical Center (CVMC) in Coatesville, PA, some employees are represented by Teamsters Local 115 (which the VA has exempted from EO 14251), and some employees are represented by AFGE Local 310 (not exempted).  Employees represented by Teamsters Local 115 occupy the same or similar positions and have virtually indistinguishable job descriptions and responsibilities at CVMC compared to employees represented by AFGE Local 310.  Teamsters Local 115 represents registered nurses at this medical center, whereas AFGE Local 310 represents, among others, nurse practitioners, physical assistants, social workers, and psychologists.  VA employees represented by Teamsters Local 115 work together on the same patient care teams and, often, in the same departments, including medical surgery and mental health, as employees represented by AFGE Local 310.  Yet, without justification, in August, the VA implemented EO 14251 to preserve collective bargaining rights for the employees represented by the Teamsters Local 115, and not for the employees represented by AFGE Local 310.

78.    Furthermore, the VA implemented EO 14251 in a manner that failed to comply with the plain text of Section 2 of the EO.  Section 2 of EO 14251 provides that "Notwithstanding the forgoing," i.e., the withdrawal of Chapter 71 coverage, "nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code: (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons."

79.    The August 6 Termination failed to correctly implement this exemption.  Within the Veterans Health Administration (VHA), the VA police force is organized at the local, facility

level.  The command structure is established so that individual police officers report to facility police chiefs, and each police chief in turn, reports to the local medical facility director.  The "local employing office" of these police officers is therefore the local medical facility, which also employs bargaining unit employees in many occupations other than police officer, firefighter, or security guard.  Yet, on their face, the August 6 Termination Letters claim to only exempt "police officers, firefighters, and security guards represented by AFGE" from the bargaining unit employees whose contracts were terminated, on the basis that "EO 14251 exempted police officers, firefighters, and security guards from its coverage."  Exhibit C. Internal VA memoranda issued by Secretary Collins further confirm the Secretary's intent to exempt three positions (*i.e.*, police officers, firefighters, and security guards) from EO 14251.[12] A copy of this memo is attached hereto as **Exhibit E**.

80.    However, EO 14251 did not merely exempt these three *positions* or give the Secretary authority to do so.  Rather, it exempted "*the immediate, local employing offices* of any agency police officers, security guards, or firefighters." EO 14251 at § 2 (emphasis added).  The VA's implementation of EO 14251 ignores the language about "immediate, local employing offices."  Indeed, at VA medical centers across the country, bargaining unit members of the ***same*** AFGE local union are divided into two groups—police officers who kept their collective bargaining rights and non-police officers who lost their rights—because of the VA's failure to implement Section 2 according to its plain meaning.

81.    When it publicly announced its termination of the Master Agreement, the VA emphasized NVAC's advocacy as a reason why its members were losing their collective bargaining rights.

82.    For example, VA claimed that: "AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first

---

[12] Memo of Secretary Collins, *Implementation of Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs (Exclusions) (VIEWS 13530892)*, Dep't of Veterans Affairs (Aug. 6, 2025).

Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term." *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.    The    VA    also highlighted AFGE's opposition to the 2018 MISSION Act signed into law during President Trump's first term.

83.    The VA also claimed that the termination of the Master Agreement would save administrative "cost[s]" such as "lost rent and expenses for union bosses' government phones and computer equipment." *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.

84.    The August 6 Termination stripped more than 300,000 AFGE bargaining unit employees represented by NVAC of critical workplace rights and benefits, inflicting immediate and devastating consequences on VA workers nationwide.

85.    Without contractual safeguards on work schedules, management may now unilaterally impose overtime, shift rotations, and schedule changes; deny rest breaks; and assign undesirable hours or shift assignments with no meaningful check or procedural safeguards like those negotiated in the Master Agreement, such as advance notice or consideration of extenuating circumstances.    Alternative, compressed, and flexible work schedules are being unilaterally terminated without advance notice.    Similarly, without negotiated leave provisions, NVAC-represented employees have lost important procedural protections, such as the ability to swap shifts with one another, challenge arbitrary denials, or challenge cancellations of leave.    And without enforceable health and safety provisions, employees face more hazardous conditions, less accountability, and an increased risk of injury and illness in the workplace.

86.    NVAC-represented employees no longer have the benefit of contractual entitlements to union representation and consultation rights during investigatory examinations where they are compelled to answer questions under the threat of discipline and termination.    VA

officials are issuing disciplinary action to employees without advance notice and an opportunity to respond to the charges and evidence compiled against them.  Once disciplinary action is issued to employees, their appeal options no longer include an opportunity to file a grievance through the negotiated procedure and proceed to binding arbitration.  Instead, NVAC-represented employees are often left with no recourse to challenge personnel actions before a neutral, third party outside of the VA.  For non-adverse actions, statutory appeal procedures are only available on limited grounds to employees alleging discrimination or whistleblower retaliation who can file appeals with the Equal Employment Opportunity Commission or Office of Special Counsel, respectively.

### G.    The Secretary's subsequent actions.

87.    On August 28, 2025, President Trump issued Executive Order 14343 (Further Exclusions Order) that determined that at least six additional agencies or subdivisions should be excluded from FSLMRS and denied collective bargaining rights to the Patent and Trademark Office, National Weather Service, United States Agency for Global Media, and others.  *See* Further Exclusions Order § 2.  A copy of the Further Exclusions Order is attached hereto as **Exhibit F**. The Further Exclusions Order also extended the deadline for Secretary Collins to exempt VA subdivisions from the original EO 14251's scope, thus permitting an additional opportunity to amend the April 11 Order and rectify its deficiencies.  Secretary Collins again chose not to consult with AFGE or its Councils or Affiliates as to whether the April 11 Order should be amended. Instead, he chose to do nothing.

88.    On November 7, 2025, only three days after NVAC filed this lawsuit and one day after being served with the initial complaint, the Secretary issued a new order rescinding his April 11 Order (November 7 Rescission). As before, the Secretary provided no reasonable explanation for this change of direction. Instead, Secretary Collins simply stated that "[h]aving further considered the delegation of authority provision under Section 4 of EO 14251 and the statutory authority under 5 U.S.C. 7103(b)(1), VA's order of suspension . . . is hereby rescinded."  A copy of the November 7 Rescission is attached hereto as **Exhibit G**.

Notwithstanding that the Secretary's authority to act under Section 4 of EO 14251 had expired and that Section 4 authorized the Secretary to act only when consistent with national-security requirements, the Secretary offered no explanation for the November 7 Rescission, which is obviously litigation-inspired conduct.

**CLAIMS FOR RELIEF**
**COUNT 1:**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**(Against All Defendants)**

89.     Plaintiffs incorporate paragraphs 1 through 88 above by reference as if fully set forth herein.

90.     Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

91.     The Termination is a final agency action.

92.     The Termination is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (as prohibited by § 706(2)(A)) for several reasons. *First*, the Termination lacks any written rationale. Congress wrote Section 7103(b) to require the President to make two specific findings: (1) that an agency or subdivision has a primary function intelligence, counter-intelligence, investigative or national security work, and (2) that Chapter 71 could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. EO 14251 delegated to Secretary Collins the authority to determine whether Chapter 71 could be applied to certain subdivisions consistently with national security requirements and considerations. But Secretary Collins did not make that determination in exercising his authority under EO 14251. Indeed, the Secretary's April 11 Order offers no explanation for why he exercised his Section 4 authority on behalf of some unions but not others, leaving courts and the public without any basis to understand his reasoning.

93.    *Second*, the agency initially selected **unions** to be inside or outside of Chapter 71's coverage.  This was not authorized by EO 14251 or Section 7103, which permits Chapter 71 classifications to occur at the agency or agency "subdivision" level, not by individual unions.

94.    *Third*, Defendants failed to follow the plain text of Section 2 of EO 14251, which states that "nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code: (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters."  The Termination purports to exempt from Chapter 71's coverage hundreds of thousands of NVAC-represented employees who work at the "immediate, local employing offices" of VA police officers, security guards, or firefighters.  The Secretary acted in excess of his delegated authority by misinterpreting Section 2 to apply only to employees occupying the positions of police officers, security guards, and firefighters rather than to the "immediate, local employing offices" of such positions.

95.    *Fourth*, at the time it was ordered, the Termination selected which unions should retain their collective bargaining rights based on their political activity and based on the purported administrative "costs" of complying with collective bargaining agreements.  This determination was not in accordance with Section 7103, which requires that such determinations be made on the basis of national security requirements and considerations, not upon the Secretary's political aims.

96.    *Fifth*, at the time it was ordered, the Termination granted some VA employees Chapter 71 rights while depriving other VA employees Chapter 71 rights, even where differently-treated employees work at the same VA facility, or in substantially similar roles.  These classifications were arbitrary and capricious themselves, and they are evidence that the Termination was ordered not on the basis of whether Chapter 71 could be "applied . . . in a manner consistent with national security requirements and considerations," but rather that the Termination reflected retaliation and political animus.

97.    *Sixth*, the Termination is inconsistent with OPM Guidance in effect at that time instructing agencies to refrain from terminating collective bargaining agreements until the conclusion of litigation over EO 14251.

98.     The Secretary's November 7 Rescission demonstrates the capricious nature of Defendants' actions.  In the April 11 Suspension, the Secretary claimed that he considered national security. Yet, three days after Plaintiffs filed their initial complaint, which challenged the April 11 Order, the Secretary rescinded it, stating merely that he had "further considered the delegation of authority provision under Section 4 of EO 14251 and the statutory authority under 5 U.S.C. 7103(b)(1)."  The Secretary does not attempt to explain how providing Chapter 71 coverage to the previously exempted unions and their represented employees suddenly implicates national security concerns, nor could the Secretary provide any such explanation, given that in April he specifically certified that those unions and the VA employees they represent could continue to bargain collectively consistent with national security considerations.

## COUNT 2:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B) (Against All Defendants)

99.     Plaintiffs incorporate paragraphs 1 through 98 above by reference as if fully set forth herein.

100.     Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (B) contrary to constitutional right, power, privilege, or immunity."

101.     The Termination violates the First Amendment in contravention of § 706(2)(B).

102.     *First*, the Termination is unconstitutional retaliation.  The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech.  The government retaliates in violation of the First Amendment when it takes an adverse action, sufficient to chill a person of ordinary firmness, against a person for their protected expression.

103.     Defendants acted because of NVAC's advocacy, litigation, and speech and because of Plaintiffs' association with AFGE and its advocacy, litigation, and speech.  This violates the First Amendment's prohibition on government retaliation for engaging in speech that the

30

government disfavors.  NVAC and AFGE engage in advocacy in support of its union members and represented employees, which has drawn the ire of the VA and the Trump Administration, including by filing several lawsuits protecting its members' and represented employees' interests from the Trump Administration's assault on the federal workforce. NVAC has filed several national level grievances against the VA, including more than 20 in 2025.  In 2025, NVAC has submitted more than 20 demands to engage in mid-term bargaining including on topics like employee classification consistency, OPM's "fork in the road" email concerning a deferred resignation option for federal employees, and realignment of VA departments.  NVAC also opposed the VA Accountability Act signed into law by President Trump in 2017, filed two related national grievances, and engaged in litigation resulting with a settlement with the VA in 2023 under the Biden Administration.  NVAC and AFGE also jointly lobbied members of Congress in opposition to the 2018 VA MISSION Act.  AFGE and other organizations have created an online clearing house called "Civil Service Strong" that provides best practices and resources for federal workers trying to understand and exercise their rights.  AFGE has also held town halls, rallies, and engaged in educational and legislative efforts in Congress.

104.    Secretary Collins and the VA terminated the Master Agreement to retaliate against NVAC for protected First Amendment activity.  The Termination—which scrapped years of painstaking negotiation and eliminated a myriad of hard-bargained for rights and protections—would chill a person of ordinary firmness from engaging in speech opposing the Trump Administration.

105.    Secretary Collins and the VA terminated the Master Agreement to punish Plaintiffs' speech and expressive associations. The VA has said explicitly in the Texas Action that it is concerned with "[union]s hostile to the President's Agenda," and it identified those "hostile" initiatives as including AFGE's attempts to engage in protected petitioning and advocacy activity. The VA justified the Termination by explaining that exempted unions had "posed no or minimal hindrance to VA operations" in part because they "have filed no or few grievances against VA"

(even though the Secretary later acted to withdraw Chapter 71 coverage even from those unions it intended to favor).

106.    *Second*, the Termination is unconstitutional viewpoint discrimination. The government must abstain from regulating speech based on content—when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. Viewpoint discrimination is an egregious form of content-based regulation, is presumptively unconstitutional, and may be justified only if the government provides that the regulation is narrowly tailored to serve compelling state interests.

107.    The Termination violates the First Amendment's prohibition on viewpoint discrimination. Plaintiffs engage in protected expression and expressive association. The VA and Secretary Collins seek to punish Plaintiffs because Defendants disagree with their viewpoint. Defendants have openly stated their view that NVAC is "hostile" to the "President's ability to oversee the Executive Branch" and seek to "limit his authority to oversee agents executing and implementing initiatives." Defendants have identified NVAC and AFGE as "unions that oppose [the Trump] administration's agenda" and that are "hostile to the President's agenda." In particular, the VA and Secretary Collins are concerned about AFGE's litigation and advocacy efforts against President Trump. Defendants' reasons for the Termination include NVAC's and AFGE's opposition to legislation and "hand-in-hand" work with the Biden Administration resolving litigation and grievances over terminations of VA employees pursuant to the VA Accountability Act.[13] Defendants cannot articulate a compelling government interest for the classifications they have made, nor can they show that their actions are narrowly tailored.

108.    *Third*, the Termination violates the First Amendment's right to expressive association. The First Amendment protects the right to associate with others in pursuit of a wide variety of political, social, and economic ends. The government may not punish public employees,

---

[13] *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025) https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.

3379461

through employment decisions, withholding of workplace benefits or imposition of inconveniences, or otherwise, on the basis of their political beliefs and associations absent action that is narrowly tailored to serve a compelling state interest.

109.    The Termination violates Plaintiffs' and their represented employees' rights to expressive association.  Plaintiffs and their represented employees associate with each other in furtherance of political, social, and economic goals; they also associate with AFGE for those same purposes.  The Termination severs the bonds between those members and their union and cripples NVAC's ability to effectively advocate with the VA for the contractual rights of its represented employees.  Defendants also eliminated any official time or physical space NVAC members or represented employees could use to coordinate union activities, gutted procedural protections governing vacations and paid time off, and revoked family and medical leave options on the basis of their associations with NVAC and AFGE.  Furthermore, Defendants punish Plaintiffs for NVAC's work with other unions and NVAC's petitions, advocacy to the public, Congress, and Trump Administration.  Defendants further seek to penalize Plaintiffs for their association with AFGE and AFGE's efforts to coalition build, to create its "Civil Service Strong" clearinghouse, to persuade and educate the public and members of Congress, and to engage in petitions. As discussed, Defendants fail to provide any compelling government interests narrowly tailored to justify these burdens.

110.    *Fourth*, the Termination violates the First Amendment's right to petition.  The Petition Clause of the First Amendment protects the rights of individuals to appeal to courts and other forums established by the government.  The government must not significantly impair an entity's ability to approach any department of the government including administrative agencies and courts absent a substantial relation between that impairment and a sufficiently important government interest.

111.    The Termination significantly impairs Plaintiffs' right to petition the government, including bargaining with the VA over pay and work conditions and participating in certain grievance procedures.  Defendants also seek to punish Plaintiffs for bringing litigation in court

against the Trump Administration.  Further, Defendants' intended effect is to eliminate NVAC, which will have the obvious knock-on effect of chilling the ability of individual employees to petition the government in similar ways on matters of public concern.  Defendants offer no important government interest as justification for this impairment, let alone one with substantial relation to some purported need for the impairment.

## COUNT 3:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)
### (Against All Defendants)

112.    Plaintiffs incorporate paragraphs 1 through 111 above by reference as if fully set forth herein.

113.    Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be. . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

114.    The Secretary exceeded his statutory authority by issuing the Termination.  The Termination retained NVAC and its represented employees from exclusion from Chapter 71 coverage by making union-level classifications, which is not authorized. Instead, Section 7103 only permits Chapter 71 classifications at the level of the "agency" or the "agency subdivision."

## COUNT 4:
### Violation of the First Amendment
### (Against All Defendants)

115.    Plaintiffs incorporate paragraphs 1 through 114 above by reference as if fully set forth herein.

116.    Separate and apart from the APA, 5 U.S.C. § 706(2), Defendants violate the First Amendment of the Constitution for the same reasons discussed in paragraphs 99-111 above, which Plaintiffs incorporate as fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter orders:

3379461

**A.**     Declaring that the August 6 Termination of NVAC's Master Agreement is arbitrary and capricious, in excess of statutory authority, violates the First Amendment's prohibitions on retaliation, viewpoint discrimination, right to petition, and freedom of association; and is null and void;

**B.**     Preliminarily and permanently enjoining Defendants and all their officers, employees, contractors, and agents from implementing, enforcing, and/or taking any action to effectuate the August 6 Termination;

**C.**     Staying, postponing, or preliminarily setting aside the August 6 Termination pursuant to 5 U.S.C. § 705, and permanently doing the same pursuant to 5 U.S.C. § 706;

**D.**     Directing Defendants to issue guidance to all their officers, employees, contractors, and agents to rescind the termination of the Master Agreement and to abide by its terms;

**E.**     Awarding Plaintiffs reasonable attorney fees and costs incurred;

**F.**     Providing such further relief as the Court may deem just and appropriate.

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

Dated: November 25, 2025

By:     */s/ Carly Beauvais Iafrate*

Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: November 25, 2025        By:    */s/ Travis Silva*
Brook Dooley *(pro hac vice)*
Travis Silva *(pro hac vice)*
Taylor Reeves *(pro hac vice)*
JiLon Li *(pro hac vice)*
Alexandra Wheeler *(pro hac vice)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
BDooley@keker.com
TSilva@keker.com
TReeves@keker.com
JLi@keker.com
AWheeler@keker.com

*Attorneys for American Federation of
Government Employees National VA
Council and American Federation of
Government Employees Local 2305*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I electronically filed this amended complaint for declaratory and injunctive relief, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

I further certify that I will serve by certified mail a copy of this amended complaint for declaratory and injunctive relief and all supporting papers on the individuals listed below (see Fed. R. Civ. P. 4(i)), and that such mailing is intended to be completed on November 26, 2025.

1.     U.S. Department of Veterans Affairs, Office of the General Counsel (022D), 810 Vermont Avenue N.W. Washington, D.C. 20420.

2.     Douglas Collins, in his official capacity as Secretary of the Department of Veterans Affairs, U.S. Department of Veterans Affairs Office of the General Counsel (022D), 810 Vermont Avenue N.W. Washington, D.C. 20420.

3.     Civil Process Clerk, Office of the United States Attorney, District of Rhode Island, One Financial Plaza, 17th Floor Providence, RI 02903.

*/s/ Jessica Landers*

3379461