## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and**<br><br>**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305**<br><br>  *Plaintiffs,*<br><br>  **v.**<br><br>**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;**<br><br>**DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs**<br><br>  *Defendants.* | **Case No. 1:25-cv-00583-MRD-PAS**<br><br>**Oral Argument Requested (LR Cv 7)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................4

    A.    VA employees have a statutory right to bargain collectively. .................................4

    B.    NVAC represents hundreds of thousands of VA employees..................................5

    C.    NVAC and AFGE have opposed the President and this Administration................6

    D.    President Trump issued Executive Order 14251 to punish unions that oppose him politically............................................................................................8

    E.    The VA's actions under the Executive Order .......................................................10

ARGUMENT ...................................................................................................................13

    A.    Legal Standard .....................................................................................................13

    B.    Plaintiffs are likely to prevail on their First Amendment and APA claims. ..........14

        1.    The Court has jurisdiction over this case. ...................................................14

        2.    Plaintiffs are likely to prevail on their First Amendment claims...............15

            a.    Plaintiffs will show that Defendants' retaliation is barred by the First Amendment.........................................................................15

            b.    Plaintiffs will show that Defendants' viewpoint discrimination is barred by the First Amendment.........................19

        3.    Plaintiffs are likely to prevail on their APA claims....................................22

            a.    The Termination was a final agency action. ...................................22

            b.    The Secretary acted arbitrarily and capriciously. ..........................22

            c.    The Secretary acted contrary to the First Amendment. .................27

    C.    Plaintiffs have suffered and will continue to suffer irreparable harm. .................27

    D.    The remaining preliminary injunction factors weigh in favor of an injunction. ............................................................................................................33

    E.    A nominal or waived bond is appropriate.............................................................34

CONCLUSION..................................................................................................................34

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFL-CIO, et al. v. Trump, et al.*,
  25-cv-02445-PLF, ECF No. 44 (D.D.C. Oct. 1, 2025).............................................11

*AFSCME v. Trump*,
  25-cv-03306-PLF, ECF No. 38 (D.D.C. Nov. 18, 2025).......................................34

*Akebia Therapeutics, Inc. v. Azar*,
  976 F.3d 86 (1st Cir. 2020).................................................................................13

*Am. Fed. of Gov't Emps., et al. v. Ezell*,
  No. 1:25-cv-10276 (D. Mass.) ..............................................................................7

*Am. Fed. of Gov't Emps., et al. v. Trump, et al.*,
  No. 1:25-cv-00352 (D.D.C.) .................................................................................8

*Am. Fed. of Gov't Emps., et al. v. Trump, et al.*,
  No. 3:25-cv-03070 (N.D. Cal.) .............................................................................8

*Am. Fed. of Gov't Emps., et al. v. Trump, et al.*,
  No. 3:25-cv-3698 (N.D. Cal.) ...............................................................................8

*Am. Fed. of Gov't Emps., et al. v. U.S. Off. of Pers. Mgmt., et al.*,
  No. 3:25-cv-01780 (N.D. Cal.) .............................................................................8

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
  785 F. Supp. 3d 833 (W.D. Wash. 2025).............................................................22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  792 F. Supp. 3d 985 (N.D. Cal. 2025) ...........................................................14, 17

*Bennett v. Spear*,
  520 U.S. 154 (1997).............................................................................................22

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011).......................................................................................16, 19

*Cole v. Young*,
  351 U.S. 536 (1956).............................................................................................26

*Crowley v. Local No. 82, Furniture & Piano Moving*,
  679 F.2d 978 (1st Cir. 1982)................................................................................34

ii

*da Silva Medeiros v. Martin*,
    458 F. Supp. 3d 122 (D.R.I. 2020) ................................................................34

*Dep't of Def., et al. v. AFGE, Dist. 10, et al.*,
    6:25-cv-00119 (W.D. Tex. Mar. 27, 2025) .......................................... 10, 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ........................................................................................23

*Doe v. Trump*,
    766 F. Supp. 3d 266 (D. Mass 2025) .........................................................34

*D.B. ex rel. Elizabeth B. v. Esposito*,
    675 F.3d 26 (1st Cir. 2012) .........................................................................15

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ....................................................................................16

*Fed. Educ. Ass'n v. Trump*,
    2025 WL 2355747 (D.D.C. Aug. 14, 2025) ...............................................29

*Fed. Educ. Ass'n v. Trump*,
    2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) .............................. 11, 17, 23, 34

*Heffernan v. City of Paterson*,
    578 U.S. 266 (2016) ....................................................................................19

*Immigr. Defs. Law Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025) .....................................................................13

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) .......................................................................27

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................33

*Lozman v. City of Riviera Beach*,
    585 U.S. 87 (2018) ......................................................................................15

*Murphy v. NSL Country Gardens, LLC*,
    2019 WL 2075590 (D. Mass. May 10, 2019) ............................................30

*Pye ex rel. N.L.R.B. v. Excel Case Ready*,
    238 F.3d 69 (1st Cir. 2001) .........................................................................33

*Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*,
    2025 WL 2807652 (D.N.H. Oct. 2, 2025) .................................................28

3397822

*Nat'l Rifle Assoc. of Am. v. Vullo*,
    602 U.S. 175 (2024).................................................................................20

*Nat'l Treasury Emps. Union v. Trump*,
    780 F. Supp. 3d 237 (D.D.C. 2025) ........................................... *passim*

*Nat'l Treasury Emps. Union v. Trump*,
    No. 25-5157 (D.C. Cir. Sept. 9, 2025), ECF No. 2134119...................24

*New Hampshire Hosp. Assoc v. Burwell*,
    2016 WL 1048023 (D.N.H. Mar. 11, 2016) .......................................14

*New York v. Kennedy*,
    789 F. Supp. 3d 174 (D.R.I. 2025).....................................................14

*New York v. McMahon*,
    784 F. Supp. 3d 311 (D. Mass. 2025) ...............................................28

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025)..............................................................19

*Nken v. Holder*,
    556 U.S. 418 (2009).................................................................13, 33

*Ohio v. Env't Prot. Agency*,
    603 U.S. 279 (2024).........................................................................23

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).........................................................................20

*Rhode Island v. Trump*,
    155 F.4th 35 (1st Cir. 2025)..............................................................34

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996).........................................................27, 33

*San Francisco Unified Sch. Dist. v. AmeriCorps*,
    789 F. Supp. 3d 716 (N.D. Cal. 2025) ..............................................23

*Shapiro v. Thompson*,
    394 U.S. 618 (1969).........................................................................21

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016)............................................................22

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) .........................................................29

iv

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)........................................................................................14

*U.S. Dep't of Treasury, et al. v. Nat. Treasury Emps. Union Chapter 73, et al.*,
    No. 2:25-cv-00049 (E.D. Ky.) ......................................................................10

*Unemployed Workers Union v. Hackett*,
    332 F. Supp. 1372 (D.R.I. 1971)....................................................................21

*United States v. Sawyer*,
    85 F.3d 713 (1st Cir. 1996)......................................................................15, 16

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009)..........................................................................13

*Vidal v. Elster*,
    602 U.S. 286 (2024)......................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................13, 27, 33

**Statutes**

5 U.S.C. § 705.................................................................................................4, 13

5 U.S.C. § 706.................................................................................................23, 27

5 U.S.C. § 7101...............................................................................................4, 21

5 U.S.C. § 7103................................................................................................ *passim*

5 U.S.C. § 7111......................................................................................................4

5 U.S.C. § 7114......................................................................................................4

5 U.S.C. § 7121....................................................................................................29

5 U.S.C. § 7131....................................................................................................28

VA Accountability and Whistleblower Protection Act ....................................... *passim*

VA Maintaining Internal Systems and Strengthening Integrated Outside Networks
    Act of 2018 ......................................................................................................7

**Other Authorities**

First Amendment ............................................................................................ *passim*

Exec. Order 12338, 47 Fed. Reg. 1369 (Jan. 11, 1982)......................................9

3397822

Exec. Order 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002) ...................................................................9

Exec. Order 13760, 82 Fed. Reg. 5325 (Jan. 12, 2017) .................................................................9

Exec. Order 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017) ..............................................................9

Exec. Order 14251, 90 Fed. Reg. 17052-01 (Apr. 23, 2025) ................................................ *passim*

Exec. Order 14343, 90 Fed. Reg. 42683 (Aug. 28, 2025) ............................................................34

Fed. R. Civ. Proc. 65 ................................................................................................................4, 34

## INTRODUCTION

In 2023, Plaintiff the American Federation of Government Employees National VA Council and Defendant the United States Department of Veterans Affairs signed a collective bargaining agreement, known as the Master Agreement, to govern labor relations between the VA and the 300,000 VA employees that NVAC represents.[1]  The parties negotiated the Master Agreement under the terms of the Federal Service Labor-Management Relations Statute, or Chapter 71, which authorizes federal employees to bargain collectively with the federal government.

On August 6, 2025, Defendant Douglas Collins, the Secretary of Veterans Affairs, terminated the Master Agreement, thus terminating all collective bargaining rights for virtually every NVAC-represented employee nationwide.  In issuing the August 6 Termination, Secretary Collins relied upon (1) Executive Order 14251 issued by President Trump in March 2025, which broadly withdrew Chapter 71 rights across the government (in the case of the VA, subject to "suspension" by the Secretary) and (2) the Secretary's April 11, 2025 decision to apply Executive Order 14251 to NVAC.  This case challenges the Termination.

The August 6 Termination was unlawful, and the Court should issue a preliminary injunction.  Plaintiffs are likely to succeed on the merits of their First Amendment and Administrative Procedure Act claims.  In violation of the First Amendment, the Secretary retaliated against NVAC for NVAC and AFGE's advocacy against the Trump Administration.

---

[1] In this brief, "NVAC" refers to Plaintiff American Federation of Government Employees National Veterans Affairs Council; "VA" refers to the U.S. Department of Veterans Affairs; "the Secretary" and "Secretary Collins" refer to Defendant U.S. Secretary of Veterans Affairs Douglas A. Collins; "Executive Order" and "EO 14251" refer to Executive Order 14251; "Chapter 71" and "FSLMRS" refer to the Federal Service Labor-Management Relations Statute, which is codified at Chapter 71 of title 5 of the U.S. Code; "the Termination" and "the August 6 Termination" refer to the Secretary's decision, communicated in a letter to NVAC dated August 6, 2025, to terminate the Master Agreement; "Section 7103" refers to 5 U.S.C. § 7103; "OPM" refers to Office of Personnel Management; and "APA" refers to the Administrative Procedure Act.

1

NVAC and AFGE have vocally opposed both the first and second Trump Administration's efforts to reduce and eliminate collective bargaining rights. They've lobbied; they've sued; they've filed labor grievances; and they've empowered their membership to oppose the Administration's political goals. The timeline of relevant events, the White House's and the VA's own statements about the Executive Order, and the VA's record of implementing the Executive Order make clear that Secretary Collins terminated the Master Agreement to retaliate against NVAC for its speech. Because the First Amendment forbids this conduct, Plaintiffs are likely to succeed on their First Amendment claims.

Plaintiffs are also likely to succeed on their Administrative Procedure Act claims. To start, unconstitutional actions are per se impermissible under the APA, so the Secretary's First Amendment violations are a basis for relief under the APA. But there are many additional, independent bases for finding the Secretary's actions arbitrary and capricious. The APA requires that the Secretary give a reasoned explanation for his action, but he failed to offer any explanation at all. The Secretary disregarded statutory limits on his authority. Section 7103(b)—the statute in Chapter 71 that the underlying Executive Order is based on—required the Secretary to consider whether *agency subdivisions* could engage in collective bargaining in a manner that is consistent with national security. But instead of considering what VA *subdivisions* could collectively bargain consistent with national security, the Secretary chose which *unions* would retain Chapter 71 coverage, and the VA admits that these decisions were motivated by political, not national security, considerations. The Secretary also disregarded a provision of the Executive Order forbidding the Secretary from withdrawing Chapter 71 rights from employees who work at the "immediate, local employing offices of any agency police officers, security guards, or firefighters." Because of how the VA is organized, that prohibition

covers many employees who work at medical centers, including non-law enforcement personnel, yet the VA no longer recognizes any of those employees' Chapter 71 rights. Acting without explanation, in violation of the key statute is issue, and without regard to the limitations imposed in Executive Order 14251 all epitomize arbitrary and capricious decision-making.

The unlawful Termination is causing Plaintiffs, and their members, irreparable harm that mounts with each passing day. These harms occur throughout the country, and many of them are illustrated by the experience of AFGE Local 2305 here in Rhode Island. The VA is trampling on members' individual rights under the Master Agreement. For example, NVAC bargained for its employees to have more family leave than is required by statute, but the VA now refuses to honor that commitment. The VA has refused recent mothers their full maternity leave, denying them their benefits under the Master Agreement. By way of another example, the Master Agreement guarantees employees the right to union representation as part of the discipline process. Local VA officials are disregarding this right around the country; indeed, the VA's local Rhode Island management refuses to notify Local 2305 officials of investigations, won't allow Local 2305 officials to represent employees in interviews, and refuses to allow Local 2305 officials to take "official time" (*i.e.*, paid release time from VA duties) to aid members. The Master Agreement contains a grievance procedure that allows union officials to raise disputes with management, but the VA has withdrawn from that process at both the national and local levels. The VA is lobbying its employees to withdraw their membership from NVAC, and the VA has even instructed employees, including employees represented by Local 2305 in Rhode Island, to remove AFGE stickers, AFGE magnets, and other AFGE-branded items from their workstations. Since this litigation started, the VA has turned to threatening union officials with termination. All of this conduct constitutes irreparable harm to employees, and it also poses a

grave threat to the unions' continued existence.  Nationally, NVAC membership has decreased this year from 140,000 members to around 72,000 members as of November 2025.  In just the wake of the August 6 Termination, Local 2305's membership has decreased from 280 members to 199 members.  There is real risk that, absent interim relief, Defendants' unlawful conduct will break Plaintiffs.

Defendants have violated the First Amendment and the APA.  Their conduct is irreparably harming Plaintiffs and their members.  The remaining preliminary-injunction factors favor granting interim relief.  The Court should grant a preliminary injunction.[2]

## BACKGROUND

### A.    VA employees have a statutory right to bargain collectively.

In 1978, Congress recognized federal employees' right to collectively bargain.  The FSLMRS, codified at Chapter 71 of title 5 of the U.S. Code, established a comprehensive framework governing labor relations for federal employees that was "designed to meet the special requirements and needs of the Government."  5 U.S.C. § 7101(b).  Congress enacted Chapter 71 because "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business."  5 U.S.C. §§ 7101(a)(1)(A)–(B).  Chapter 71 requires federal agencies to give exclusive recognition to labor unions that a majority of employees select as their representative.  5 U.S.C. § 7111(a).  Agencies are required to "meet and negotiate in good faith" to reach a collective bargaining agreement.  5 U.S.C. § 7114(a)(4).

---

[2] Plaintiffs move for a preliminary injunction under Rule 65 and for postponement under 5 U.S.C. § 705.  For ease of reading, the brief refers to these requests collectively as a request for a preliminary injunction.

**B.      NVAC represents hundreds of thousands of VA employees.**

AFGE is the recognized bargaining unit for more than 800,000 government employees overall, about 300,000 of whom are VA employees.  NVAC is the bargaining council of AFGE; it bargains for VA employees under Chapter 71.  AFGE delegated its bargaining authority on behalf of VA employees to NVAC, providing the VA with a single, nationwide counterparty that bargains on behalf of AFGE-represented VA employees.  Declaration of William Wetmore in support of Plaintiffs' Motion for Preliminary Injunction ("Wetmore Decl."), ¶¶ 6-8.  AFGE is further subdivided into local unions, such as Local 2305 based in Providence, which represents more than 450 employees, including many working at VA facilities in Rhode Island.  AFGE Local 2305-represented employees include psychologists, program support assistants, social workers, program specialists, vocation rehabilitation counselors, and veterans service representatives.  Declaration of Frederick Sacchi in support of Plaintiffs' Motion for Preliminary Injunction ("Sacchi Decl."), ¶¶ 5-6.

In 2023, NVAC and the VA agreed to the current Master Agreement, which went into effect on August 8, 2023.  Wetmore Decl., Ex. A (hereinafter, "Master Agreement").  It expires on August 8, 2026, though it will automatically renew unless a party serves a timely notice to reopen.  The Master Agreement was the product of six years of painstaking and often contentious negotiations.  *Id*. ¶ 14.  The Master Agreement contains worker protections, such as merit-based hiring practices, family leave benefits, scheduling and leave benefits, health and safety protections, due process protections in the context of employee discipline, and informal and formal dispute resolution mechanisms that employees and NVAC can invoke to challenge breaches of the Master Agreement and violations of other agreements between the parties.[3]

---

[3] *See* Master Agreement, Art. 14 §§ 1, 6, 7, 9 (procedures regarding discipline); Art. 18 § 8(B) (duties related to fair employment); Art. 21 §§ 1(B), 2(A), and 4 (rest breaks, setting schedules, and overtime); Art. 24 §§ 1–3 (use of

C.      **NVAC and AFGE have opposed the President and this Administration.**

NVAC and AFGE have continuously opposed President Trump and his Administrations' political goals.  AFGE endorsed Joe Biden in the 2020 presidential election.  It endorsed Kamala Harris in the 2024 presidential election, and in that endorsement, AFGE stated "AFGE members have made clear that their top priority in 2024 is defeating Donald Trump and stopping anti-worker efforts."  Declaration of Mary-Jean Burke in support of Plaintiffs' Motion for Preliminary Injunction ("Burke Decl."), ¶ 40.

During the first Trump Administration, NVAC and AFGE strongly opposed two seminal pieces of VA-related legislation supported by President Trump.  First, NVAC opposed the VA Accountability and Whistleblower Protection Act ("VA Accountability Act"), because it weakened collective bargaining rights and due process protections for VA employees.  *Id.*, ¶ 23.  After the VA Accountability Act was enacted, NVAC filed and prevailed in two national grievances against the VA after it unilaterally implemented the Act without complying with the FSLMRS and Master Agreement.  *Id.*, ¶ 24.  As a result of NVAC's grievances and other litigation in administrative forums and federal court, the VA voluntarily ceased use of its disciplinary authority under the VA Accountability Act, agreed to monetary settlements with NVAC to remedy harmed caused to thousands of former VA employees who had been wrongfully discharged, and agreed to reinstate some former employees.  *Id.*, ¶ 25; Declaration of Travis Silva in support of Plaintiff's Motion for Preliminary Injunction ("Silva Decl."), Ex. A at 1.  President Trump (while campaigning in New Hampshire for his second term) lambasted the settlement, saying that he would "direct my Secretary of Veterans Affairs to fire every corrupt

---

personnel records); Art. 27 § 10 (performance improvement plans) Art. 29 §§ 5, 8, 9, 26, 27(A) (abatement of unsafe working conditions, training, procedures regarding reprisals, workplace violence, safety and health records); Art. 35 §§ 4–6, 9, 16, 18 (sick leave, jury duty, family leave, bereavement leave); Arts. 43–44 (grievances and arbitration); Art. 62 § 3 (internal promotions).

VA bureaucrat who Joe Biden has outrageously refused to remove from the job or put back in the job" and that he would "take every penny of those funds to finally build a brand-new state-of-the art VA hospital right here in the great state of New Hampshire."  Silva Decl., Ex. D. Second, NVAC also opposed the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act of 2018 (VA MISSION Act), which privatized segments of Veterans Affairs healthcare services. NVAC and AFGE lobbied against the legislation, including by testifying in legislative hearings and directly lobbying individual members of Congress.  Burke Decl., ¶¶ 26-36.  NVAC's opposition to the VA MISSION Act, the VA's implementation of this legislation, and the second Trump Administration's legislative efforts to expand the law continue to this day.  Burke Decl., ¶ 37.

NVAC also protects the rights of its bargaining unit employees by filing grievances under the Master Agreement and actively seeking to negotiate mid-term agreements with the VA.  In 2025 alone, NVAC has filed more than 20 national level grievances against the VA.  Wetmore Decl., ¶ 20.  Hundreds more local level grievances have been filed by AFGE affiliates across the VA.  *Id*.  And, in 2025, NVAC has submitted more than 20 demands to engage in mid-term bargaining of the Master Agreement.  *Id.* at ¶ 22.

AFGE litigates against the Trump Administration to protect the interests of its members and the employees it represents.  AFGE filed multiple lawsuits against the Administration's attempts to dismantle protections for government workers in the weeks before President Trump issued EO 14251.  On February 4, 2025, AFGE sued to stop the infamous "Fork in the Road" initiative—that demanded federal employees either accept deferred resignation or submit themselves to the mercy of unspecified job changes—as arbitrary and capricious.[4]  On February

---

[4] *Am. Fed. of Gov't Emps., et al. v. Ezell*, No. 1:25-cv-10276 (D. Mass.).

6, 2025, AFGE sued to stop the administration from shutting down the U.S. Agency for International Development.[5]  On February 19, 2025, AFGE sued to stop a government directive for mass termination of probationary employees at six agencies, including the VA.[6]  Through these suits and other public advocacy, AFGE had thus positioned itself as a prominent critic of the Trump Administration in the weeks before the President issued EO 14251.  NVAC leaders publicly assisted AFGE with these efforts, including by submitting declarations in support of motions filed by AFGE.[7]

**D.    President Trump issued Executive Order 14251 to punish unions that oppose him politically.**

When it enacted Chapter 71, Congress included provisions intended to balance national security needs with the provision of collective bargaining rights to government employees. Several agencies, such as the Central Intelligence Agency, are excluded from Chapter 71 coverage.  Section 7103(a)(3).  And in Section 7103(b)(1) (which is part of Chapter 71) Congress granted the President limited authority to exclude additional agencies or agency subdivisions from Chapter 71's coverage after making specific determinations related to national security or similar concerns:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

---

[5] *Am. Fed. of Gov't Emps., et al. v. Trump, et al.*, No. 1:25-cv-00352 (D.D.C.).

[6] *Am. Fed. of Gov't Emps., et al. v. U.S. Off. of Pers. Mgmt., et al.*, No. 3:25-cv-01780 (N.D. Cal.)

[7] *See, e.g., Am. Fed. of Gov't Emps., et al. v. Trump,* No. 3:25-cv-03070 (N.D. Cal.), ECF No. 15-9 (April 1, 2025 Declaration of Mary-Jean Burke, then-NVAC Executive Vice President); *Am. Fed. of Gov't Emps., et al. v. Trump, et al.*, No. 3:25-cv-3698 (N.D. Cal.), ECF No. 37-9 (Apr. 28, 2025 Declaration of Mary-Jean Burke, then-NVAC Executive Vice President).

Section 7103(b)(1).

Before 2025, presidents had invoked Section 7103 in narrow ways. For example, President Reagan excluded subdivisions under the Joint Chiefs of Staff and subdivisions of the Department of Energy. *See* Exec. Order 12338, 47 Fed. Reg. 1369 (Jan. 11, 1982). President George W. Bush excluded subdivisions of the Department of Justice, such as the National Drug Intelligence Center and Office of Intelligence Policy and Review. *See* Exec. Order 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002). President Obama excluded subdivisions of the Departments of the Army, Navy, and Air Force, as well as other subdivisions of the Department of Defense. *See* Exec. Order 13760, 82 Fed. Reg. 5325 (Jan. 12, 2017). And, President Trump, in his first term, excluded the Defense Counterintelligence and Security Agency within the Department of Defense. *See* Exec. Order 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017).

On March 27, 2025, President Trump issued EO 14251. Silva Decl. Ex. E. Unlike prior orders issued under Section 7103, "[t]he effect of the Executive Order was substantial: it removed collective bargaining rights from approximately two-thirds of the federal workforce." *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 245 (D.D.C. 2025) (hereinafter, "*NTEU*"). Subject to an exemption relating to police officers, firefighters, and security guards, EO 14251 applies to entire governmental departments and agencies, including the VA and the Departments of Defense, Justice, State. *See* Exec. Order 14251, § 2(b)(1-401, 1-404, 1-499(a)). President Trump purportedly "determined" that these agencies "have as a primary function intelligence, counterintelligence, investigative, or national security work" and that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." *Id.*, § 1(a).

9

The White House issued a "Fact Sheet" alongside EO 14251.  Silva Decl., Ex. F (hereinafter, "Fact Sheet").  The Fact Sheet labels certain federal unions as "hostile" and "dangerous" and criticizes them for "declar[ing] war on President Trump's agenda."  The Fact Sheet specifically calls out AFGE ("[t]he largest Federal union") and other unions representing VA employees for "block[ing] the implementation of the VA Accountability Act," "fighting back" against "Trump policies," and "fil[ing] 70 national and local grievances over President Trump's policies since the inauguration" and cites these actions as examples of the "mass obstruction" that President Trump "will not tolerate."  *Id.*

Highlighting the Trump Administration's intent to target NVAC specifically, on March 27, 2025, the same day that Executive Order 14251 was issued, several government agencies, including the VA, sued NVAC and other AFGE affiliates, requesting a declaratory judgment "to confirm" the government's authority to rescind collective bargaining agreements.  *Dep't of Def., et al. v. AFGE, Dist. 10, et al.*, 6:25-cv-00119, Dkt. 1, ¶ 11 (W.D. Tex. Mar. 27, 2025) ("Texas Compl.").  There, the government called AFGE a "hostile union[]" and noted AFGE initiatives, including litigation, to fight the Trump Administration's labor policies.  Texas Compl., ¶ 78, 172.[8]

**E.    The VA's actions under the Executive Order**

Under the Executive Order, the President did not have the final word over whether VA unions would lose Chapter 71 coverage—the Secretary of Veterans Affairs did.  Section 4 of the Executive Order delegated to the VA and Defense Secretaries authority to suspend its application

---

[8] The Texas action, and a similar government-initiated suit, *U.S. Dep't of Treasury, et al. v. Nat. Treasury Emps. Union Chapter 73, et al.*, No. 2:25-cv-00049, (E.D. Ky.), have been dismissed for lack of standing.

to "any subdivisions of the departments they supervise."  The Executive Order imposed an April 11, 2025, deadline for Secretary Collins to exercise this authority.

On April 3—shortly after the President issued the Executive Order, but before the Secretary's April 11 deadline—AFGE sued in the Northern District of California to enjoin the Executive Order.  The District Court issued an injunction, which has since been stayed pending appeal.[9]  The Northern District of California lawsuit challenges only the Executive Order; it does not challenge any action taken by the Secretary.

During the 15-day period following the President's issuance of the Executive Order, AFGE, NVAC, and members of Congress lobbied the Secretary to use the authority delegated to him under Section 4 to exempt the entire VA from the Executive Order, which would have had the effect of restoring Chapter 71 rights to NVAC and NVAC-represented employees.  Wetmore Decl., Exs. B & C; Silva Decl., Ex. M.

The Secretary exercised his authority under Section 4 on April 11.  Under Section 4, he was supposed to consider "suspending the application of" the Executive Order "to any subdivisions of the" VA, "thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute."  Executive Order, § 4(a)(i).  The principal "subdivisions" of the VA are the Veterans Health Administration, the Veterans Benefits Administration, and the National Cemetery Administration.  Wetmore Decl. ¶ 8.  The Secretary was to determine whether "the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations."  Executive Order, § 4(b)(i).

---

[9] There has been substantial litigation over EO 14251.  There are at least five District Court orders enjoining its application to specific unions.  To Plaintiffs' knowledge, two of those injunctions are currently in effect while the remaining three injunctions have been stayed pending appeal.  *See AFL-CIO, et al. v. Trump, et al.,* 25-cv-02445-PLF, ECF No. 44  (D.D.C. Oct. 1, 2025); *Fed. Educ. Ass'n v. Trump,* 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025).

But instead of exercising the authority delegated to him and considering agency "subdivisions" and "national security requirements," the Secretary suspended the application of the Executive Order as to one international union and six local unions, thus restoring their Chapter 71 rights. Silva Decl., Ex. G (hereinafter, "April 11 Suspension"). Because the Secretary made his decisions on a union-by-union basis (instead of looking at agency subdivisions), the April 11 Suspension had a disparate effect on similarly situated unions and VA employees. For example, at a Pennsylvania facility, registered nurses kept their Chapter 71 rights while nurse practitioners lost theirs. Declaration of Ira Kedson in support of Plaintiffs' Motion for Preliminary Injunction ("Kedson Decl."), ¶ 6, 21. And in a California hospital, registered nurses kept their Chapter 71 rights but nursing assistants did not. Declaration of Dewanda Mitchell in support of Plaintiffs' Motion for Preliminary Injunction ("Mitchell Decl."), ¶ 31. The Secretary provided no rationale for making these classifications, which were supposed to be based on "national security requirements."

A VA spokesperson, however, issued a statement explaining Secretary Collins' real rationale behind the April 11 Suspension. He stated that "[t]he unions in the exempted units have posed no or minimal hinderance to VA operations" as "[t]hey have filed no or few grievances against VA and they have not proved an impediment to the department's ability to carry out its mission." Silva Decl., Ex. H. The VA further stated that "AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the [Trump] administration's ability to manage the agency." *Id.*

Still, the VA left the Master Agreement in place until August 6, when Secretary Collins informed NVAC's leadership that he was unilaterally terminating the Master Agreement along with "any amendments, local supplemental agreements, and memoranda of understanding at all

levels with AFGE for all VA bargaining unit employees." Wetmore Decl., Exs. D and E. Secretary Collins stated that "effective August 6, 2025," the "VA no longer recognize[d] NVAC/AFGE as the exclusive representative" for the nearly 300,000 VA bargaining unit employees. *Id.*

On November 4, NVAC and Local 2305 filed this lawsuit. Three days later, Secretary Collins approved a new order rescinding the April 11 Suspension. Silva Decl., Ex. N (hereinafter, "November 7 Rescission"). The sole basis provided by Secretary Collins for his November 7 Rescission is that he had "further considered" the Executive Order and Section 7103.

## ARGUMENT

### A.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). For the first factor—likelihood of success on the merits—courts "need not conclusively determine the merits of the underlying claims," but rather assess "probable outcomes." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020). The second factor, irreparable injury, operates "as a sliding scale, working in conjunction with . . . likelihood of success on the merits" where strength in one factor offsets the showing needed in the other. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). When the government is the opposing party, the third and fourth factors merge and are considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same legal standard applies for relief under 5 U.S.C. § 705. *See Immigr. Defs. Law Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir.

13

2025); *accord New Hampshire Hosp. Assoc v. Burwell*, 2016 WL 1048023, at *5 n.6 (D.N.H.

Mar. 11, 2016).

**B.      Plaintiffs are likely to prevail on their First Amendment and APA claims.**

      **1.      The Court has jurisdiction over this case.**

      In litigation about the Executive Order, the government has asserted that Chapter 71's

provision of an administrative tribunal, the Federal Labor Relations Authority, for certain labor

disputes, displaces district court jurisdiction under *Thunder Basin Coal Co. v. Reich*, 510 U.S.

200 (1994).  But "[t]he statute's plain language makes clear the FLRA's authority extends only

to those disputes which arise under Chapter 71," and "FLRA itself is of the view that it does not

have authority to hear claims brought in connection with agencies excluded from Chapter 71

coverage."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 792 F. Supp. 3d 985, 998–99 (N.D.

Cal. 2025) (hereinafter, "*AFGE*"); *accord NTEU*, 780 F. Supp. 3d at 251.[10]  Moreover, when the

VA sued NVAC seeking a declaratory judgment related to the Executive Order, the VA asserted

that District Court jurisdiction was proper, which is an "inconsistent position" with any

channeling argument it may raise here.  *AFGE*, 792 F. Supp. 3d at 999.  There is therefore no

basis for a *Thunder Basin* argument here.  Indeed, no court hearing a challenge to the Executive

Order has accepted the argument; this Court should not be the first to do so.[11]

---

[10] The cited district court orders are on appeal.

[11] This Court considered—and rejected—a similar channeling argument in *New York v. Kennedy*, 789 F. Supp. 3d
174, 199 (D.R.I. 2025), where it ruled that Chapter 71 did not preclude judicial review of the Health and Human
Services Secretary's efforts to reorganize that government department.

2.      **Plaintiffs are likely to prevail on their First Amendment claims.**

a.      **Plaintiffs will show that Defendants' retaliation is barred by the First Amendment.**

The First Amendment "prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To prevail on their First Amendment retaliation claim, Plaintiffs must show "that (1) [they] engaged in constitutionally protected conduct, (2) [they] w[ere] subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). "The defendant may then avoid a finding of liability by showing that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* (citation modified).

**First element: Protected conduct**. NVAC and AFGE's advocacy against President Trump's agenda reaches back to his first term, when NVAC led a sustained campaign against the so-called VA Accountability Act and the VA MISSION Act. NVAC lobbied against the bills' passage. *See* Burke Decl., ¶¶ 21–37. This is quintessential protected speech. *See United States v. Sawyer*, 85 F.3d 713, 731 n.15 (1st Cir. 1996) (recognizing that the Petition Clause protects efforts to "persuade and influence legislators"). After the bills' enactment, NVAC leaders testified before Congress about the VA's implementation of these laws. Burke Decl., ¶ 27. NVAC's right to communicate with Congress is protected by the First Amendment. *Sawyer*, 85 F.3d at 731 n.15. NVAC filed multiple grievances to challenge the VA's unilateral implementation of the VA Accountability Act; NVAC prevailed in these grievances, receiving favorable decisions from the Federal Labor Relations Authority in both instances. Burke Decl., ¶ 24. Because these grievances related to the VA's systemic violations of collective bargaining rights, the incompetence of government officials, and the flagrant misuse of authority to

15

terminate the employment of thousands of civil servants, they are also protected speech.  *See Borough of Duryea*, *Pa. v. Guarnieri*, 564 U.S. 379, 389 (2011).

NVAC engaged in additional advocacy related to the grievance and arbitration process, all of which was protected speech. *Sawyer*, 85 F.3d at 731 n.15.  NVAC negotiated a settlement with the VA to compensate, and in some instances reinstate, nearly 5,000 employees for being wrongfully disciplined.  Burke Decl., ¶ 25.  Senior executives and attorneys from the VA testified before the Senate Committee on Veterans' Affairs to answer questions about these settlements and the VA's prior conduct under the VA Accountability Act in connection with pending legislation.  *See* Silva Decl. Ex. C.  NVAC submitted a statement for the record at this hearing defending its protected conduct related to the VA Accountability Act and opposing proposed legislation to further weaken due process and collective bargaining rights.  *Id.*

NVAC and AFGE have also opposed the current President in the run-up to, and during, his second term.  AFGE endorsed President Trump's political opponent.  Burke Decl., ¶ 40.  This is core political speech.  *See Eu v. San Francisco Cnty. Democratic Cent. Comm*., 489 U.S. 214, 223 (1989) ("[D]ebate on the qualifications of candidates is integral to the operation of the system of government established by our Constitution.").  After President Trump was inaugurated, one of his Administration's first high profile initiatives was the "Fork in the Road" memo, which purported to offer some government employees money for agreeing to leave government.  AFGE was the lead plaintiff in a highly-publicized lawsuit against that initiative, one of the first pieces of litigation brought against the second Trump Administration.  AFGE has brought other high-profile cases against the Trump Administration. *See supra*, pp. 7-8.  This, too, is protected speech.  Indeed, the Supreme Court made clear in *Borough of Duryea* that "the Petition Clause protects the right of individuals to appeal to courts."  564 U.S. at 387.

**Second element: Adverse action**.  Plaintiffs and the employees they represent have been subject to adverse government action.  This is obvious.  The Master Agreement confers many valuable rights on the union and represented employees, and the termination of those rights adversely affects union and employee interests.  *See infra*, pp. 27-33 (describing harms suffered because of the Termination).  The Termination and Defendants' subsequent anti-union campaigning also chills protected speech, which is a separate adverse action.  *See infra*, pp. 31-32.

**Third element: Substantial or motivating factor.**  AFGE and NVAC's protected First Amendment conduct was a "substantial or motivating factor" in the Secretary's decision to order the Termination.  For starters, it is clear that President Trump was motivated to issue the Executive Order because of AFGE's protected speech.  As another court has found, there is "solid evidence of a tie between the exercise of First Amendment rights" and the Executive Order.  *AFGE*, 792 F. Supp. 3d at 1002, *order stayed pending appeal*, 148 F.4th 648 (9th Cir. 2025).  In particular, "the White House Fact Sheet" issued with the Executive Order "reflects retaliatory motive towards certain unions," including AFGE.  *NTEU*, 780 F. Supp. 3d at 255; *see also Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at *11 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring) (citing the District Court's retaliation findings in *NTEU* as "support" for the "conclusion" that the President issued the Executive Order "to achieve improper goals").[12]  The *NTEU* court's findings, in particular, are detailed:

> The Fact Sheet states that "certain Federal unions have declared war on President
> Trump's agenda," by, inter alia, filing grievances against President Trump and by
> stating that they would "fight back against Trump."  The Fact Sheet further states

---

[12] In the *AFGE* case in the Northern District of California, the District Court issued a preliminary injunction on First Amendment grounds.  The litigation in the D.C. Circuit and the District of the District of Columbia centers on ultra vires claims.  However, part of the ultra vires analysis is the question of "whether the 'presumption of regularity' applies to the President's exercise of authority."  *NTEU*, 780 F. Supp. 3d at 253.  In that context, the D.C. courts have made rulings about the President's retaliatory reasons for issuing the Executive Order.  *E.g.*, *id.* at 255.

that the Civil Service Reform Act of 1978 – of which the FSLMRS is a part – "enables hostile Federal unions to obstruct agency management," and that the President "refuses to let union obstruction interfere with his efforts to protect Americans and our national interests." These statements bear no relation to the criteria established by Congress in Section 7103(b)(1). Rather, the statements reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights – such as through "filing grievances to block Trump policies" – and the impact those activities have had on his policy directives and "agenda."

780 F. Supp. 3d at 255-56 (quoting Fact Sheet, alterations and brackets omitted).   Lest there be any confusion as to whether the Executive Order was intended to single out AFGE and NVAC in particular, the Fact Sheet specifically criticizes unions that sought to "block the implementation of the VA Accountability Act" and refers to the "VA's unions [which] have filed 70 national and local grievances over President Trump's policies since the inauguration."  Fact Sheet at 3.

The Secretary's animus toward AFGE and NVAC motivated his decision to order the Termination.  The VA explained that Secretary Collins did not apply the April 11 Suspension to NVAC because "AFGE, NAGE, NNU and SEIU . . . are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to manage the agency."  Silva Decl., Ex. H.  And the Secretary justified the Termination by saying that AFGE and NVAC "worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees" and obtained the settlement of "nearly $134 million" on behalf of "1,700 former VA employees."  Silva Decl., Ex. I.  Days later, the VA reiterated that these were its motives in an email to VA employees, suggesting that the Termination would allow the VA to eliminate "union filtering or interference" by NVAC.  Burke Decl., Ex. L.  These references to *political* considerations make transparent the retaliatory nature of the Termination, given that the Executive Order and the statute upon which it is based, Section 7103, relate narrowly to *national security* concerns.

18

The President even made explicit his intent to order the Secretary to act against NVAC and the employees it represents for political reasons.  During a campaign rally, the President said that he would "direct my Secretary of Veterans Affairs to fire every corrupt VA bureaucrat who Joe Biden has outrageously refused to remove from the job or put back in the job," and he criticized the "$200 million dollar" NVAC-negotiated settlement.  *See* Silva Decl., Ex. D.  These comments are clear references to the NVAC-negotiated settlement agreement, and they reflect a pre-determination by the President to order the Secretary to act against NVAC.[13]

The VA's animus is further evident from its decision to sue NVAC in the Texas action in which it criticized "the National Council of the AFGE" (that is, NVAC) for "'fighting back' against any presidential efforts to streamline the federal workforce" and for "tak[ing] steps to litigate against President "Trump's Attacks on Civil Service."  Texas Compl., ¶ 172 (citing *What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service* (March 3, 2025)).  With this reference to litigation, *see Borough of Duryea*, 564 U.S. at 387, there can be no doubt that a "substantial or motivating factor" for the Termination, like the Executive Order itself, is NVAC's conduct protected by the First Amendment.[14]

### b.    Plaintiffs will show that Defendants' viewpoint discrimination is barred by the First Amendment.

Viewpoint discrimination is an "egregious form of content discrimination" that is "presumptively unconstitutional and may be justified only if the government provides that" the regulation is "narrowly tailored to serve compelling state interests."  *Vidal v. Elster*, 602 U.S.

---

[13] The Secretary remains subject to the APA even when acting on the President's orders. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025).

[14] The government's conflation of NVAC and AFGE makes no difference.  While they are separate organizations, NVAC and AFGE are close affiliates, and the VA fails to distinguish between them.  In any event, in a retaliation case, the government "reason" for acting "is what counts," not whether it correctly ascertained the plaintiff's viewpoint.  *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).

286, 293 (2024) (citation omitted); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Because "the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society," the Constitution prohibits the federal government from making decisions that "pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook." *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

Plaintiffs are likely to succeed in their claim that Defendants have engaged in viewpoint discrimination. The August 6 Termination punishes Plaintiffs for views and positions NVAC and AFGE have taken in its public advocacy, grievances, and lawsuits that oppose the Administration politically. Above, Plaintiffs identify both their protected expressions of their political views (*see supra*, pp. 15-16), and the clear evidence that Defendants seek to punish Plaintiffs for those views (*see supra*, pp. 17-18). The VA's disparate treatment of unions is further proof of viewpoint discrimination. In rationalizing the April 11 Suspension, the VA said that it chose to protect unions that had filed "no or few grievances against VA" and did not act as a "hindrance" to the Trump Administration, whereas the VA acted to withdraw Chapter 71 coverage for politically active unions such as AFGE. *See* Silva Decl., Ex. H.

Defendants' conduct fails the applicable strict scrutiny analysis. The April 11 Suspension claims that the VA "has a primary function national security work," but this is obviously pretextual. There can be no reasoned justification for invoking national security to withdraw Chapter 71 coverage from employees who perform very similar functions to employees who the Secretary initially permitted to retain Chapter 71 rights. *See supra*, p. 12. Indeed, the November 7 Rescission, which was clearly motivated by this lawsuit, gives the lie to any notion that national security was ever at issue.

If the Court considered Defendants' pretextual rationales—and it should not—even those fail strict scrutiny, because they focus on improving government operations generally, and that does qualify as a "compelling interest[]" for strict scrutiny purposes. *Shapiro v. Thompson*, 394 U.S. 618, 633, 636 (1969), *overruled in part on other grounds by*, *Edelman v. Jordan*, 415 U.S651 (1974). The VA cites its desire to redirect employee energies to "serve Veterans" (an apparent reference to improving efficiency by eliminating official time), to save the "cost" of "lost rent" (an apparent reference to the Master Agreement's common, limited provision of VA space for union activity), and to better manage its employees (an apparent reference to the Master Agreement's provision of basic due process rights and performance improvement plans). *See* Silva Decl., Exs. I, J, K. It has also heralded the decision as a "new chapter that will eliminate barriers," vaguely claiming that "[t]erminating the collective bargaining agreements will benefit employees" and "permit[] employees and managers to more freely engage in open communications to improve the organization without union filtering or interference." Burke Decl., ¶ 46, Ex. L. But union-busting is not a compelling governmental interest or even a legitimate one, given that Congress enacted Chapter 71 because public sector collective bargaining "safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. §§ 7101(a)(1)(A)–(B). And garden-variety interests in operational efficiency and cost savings are not "compelling" for strict scrutiny purposes. *Shapiro*, 394 U.S. at 633, 636; *Unemployed Workers Union v. Hackett*, 332 F. Supp. 1372, 1375 (D.R.I. 1971) (government cannot "sacrifice on the altar of bureaucratic efficiency the rights of the citizenry to speak, associate and petition their government for a redress of grievances").

* * *

Defendants terminated the Master Agreement because of, and to suppress, Plaintiffs' expressive conduct.  The First Amendment forbids this.  As a result, Plaintiffs are likely to succeed on their First Amendment claims and the Court should enjoin the Termination.

**3.      Plaintiffs are likely to prevail on their APA claims.**

Defendants violated the APA by acting arbitrarily and capriciously and contrary to the First Amendment. Therefore, Plaintiffs are likely to succeed on their APA claims.

**a.      The Termination was a final agency action.**

For an agency action to be final, it must (1) "mark the consummation of the agency's decision making process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (citation modified).  The "primary indicia" of finality is whether the agency action had a "direct and immediate . . . effect on the day-to-day business" of the affected parties. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016).

The Termination was a final agency action because it marked the end of the VA's implementation of the Executive Order with respect to Plaintiffs. *Bennett*, 520 U.S. at 177–178; *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F. Supp. 3d 833, 843, 852 (W.D. Wash. 2025) (reviewing CBA termination as final agency action).  The Termination stripped NVAC-represented employees of bargained-for and statutorily guaranteed contractual workplace rights such as safety protocols, leave policies, union representation, and grievance procedures. It thus had a "direct and immediate" impact on the day-to-day business of NVAC and represented employees. *Sig Sauer*, 826 F.3d at 600 n.1.

**b.      The Secretary acted arbitrarily and capriciously.**

A court reviewing agency action "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

22

otherwise not in accordance with law" 5 U.S.C. § 706(1)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The court "must ensure . . . that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (citation modified). Agency action is also unlawful where it is "based on unexplained and obvious deviations from statutory text." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring). "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation modified).

The Termination fails arbitrary and capricious review for five reasons.

***First***, the Secretary failed to offer a reasonable explanation for the Termination. Neither the Termination Letters (Wetmore Decl., Exs. D, E) nor the April 11 Suspension order (Silva Decl., Ex. G) identify any facts relevant to the Secretary's decision. Thus, they necessarily fail to "offer[] 'a satisfactory explanation for [the VA's] action, including a rational connection between the facts found and the choice made,'" *Ohio*, 603 U.S. at 292. They also fail to offer an explanation for why the VA abandoned a more than four-decade-old practice of collectively bargaining. *See Regents*, 591 U.S. at 30. The failure to provide a reasonable explanation for the VA's action violates the APA. *See Ohio*, 603 U.S. at 292.

The Secretary's sole basis for ordering the Termination was the Executive Order. Wetmore Decl., Exs. B, C. But it is not enough to cite "executive order priorities"; a "reasoned analysis for [a] change" in policy is still required. *San Francisco Unified Sch. Dist. v.*

*AmeriCorps*, 789 F. Supp. 3d 716, 752 (N.D. Cal. 2025) (quoting *Motor Vehicles Mfrs. Assoc. of the United States, Inc. v. State Farm Mut. Automobile Inc. Co.*, 463 U.S. 29, 41–42 (1983)) (reviewing grant termination under the APA where agency ordered termination to comply with executive order).  Furthermore, the Secretary's suggestion that the Executive Order *required* the Termination does not withstand scrutiny.  The Secretary himself did not terminate the Master Agreement in March, when the Executive Order was issued, or in April, after he issued the April 11 Suspension.  In fact, at the time the Secretary ordered the Termination, there was in place Office of Personnel Management guidance stating that "[a]gencies should ***not*** terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination."  Silva Decl., Ex. L (OPM guidance).[15]  Even today, there are multiple agencies that are referenced in the Executive Order that have not terminated their collective bargaining agreements.[16]  The Secretary's August 6 *ipse dixit* is thus inconsistent with how the Executive Branch is otherwise implementing the Executive Order.

***Second***, the Termination is contrary to the unambiguous text of Section 2 of the Executive Order, which provides that "nothing in this section shall exempt from the coverage of Chapter 71 . . . the ***immediate, local employing offices*** of any agency police officers, security guards, or firefighters."  Silva Decl., Ex. E (Executive Order) § 2 (emphasis added). Within the Veterans Health Administration, the VA police force is organized at the local facility level.  The command structure is established so that individual police officers report to facility police chiefs, and each police chief in turn, reports to the local medical facility director.  The "local employing

---

[15] OPM rescinded that guidance eight days *after* the Secretary issued the Termination.

[16] *See, e.g.,* Brief for Appellants, *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157 (D.C. Cir. Sept. 9, 2025), ECF No. 2134119, at n.2 (representing that National Treasury Employees Union collective bargaining agreement still in effect); Appellants' Reply, *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157 (D.C. Cir. Oct. 30, 2025), ECF No. 2143095 at 31 (same).

office" of these police officers is therefore the local medical facility, which also employs bargaining unit employees in many occupations other than police officer, firefighter, or security guard. Mitchell Decl. ¶ 23; Wetmore Decl. ¶ 11.  Thus, hundreds of thousands of NVAC-represented employees, from doctors to registered nurses to housekeepers to social workers are employed at "the immediate, local employing offices of . . . agency police officers, security guards, or firefighters," and so by its plain terms, the Executive Order does not apply to them. Silva Decl. Ex. E.  Yet, the August 6 Termination Letters claim to exempt only "police officers, firefighters, and security guards represented by AFGE" from the Termination on the erroneous basis that "EO 14251 exempted police officers, firefighters, and security guards from its coverage."  Wetmore Decl., Ex. D at 1, Ex. E at 1.  The Secretary's action was inconsistent with the Executive Order's plain text and thus arbitrary and capricious.

**Third**, the April 11 Suspension, which forms part of the overall record of agency action, ignored the fact that Section 7103 and Section 4 of the Executive Order require that Chapter 71 coverage decisions be made on an agency or "agency subdivision" basis.[17]  When he exercised his Section 4 authority, the Secretary exempted unions, not VA subdivisions, offering no explanation for why he did so.  Silva Decl., Ex. G.  Not only does this contradict the text of the statute and the Executive Order, but it also led to the absurd result that similarly situated VA workers have ended up with different labor rights.  Little could demonstrate the arbitrary nature of the Secretary's actions better than the fact that his implementation of the Executive Order, at least between August 6 and November 13, left *nurses* at one facility with Chapter 71 rights, but *nurse practitioners* at the same facility without such rights.  *See supra*, p. 12.

---

[17] The Secretary of Defense issued a suspension order pursuant to Section 4 of the Executive Order that issued exemptions relating to "component subdivisions." Executive Order 14251 Certification, 90 FR 17052-01 (Apr. 23, 2025).

*Fourth*, throughout the VA's process of implementing the Executive Order, the Secretary failed to consider whether Chapter 71 could be applied to the VA in light of national security requirements, which is the sole question he was supposed to consider.  *See* Silva Decl., Ex. E § 4. Instead, as Plaintiffs demonstrate above, the Secretary acted out of animus toward AFGE and NVAC.  The decision to terminate the Master Agreement, like the interim April 11 decision to exempt other unions but not NVAC from the Executive Order's sweep, was retaliatory; the Secretary acted because NVAC opposed legislation, because NVAC zealously represented covered employees, and because of NVAC and AFGE's political speech.  These considerations are not proper considerations under Section 7103(b)(1)(B).  Even the VA's self-serving, pretextual rationale is not a proper consideration.  The VA claims that it ordered the Termination because of the "costs" of complying with the Master Agreement "in lost rent and expenses for union bosses' government phones and computer equipment" and hours working on behalf of government unions rather than VA beneficiaries.  Silva Decl., Ex. I (VA press release).  But basic considerations of government efficiency do not qualify as national security concerns.  *Cole v. Young*, 351 U.S. 536, 544 (1956) ("national security" was "intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare").  The April 11 Suspension thus drew irrational distinctions that were divorced from the textual requirements of the statute and the Executive Order.

*Fifth*, the Secretary's November 7 rescission of the April 11 Suspension demonstrates the unprincipled nature of Defendants' actions.  The issue that the President instructed the Secretary to address was whether Chapter 71 could "be applied to such subdivision in a manner consistent

with national security requirements and considerations."  Silva Decl., Ex. E § 4(b)(i).  In the April 11 Suspension, the Secretary claimed that he considered national security.  April 11 Suspension.  Yet, three days after Plaintiffs filed their initial complaint, which challenged the April 11 Suspension, the Secretary rescinded it, stating merely that he had "further considered the delegation of authority provision under Section 4 of EO 14251 and the statutory authority under 5 U.S.C. 7103(b)(1)."  November 7 Rescission.  This is obviously retaliatory, litigation-inspired conduct; the Secretary rescinded the April 11 Suspension because he (wrongly) perceived that to provide Defendants a litigation advantage.  Had the Secretary believed that his April 11 decision was in the best interest of national security, surely he would not have been so quick to abandon it in the face of litigation.

### c.  The Secretary acted contrary to the First Amendment.

The APA authorizes the Court to "set aside" any action that is "contrary to a constitutional right."  5 U.S.C. § 706(1)(B).  Above, Plaintiffs demonstrate how the Termination violated the First Amendment.  The First Amendment violation is independently actionable—but it is also a reason to grant relief under the APA.

### C.  Plaintiffs have suffered and will continue to suffer irreparable harm.

A preliminary injunction is necessary because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 19 (1st Cir. 1996).  Plaintiffs need only show that "irreparable injury is likely" to warrant relief, and the Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief."  *Winter*, 555 U.S. at 22; *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989).

27

Plaintiffs have suffered irreparable injury for at least six reasons. *First*, the Termination has impeded Plaintiffs' ability to carry out their core organizational functions and representational duties. *See New York v. McMahon*, 784 F. Supp. 3d 311, 362 (D. Mass. 2025) ("Actions by a defendant that 'make it more difficult' for' an organization 'to accomplish its primary mission ... provide injury for purposes ... irreparable harm.'" (citation omitted)). The Master Agreement provides for "official time" consistent with 5 U.S.C. § 7131, which union representatives use during the workday to perform their representational duties, such as assisting represented employees with investigations and disciplinary matters, payroll errors, requests for reasonable accommodation, performance improvement plans, questions about leave, etc. Wetmore Decl. ¶ 35. Since the Termination, the VA has prohibited all union officers and representatives covered by the Master Agreement from using official time, except those occupying the positions of police officer, firefighter, and security guard, thus preventing the union from performing its most fundamental representational role and denying bargaining-unit employees the day-today assistance and advocacy that official time is designed to ensure.[18] These actions are core union functions. *Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*, 2025 WL 2807652, at *24 (D.N.H. Oct. 2, 2025) ("harm to [organization's] core activities" including "adequately advising members on how to avoid discipline" or "providing professional development services" "constitutes irreparable harm"). The VA has likewise prohibited the union's use of official facilities and office space guaranteed by the Master Agreement.[19] This

---

[18] Wetmore Decl., ¶ 35. For testimony detailing local union officials' loss of official time, see Declaration of Sonia Chaves, ¶¶ 16-17; Sacchi Decl. ¶¶ 13-14; Kedson Decl. ¶¶ 11-12; Mitchell Decl. ¶¶ 14-15.

[19] *See* Chaves Decl. ¶ 18; Sacchi Decl. ¶ 12; Kedson Decl. ¶ 13; Mitchell Decl. ¶ 13 (all detailing loss of office space).

sudden eviction further disrupted union representatives' ability to meet with employees, maintain confidential records, and carry out even the most basic aspects of the union's core duties.

*Second*, the Termination is preventing union representatives and bargaining unit employees from taking part in negotiated grievance procedures that protect employees from unchecked managerial error, retaliation, discrimination, and other workplace injustices. Wetmore Decl. ¶¶ 30-31.  As required by Chapter 71 (5 U.S.C. § 7121(b)), the Master Agreement obligates VA officials to meet with employees and union representatives to resolve workplace disputes and if they cannot, to proceed to binding arbitration at the election of the union.  *Id*.  VA officials have refused to participate in the negotiated grievance process, unilaterally terminating pending grievances and refusing to process any new grievances filed by union representatives.[20]  These types of procedural and due-process deprivations are quintessential irreparable harms warranting injunctive relief, as they cannot be retroactively cured.  *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("The value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost.") (citation omitted); *accord Fed. Educ. Ass'n v. Trump*, 2025 WL 2355747 at *16 (D.D.C. Aug. 14, 2025)*.

*Third*, the Termination has eliminated NVAC's ability to provide bargaining unit employees with due-process protections in disciplinary and investigatory proceedings. Under the Master Agreement, bargaining-unit employees were guaranteed fundamental procedural safeguards in every disciplinary matter, including advance notice of proposed discipline and an opportunity to review and respond to the agency's evidence. Wetmore Decl. ¶ 32.  The

---

[20] *See* Declaration of Sonia Chaves in support of Plaintiffs' Motion for Preliminary Injunction, ¶¶ 11-12; Mitchell Decl. ¶ 11; Wetmore Decl. ¶ 31.  Individual employees—but not the union—may still have access to the VA's internal grievance procedure.  The VA's procedure does not provide the complainant with neutral decisionmaker outside of the VA.  Wetmore Decl. ¶¶ 33-34.

Agreement also reinforced employees' *Weingarten* rights, which entitle an employee to union representation if requested during any investigatory examination that could reasonably result in discipline. *Id*. Since the Termination, the VA has refused to provide these procedural safeguards. Management officials have issued disciplinary actions without providing notice or access to the underlying evidence, depriving employees of a fair and meaningful opportunity to defend themselves. Chaves Decl. ¶ 13. VA officials are ignoring employees' *Weingarten* rights and have refused to allow union representatives to participate in meetings that may lead to discipline. Sacchi Decl. ¶ 11. One union leader was even told he was not allowed to "open [his] mouth" to defend employees during disciplinary meetings or he would be asked to leave. Kedson Decl. ¶ 10.

Bargaining unit employees have suffered severe consequences due to the loss of these critical protections. In one instance, an employee was investigated for speaking Spanish with a co-worker. In an initial, pre-Termination interaction, where the employee had union representation, the VA opted not to impose discipline. But after the Termination, the VA reopened the matter and formally disciplined the employee, who was forced to proceed without union assistance or other procedural safeguards provided by the Master Agreement. Chaves Decl. ¶¶ 13-14. Loss of such rights is irreparable harm. *Murphy v. NSL Country Gardens, LLC*, 2019 WL 2075590, at *4 (D. Mass. May 10, 2019) ("The prospect of irreparable harm to the Union from its enforced absence from the workplace is plain. . . . employees have suffered – and continue to suffer – the loss of just cause discipline protections [and] a grievance arbitration procedure[.]'").

***Fourth***, the Termination stripped employees of hard-won terms and conditions of employment secured through collective bargaining, such as parental leave and flexible work

scheduling.  The Master Agreement provides sixteen weeks of parental leave—exceeding the twelve weeks guaranteed under federal law.  Wetmore Decl. ¶17(vi).  The Termination rescinded this bargained-for benefit, causing irreparable harm to employees who will never recover the lost bonding and recovery time that the Master Agreement provided.  For example, one employee preparing for leave was informed that they would not receive the full sixteen weeks of leave they had planned for.  Kedson Decl. ¶ 14.

*Fifth*, the Termination also stripped employees of the health and safety protections guaranteed by the Master Agreement, protections that exceeded baseline statutory requirements and were designed to prevent illness and injury.  Burke Decl. ¶¶ 14-17.  These provisions include specialized training programs and materials, the appointment of union health and safety representatives on safety committees, the presence of local union representatives during facility inspections, medical surveillance for employees in high-risk positions, and numerous other protocols intended to ensure a safe work environment.  *Id*.  The Master Agreement also guaranteed union representation for any dispute involving a work-related injury or illness.  *Id*. ¶ 18.  Since the Termination, VA facilities have stopped honoring these protections, foregoing consultations with national and local health and safety representatives and leaving employees without critical safeguards.  *Id.* ¶ 19.

*Sixth*, the Termination and VA's associated conduct has chilled Plaintiffs' and represented employees' speech.  Following the Termination, bargaining unit employees at VA facilities have faced intimidation and restriction of their speech and association at the hands of management officials, who have repeatedly reinforced anti-union sentiments in written and verbal communications, such as by saying "there is no union" or "the union can't help you."  *See, e.g.*, Burke Decl. ¶¶ 42-43; Chaves Decl. ¶ 20; Kedson Decl. ¶ 15; Sacchi Decl. ¶ 15.

Officials have instructed bargaining unit employees that they can no longer wear AFGE-branded clothing or accessories to work, though non-union logos such as sports apparel and educational logos are permitted. Chaves Decl. ¶ 22; Mitchell Decl. ¶ 19.  At the Providence VA Regional Office (Providence VARO), AFGE Local 2305 officials have been instructed to remove any items in their offices or workspaces that include the words "AFGE" or "union."  Sacchi Decl. ¶ 16.  This has left many AFGE Local 2305 officers and stewards feeling like they have a "target on their back."  *Id.* ¶ 17.  ***After this lawsuit was filed***, the VA started emailing local union officials to "address significant concerns that have recently been reported regarding ongoing union activities utilizing government resources."  Burke Decl., Ex. N.  Invoking nothing but the passive voice and "we've been hearing things," the VA continues to threaten these local union officials with "disciplinary action up to and including removal."  *Id.*

Due to the VA's conduct, bargaining unit employees fear retaliation for their association with NVAC and the union at large.  Burke Decl. ¶ 44; Chaves Decl. ¶ 21; Mitchell Decl. ¶ 20.  They are hesitant to speak to union representatives, ask questions about their employment, report potential violations of the law.  Chaves Decl. ¶ 21; Mitchell Decl. ¶ 20.  The intimidation extends even to local union officers, fewer of whom are willing to file grievances or communicate with management or employees for fear of institutional retaliation. Chaves Decl. ¶ 23; Mithcell Decl. ¶ 21.  Here in Rhode Island, AFGE Local 2305 officers are afraid that the VA will "come after them" based on their association with the union, which has made it challenging to recruit and retain union representatives.  Sacchi Decl. ¶ 17.

Because the Termination has eliminated protections provided by the Master Agreement and undermined confidence in the union's functionality, union membership is rapidly declining. Nationally, NVAC has seen its numbers fall from 140,000 in March 2025 to 72,000 following

the Termination. Burke Decl. ¶ 51. The membership of some local unions has likewise fallen by more than half, reflecting growing marginalization and disinterest in collective action. Chaves Decl. ¶ 24; *see also, e.g.*, Kedson Decl. Exs. A, B (bargaining unit employees requesting to cancel membership due to Termination); Sacchi Decl. Ex. A (same). The First Circuit has recognized this as irreparable harm in NLRA litigation. *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001) ("[T]he disappearance of the 'spark to unionize' may be an irreparable injury for the purposes of § 10(j).") (citation omitted). And there is no reason not to recognize it as such here. The two statutes, while not identical, serve similar purposes and were intended to protect similar interests. Further, NVAC's reputation has likewise suffered as a result of the VA's actions to marginalize and undermine the union. *See, e.g.,* Burke Decl. ¶ 45; Mitchell Decl. ¶ 18; Sacchi Decl. ¶ 15. The First Circuit has also recognized this as irreparable harm. *See also Ross-Simons of Warwick, Inc.*, 102 F.3d at 20 ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

**D.    The remaining preliminary injunction factors weigh in favor of an injunction.**

Where the Government opposes a preliminary injunction, the balancing of the equities and weighing of public interest merge. *See Nken*, 556 U.S. at 435. Courts "must balance the competing claims of injury and must consider the effect on each party [and the public] of the granting or withholding" relief. *Winter*, 555 U.S. at 24.

The injuries to Plaintiffs and their members have been immediate and severe. The Termination has already inflicted severe and irreparable harm on Plaintiffs by violating their constitutional rights and the constitutional rights of its members. Even a "substantial risk" of a deprivation of "fundamental . . . right[s]" tilts the equities against the government. *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[I]t is always in

33

the public interest to prevent the violation of a party's constitutional rights." *Doe v. Trump*, 766 F. Supp. 3d 266, 286–87 (D. Mass 2025) (citation omitted). The other harms caused by termination of the Master Agreement will only mount as time passes including the accumulation of unrecoverable membership losses, violation of the procedural rights of Plaintiffs' members, and the denial of family and sick leave. By contrast, "there is generally no public interest in the perpetuation of unlawful agency action." *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025). And the restoration of bargaining rights will have no effect, let alone direct effect, on the "ability to keep the nation safe." *Fed. Educ. Assoc.*, 2025 WL 2738626, at *12 (Pan, J., concurring). Thus, the balance of equities and public interest weigh decisively in favor of issuance of a preliminary injunction.

### E.    A nominal or waived bond is appropriate.

Under Rule 65(c), "no bond is required in suits to enforce important federal rights or 'public interests.'" *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) (citation omitted); *accord da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (finding "that requiring bond would unduly restrict the federal rights at issue"). Defendants' actions vitiate vital First Amendment and Chapter 71 rights and, thus, a nominal or waived bond is appropriate. *See Nat. Treas. Emps. Union v. Trump*, 780 F. Supp. 3d 237, 268 (D.D.C. 2025).[21]

### CONCLUSION

The Court should grant a preliminary injunction.

---

[21] In a similar case brought by an AFGE affiliate, the District Court recently enjoined Executive Order 14343 (which extended Executive Order 14251's reach by withdrawing Chapter 71 rights from yet more federal employees) and set bond at $100. *AFSCME v. Trump*, 25-cv-03306-PLF, Order Granting Preliminary Injunction, Dkt. 38, at 2 (D.D.C. Nov. 18, 2025).

3397822

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

Dated: November 25, 2025

By:    */s/ Carly Beauvais Iafrate*
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: November 25, 2025    By:    */s/ Travis Silva*
Brook Dooley *(pro hac vice)*
Travis Silva *(pro hac vice)*
Taylor Reeves *(pro hac vice)*
JiLon Li *(pro hac vice)*
Alexandra Wheeler *(pro hac vice)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
BDooley@keker.com
TSilva@keker.com
TReeves@keker.com
JLi@keker.com
AWheeler@keker.com

*Attorneys for American Federation of
Government Employees National VA
Council and American Federation of
Government Employees Local 2305*

35

3397822