# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL** <br><br> **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305** <br><br>      *Plaintiffs,* <br><br>      **v.** <br><br> **UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and** <br><br> **DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs** <br><br>      *Defendants.* | **Case No. 1:25-cv-00583-MRD-PAS** |

## DECLARATION OF TRAVIS SILVA

I, Travis Silva, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and am a partner at the law firm of Keker, Van Nest & Peters LLP, counsel for Plaintiffs American Federation of Government Employees National VA Council ("NVAC") and AFGE Local 2305. My motion to appear pro hac vice in this litigation was granted on November 4, 2025.  I have knowledge of the facts set forth herein, and if called upon as a witness, I could testify competently under oath.

2.      On March 5, 2023, Department of Veterans Affairs ("VA") Assistant Secretary for Human Resources and Administration/Operations, Security and Preparedness Gina Grosso issued a memorandum entitled "Cessation of the Discretionary Authority to Use 38 U.S.C. § 714 - Employees: Removal, Demotion, or Suspension based on Performance or Misconduct (VIEWS 9547134)."  A true and correct copy of that memorandum is included herewith as **Exhibit A**.

3.      A true and correct copy of a July 28, 2023 VA press release entitled "VA and AFGE reach settlement agreement resolving litigation over discipline taken under the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017" is included herewith as **Exhibit B**.

4.      On October 25, 2023, executives and attorneys from VA testified before the Senate Committee on Veterans' Affairs to answer questions about these settlements and the VA's prior conduct under the VA Accountability Act in connection with pending legislation. NVAC submitted a statement for the record at this hearing opposing proposed legislation.  A true and correct copy of an excerpt of the official record of those proceedings is included herewith as **Exhibit C**.

5.      On August 8, 2023, Donald Trump gave a speech in New Hampshire while campaigning.  C-Span has posted the speech to the Internet, and it is available at https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-in-windham-new-hampshire/630830A.  Attached hereto as **Exhibit D** is a true and accurate transcription of the speech from timestamp 14:20 to 17:03.

6.      On March 27, 2025, President Trump issued Executive Order 14251 (EO 14251). It was printed in the Federal Register at https://www.federalregister.gov/documents/2025/04/03/2025-05836/exclusions-from-federal-labor-management-relations-programs.  A true and correct copy of EO 14251 is included herewith as **Exhibit E**.

7.      The White House issued a "Fact Sheet" concurrently with EO 14251.  It is available at https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.  A true and correct copy of the Fact Sheet, downloaded on November 24, 2025, is included herewith as **Exhibit F**.

8.      On April 11, 2025, Defendant Secretary Collins issued an "Order Suspending the Application of Section 1–402 or 1–404 of Executive Order 12171" which was published in the Federal Register, https://www.federalregister.gov/documents/2025/04/17/2025-06566/order-suspending-the-application-of-section-1-402-or-1-404-of-executive-order-12171, on April 17, 2025.  A true and correct copy of this order is included herewith as **Exhibit G**.

9.      A true and correct copy of an Erich Wagner article published on April 18, 2025 in Government Executive, entitled "VA is selectively enforcing Trump's order stripping workers of union rights," and available at https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/, is included herewith as **Exhibit H**. The article relates to the order that is Exhibit G to this Declaration and it quotes VA spokesperson Pete Kasperowicz as saying that "The unions in the exempted units have posed no or minimal hindrance to VA operations.  They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to carry out its mission. . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the administration's ability to manage the agency."

10.     A true and correct copy of an August 6, 2025 VA press release entitled "VA terminates union contracts for most bargaining-unit employees," is included herewith as **Exhibit**

I. A true and correct copy of a VA press release dated August 22, 2025, entitled "VA redirects millions in wasteful union spending back to Veterans," is included herewith as **Exhibit J.** In this press release, the VA claims that it had saved "$39.75 million" following the elimination of "official time" because "the employees are now back working full time for the VA . . . rather than performing work on behalf of the union." A true and correct copy of a VA press release dated November 10, 2025, entitled "Ahead of Veterans Day, Sec. Collins vows to keep improving VA services," is included herewith as **Exhibit K**. The press release states: "VA has terminated union contracts for most bargaining unit employees and redirected millions in wasteful union spending back to Veterans."

11.     A true and correct copy of an Office of Personnel Management guidance document, issued on April 8, 2025 and entitled "Frequently Asked Questions, Executive Order 14251: 'Exclusions from Federal Labor-Management Relations Programs," is included herewith as **Exhibit L**. Question 1 posed in this document is "Q1: What do agencies need to do to terminate applicable CBAs." Answer 1 is: "Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016)."

12.     A true and correct copy of a letter dated April 2, 2025 from several United States congressmembers to VA Secretary Douglas Collins, urging Secretary Collins to request waiver for all VA employees from EO 14251, is attached hereto as **Exhibit M**.

13.     This lawsuit was filed on November 4, 2025. Dkt. No.1. Secretary Collins was served a copy of the complaint on November 6, 2025. Dkt. No. 12. The next day, the Secretary approved the "Rescission of Order Suspending the Application of Section 1–402 or 1–404 of Executive Order 12171" published in the Federal Register on November 13, 2025, https://www.federalregister.gov/documents/2025/11/13/2025-19867/rescission-of-order-suspending-the-application-of-section-1-402-or-1-404-of-executive-order-12171. A true and correct copy of "Rescission of Order" is included herewith as **Exhibit N**.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct. Executed this 25 day of November 2025, in Oakland, California.

_____

Travis Silva

# Exhibit A

**Department of
Veterans Affairs**

# Memorandum

Date:    March 5, 2023

From:    Assistant Secretary for Human Resources and Administration/Operations, Security and Preparedness (006)

Subj:    Cessation of the Discretionary Authority to Use 38 U.S.C. § 714 - Employees: Removal, Demotion, or Suspension based on Performance or Misconduct (VIEWS 9547134)

To:    Under Secretaries, Assistant Secretaries and Other Key Officials

1. The purpose of this memorandum is to communicate the Secretary's decision to cease using the provisions of 38 U.S.C. § 714 to propose new adverse actions against employees of the Department of Veterans Affairs (VA), effective April 3, 2023. Although VA will cease using this provision, management will employ other authorities to continue to hold employees accountable for their conduct and performance deficiencies and will defend actions that were previously taken under 38 U.S.C. § 714.

2. On June 23, 2017, P.L. 115-41, the VA Accountability and Whistleblower Protection Act of 2017 (the Act) was signed into law. Title I, Section 202 of the Act granted the Secretary the discretionary authority to remove, demote or suspend certain employees for conduct or performance deficiencies using the procedures codified at 38 U.S.C. § 714. Since its inception, the U.S. Court of Appeals for the Federal Circuit, the Merit Systems Protection Board and the Federal Labor Relations Authority have issued several decisions impacting the use of this authority and rendering it currently inapplicable to a large portion of the workforce. As a result of these decisions, there are few remaining practical differences between the use of 38 U.S.C. § 714 and traditional title 5 adverse action authorities. Additionally, the complexities of using section 714 have created confusion regarding the application and processing of the relevant adverse action requirements.

3. No new adverse actions will be proposed under section 714 on or after April 3, 2023. Actions proposed under section 714 prior to April 3, 2023, may proceed (i.e., a decision may be issued) and are not impacted by the Secretary's decision to cease the use of this authority. Additionally, prior to April 3, 2023, management may propose an action under either section 714 or another appropriate authority, e.g., 5 U.S.C. Chapters 43 or 75. Given the facts of each case may differ, management should consult with the Office of General Counsel as needed to determine the appropriate authority to use or when there are questions regarding the impact of section 714 litigation decisions on an action.

4. Human Resources Management Letter (HRML) Nos. 05-17-05 and 05-17-06, Adverse Action Procedures, will not be used to propose actions on or after

Page 2.

Subj: Cessation of the Discretionary Authority to Use 38 U.S.C. § 714 - Employees: Removal, Demotion or Suspension based on Performance or Misconduct (VIEWS 9547134)

April 3, 2023, but these HRMLs will continue to govern any action proposed under section 714 prior to that date. Additionally, references to the use of 38 U.S.C. § 714 in HRML 05-21-01, Actions Taken in Accordance with 38 U.S.C. § 731 and 5 U.S.C. § 7515, are no longer applicable.

5. Management will ensure the timely processing of all disciplinary and adverse actions regardless of the authority under which they are imposed in accordance with VA Directive and Handbook 5021, Employee Management Relations. Management should continue to provide the evidence file to an employee for whom an action has been proposed at the time the proposal notice is issued. Management must also adhere to the provisions of relevant collective bargaining unit agreements when taking a disciplinary or adverse action against bargaining unit employees. Management is strongly encouraged to issue a decision notice as soon as possible, following any required reply and/or notice periods, as applicable (e.g., decision notices will generally be issued within 30 calendar days of the proposal when practicable, noting the appropriate effective date).

6. The decision to cease using 38 U.S.C. § 714 does not impact disciplinary and major adverse actions imposed against employees appointed under 38 U.S.C. § 7401(1). HRML 05-21-02, Disciplinary and Major Adverse Action Procedures (Title 38 Employees), remains in effect. It also does not impact any other employees who were excluded from coverage of section 714, such as senior executives covered by 38 U.S.C. § 713, employees appointed under 38 U.S.C. § 7405 and probationary employees.

7. Thank you for your attention to this important matter. Questions concerning this memorandum may be directed to the Employee Relations and Performance Management Service (051) at vaco051cacgohrm@mail.va.gov.

GINA GROSSO Digitally signed by GINA GROSSO
Date: 2023.03.05 15:21:23 -05'00'

Gina M. Grosso

# Exhibit B

🇺🇸 An official website of the United States government  Here's how you know ⌄

VA.gov    Locations    Business    VA Careers    Contact Us

**VA | News**

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# VA and AFGE reach settlement agreement resolving litigation over discipline taken under the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017

FOR IMMEDIATE RELEASE

July 28, 2023  4:15 pm

**WASHINGTON** – Today, the Department of Veterans Affairs announced a new settlement agreement with the American Federation of Government Employees (AFGE) that resolves litigation over adverse actions taken against former VA employees under the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017. This settlement resolves the Federal Labor Relations Authority finding that VA failed to bargain with AFGE regarding the impact and implementation of the 2017 law.

As part of the agreement, many former VA employees will have the option either to return to work at VA or receive compensation in lieu of being reinstated. However, according to the terms of the agreement, hundreds of former VA employees who the VA and AFGE mutually agree were terminated for grievous misconduct will not be eligible to return to work. The total cost of this settlement is expected to be in the hundreds of millions of dollars, with the exact figure being determined over the coming years by how many former employees elect to return to VA. The associated costs represent a fair agreement between both parties.

This agreement allows AFGE and VA to move forward and continue our work to deliver world-class care and benefits to Veterans, their families, caregivers, and survivors without expending additional resources on legal challenges to VA's application of the 2017 law. VA is no longer using the authority granted under section 714 of the 2017 law, which has been rendered ineffective and unusable by years of litigation and adverse administrative and court decisions following its passage. Even without this authority, VA is confident that it currently has the necessary authorities to manage its workforce and hold employees accountable for misconduct and poor performance.

"This agreement will allow VA and AFGE to move forward and focus on what matters most: delivering world-class care and benefits to Veterans, their families, caregivers, and survivors," said **VA Secretary Denis McDonough.** "Union employees are the backbone of VA's workforce, and we are proud to support them — today and every day in our shared mission to serve those who served."

VA has also reached a tentative agreement with the AFGE on a new master bargaining agreement. This agreement was ratified by AFGE members June 2, 2023 and will be signed by both parties soon. The new agreement will help VA's dedicated public servants continue delivering more care and more benefits to more Veterans than ever before in our nation's history. It will also help VA better retain employees, hire more quickly, and add the staff required to implement the PACT Act — the largest expansion of Veteran health care and benefits in decades.

This master bargaining agreement is a part of VA's broader efforts to support bargaining unit employees and execute President Biden's Executive Order on Worker Organizing and Empowerment. More than 79% of all VA's public servants are bargaining unit employees, and VA is committed to supporting them as they serve the nation's Veterans, their families, caregivers, and survivors.

---

 Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov.

 Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA

 Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question

 Subscribe today to receive these news releases in your inbox.

Topics     Secretary McDonough    Whistleblower

**LET OTHERS KNOW ABOUT THIS**





## More from the Press Room

NEWS RELEASES    SEPTEMBER 23, 2025

**VA awards $84M in grants to fight Veteran homelessness**

VA awards $84M in grants to fight Veteran homelessness.

NEWS RELEASES    SEPTEMBER 10, 2025

**VA dedicates new Southern Utah National Cemetery**

VA dedicates the Southern Utah National Cemetery in Cedar City, Utah.

NEWS RELEASES    SEPTEMBER 8, 2025

**VA cemeteries to hold national day of service and remembrance marking the 24th anniversary of 9/11**

Department of Veterans Affairs national cemeteries will host a day of service and remembrance to honor victims of the 9/11 attacks on Sept. 11, also known as Patriot Day.



Last updated January 30, 2025

**VA** | U.S. Department of Veterans Affairs

U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

**VA** News

**An official website of the U.S. Department of Veterans Affairs**

VA.gov
ChooseVA
DiscoverVA
DigitalVA
VA Outreach Events
VA Forms

VA Publications
About VA
VA mobile apps
Accessibility at VA
No FEAR Act data
Whistleblower Protection

Office of the Inspector General
VA plans, budget, finances, and performance
Agency Financial Report
Privacy policy
FOIA requests

Disclaimers
Open data
Vulnerability disclosure policy
Copyright policy

Looking for U.S. government information and services? Visit USA.gov





# Exhibit C

S. Hrg. 118–229

# VA ACCOUNTABILITY AND TRANSPARENCY: A CORNERSTONE OF QUALITY CARE AND BENEFITS FOR VETERANS

## HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTEENTH CONGRESS

FIRST SESSION

————

OCTOBER 25, 2023

————

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.govinfo.gov

————

U.S. GOVERNMENT PUBLISHING OFFICE

54–762 PDF                WASHINGTON : 2024

4

your full written testimony will be a part of the record, and you have the floor for the next 5 minutes, Tracey.

## STATEMENT OF TRACEY THERIT ACCOMPANIED BY DAVID PERRY, AARON ROBISON, AND TED RADWAY

Ms. THERIT. Good afternoon Chairman Tester, Senator Cassidy, Members of the Committee. I appreciate the opportunity to discuss VA's ongoing efforts to provide world-class care and benefits to every veteran who entrusts us with those needs, be that health care, benefits, or end-of-life arrangements.

I am accompanied today by David Perry, Chief Office, Workforce Management and Consulting, Veterans Health Administration; Ted Radway, Executive Director, Investigations, and Acting Executive Director, Compliance and Oversight, Office of Accountability and Whistleblower Protection; and Aaron Robison, Senior Attorney-Advisor, Accountability, Office of General Counsel. We look forward to discussing what VA is doing to enhance employee and organizational accountability across the Department, maintain strong labor-management partnerships, and ensure appropriate oversight of our resources.

We, at the VA, are laser-focused on hiring and retaining a workforce that provides timely access to care and benefits. To that end, we thank Congress for providing the critical authorities and appropriations in bills such as the Reforming American Immigration for Strong Employment Act, the PACT Act, and the 2023 Consolidated Appropriations Act. We appreciate the intent of the VA Clinician Appreciation Recruitment, Education, Expansion, and Retention Support, CAREERS Act of 2023, and support many of the provisions in this bill as it aligns with several legislative proposals offered as part of VA's fiscal year 2024 budget submission.

My written statement provides more detailed information on the two bills central to this hearing, but I would like to take a few moments to offer a general overview of the Department's position on each bill.

First, VA agrees with the underlying premise of S. 2795, the Leadership, Engagement, Accountability, and Development Act of 2023, LEAD Act, though we propose amendments to various provisions in the bill. The LEAD Act nests well with VA's existing policies and procedures for responding to potential acts of misconduct and poor performance, to include training and standards of accountability. VA supports the establishment of an Office of Transparency, Engagement, Accountability, and Management, referred to as the TEAM Office, in the Veterans Health Administration, a provision that aligns with VA's optimization plan on which we recently briefed this Committee.

VA also supports aligning the Office of the Medical Inspector under the TEAM's Office with minor technical amendments to ensure role clarity due to the critical oversight function this office provides. VA does not support Section 301, which would establish an Office of General Counsel within OAWP. OAWP's independence is crucial to avoiding a conflict of interest or the appearance of one in VA investigations.

To facilitate independence, OAWP created the Investigative Attorney Division, IAD, in 2022, a division of skilled attorneys who

5

specialize in whistleblower and Federal personnel law. IAD reports to the OAWP's Assistant Secretary through the Executive Director for Investigations, and its attorneys are independent of VA's Office of General Counsel.

Second, VA does not support S. 2158, the Restore Accountability Act of 2023. Even without using 714 against American Federation of Government Employees bargaining unit employees since 2021, VA has taken over 4,000 adverse actions in each of the last two fiscal years using existing authorities. VA is concerned that as written the Restore Accountability Act will continue to be the subject of extensive litigation and constitutional challenges, and we strongly caution against enacting requirements that could create unintended outcomes in the future.

VA appreciates the Committee's willingness to engage on these bills, and we welcome the opportunity to collaborate on how we can deliver care and services to our Nation's veterans and their families. We thank the Committee for this opportunity. This concludes my statement, and we welcome your questions.

[The prepared statement of Ms. Therit appears on page 27 of the Appendix.]

Chairman TESTER [Inaudible]. The 2017 accountability law, which included new authorities it requested to better hold its employees accountable. Tracey, can you tell me what has changed and why the VA now concludes it does not need additional authorities to discipline mid- and lower-level employees from those outlined in Title 5?

Ms. THERIT. Senator, within the last 6 years we have seen the challenges that implementing 714 faces. The entire bill, we are using the provisions that deal with 713, which allows us to take actions against senior executives, and we are also implementing the provisions of the bill that allow us to recoup bonuses and awards as well as relocation expenses and reduce annuities. So there are many provisions of the 2017 Accountability Act that we are using, and the fact that we have the OAWP established as a venue for employees to air their concerns and grievances and have those investigated.

I think what we have seen with the legal challenges in the courts as well as with the labor partners is an opportunity to strengthen our processes and procedures not just on the back end, when it comes to proposing and deciding an action, but then need for that increased consistency and improvement in our policies and procedures as well as our reporting and collecting of data on the front end, and that is why the LEAD Act fits so much better into what we need to do to make the Department more accountable in the future.

So I think what we have seen is where we need to strengthen our employee relations procedures so that we can hold employees accountable, and that is on the execution of our authorities as opposed to additional authorities.

Chairman TESTER. Mr. Robison, can you talk about the Department's position and what would happen if Congress gave you broader disciplinarian authorities with lower evidence standards and fewer due process protections?

6

Mr. ROBISON. Yes. Thank you for the question, Senator. You know, obviously the details of what types of due process protections are being lowered and what other changes are being proposed matter in that type of conversation. But generally what we will see if additional authorities that do those things are provided, we will, as Ms. Therit mentioned, we will see legal challenges, and we will go through that litigation process with really no guarantee that the VA will prevail in those legal challenges.

We have spent the last 6 years in administrative and judicial courts talking about these burden of proof and due process issues. And if we are talking more specifically about provisions such as those in the Restore Accountability Act, the Department has legal concerns, significant legal concerns, about how those would play out in court.

And I would also like to emphasize what Tracey had mentioned, which is accountability starts long before we get to the point where we are proposing actions. So what we like about the LEAD Act is being able to focus our attention on that front-end process, where we are focusing on trying to make investigations more efficient, more thorough, and devoting our resources to that.

Chairman TESTER. After the 2017 law was passed, VA took several steps during implementation, and those steps landed them in court. Mr. Robison, why did the VA end up winning most of those cases, or did the VA end up winning most of those cases?

Mr. ROBISON. So with respect to implementation there are kind of two lines of cases that we talk about, and the first line of cases is in the labor arena, where the decision was made in 2017 to implement and start using the authority without bargaining prior to implementation with the union. A grievance was filed at that time, and from there it culminated in the AFGE settlement agreement that we have discussed. And in between them there was a lot of litigation between those two points and a lot of events that occurred during that time.

And in the second line of cases really had to do not so much with implementation but had to do with interpretation of the statute. So really when we are talking about just implementation that occurred in 2017, we are talking about those labor cases.

Chairman TESTER. And those court decisions ended up in a situation where a number of employees had to be reinstated. Is that correct?

Mr. ROBISON. Well, when we are talking about the labor cases there was one case related to performance-based actions in which performance-based actions were overturned and folks were reinstated. As far as the other labor case that resulted in the AFGE settlement agreement, a smaller number than the pool of individuals impacted by that decision will be reinstated. There is a whole process that is going to have to play out in facilitating that settlement agreement.

Chairman TESTER. Senator Cassidy.

Senator CASSIDY. I will yield to Senator Tuberville.

**SENATOR TOMMY TUBERVILLE**

Senator TUBERVILLE. Thank you. Thank you, Chairman Tester and Ranking Member.

7

You know, I am from Alabama. We are very proud of the VAs that we have in our State. And we have recently had a new one put in. It is a clinic and we are very proud of that. I have got some friends that have some relatives in there and they are doing a great job.

And I think it is our sacred duty to take care of our veterans. I believe most people at the VA try to do that every day. I know since I have been on this Committee for 3 years we have worked awfully hard to make our VA better. But the fact is that we have had some abuses going on for a long time, and we all know that. I mean, it happens in every hospital.

But we have had some happen in the VA, and we are responsible for that. And we knew that during the Obama years. We had veterans dying on waiting lists. VA's employees lied to cover it up. It was horrible. I mean, I have read some of the statements. I mean, you cannot fathom that. It is an insult to everybody that wears a uniform to have to go in some of these places.

So these people needed to be held accountable. Frankly, a lot of them should have gone to jail for what I saw. When President Trump took office he addressed this problem head on. A bipartisan Congress passed the VA Accountability Act. It passed by voice vote in the Senate, overwhelming in the House. It allowed the VA to fire 4,000 employees. Now I was not here when that happened, but that is just amazing to me. Four thousand people were fired basically for not doing their job, at the end of the day. And they were fired for cause.

Now these were not layoffs. These were people that just absolutely either did a terrible job, did not care about what they were doing, and they got laid off. And this is exactly what a bipartisan Congress intended to do is get this straight. Now these people have no business getting a paycheck from the taxpayers. It is criminal.

The law is still on the books, but for some reason we have reached a settlement. Somebody has reached a settlement with trial lawyers and we are not enforcing this anymore. The law is still on the books. This is not how the Constitution works, the last time I looked. You know, we pass the laws and we are supposed to go by the law. I mean, this has been in the playbook for a long time on the left to try to make this work like this, and we cannot do it. I mean, we keep trying to make the VA better, and we are making it worse. I mean, we are not making any progress here.

We saw under President Obama that things would change. We thought they would change. It did not change. Arguably, it got much worse. So now we have agreed to give free money to people that did not do their job. It is mind-boggling to me. I mean, we take one step forward and two steps back. This cannot be how the system works. I mean, that is not the reason I ran for this job, and hopefully the reason that you are not doing your job. Veterans need help, and obviously we all know it is the biggest health care system in the world. The VA is the biggest health care system, and it is hard. Understandably, it is hard.

But now, in my State of Alabama, we have 74 people who were fired for cause, not laid off, and now they are getting their jobs back. And I have heard some horror stories about what some of them did. And it is embarrassing to me now to talk to veterans

8

about the situation that we have got ourselves in, try to get our-
selves out, and now we are back in it.

So it is no secret that it is getting worse, and we cannot continue
to do this. I do not care what we have got to do. We have got to
make it better. But when we make a law we have got to go by it,
and we have got to make it work.

Ms. Therit, I want to believe that the VA is hiring only the best
and the brightest employees, and we all want that—sometimes you
do not know what you are getting—to serve our veterans. But as
many of us have discussed since I have been here for 3 years, we
know not everybody in the VA is going to be exactly what we want.

So how does the VA plan to protect these veteran patients from
this grievous misconduct if we are not going to go by this Account-
ability Act? How are we going to do that?

Ms. THERIT. Senator Tuberville, I acknowledge that we want the
best working at the VA and we want to protect the rights of vet-
erans, and we do have authorities that allow us to take adverse ac-
tions. I mentioned in my opening statement that since 2021 we
have not been using 714 for American Federation of Government
Employees because we were found to have not bargained impact
and implementation with them. We have used our existing authori-
ties for performance and conduction actions under Chapter 43 and
Chapter 75, and we continue to take over 4,000 adverse actions,
which are removals, demotions, suspensions of more than 14 days.
So we have found the opportunity to use the existing authorities
that we have to hold employees accountable.

I do acknowledge, and I do not want any views on these bills to
indicate that we are happy with the status quo or we do not see
opportunity to improve and do better. We know there is still incon-
sistency in how actions are executed in the field. We know that
things still take too long. And that is why we want to work with
this Committee on something like the LEAD Act, where we can
look at those policies and procedures that we take prior to pro-
posing an action to make sure that we have evidence, as the Chair-
man had mentioned, that is thorough, that is timely, and affords
employees due process. So at the end of the day we are able to re-
move those employees who should not be working for the VA.

We also just completed a record year of hiring, and we are learn-
ing from the authorities that we received in the PACT Act how to
hire more effectively and efficiently. So with that we are looking at
making sure that we have employees who are committed to those
who have worn the uniform and that we are able to remove those
with performance and conduct issues as the earliest point we see
those issues.

Senator TUBERVILLE. These 4,000, will we have any special over-
sight? You know, they did something wrong at the beginning. You
know what I am saying? I mean, somebody has got to be held ac-
countable because if this happens again we will have people lose
their lives. My goodness.

Ms. THERIT. No, I absolutely agree, Senator Tuberville, and what
I would say in the settlement that we reached with the American
Federation of Government Employees that impacts about 4,000 em-
ployees, we do have a provision in that settlement agreement that
allows us to repropose the action which the FLRA determined was

9

not taken lawfully because we did not engage in impact and imple-
mentation bargaining.

So even though that action taken under 714 we could not sus-
tain, we can look at actions and retake them under 43 and 75 and
continue to make sure that individuals who should not be working
in our medical centers are removed for the reasons that they
should not be working there.

Senator TUBERVILLE. Well hopefully start with two strikes, you
know, and not get three strikes.

Thank you, Mr. Chairman.

Chairman TESTER. Senator Hassan.

**SENATOR MARGARET WOOD HASSAN**

Senator HASSAN. Thank you, Chairman Tester and acting Rank-
ing Member Cassidy, and thanks to our witnesses for being here
today. This is a really important topic of accountability and trans-
parency at the VA, and I look forward to discussing with you.

Ms. Therit, we have been discussing the importance of trans-
parency and accountability, and the VA Office of the Inspector Gen-
eral is an important partner in this work. Senator Boozman and
I joined together to introduce the VA OIG Training Act, which
would require new VA employees to be trained about the role of the
inspector general, the resources that the office provides, and its
mission to root out waste, fraud, abuse, and misconduct at the VA.
The Senate passed our bill this summer. We are hoping to see it
pass the House as well.

In order to improve oversight and accountability why is it impor-
tant that employees understand the role of the inspector general?

Ms. THERIT. Senator Hassan, I support the legislation that you
have put forth and we are ready to implement it if enacted. The
organization that I lead is responsible for our talent management
system so any courses that we would require of our workforce
would be tracked and monitored in that system. But as the Chair-
man had mentioned, our latest All-Employee Survey shows that
only 25 percent of our workforce feels comfortable reporting issues
and not being retaliated against for that.

Training, like what you are proposing, would help to increase the
confidence that our employees can raise issues at the earliest point
possible and bring them to the attention of either the inspector
general or the Office of Accountability and Whistleblower Protec-
tion.

I know my colleague, Mr. Radley, has seen tremendous improve-
ment in OAWP's ability to get employees to come to them with
issues, to investigate those issues, and hold individuals accountable
when they are found to have engaged in wrongdoing.

Senator HASSAN. Well, I appreciate that, and I am just going to
kind of follow up this conversation and I am happy to take com-
ments. Because obviously the women and men who work at the VA
are our most critical assets in delivering care and benefits to vet-
erans, and they are also best positioned within the Department to
see when something or someone is not meeting the standards that
the Department sets to ensure excellent service to our veterans.

Sometimes employees who notice something is wrong, as you are
pointing out and as we are all talking about, may not know the

10

right way to bring up their concerns. So training is one thing we just talked about, but how can the VA foster a culture of transparency and provide employees with that information on where they go to report wrongdoing?

Ms. THERIT. I will start and then pass the question to Mr. Radley. There is a provision in the LEAD Act that talks about us increasing the surveys and the training that we do. I think getting the information out in multiple forms, whether it is in that All-Employee Survey, that 75 percent of our workforce recently took, making sure that they know where they can go, and if there are concerns that they have about going to those resources that are available that we are able to address those in real time.

I will ask Mr. Radway if he has any other additional thoughts on that question.

Mr. RADWAY. Just on training, we have, in the past year, trained over 405,000 VA employees on whistleblower rights and protections, over 40,000 supervisors, and that is through our TMS video system, trained over 13,000 supervisors live. OAWP has been reaching out and doing live training. We have also been meeting with division leadership on a one-on-one basis and advising them about what our office does, the opportunities. And we have also established a whistleblower navigator position that helps whistleblowers navigate through the process and understand their rights and abilities.

Senator HASSAN. Thank you. And that brings me really to my last question. Once an employee has lodged a complaint as a whistleblower he or she is obviously entitled to certain rights and protections. But VA employees have shared with my office that once a complaint is filed they never hear anything further about the status of the case, for example, whether it was investigated, whether any action was taken.

Now we understand that there is certain sensitive information that cannot be shared because of privacy concerns, but how can we better communicate with whistleblowers to ensure that they know that their concerns have been considered and that they can be part of the solution toward improving accountability at the VA?

Mr. RADWAY. Senator, we have recently modified our procedures in OAWP, and complainants will be notified approximately every 2 weeks, given an update on the status of their complaint.

Senator HASSAN. All right. That is very helpful. Thank you very much. Thanks, Mr. Chair.

Chairman TESTER. Senator Cassidy.

### SENATOR BILL CASSIDY

Senator CASSIDY. Mr. Radway, I understand that you are responsible for investigating VA leadership. Again, I mentioned earlier my concerns regarding the Veterans Crisis Hotline. The VA inspector general uncovered systemic issues at the VCL, and that the VCL Director for Quality and Training provided advice and incorrect information to witnesses, potentially compromising the accuracy and integrity of the IG investigation. The Executive Director called off a necessary root cause analysis following a patient's suicide stating, quote, "There was insufficient information for us to

11

really move forward." The root cause analysis only initiated after the VA received notice of an IG investigation.

And I also am told that this person remains in a leadership position at the Veterans Crisis Hotline and that the Veterans Crisis Executive Director was promoted to a senior executive role at VA headquarters, now serving as a senior advisor in the Secretary's Office. Whoa.

Are you aware of the IG report, and explain this in a way which makes us feel better about the process taking place.

Mr. RADWAY. Thank you for the question, Senator. I am not aware of whether OAWP has a specific investigation in that matter but I believe some Mr. Perry can provide some additional illumination on your question.

Mr. PERRY. Thank you, Senator Cassidy, for that question. To your point we do have the findings of the OIG report that came back early last month, so we are in the process of reviewing the recommendations and findings of that report.

The actual event itself, as tragic as it is, as we all know, there were some opportunities for us to look at the process and procedures that were in place, and some changes have been made already to account for those changes that needed to be taken. So retraining occurred for those crisis responders and then also looking at the process of who can fill in when those positions need to be staffed adequately. So those changes have already occurred in the actual procedures itself.

The supervisor you mentioned is still in staff but they are not in a direct veteran crisis responder role.

Senator CASSIDY. That is beside the point as it regards to the supervisor's role. The question is if they interfere with an investigation, as is alleged, they should not be in any role. Why would you have any faith in the integrity of what they did when apparently what they have already done was to interfere with an investigation and to tamper with an investigation?

Mr. PERRY. Yes sir, and we agree with you, and so that is what we are currently reviewing.

Senator CASSIDY. So you said that you received this report early last month.

Mr. PERRY. About 3, maybe 4 weeks ago, at most.

Senator CASSIDY. So alacrity comes to mind, or the lack thereof. I mean, you have had 4 weeks to investigate something which is fairly significant. This is not a traffic ticket. This is something which may have resulted, or did result in somebody's death, and which interfered with an investigation, so we are about accountability. When will you be complete, if 4 weeks is not enough?

Mr. PERRY. Four was just from the time we received the OIG report. It is actively being reviewed now.

Senator CASSIDY. So when will your active review be through?

Mr. PERRY. I cannot give you a timeline. I can tell you——

Senator CASSIDY. I have got to tell you, 4 weeks seems plenty enough time to investigate.

Mr. PERRY. Agree, sir. It is on the top of our priority list to make sure that we take the necessary——

Senator CASSIDY. It is on the top of your priority list and it is 4 weeks and it still has not been done. It suggests to me that your

12

priorities again lack alacrity, urgency, a reason to get on top of it
right away. And I do not think I am being hard here. If there is
a problem in my house I do not wait 4 weeks to fix it.

This person has been elevated, I mean elevated, after this was
alleged. So again, tell us and the Committee of Oversight why we
should have confidence in your processes.

Mr. PERRY. Sir, the report we received from the OIG is not a full
investigative file, and so we are working through that process now
to look at all the underlying evidence and recommendations, and
corrective actions will be taken upon that review.

Senator CASSIDY. So, Mr. Perry, briefly, how are employees
rated? I have been told by people in the VA workforce that it really
depends on who you know. So what are the qualitative measures
used to rate somebody?

Mr. PERRY. We put the performance measures in everyone's
standards performance plans and they are measured accordingly,
based on their performance. So that is consistently across, by occu-
pation.

Senator CASSIDY. And who judges their performance?

Mr. PERRY. Their first-level supervisor, and then by their second
level.

Senator CASSIDY. And do you have any sense of this person who
is in question what their evaluations have shown in the past?

Mr. PERRY. Sir, I do not have access to their actual performance
information, but that will be something that does get taken under
review.

Senator CASSIDY. Okay. I yield.

Chairman TESTER. Senator Brown.

## SENATOR SHERROD BROWN

Senator BROWN. Thank you, Mr. Chairman, for holding this
hearing. I have two letters, one from 12 labor unions including the
AFL, AFG, SEIU, and NNU, and one from the Fraternal Order of
Police I would like to enter into the record, raising concerns about
provisions in the Restore VA Accountability Act that would under-
mine workers and undermine patient safety. I ask unanimous con-
sent.

Chairman TESTER. Without objection.

[The letters referred to by Senator Brown appear on pages 89
and 91 of the Appendix.]

Senator BROWN. Thank you, Mr. Chairman. These letters share
my concerns over a section of this bill that would override current
collective bargaining agreements. It is always open season in this
Committee attacking Federal labor unions, or attacking labor
unions anywhere, maybe. These collective bargaining agreements
are that. They are an agreement. They are a contract between
labor and management that come from hard-fought negotiations.

Throwing collective bargaining agreements to the side when one
party does not like it undermines the bargaining process for the
hardworking and dedicated VA employees who serve our veterans
every day, and many of whom are veterans themselves, of course.
We owe to the Americans who work in our VAs and care for our

13

veterans to respect the collective bargaining agreements that have
been obviously agreed to by both sides.

A question for Ms. Therit. We want employees to come forward
and tell section chiefs what is going right and what is going wrong
at our facilities. Ohio has large facilities at Dayton, Chillicothe,
Cincinnati, Cleveland, and big regional, that are not quite VA fa-
cilities and 28, 29, 30 CBOCs. We do not want employees afraid to
raise concerns because of supervisory retaliation or because they do
not think anything will change if they do report it.

In your judgment, will the LEAD Act improve the VA's process
to hold individuals responsible for egregious actions like fraud and
patient safety or retaliatory actions against whistleblowers?

Ms. THERIT. Senator Brown, I do. The LEAD Act gives us great
opportunity to improve our processes, our procedures, our data col-
lection, provide you with information for recurring reporting proc-
esses, improve our surveys, improve our training, and do some re-
structuring within the Veterans Health Administration to strength-
en the oversight of our field.

Senator BROWN. Okay. No other comments, Mr. Chairman.
Thank you.

Chairman TESTER. Senator Tillis.

### SENATOR THOM TILLIS

Senator TILLIS. Thank you, Mr. Chair. Thank you all for being
here.

Ms. Therit, I think in your testimony you made a reference to
quoting someone else saying, "We are hiring and retaining the best,
most talented, and dedicated employees in health care." Now I
have recently learned that there have been at least 15 individuals
that were let go due to grievous misconduct. That is defined else-
where and I will expand the definition. Yet under the direction of
the Central Office and the settlement agreement, the VISNs will
have to offer these 15 people, who were judged to have been guilty
of grievous misconduct, to offer them reinstatement.

So my understanding of grievous is defined as "misconduct re-
lated to patient abuse, reckless or intentional disregard for patient
welfare, racial harassment, sexual harassment, impairment while
on duty, violent threats, reckless or intentional endangerment of
others, and/or criminal activity."

So explain to me how someone who may have been separated due
to grievous misconduct has to be offered an opportunity to come
back to work at the VISNs?

Ms. THERIT. Senator Tillis, no one from my office was involved
in the negotiations of that settlement. The Veterans Health Admin-
istration, the Office of General Counsel participated in those nego-
tiations. So I am going to ask Mr. Perry to speak to the process
for identifying grievous misconduct cases.

Senator TILLIS. Thank you.

Mr. PERRY. Thank you, Senator, for that question. To your point
we did look at those cases, and so when we received the court rul-
ing we had to canvass all of our field sites to understand what
their population of these cases that met the criteria of grievous
misconduct. In that review, if we had questions we worked collabo-
ratively back with those offices to make sure that we had complete

14

case files and could support the justification for the adverse action that was taken. In that review there was a lot of back-and-forth to make sure that we got it right, and those cases did go up, and that was part of the final settlement agreement.

Ultimately, anyone that does elect to come back and be reinstated, we did have that carve out, as Mr. Robison mentioned, that allows us to propose subsequent action upon their return under one of our other authorities.

Senator TILLIS. Subsequent disciplinary action or——

Mr. PERRY. Based on the original actions. Yes, sir. We can repropose those actions under 75 or 43.

Senator TILLIS. Okay.

Mr. PERRY. Yes, sir.

Senator TILLIS. I am sorry.

Mr. ROBISON. I would like to make one point. If an individual, under the settlement agreement, qualifies under the "grievous" category, "grievous misconduct" category, they do not get reinstated.

Senator TILLIS. Okay. You all are aware of the—I want to make sure I get the terminology right—the critical skills incentive. I know that is under investigation right now. I am not going to dig too deep, except to say let us assume that somebody thought that the population that got the bonuses, the executives, should have been subject to some sort of process. I do not want to talk about who got it. I want to talk about the methodology that was used that would have provided a rational basis that these certain skill categories fit congressional intent. Can I at least get an answer on that?

Ms. THERIT. Absolutely, Senator Tillis. First we are very grateful for the authorities in the PACT Act. It helped us to hire record levels in both VHA and VBA this past year, grow the workforce by a percentage we have not seen in the last 15 years.

With the critical skills incentives what I can offer is the purpose of that incentive is to close mission-critical skills gaps or to promote reskilling of employees. And in our policy we have two categories by which someone can be eligible for a critical skills incentive. Either they have a shortage skill, which is on an approved list—that means either our human capital operating plan includes that shortage skill or it is in one of the OIG shortage lists or VHA shortage occupation lists. Ninety-six percent of the critical skills incentives that we have approved to date fall within that category of a shortage skill on one of those approved lists.

Senator TILLIS. Would these executive positions have fit into that list?

Ms. THERIT. They did not, sir. There is a second category called high demand skills, which you need a market factor's justification to support. Once these were processed and they were raised with our Secretary as having been approved, we looked back and we did not see that the precision that was needed to identify the individuals that were recommended for the CSI as having a high-demand skill that was supported by market factors. And the group incentives are to be very narrowly defined. This was way too broad, with too many occupational series, too many varied occupations.

So since that occurred the Office of Inspector General is doing a review so they can help us strengthen our policies and procedures,

15

add more internal controls to the use, and the Secretary has raised the delegation of authority for CSIs to senior executives to his level so that any recommendations in the future have to be approved by him.

Senator TILLIS. Okay.

Ms. THERIT. I am sorry. One more thing. We have also canceled all of the CSIs that were processed for our VHA and VBA Central Office executives, are establishing debts, and collecting those moneys that were paid.

Senator TILLIS. Okay. So did I hear you say clawback?

Ms. THERIT. Yes, sir.

Senator TILLIS. Good. Okay. Thank you.

Chairman TESTER. Senator King.

Senator KING. I defer to Senator Manchin. He has a deadline. It is not something I do every day.

Chairman TESTER. That is no excuse. Senator Manchin.

**SENATOR JOE MANCHIN III**

Senator MANCHIN. Thank you. Thank you, Chairman. Let me just say, first of all, most everybody in West Virginia, and we have a lot of veterans, they all want to go to the veteran clinics or the veteran hospitals to get their care. They say they are better understood, they feel much more comfortable, and they feel that their care is just as good, if not better.

The problem we are having in West Virginia comes from my field workers. They are getting cancellations unbelievably because of lack of personnel. I do not know if you all have been getting that up at your level, Ms. Therit and Mr. Perry, but the medical staff and doctors, the staff of primary care and specialty, they are just not there. And the wait lines are so long they have to get community care because they cannot get their veterans care.

So I do not know what you all can do about that. If you can get back to me and let me know how we can help or do anything to recruit. We have four hospitals in West Virginia, and we have some CBOCs also, but we have four major hospitals, and we are running that—this is our highest request when they come. So are you getting this around the country or in rural areas?

Mr. PERRY. Senator Manchin, thank you for that question. Yes, we do have historic challenges in some of the rural areas with hiring and recruiting. I think thanks to the PACT Act that we received last year we are making some progress in those areas. To your point where we are not able to see a veteran in-house for primary care or specialty care, we do refer out to the community to make sure that we are not making the veteran wait longer than they have to.

Senator MANCHIN. I do not want to lose our veterans to—if we do, I can guarantee you, they might not come back. They do not want to go.

Mr. PERRY. Yes, sir.

Senator MANCHIN. They want to stay with us, with the VA.

Mr. PERRY. Yes. So we are working aggressively. I will tell you that what we are focused on now in VHA is looking at our upcoming access, to look at where we can actually improve access.

16

Senator MANCHIN [continuing]. The most egregious where we have in our four hospitals that we have in State, I will get our staff to get back with you and tell you the ones where we are really having shortages and long lines, long wait times.

The other one is the compensation and pension exams. That is our most requested thing, and they are having a tremendous backlog on these. I mean, it is probably part of the same problem. But these compensation and pension exams is something that it seems like almost every veteran is asking for, to see if they can get a little bit more financial help.

What I would like to know is, what is the rejection rate of people claiming they have a medical problem that was caused by the military service and you all find out it is not really caused by the military service?

Mr. PERRY. Yes, sir. I do not have that data. That is on our Veterans Benefit side. We are certainly happy to bring that back to you.

Senator MANCHIN. That is another thing that you should check on, any of you, to check on this.

I have been told that basically we have a higher percentage of new recruits coming into the service in all branches that within the first year they are claiming disability, and they are having a hard time justifying it, whether they were not examined properly before they came in. But then the Federal Government and the veterans end up with that responsibility. And we want to make sure that we are able to take care of those who truly have military-related illnesses and dependencies and different medical services, rather than those that are coming in with one and then claiming it once they get in. Does that make sense? Do you all see?

Ms. THERIT. So tracking exactly what you are saying, Senator Manchin, looking at the recruitment, looking at C&P exams, looking at the recruits identifying as having a disability, we are publishing, related to the PACT Act, a monthly dashboard that looks at all of that information. I think a lot of the data that we are seeing is supporting the information that you are providing to us as well, and we are happy to work with your staff on those issues.

Senator MANCHIN. Okay. That is all. Thank you, Mr. Chairman.

Chairman TESTER. Senator Boozman.

## SENATOR JOHN BOOZMAN

Senator BOOZMAN. Well, thank you, Mr. Chairman, and thank you very much for having this hearing, and thank you all for being here and the good work that you do.

Accountability and transparency at the VA are imperative in ensuring quality care within the organization, and we look forward to continuing our work on this Committee to provide the VA with the tools it needs to deliver world-class care to veterans. And I apologize for not being here earlier but I am Ranking Member on VA MILCON, and we are pleased to have the bill on the floor right now. We are discussing it, and hopefully early next week we will get that passed and have some certainty on the Senate side and then work with our colleagues in the House.

The good news is there is tremendous support. You know, we hear about all the rancor going on up here, but the nice thing

17

about veterans, nobody cares if they are Democrats or Republicans, and this Committee is a very, very bipartisan group that with you all's help has done a lot for veterans in the last several years.

Leadership at the local medical center level is important, especially during times of operational changes to the organization. This importance has been highlighted during the deployment of the new electronic health record system that DoD has been able to implement the same system at almost all of its facilities in the U.S. However, the VA has not yet fully implemented this system even in one facility. It is my belief that leadership at the local level is critical to the success of the implementation of the EHRM. And I know that we have all been frustrated with that. You all have been frustrated with it and working really hard to get it going.

Ms. Therit, is the VA exploring options to put systems or processes in place to hold medical directors accountable if you encounter resistance in implementing EHR at their facility when there are no technical issues with the system?

Ms. THERIT. Senator, I am going to ask Mr. Perry if he has information related to the question that you posed with respect to VHA.

Senator BOOZMAN. You are like me.

Mr. PERRY. Thank you, Senator.

Senator BOOZMAN. Why don't you just say, "Take it, David."

Mr. PERRY. Yes, sir. I am not aware of specifically any leadership that is pushing back on the electronic health record deployment. I know what I can say is that we heard loud and clear from our clinical community that there were some real challenges with the system, and we wanted to make sure that we got it right. So when we made that strategic pause in the deployment of Cerner, that is exactly why we did so, so we could go back to the vendor to make sure that the concerns that were addressed by our clinicians were addressed, so that when we did go forward with more deployments we did not actually cause any more harm.

In the case of where we had a leader decide not to implement EHR we would take appropriate steps to make sure that did not occur. But that was not the reasoning for delaying any of the deployment, sir.

Senator BOOZMAN. Good. Very good. That is good to hear.

I recently joined Senator Peters in introducing the VA Peer Review Neutrality Act. This legislation is important. It would require peer reviewers to withdraw from the case where they have direct involvement or a conflict of interest, and have a peer review committee at another VA facility evaluate the findings. So Ms. Therit or Mr. Perry, whoever is appropriate, can you speak to the importance of having impartiality and neutrality when conducting quality management and administrative investigations?

Mr. PERRY. Absolutely, sir, and I think that is one of the main reasons we support the LEAD Act is to make sure that when we have those concerns come up that we have the appropriate oversight and reviews that happen from a point of neutrality. And so I think combining some of those focuses on the clinical and the administrative side, I think those outside neutral reviews are paramount to make sure that we get it right and that we do not have things continue to happen that lead to bad outcomes.

18

Senator BOOZMAN. Very good. Did you take note of that, Mr. Chairman, that they support this and feel like we need to get it pushed forward.

Chairman TESTER. It is your request, Senator Boozman.

Senator BOOZMAN. No, again, thank you all very much, and we do appreciate all of your hard work and look forward to continuing to work with you in the future on all of these different things. So again, thank you. Thank you, Mr. Chairman.

Chairman TESTER. Senator Boozman, I might add that the VA MILCON bill is on the floor to your good leadership.

Senator King.

Senator BOOZMAN. I do not know if that is true, but we will take it.

### SENATOR ANGUS S. KING, JR.

Senator KING. Thank you, Mr. Chairman. I want to follow up on a point that Senator Manchin made, because I think it was a really important one. We are turning away and losing veterans because of lack of staff. It is an enormous problem, and I understand it is a problem throughout the society. Every business that I talk to is short of staff. But I want to talk about the staffing problem in the VA, and that is where you might be able to help us.

There are two issues that I have identified. One is pay and the other is red tape. Let us talk about pay for a minute. It is interesting. I will submit for the record, Mr. Chairman, a chart from the VA on VISN 1 on time to fill, and it is interesting. What I would like you to do is do some additional research. But of the time to fill, the lowest are generally urban areas and the highest are rural areas. Now this is a small sample, but I would like you to do this analysis on a broader sample and see if I am correct. But I believe that you will find that rural areas are having a harder time. The time to fill in Maine is 251, in White River Junction it is 261, in Providence it is 127.

[The chart referred to by Senator King appears on page 92 of the Appendix.]

And so I think that is where we get to the pay part, and the differential in pay between different areas of the country, I think, is obsolete because people can work anywhere. You can now live in rural Maine and work remotely for the VA in Boston. Why would you go to work for the VA in Togus, Maine, at a 15 or 20 percent pay cut, if you can work remotely in Boston? Do you see what I mean? We are hurting the competitiveness of our rural VA facilities.

So I think we should really have a rethinking of the pay differential, which is based on times you did not have remote working, people were not as mobile. This is national competition for professionals.

Ms. Therit, you have nodded a few times. What do you think?

Ms. THERIT. So I think Mr. Perry and I may join forces on answering this question. I agree. I think the authorities that we have in the PACT Act have helped us to level some of those gaps or close some of those gaps that you have talked about between urban and

19

rural because we are able to offer more incentives to those rural facilities.

Senator KING. But I know that Togus is not competitive with Boston or New Bedford or Providence.

Ms. THERIT. We still have a long way to go, and then working with organizations like the Federal Salary Council and the Federal Prevailing Rate Advisory Committee. That is where I am trying to spearhead some of these efforts at a broader level.

I know Mr. Perry's team is working on one deliverable that we still owe the Committee from the PACT Act, which is the Rural Recruitment and Retention Plan, where we can put more effort into reducing the red tape that you are seeing with——

Senator KING. Well, I have not gotten to that yet. But look at the pay issue. I mean, I believe that the whole idea of differential pay in different regions, based on cost of living, is somewhat obsolete because when you are competing, for a health care professional, they have nationwide choices. And to have a significant disadvantage in pay, I do not think it is any coincidence that White River and Togus are the ones that are lagging here, because they both have really good management. I know the people at Togus and they are terrific. So it is not a management issue. It is that they have got to compete, and they have to compete with local hospitals, and that is a real problem.

Let me talk about the red tape issue. Well, again, let's go back to competition. To hire a professional at Togus or White River is around 250 days' time to fill. Our Northern Light Health Care Facility, which is in the same region in northern and eastern Maine, it is 56 days. Maine Health is about 89 or 90 days, but significantly below. And yet that is who we are competing with.

We have to really think hard about all the steps, and here is one of them. My understanding and my research tells me that there is something like 24 steps to hire somebody in the VA, and at Northern Light it is 7. We have got to rethink that, it seems to me, because again, we are in a competitive situation and the net result is less service to veterans.

So how do we do that? I do not think Walmart has to go through some regional center when they want to hire somebody in Brunswick, Maine, or wherever they have a store. Why not empower the local managers, if they have a need give them a budget, they decide what they need, who they need, and do the hiring and hold them accountable. But do not have 24 steps in the process. Thoughts? She is passing it to you.

Mr. PERRY. Yes, sir. I agree with you there are a lot of steps in the hiring process, and I think we have a concerted effort to make sure we can streamline those where we can. Some of those steps that you mentioned are required.

Senator KING. Required by whom?

Mr. PERRY. Some of them are self-imposed. Some of them are from our Offices of Personnel Management. We have requirements around credentialing and privileging, so we have to make sure——

Senator KING. They work for you, or they work for Denis. I mean, in other words, if they are required by us, let me know, because that is something we can fix.

Mr. PERRY. Yes, absolutely.

20

Senator KING. If they are required within your system, that is what I want you to reexamine.

Mr. PERRY. And those are the ones that we are streamlining, sir, and to make sure that we reduce those redundant steps. But there are requirements that we have to apply because it is just the Federal rules that we have to comply with.

To your point about the time it takes, you are exactly right. I think it does happen not as quickly as we want.

To make one point of clarification, the decision to hire is at the local level and those budgets are managed at the facility level, so they have complete autonomy to decide when they want to hire and who they want to hire, or for what types of positions.

Senator KING. They still have to go through those 24 steps.

Mr. PERRY. Yes, sir. The steps do apply, so that is where we are looking to gain efficiency, as many as possible.

Senator KING. Well, I hope you can come back to this Committee and show us some changes that will deal with this problem because ultimately—and I know I am over time, Mr. Chairman—ultimately this is all about service to veterans. You can have the best hospital in the world, but if they cannot get an appointment because there is a lack of staff, then we are not meeting our commitment.

Thank you, Mr. Chairman.

Chairman TESTER. Well, just to further add on because I know Senators Blackburn, Moran, and Senator Blumenthal is already here, the end result of this is we cannot compete with the private sector. They are beating us to the punch for good employees. When employees want to work for the VA it just takes too long and people cannot survive on their good looks. They have got to have a check coming in.

And so it is important that if it is something that we need to do here, please let us know what that is. I have got a notion that King would probably write a bill up tomorrow, okay. I also have a notion that Boozman would probably co-sponsor it. So, you know, it is good.

Senator BOOZMAN. During COVID, did you all have the ability to cut through some of that stuff?

Ms. THERIT. So your question is appropriate because during COVID what we did is we either deferred or delayed certain steps in the process to get people on board in less days.

Senator BOOZMAN. So we have the ability to have essentially a study to look back and see if that caused problems, and to me, I do not think it did. And so, you know, it looks to me like you could come to us and say, "We did it this way" and somehow us be helpful of saying, "Hey, this has worked in the past. Why are we not doing it now?"

Ms. THERIT. I would welcome those conversations because we did have a GAO report that identified some lack of compliance with them going back in and updating the system or following up on actions that were delayed or deferred. Though on one hand you want to respect the findings of the GAO study and say, well, maybe we should not have done those things, but on the other hand, to your point, we do not want to lose talent because we are taking 24 steps and it should be 7 steps. So trying to find that right balance.

21

Chairman TESTER. So I was misinformed. People got waylaid on their way to the VA Committee. So I want to thank you for being our witnesses today. We have more work to be done in this space. I look forward to productive discussions on this and other issues that have been brought up today so that we can move VA forward.

The record will open for a week. This hearing is adjourned.

[Whereupon, at 4:28 p.m., the hearing was adjourned.]

# **A P P E N D I X**

**Prepared Statement**

27

**STATEMENT OF TRACEY THERIT
CHIEF HUMAN CAPITAL OFFICER, OFFICE OF HUMAN RESOURCES AND
ADMINISTRATION/OPERATIONS, SECURITY AND PREPAREDNESS,
DEPARTMENT OF VETERANS AFFAIRS OFFICE OF HUMAN RESOURCES AND
ADMINISTRATION/OPERATIONS, SECURITY AND PREPAREDNESS
DEPARTMENT OF VETERANS AFFAIRS
BEFORE THE
COMMITTEE ON VETERANS' AFFAIRS
UNITED STATES SENATE
ON
VA ACCOUNTABILITY AND TRANSPARENCY: A CORNERSTONE OF QUALITY
CARE AND BENEFITS**

**October 25, 2023**

Good afternoon, Chairman Tester, Ranking Member Moran, and Members of the Committee. Thank you for the opportunity to discuss employee and organizational accountability across the Department of Veterans Affairs (VA), as well as labor-management relationships, workforce management and accountability related to workplace misconduct or performance issues. We also look forward to providing our views on S. 2679, the Leadership, Engagement, Accountability and Development (LEAD) Act of 2023 and S. 2158, the Restore VA Accountability Act of 2023. I am joined today by David Perry, Chief Officer, VHA Workforce Management and Consulting Office, Veterans Health Administration (VHA), Ted Radway, Executive Director, Investigations, and Acting Executive Director, Compliance and Oversight, Office of Accountability and Whistleblower Protection, and Mr. Aaron Robison, Senior Attorney Advisor, Accountability, VA Office of the General Counsel.

While our testimony will address the elements of the hearing invitation, I want to echo a recent statement by the Under Secretary for Health Dr. Shereef Elnahal: "we're hiring and retaining the best, most talented and dedicated employees in health care." At VA, "we're bringing on new people with one goal in mind: providing world-class care to every Veteran who entrusts us with their health." I cannot think of a better way to exemplify our commitment to world-class care than to share a story about one of our valued employees, who epitomizes the ethos of service above self.

Bill Barksdale, Assistant Director of the Roanoke Regional Office, was recently recognized with an "Own the Moment Award" at a Customer Experience Symposium. When a Veteran experiencing homelessness came to Bill's office in crisis, Bill jumped into action. He phoned the Vet Center and was instructed to transport the Veteran to the Vet Center to get the medical attention he needed. Bill drove the Veteran to the Vet Center himself. Once there, it was determined the Veteran needed more care at the Salem Veterans Affairs Medical Center (VAMC) and Bill drove him there, too. While sitting in the waiting room, Bill made some calls, reached out to Support Services Division, checked on the Veteran's finances and checked to see if he was receiving his compensation checks.

Page 1 of 8

28

Bill discovered that the Veteran was forced from his home in Newport News, Virginia, after a series of thefts. Bill called the Louisville Fiduciary Hub, asking them to help set up a temporary fiduciary. By night's end, after the Veteran was released from the VAMC, Bill drove him to the Roanoke Rescue Mission to set him up with temporary housing. Bill worked across VA, setting up support systems to help the Veteran manage his finances and facilitate his transition to a permanent place he can call home. Two weeks later, the Veteran was permanently housed in a senior living facility and Bill has been following up with the Veteran to ensure he is adjusting and getting the services and resources he needs. Every step of the way, Bill was right there--not because it is his job--but because getting Veterans the support they need to be successful is, to Bill, a sacred duty and source of personal pride.

This is just one of many examples of the high caliber of employees whose dedication and commitment to service and Veterans typifies VA. While we are very proud of our talented and outstanding employees, VA recognizes that more can be done in to ensure an effective and efficient management of a nearly 500,000-member workforce.

We thank Congress for providing critical authorities and appropriations in bills such as the Reforming American Immigration for Strong Employment Act, the PACT Act and the 2023 Consolidated Appropriations Act. Because of this legislation, VHA's total workforce has grown by 6%. That is the greatest growth we have seen in more than 15 years and VHA is on pace to exceed this year's goal of 52,000 new hires. As of September 2023, VHA has an onboard strength of 464,720 employees and continues to grow each year in response to increased demand for its services, improved access to care and benefits, reduced wait times, improved quality, enhanced Veteran satisfaction and overall mission growth. VHA accounts for approximately 89% of VA employees and most of the additional staffing needed at VA in the past 5 years have been in clinical occupations, which account for approximately 63% of VA employees. As the largest integrated health care delivery system in America, most of VA's challenges in maintaining a clinical workforce mirror those faced in the private health care industry.

**A. Background on Section 714**

Before we present VA's perspectives on the two accountability bills, context is important. Let me first provide some history on the VA Accountability and Whistleblower Protection Act of 2017, particularly the language codified at 38 U.S.C. § 714 and then share how we think proposed legislation may improve current processes and support VA's goals.

Since the Accountability Act was passed, decisions from the U. S. Court of Appeals for the Federal Circuit, the Merit Systems Protection Board (MSPB), independent arbitrators, and the Federal Labor Relations Authority (FLRA) have significantly limited the application of section 714. These courts and administrative bodies have interpreted section 714 to require higher standards for these disciplinary

29

actions. According to the Federal Circuit, VA was required to use a preponderant evidence standard and to apply Douglas factors (which are 14 specific factors that must be reviewed when a disciplinary decision is made under title 5) even when taking actions under section 714. The Court also decided that section 714 could not be used for conduct and performance actions that took place prior to its implementation. *See Sayers v Department of Veterans Affairs*, No. 18-2195 (Fed. Cir. 2020); *Connor v. DVA*, No. 2021-1064 (Fed. Cir. 2021); *Rodriguez v. DVA*, No. 2019-2025 (Fed. Cir. 2021). The decisions also limited section 714 coverage to fewer types and numbers of employees by excluding "hybrid" employees. Additionally, in March 2021, VA was ordered to cease using section 714 to take adverse actions against American Federation of Government Employees (AFGE) bargaining unit employees until retroactive bargaining was completed. Thus, VA is currently unable to use section 714 for a large portion of its workforce. Out of approximately 465,000 VA employees, the section 714 authority can only be used for approximately 75,000 employees, which is roughly 16% of VA's workforce. Section 714 authority cannot be used for pure title 38 employees title 38 hybrid employees or AFGE bargaining unit employees. Because there are few remaining practical differences between the use of 38 U.S.C. § 714 and traditional title 5 adverse action authorities, and because VA could not use section 714 on an overwhelmingly majority of its workforce, VA ceased proposing new adverse actions under section 714 in April 2023.

**B. VA's Position on the Proposed Restore Accountability Act**

Given the complexities and dynamics of our experience with section 714, VA is confident that the authorities currently available to VA are sufficient to hold employees accountable for misconduct and poor performance. Even without using section 714 against any AFGE bargaining unit members, its largest union, since 2021, VA has taken more than 4,000 adverse actions in each of the last 2 fiscal years using its existing authorities.

As such, VA does not support S. 2158, the Restore Accountability Act of 2023. VA has legal concerns regarding some of the language in the draft bill. Specifically, this language will continue to be the subject of extensive litigation and constitutional challenges, creating uncertainty and potentially leading to a continued pattern of overturned disciplinary actions. VA's position is informed by the experience of using these authorities over the past 6 years and the morass of litigation they spawned.

While VA appreciates the Committee's efforts, VA believes that other authorities available to address performance and conduct deficiencies (e.g., 5 U.S.C. Ch. 43 and 75) are sufficient to act against supervisory personnel when warranted. This includes being subject to mandatory proposed penalties for certain types of misconduct related to whistleblower retaliation or other prohibited personnel actions pursuant to 38 U.S.C. § 731 and 5 U.S.C. § 7515. Finally, this bill is potentially detrimental to VA in the form of legal risk, uncertainty and further litigation, potentially resulting in overturned adverse actions and substantial monetary damages, which VA experienced in its implementation of section 714. The enactment of 38 U.S.C. § 712 as well as the proposed amendments

30

to 38 U.S.C. §§ 713 and 714 will likely face the same gamut of legal challenges. VA recommends that disciplinary action continue to be taken under applicable existing authorities, providing certainty and minimizing legal risk to VA.

To be a model employer for the Federal Government, VA must focus on modernizing and improving VA's hiring, preserving rights of VA employees and fostering a positive and collaborative labor-management relationship. Ensuring we deliver the best health care, benefits and services to our Veterans is non-negotiable. Providing the very best outcomes means having agile and responsive workforce management policies and processes.

**C. VA's Position on the Proposed LEAD Act**

To ensure our workforce continues to meet the standards of excellence Veterans and their families deserve, VA generally supports S. 2679, the LEAD Act of 2023, subject to the availability of appropriations. This bill seeks to strengthen accountability and oversight at VA. VA has taken several steps to strengthen accountability and oversight across the Department, including implementing the VA Accountability and Whistleblower Protection Act of 2017 and being committed to continuous improvement in this area. VA supports this bill, if amended for clarity, legal sufficiency and more effective implementation as outlined in the Department's technical assistance and subject to the approval of funding to support. This testimony will highlight specific provisions of the bill that serve to strengthen VA's existing programs and will express where we do not support provisions of the legislation.

First, section 101 of S. 2679, the LEAD Act, would require VA to determine the steps and processes for responding to potential acts of misconduct and poor performance, provide training on this process and compile data regarding the outcomes. As VA already has policies governing these procedures, it will not need to establish a new system or standards for accountability. VA agrees with the underlying premise of this section, acknowledging that, while scenarios will differ, it is possible to provide overall steps to the process as established in existing policies. This information can be distributed, and training provided within the organization to ensure a better understanding of the process for investigating and addressing potential misconduct and poor performance and the rights of employees.

VA recommends this section be amended to include clarifying the definition of adverse actions given the differing definitions of that term in title 5 and title 38 and aligning the outcome metrics with available data. We estimate this section of the bill will cost $5 million over fiscal year (FY) 2024 and FY 2025 and $500,000 each year over a 10-year period to hire staff to manage this section; develop, deliver and track the training; and modify and maintain the system.

Section 102 establishes the Office of Transparency, Engagement, Accountability and Management (TEAM Office) in VHA. VA supports creating the TEAM Office, which aligns with ongoing consolidation efforts under VHA's optimization plan. VA requests

Page 4 of 8

31

amendments to this section to: (1) expand the pool of qualified candidates for the head of the TEAM Office to include compliance professionals; (2) make technical edits to avoid conflict with 38 U.S.C. § 7306 and clarify reporting structures; (3) clarify that Government Accountability Office (GAO) and Office of Inspector General (OIG) recommendations are not mandatory; and (4) add functions and offices to the TEAM Office to align with VHA's operations.

Second, section 201 of the bill requires officials such as medical center directors, other medical center executive leaders and network directors to conduct oversight visits to medical facilities within their jurisdictions. This section also contains required reporting. VA supports the site visit requirement in section 201 since it is a good management practice and is currently a VHA practice. VA requests this section be amended by omitting or modifying the reporting requirements in subsection (b). The way this reporting is structured, it would potentially contain observations from more than 600 leaders and VHA will have difficulty providing all the submitted observations as required in section 201(b)(1). Instead, VHA will be able to provide data highlighting important changes from leadership engagements.

Section 202 creates a new provision at 38 U.S.C. § 7306B, which directs VHA to establish the Office of the Medical Inspector (OMI) and align OMI within the TEAM Office from 38 U.S.C. § 7306A. The provision also outlines the requirements for the head of the office, the Medical Inspector to codify the OMI functions and directs VHA to establish certain capabilities and internal controls for OMI. VA supports codifying OMI and its functions in the bill. OMI has existed as a health care investigation entity within VHA since 1980 and VHA wants to ensure the language in the bill supports this role and OMI's unique mission. VA requests amendments to section 202 to (1) ensure that the existing OMI office is realigned to the TEAM Office; (2) modify OMI's functions to confirm proper coordination of oversight functions in VHA; (3) ensure OMI's mission remains focused on health care related incidents; and (4) avoid duplicating efforts of other existing offices. VHA also seeks technical amendments to the provisions covering the appointment of the Medical Inspector to conform to the amendments made by section 203.

Section 204 requires VHA to either establish a new program or consolidate existing programs to create a mobile temporary staffing program to temporarily fill vacancies and provide coverage for extended absences for shortage occupations and report annually on the program. VA is requesting amendment to section 204 to refocus the legislation on expanding and supporting VHA's existing staffing contingency framework. VHA requests support for expanding its contingency staffing model. The contingency staffing model leverages float pool reserve staff established at the facility level in combination with Clinical Resource Hub (CRH) staff at the Veterans Integrated Services Network (VISN) level, supplemental staffing programs at the national level and contract staff or community care in emergency circumstances.

The CRH model is currently being used by VISNs to provide contingency staffing for multiple occupations including providers and VHA's Travel Corps is currently being used to provide contingency nursing coverage to the field from a national program. The

32

Disaster Emergency Medical Personnel System Program and the more recently established Clinical Deployment Teams support the field and Fourth Mission in the event of emergencies. However, to support the contingency staffing model, VHA is seeking additional amendments to address recruitment and retention issues for the contingency float pool fund, CRH staff and the Travel Corps. Shortage occupations may result from nationwide shortages of specific occupations in the health care industry. Without monetary or other incentives, finding employees willing to participate in a program requiring mobility and frequent assignment changes to short- or long-term duty locations will be difficult.

Third, while VA generally supports most of the provisions in title 3, VA does not support certain provisions of section 3, most notably, establishing a second General Counsel housed within the Office of Accountability and Whistleblower Protection (OAWP). Under 38 U.S.C. § 311 and 38 C.F.R. Part 14, VA's General Counsel is the chief legal officer of the Department and is the principal legal advisor to the Secretary concerning all programs and policies of the Department. The General Counsel is responsible to the Secretary for all litigation, interpretive legal advice and legal services. The General Counsel also serves as the Regulatory Policy Officer for the Department - managing, directing and coordinating all rulemaking activities. Establishing a second General Counsel within OAWP would create significant legal risk to VA through the potential for conflicting legal advice to the Secretary.

The statute establishing OAWP was passed in 2017 and was designed to improve accountability within VA and to increase protection of whistleblowers. Its provisions are innovative within the Federal Government and created an additional tool for whistleblowers. OAWP has made significant strides these last several years involving its investigative work, disciplinary recommendations, training and outreach. OAWP is implementing valuable non-disciplinary tools that are part of the statute that include: (1) the ability to issue reports and recommendations that enable advice to the Secretary on matters that involve accountability and (2) analyzing trends involving intake data and recommendations by oversight bodies such as OIG, GAO, OMI and the Office of Special Counsel (OSC), that will permit VA to address issues timely. VA looks forward to continuous improvement and execution of the important tools that Congress provided when it created OAWP.

VA believes the current organizational structure that includes attorneys within OAWP's investigations directorate and who are not attorneys within the Office of General Counsel (OGC), meets the intent of this proposed amendment concerning independence in investigations while maintaining appropriate legal consistency, uniformity and reliability within the Department. As an alternative to striking the section, VA proposes alternative language, which was also proposed in response to H.R. 8510, the Strengthening Whistleblower Protections at the Department of Veterans Affairs Act, in 2022. The language codifies OAWP's current investigative attorney division which VA developed to alleviate concerns regarding OGC involvement in providing legal advice in OAWP investigations.

33

Additionally, VA does not support the proposed language which would require OAWP to get involved in the negotiation and enforcement of settlement agreements involving whistleblower retaliation claims by tracking negotiation of agreements and developing metrics and standards for negotiation. OAWP involvement in tracking negotiations of settlement agreements will not increase efficiency, timeliness or effectiveness of the negotiations. Settlement negotiation and agreements are largely driven by fact-specific privileged legal advice and delegations of authority within VA. VA recommends limiting any tracking of such settlement agreements to only implementation of a settlement agreement once it is signed and effective (i.e., after the agreement is executed).

OAWP policies generally defer to the choice of the whistleblower to pursue corrective action through OSC and/or OGC involvement and therefore does not have any clear role in settlement negotiations for complaints which were not presented to it. OAWP involvement in tracking negotiation of settlement agreements may also interfere with the Complainant's interests which may be driven by privileged legal advice from Complainant's legal advisor. Confidentiality provisions of other complaint statutes (e.g., OSC, OIG reports) and those that are parties to a mediation process may also be implicated.

It is also unclear what tracking enforcement of settlement agreements means. Settlement agreements are generally enforced through mediation or judicial proceedings. OAWP does not have a role in these proceedings and does not have enforcement authority.

Finally, VA generally supports section 4 with amendments, and we look forward to continuing to work with the Committee to provide greater clarity regarding scope and more specificity to the training requirements.

**D. AFGE Settlement Agreement**

VA understands the Committee has interest in the recent AFGE settlement. In 2017, AFGE filed a grievance asserting VA failed to bargain impact and implementation of 38 U.S.C. 714's enhanced disciplinary authority prior to implementation. After extensive litigation, FLRA ruled that VA was required to bargain impact and implementation prior to implementation. In March 2021, VA was ordered to cease using section 714 until retroactive bargaining was completed and make whole those who suffered loss of pay, benefits, allowances or differentials due to VA's failure to bargain prior to implementation. Consequently, pursuant to these rulings, in April 2021, VA ceased using section 714 for AFGE bargaining unit employees and the parties entered into retroactive bargaining in May 2021, in accordance with the order. During this period, the parties reached an impasse and jurisdiction was declined by the Federal Impasse Services Panel. AFGE filed additional charges of unfair labor practices against VA. In November 2021, the parties began negotiating an agreement to resolve all disputes associated with the matter. After more than 6 months of mediation with AFGE, which included FLRA involvement, on July 28, 2023, VA and AFGE-National VA Council

34

signed a settlement resolving all current disputes associated with AFGE's failure to bargain grievance.

This settlement may impact approximately 4,000 current and former VA employees. As part of the agreement with AFGE, many former VA employees will have the option to either return to work at VA or receive compensation in lieu of being reinstated. However, according to the terms of the agreement, hundreds of former VA employees who VA and AFGE mutually agree were terminated for grievous misconduct will not be eligible to return to work. The total cost of this settlement will not be known for several years since it depends on how many former employees elect to return to VA or choose compensation in lieu of restatement. For those AFGE bargaining unit employees who choose to be reinstated, VA retained the right to elect to move forward with a removal using other disciplinary authorities.

**Conclusion**

VA appreciates the close collaboration with Committee staff and looks forward to continuing future legislative efforts, especially those centered around more pay flexibilities and hiring provisions that are critical to recruiting and retaining health care professionals in an increasingly competitive labor market. We continue to seek legislative and regulatory interventions to make VA a fully competitive health care employer.

I am proud to be part of this noble mission to care for the Nation's Veterans. I look forward to working with each of you on this Committee on health care hiring and staffing opportunities across VA, as well as investing in our current employees so they can continue to provide the best care and service to deserving Veterans and their families. This concludes my testimony. My colleagues and I are prepared to respond to any questions you may have.

---

**Questions for the Record**

---

37

**Department of Veterans Affairs (VA)**
**Questions for the Record**
**Committee on Veterans' Affairs Committee**
**United States Senate**
**VA Accountability and Transparency: A Cornerstone of Quality Care and Benefits**
**Invisible**

**October 25, 2023**

<u>Questions for the Record from Senator Kirsten Sinema</u>:

**Question 1: I want to ask about the reassignment of senior executives in the VA leadership. In 2018, Congress passed the Senior Executive Accountability Act, which, among other things required a report to Congress on the full costs to reassignments including salary increases, paid incentives, travel expenses for the individual and family, as well as moving expenses. Do you generally believe that these incentives are necessary and fair?**

**Response:** Yes, these incentives are necessary and fair. The adjustments to salary, payment of incentives, and travel expenses are in accordance with regulation and policy. Salary adjustments are necessary when a member of the senior executive service (SES) moves to a position of greater responsibility. Regulation requires Federal agencies to cover costs such as relocation expenses when reassigning an SES member to a position outside their current geographic location. Travel expenses are managed by VA's Office of Management and must be documented to support reimbursement.

**Question 2: I'm hoping you can walk me through the computation of "PCS Expenses" which I believe is the cost of moving an individual to their new duty station. In the VA's most recent report to Congress, in addition to a salary increase and an incentive payment, one individual was paid 190 thousand dollars for PCS expenses. Three more individuals were paid over 130 thousand dollars in moving expenses. But these four executives were conducting interstate moves. Why are these moves so expensive?**

**Response:** Relocation allowances are governed by the Federal Travel Regulation and are generally comprised of two categories of expenses: 1) mandatory, expenses an agency must reimburse if the employee is eligible and 2) discretionary, expenses an agency may reimburse when in the best interest of the Government.

The actual cost of a relocation depends on the package of mandatory and discretionary benefits agreed to by both the individual and the Government. The Government may offer more robust relocation benefits if it is a critical or hard-to-fill position, and it is determined to be in the Government's best interest. Higher cost relocations, like the

38

ones referenced in your question, are not necessarily the norm; however, they typically involve buying and/or selling support for real estate transactions.

**Question 3: I'm told incentive payments are limited to 25% of the salary listed. In one report last year, I saw individuals receiving 75% incentive payments, and many more making 30 or 45%. What is the process by which these incentives are calculated?**

**Response:** Recruitment, retention, and relocation incentives—referred to as the 3Rs—are generally limited to 25% of salary. The Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics (PACT) Act has provided VA the temporary authority to approve incentives up to a 50% cap based on a critical agency need if a total relocation or recruitment incentive does not exceed 100% of the employee's annual rate of basic pay in effect at the beginning of the service period. A 75% incentive cannot be authorized per existing Federal regulations and policy.

Relocation incentives are based on the individual's annual rate of basic pay (i.e., salary) at the beginning of the service period, and generally may not exceed 25% of that basic pay. Service periods can include fractions of a year but cannot exceed a total of 4 years. The approved incentive percentage and length of service selected will reasonably correlate to difficulties experienced in obtaining high quality candidates or documented evidence of long-term staffing difficulties.

The total amount of incentive payments paid to an individual is calculated by multiplying the individual's annual rate of basic pay by the percentage authorized for the incentive, multiplied by the total year(s) in the service period, which equals the incentive amount ((basic pay x %) x service period = incentive amount). For example, Individual A has an annual rate of basic pay at the beginning of the service period of $75,000. A relocation incentive of 15% with a 3-year service agreement has been authorized. The total incentive amount for Individual A is $33,750 ((75,000 x 15%) x 3 = $33,750).

**Question 4: Are these incentives and PCS expenses in line with the market rate for these kinds of payments?**

**Response:** Yes, these permanent change of station expenses are in line with market relocation payments, which include the mandatory and discretionary entitlements discussed in question 2. Market rates for per diem, mileage, and household good transportation are established by the General Services Administration and used by all Federal agencies. In addition to salaries paid outside the Federal Government for similar positions, incentive amounts also take several other factors into consideration, including availability and quality of candidates, position turnover, special or unique competencies required, non-pay authority utilization, desirability of the position and/or location, and any other special factors or circumstances that may be applicable.

39

**Question 5:** We only have a small snapshot in time to observe these movements of senior executives. However, we are already starting to see patterns of individuals leaving one VA posting for another for an incentive, leaving a vacancy in their wake and setting of a domino effect of continued incentive payments. One individual movement can have several hundred thousand dollars of incentive payments to fully replace. What can we do to capture the full impact of these knock-on costs?

**Response:** VA understands the concern raised about creating incentives for executives to move across the system in search of a higher compensation package, which may have the unintended consequence of creating vacancies elsewhere in the system and increasing total costs. As such, VA has taken several recent steps to improve total compensation packages for field leaders, including a consistent national approach to implementing PACT Act title IX authorities. Specifically, all eligible Medical Center Directors (MCD), Deputy MCDs, Associate Directors, and Assistant Directors are receiving a consistent level of Critical Skills Incentive (i.e., there is no variation at each facility). Additionally, the Veterans Health Administration (VHA) will use the Critical Position Pay authority recently approved by the Office of Management and Budget. This will allow VHA to implement a new executive compensation model that is decoupled from facility complexity level, and instead uses market-aligned criteria to align positions within relevant pay bands. While it is too early to see the full impact of these new authorities, early signs indicate that this consistent approach has supported the lowest MCD vacancy rate VHA has seen in many years, and we expect that the need to use individual recruitment or retention incentives to fill these positions will be reduced.

40

Questions for the Record from Senator Marsha Blackburn:

**Question 6: As of October 21st, 2023, the current case log for veterans applying for benefits was one million, ninety-eight thousand, three hundred and sixty-nine. Can you explain why the current case log is so backlogged, and what the VA plans to do to address this backlog?**

**Response:** As of December 3, 2023, the inventory was 1,081,025 with 325,361 claims pending over 125 days. This translates to 30.1% of the total inventory being considered backlog claims—53.2% below the Agency's backlog peak on March 25, 2013 (611,073).

Since the PACT Act was signed in August 2022, Veterans and their families have filed more than 3,111,115 total claims. The Veterans Benefits Administration (VBA) projects they will continue to receive a high rate of claims into fiscal year (FY) 2024, based on the high number of Intents to File (ITF) submitted. ITFs are protective filings for the effective date of payment, should entitlement to benefits be granted. As expected, VBA is seeing an accelerated growth of claims pending over 125 days heading into FY 2024, due to the increased demand for benefits because of the PACT Act.

To address the backlog, VBA is hiring and training new claims processors, and expanding the use of automated decision support tools.
Explained in detail:

- VBA is aggressively hiring, and has grown by nearly 23.3% from October 1, 2022, through September 30, 2023—with a total end-strength of more than 31,000 people—allowing VA to ensure timely service to Veterans.

- Over the past 2 years, VA has hired and trained 11,480 new claims processors, growing our claims processing workforce by approximately 58% since FY 2021. To continue increasing claims processing speed, we plan to bring on thousands of additional claims raters in the coming year.

- VBA is expanding the use of automated decision support tools and training our processors on how to use them. VBA is in the early process of leveraging automated tools, with the full potential yet to be realized. However, the potential benefit is two-fold: 1) improving the efficiency of our claims processors and 2) potentially reducing the number of examinations Veterans must attend.

By the end of 2025, VBA aims to reduce claims pending over 125 days to approximately 100,000. VA remains committed to delivering accurate and timely benefits to Veterans, survivors, and other beneficiaries in a manner that honors their service.

In FY 2024, through December 3, 2023, VBA completed 386,669 claims—24.7% greater than at this point in FY 2023. FY 2023 claims completions of 1,981,854 exceeded VBA's prior record-breaking completions in FY 2022, with 1,709,765 claims completed.

41

**Question 7:** The report the SVAC minority staff requested regarding the employees that were reinstated following their expulsion for grievous misconduct asked for specific evidence for how the determination was made to overturn each grievous misconduct decision. Will the VA be providing the specific determination for each of the several thousand employees that were granted reinstatement?

**Response:** Employees removed for grievous misconduct will not be granted reinstatement. Only those employees that were removed for misconduct that did not meet the definition of grievous misconduct, per the settlement agreement, will be offered or granted reinstatement. The American Federation of Government Employees does not agree with 30 cases that the agency asserts qualify as grievous misconduct removals. These cases will be arbitrated to determine their final settlement category. The arbitrator will provide a written explanation for any decision in favor of the Union that a specific removal was not based on grievous misconduct and, if this occurs, the employee will be offered reinstatement. As of May 2, 2024, no hearing date has been set.

**Question 8:** Are you personally comfortable with receiving medical care from an individual that has evidence of prior patient abuse, reckless or intentional disregard for patient welfare, racial harassment, sexual harassment, impairment on duty, violent threats, reckless or intentional endangerment of others, and/or criminal activities?

**Response:** No. The Department of Veterans Affairs takes allegations of misconduct very seriously and works to ensure allegations are investigated and actioned appropriately.  The categories of misconduct listed above are very serious; per the 714 settlement agreement, individuals who were found to have committed misconduct of this nature have not been offered reinstatement.

**Question 9:** Following up on the team leader responsible for scheduling for the Atlanta VA Medical Center's community care office. If you recall this team leader is the one that had posted a picture to their social media accounts of them teleworking in their bathtub. Is this employee still employed by the VA, and if so in what role is this individual employed?

**Response:** The agency is committed to investigating instances of potential misconduct and actioning them appropriately. The agency has reviewed the circumstances surrounding the situation and taken appropriate actions.

**Department of Veterans Affairs**
**May 2024**

**Statements for the Record**

45

**Senator Sinema**
**Statement for the Record**
**Senate Veterans' Affairs Committee**
**VA Accountability and Transparency:**
**A Cornerstone of Quality Care and Benefits for Veterans**
**10/25/23**

**Senator Sinema Statement**

Thank you, Chairman Tester, for holding this hearing and thank you to our witnesses for being here today.

It is our duty to assess and improve the policies and initiatives that govern the care of our most vulnerable citizens, including our aging population and individuals with disabilities. We trust the VA to make the most of taxpayer money they are given to provide essential services and support to the United States' 16.2 million veterans. In Arizona, we face significant challenges in ensuring equitable access to high-quality and affordable care. Workforce shortages and disparities in availability and quality of services require the VA to come up with innovative solutions that increase accessibility and reduce waste resulting from poor money management.

Arizonans should be able to trust that their tax dollars are funding a system that is able to attract a highly qualified and passionate workforce. This is to say that the care they expect to receive is timely, high quality, and accommodating of their diverse needs. By collaborating across party lines, I believe we can find innovative solutions to improve VA care, as well as increase community-based care options for veterans and cultivate a skilled and compassionate caregiver workforce.

46



# CONGRESSIONAL TESTIMONY

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO

PROVIDED TO THE

SENATE COMMITTEE ON VETERANS' AFFAIRS

HEARING ON

"VA ACCOUNTABILITY AND TRANSPARENCY: A CORNERSTONE OF QUALITY CARE AND BENEFITS FOR VETERANS"

OCTOBER 25, 2023

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W., Washington, D.C. 20001  (202) 737-8700  www.afge.org

47

Chairman Tester, Ranking Member Moran, and Members of the Committee:

The American Federation of Government Employees, AFL-CIO (AFGE) and its National
Veterans Affairs Council (NVAC) appreciate the opportunity to submit a statement for the
record on today's hearing entitled "VA Accountability and Transparency: A Cornerstone of
Quality Care and Benefits for Veterans." AFGE represents more than 750,000 federal and
District of Columbia government employees, 300,000 of whom are dedicated Department of
Veterans Affairs (VA) employees. These include front-line employees at the Veterans Health
Administration (VHA) who provide exemplary specialized medical and mental health care to
veterans, the Veterans Benefits Administration (VBA) workforce who process veterans' claims,
the Board of Veterans' Appeals (Board) employees who shepherd veterans' appeals, and the
National Cemetery Administration Employees (NCA) who honor the memory of the nation's
fallen veterans every day.

With this firsthand and front-line perspective, we offer our observations on the VA's
implementation of the Department of Veterans Affairs Accountability and Whistleblower
Protection Act of 2017, and the following bills being considered at today's hearing:

**S. 2158, the "Restore Department of Veterans Affairs Accountability Act"**

AFGE strongly opposes S. 2158, the "Restore Department of Veterans Affairs
Accountability Act." As we have stated to the Senate and House Veterans Affairs' Committees
since 2017, AFGE strongly objected to the design and implementation of the Department of
Veterans Affairs Accountability and Whistleblower Protection Act of 2017. Specifically, AFGE
has long objected to the VA's use of the disciplinary authority in 38 U.S.C. 714 (§714) of the
law and how it has harmed hardworking and dedicated employees for often petty infractions.

48

Additionally, through this experience AFGE is also aware of the failure of VA leadership to hold managers accountable under other provisions of the law.  AFGE has supported efforts to amend the law to restore fairness to VA employees, including H.R. 4906, the bi-partisan "Protecting VA Employees Act."

Contrary to this, S. 2158, the "Restore Department of Veterans Affairs Accountability Act" will again counterproductively diminish the due process and collective bargaining rights of VA employees compared federal employees in other agencies, including those in the Department of Defense who take care of the nation's active-duty military.  In particular, the bill's proposed abrogation of collective bargaining agreements, reinforcing the use of the "Substantial Evidence Standard," restating the prohibition on the Merit Systems Protection Board to mitigate penalties, limiting the use of the "Douglas Factors," and using this bill retroactively go out of their way to treat VA employees like second class federal workers, despite their noble mission.  AFGE strongly opposes the bill.

**Background**

Public Law 115-41, the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Accountability Act or Act), was signed into law on June 23, 2017. At the time of its passage, supporters claimed the Act was intended to simplify and expedite the disciplinary process at VA so that it could better hold bad employees accountable. The Act is divided into two parts, Title I, which established the Office of Accountability and Whistleblower Protections (OAWP) and Title II, which governs Accountability and Adverse Actions for Senior Executives, VA Employees, and Supervisors disciplinary procedures. Within Title II, the bill enacted 38 U.S.C. §714 which changed the following disciplinary procedures for bargaining unit employees (38 U.S.C. §713 is for managers in the Senior Executive Service):

2

49

- Required management to make a final decision within 15 business days of proposing an adverse action (i.e., suspension of more than 14 days, demotion, or removal);
- Reduced the time period for an employee to respond to a proposed adverse action to 7 business days;
- Reduced the time period for an employee to appeal the final adverse action to 10 business days;
- Lowered the standard of proof necessary to sustain an adverse action before a third party, such as arbitrators and the Merit Systems Protection Board (MSPB), from preponderance of the evidence to substantial evidence;
- Prevented third part adjudicators from mitigating unreasonable penalties assigned by VA.

**Oversight**

Since the Act's enactment, there has been robust oversight over the Act's

implementation, and its effect on the workforce in multiple venues:

**Congressional Oversight**

The House Veterans' Affairs Committee held an oversight hearing in July 2018 entitled

"*The VA Accountability and Whistleblower Protection Act: One Year Later*."[1] The committee's

goal was to address problems caused by the VA's implementation of the Act. In his opening

statement, then-Ranking Member Mark Takano addressed the VA's penchant to use the Act to

disproportionately discipline rank and file employees as opposed to supervisors and other

management officials stating:[2]

> "[Of] the 1,086 removals during the first five months of 2018, the majority of those fired were housekeeping aides...I also find it hard to believe that there are large numbers of housekeeping aides whose performance is so poor that it cannot be addressed. If that is truly the case, then it stands to reason that there are also management issues behind their poor performance. But of those 1,096 removals, only fifteen were supervisors which is

---

[1] *The VA Accountability and Whistleblower Protection Act: One Year Later: Before the H. Comm. On Veterans Affairs*, 115th Congr. (2018), https://republicans-veterans.house.gov/calendar/eventsingle.aspx?EventID=2212.
[2] *The VA Accountability and Whistleblower Protection Act: One Year Later: Before the H. Comm. On Veterans Affairs*, 115th Congr. (2018) (statement of Mark Tano, ranking member), https://republicans-veterans.house.gov/calendar/eventsingle.aspx?EventID=2212.

50

less than 1.4 percent. Firing rank and file employees does nothing to resolve persistent management issues." He continued "it is not possible to fire your way to excellence." AFGE also testified at this hearing citing how the law disproportionately harmed lower paid federal workers and not the managers who supervised them, and also further explained many of the structural problems with the law that continue to exist today.[3] AFGE has also commented on the Accountability Act at a May 19, 2021 House Veterans' Affairs Committee Subcommittee on Oversight and Investigations hearing titled "*Protecting Whistleblowers and Promoting Accountability: is VA Making Progress?*"[4] citing the problems with the current law and the need to pass reforms.

**Inspector General Investigation**

In response to requests for an investigation from multiple legislators, the Office of Inspector General (OIG) highlighted VA's failure to properly implement the portion of the Act pertaining to whistleblower protection. The OIG issued a report, which explained, "in many instances, [OAWP] focused only on finding evidence sufficient to substantiate the allegations without attempting to find exculpatory or contradictory evidence."

Further, while VA front-line employees were being disciplined more often and more harshly under §714 of the Accountability Act, the OIG report found that VA "struggled with implementing the Act's authority to hold executives accountable." OIG explained that despite statements from then-Secretary Shulkin, as of May 22, 2019, VA had only removed one covered senior executive employee under 38 U.S.C. 713. Further, of thirty-five cases involving senior

---

[3] *The VA Accountability and Whistleblower Protection Act: One Year Later: Before the H. Comm. On Veterans Affairs*, 115th Congr. (2018) (statement of then-AFGE National President J. David Cox). https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=108516.
[4] *Protecting Whistleblowers and Promoting Accountability: is VA Making Progress? Before the H. Comm. On Veterans Affairs Subcommittee on Oversight and Investigations*, 117th Congr. (2021) (AFGE Statement for the Record).

4

51

executives, VA deciding officials mitigated the discipline of thirty-two before issuing a final decision.

The OIG investigation revealed unlawful whistleblower retaliation by OAWP itself, noting that after an OAWP employee made a whistleblower complaint, Executive Director O'Rourke instructed a subordinate to remove the employee. Finally, the OIG found that the VA did not comply with reporting and training requirements of the Act and failed to adequately report to Congress regarding the outcomes of disciplinary actions.

**Freedom of Information Act**

In an attempt to learn more about the VA's use of its authorities under the Accountability Act, on May 31, 2022, AFGE submitted a Freedom of Information Act (FOIA) Request to the VA. This request asked the VA to share, without violating the privacy of employees, the VA's use of Section 204 of the Veterans Affairs Accountability and Whistleblower Protection Act of 2017, 38 U.S.C. §721, which authorizes the Secretary to issue an order, under certain circumstances, directing an employee to repay an award or bonus paid to the employee. This request covered the period from June 23, 2017, through May 31, 2022. In response to the AFGE's request, the VA responded on June 2, 2022, and stated that "This is a recently enacted VA policy and there are no responsive records." This is evidence that the VA has not utilized all of the tools at its disposal to hold employees accountable, and that the VA does not need additional tools for accountability. Instead, for the last six years, VA abused its authority under 38 U.S.C. §714 to remove thousands of front-line employees and service-connected veterans while failing to hold senior executives and management officials to the same standard.

52

**Challenges in Federal Court**

Since the enactment of the Accountability Act, several parts of the law have been successfully challenged in federal courts, resulting in multiple rebukes from the United States Court of Appeals for the Federal Circuit (Federal Circuit or Court) finding that VA violated the law and fundamental civil service protections through its abuse of 38 U.S.C. §714. One line of cases is related to the restrictions on the MSPB or third-party adjudicators to consider the reasonableness of a penalty or to mitigate that penalty. In *Sayers v. Dep't of Veterans Affairs*, the Federal Circuit determined that, contrary to VA's contentions, the MSPB was permitted to review the reasonableness of the penalty imposed by deciding officials in light of the facts of a particular case under §714. The Court explained that "[d]eciding that an employee stole a paper clip is not the same as deciding that the theft of a paper clip warranted the employee's removal." It is clear that prior to *Sayers*, the Agency promoted a limited review and harshly disciplined employees under §714, often for similarly trivial acts.

The perceived inability to consider the reasonableness of VA's chosen penalty led judges to affirm decisions where even a single charge was proven by substantial evidence. Where the harshest available penalty, removal, was used liberally, this led to a loss of employee resources for relatively minor infractions. VA's rush to remove employees was clear in performance cases as well. As Administrative Judges believed they could not consider the reasonableness of the penalty in those instances, employees were removed for easily remedied performance failures. [5]

Another key element of the law examined by the courts is the VA's mistaken claim that the Accountability Act eliminated the preponderance of the evidence standard at the administrative level and replaced it with the new substantial evidence standard that applies to

---

[5] *Brenner v. Dep't of Veterans Affairs*, 990 F.3d 1313, (Fed. Cir. 2021)

53

third party review. In *Rodriguez v. Dep't of Veterans Affairs,* the Court held that the "preponderance of the evidence, rather than substantial evidence was the correct standard for management to apply at the administrative level in conduct cases under [§]714."[6] The Court explained that when determining whether conduct justified discipline under §714, preponderance of the evidence was the correct evidentiary burden, and the MSPB's standard of review should be substantial evidence. Consequently, the Court found that VA had applied the wrong evidentiary standard in its §714 conduct cases. The Court held in August 2021 that VA and MSPB must apply the *Douglas Factors* in deciding and reviewing the imposed penalty.[7]

By subjecting management's decisions to additional scrutiny, the Court demonstrated VA's overreach in its use of the Accountability Act. The use of §714 has proven to have had its greatest impact on lower-level employees, many of whom are veterans themselves, compounding a chronic staffing crisis while doing little to address systemic problems such as inadequate training and hostile managers. Thus, while the reviewing arbitrators, Administrative Law Judges, and Federal Circuit Judges have done much to curtail VA's broad interpretation of the law, the law itself must be amended if it is to accomplish its stated goal of improving systemic flaws in the Agency.

Furthermore, in the recent case *Richardson v. Department of Veterans Affairs*, the MSPB further limited the applicability of the law.[8] In *Richardson*, the MSPB ruled that an employee appointed under 38 U.S.C 7401(3), a "hybrid" Title 38/Title 5 employee, could not be terminated

---

[6] *Ariel Rodriguez v. Department of Veterans Affairs*, 8 F.4th 1290 (Fed. Cir.) (2021).
[7] *Stephen Connor v. Department of Veterans Affairs*, 8 F.4th 1319 (Fed. Cir.) (2021).
[8] *Richardson v. Department of Veterans Affairs*, Docket No. AT-0714-21-0109-I-1 (MSPB) (2023).

54

under §714 as the text of 38 U.S.C. 7403(f)(3) dictated its reliance on "the procedures" of chapter 75 of Title 5.[9]

As a result of these and other legal rulings and determinations, the VA announced on March 5, 2023, that the VA will prospectively "cease using the provisions of 38 U.S.C. § 714 to propose new adverse actions against employees of the Department of Veterans Affairs (VA), effective April 3, 2023."

**Specific Objections to the "Restore Department of Veterans Affairs Accountability Act"**

In response to the court rulings since the enactment of the Accountability Act, H.R. S. 2158 the "Restore Department of Veterans Affairs Accountability Act" was introduced to reverse these decisions and expand the powers of the original Accountability Act. AFGE strongly objects to several provisions in the bill that will infringe upon the rights of VA employees, and harm recruitment and retention:

**Abrogation of the Collective Bargaining Agreement**

On Page 14, line 22 of the legislation, the bill states "[t]he procedure in this section shall supersede any collective bargaining agreement to the extent that such agreement is inconsistent with such procedures." The VA workforce is second largest workforce in the federal government, second only to the Department of Defense. AFGE is proud to represent more than 300,000 bargaining unit employees at VA, making the union contract that was signed by AFGE and Secretary McDonough on August 8, 2023, the largest collective bargaining agreement in the government. To say that any procedures that were meticulously negotiated at the bargaining

_____

[9] *Id.*

8

55

table in this and prior contracts are now out the window is grossly unfair, as both parties compromised to arrive at this agreement given the state of the law at the time. This would also provide the VA the opportunity to cease using Performance Improvement Plans (PIPs) prior to disciplining an employee for performance, which is a common practice within the federal workforce. Additionally, while members of both parties proudly support rank and file union members at other agencies and in the private sector, including law enforcement officers, firefighters, electricians, and plumbers, the choice to hold these employees at the VA to a standard not used for similarly situated employees at other departments is unnecessary, and only serves to dissuade potential employees from working at the VA when they could similar if not identical jobs with better protections at another agency.

**Reinforcing the Use of the "Substantial Evidence Standard"**

38 U.S.C. § 714 established by the Accountability Act mandates that the MSPB uphold management's decision to remove, demote, or suspend an employee if the decision is supported by substantial evidence. While not defined in the law, management guidance defined substantial evidence as "relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree, or evidence that a reasonable mind would accept as adequate to support a conclusion."

As discussed in *Rodriguez v. Dep't of Veterans Affairs*, VA improperly read §714 to mean that its burden of proof at the administrative level in justifying discipline was lowered to the substantial evidence standard. The Federal Circuit disagreed with the Agency's position, finding that the Agency conflated burden of proof and standard of review. Consequently, the Court found that the VA still had to meet the preponderance of the evidence burden of proof in its decision to discipline for conduct.

9

56

With the proposed text on Page 12, lines four through 10, the bill is plainly trying to overturn *Rodriguez v. Dep't of Veterans Affairs*, and force the VA, even in cases where the balance of evidence favors the employee, the opportunity if not obligation to dismiss the employee.  This is especially prevalent in "he said, she said" cases based on allegations of misconduct.  For example, if 10 individuals were witnesses to an incident and seven sided with the employee's story, but three sided with the VA's, the VA would meet its burden under "Substantial Evidence" and could dismiss the employee.  This is unfair and deprives VA employees of the same protections enjoyed in other departments in the federal government.

**Restating the MSPB's Inability to Mitigate Unreasonable Penalties**

Under current statute established by the Accountability Act, the law provides that where the Agency's decision is supported by substantial evidence, the MSPB or an arbitrator may not mitigate the penalty. Thus, the MSPB or an arbitrator could only reverse an Agency decision it determined was unreasonable. MSPB had an extremely high rate of affirming Agency decisions even before the enactment of the Accountability Act. MSPB's affirmance rate of VA decisions was 83.7 percent, of the years recorded since, 2019 was the highest rate of affirmance at 89.44 percent. Few cases were mitigated prior to 2017, however, mitigation was available to reviewing entities, saving the time of sending back a case, causing needless delay.

The text on page 14, lines seven through 10 of the legislation is a doubling down on a bad policy of letting the MSPB or a third-party arbitrator from righting obvious abuses by the VA. Not only should this provision be stricken, but the ability to mitigate a penalty should be restored to the MSPB.  This change would ensure fair determinations and restore basic notions of due process and fairness to the workforce by treating similarly situated employees in a consistent manner.

10

57

**Limiting the Use of the Douglas Factors**

*Connor v. Department of Veterans Affairs*, spoke to the issue of mitigation. In that case, on appeal, the MSPB sustained only one of the 27 charges against the employee. On appeal to the Federal Circuit, the Agency argued it need not consider the *Douglas Factors* in §714 proceedings. [10]  In its ruling, the Court ruled that the "[t]here is no basis for the government's argument that the statutory ban on penalty mitigation by the Board eliminated the obligation to consider and apply the Douglas factors."[11]  In response to this, the "Restore Department of Veterans Affairs Accountability Act" would require that only five of the Douglas Factors be considered when determining the reasonability of discipline, but goes out of its way to actively exclude the other seven Douglas Factors.  This is counter to the opinion in *Connor*, where the court referenced *Douglas v. Veterans Administration* and wrote while citing to *Douglas* "While not all of the factors will be pertinent to every case, the Board in Douglas explained that the agency must 'consider the relevant factors' and 'strike a responsible balance' in selecting a penalty."[12]  In turn, by excluding seven "Douglas Factors" the legislation goes out of its way exclude reasonable reasons why an employee should have a penalty reduced, including the sixth Douglas Factor which considers "consistency of the penalty with those imposed upon other employees for the same or similar offenses."[13]  AFGE urges that every deciding official and third party adjudicator have the obligation to consider all 12 Douglas Factors that may be relevant, not just the five which the bill considers important.  Not only should the agency be required to use

---

[10] Stephen *Connor v. Department of Veterans Affairs*, 8 F.4th 1319 (Fed. Cir.) (2021).
[11] *Id.*
[12] Stephen *Connor v. Department of Veterans Affairs*, 8 F.4th 1319 (Fed. Cir.) (2021); *Douglas v. Veterans Administration*, 5  M.S.P.B. 313 (1981) at 332-33.
[13] *Id.*

11

58

the Douglas factors, but appellate bodies should be able to review the agency's appropriate consideration of these factors governing the severity of discipline.

**Retroactive Application of the Bill**

Beyond each of the individual policy objections AFGE has with the bill, the text proposed on page 15, lines one through five stating that "[t]his section shall apply to any performance or misconduct of a covered individual beginning on the date of enactment of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41)." Considering the significant discipline and litigation that has occurred over the past six years, the idea that old disciplinary actions, including the possibility of those already resolved could now be subject to new rules after the fact only creates more tumult for a workforce that has had its fill. Retroactivity is not only unjust but creates chaos and should be stricken.

AFGE opposes S. 2158, the "Restore Department of Veterans Affairs Accountability Act" in the strongest possible terms.


**S. 2679, the "Leadership, Engagement, Accountability, and Development (LEAD) Act of 2023"**

AFGE appreciates the bi-partisan approach that Chairman Tester, Ranking Member Moran, and Senator Rounds took with the introduction of S. 2679, the "Leadership, Engagement, Accountability, and Development (LEAD) Act of 2023." This bi-partisan bill creates a number of opportunities for the Senate Committee on Veterans' Affairs to pursue oversight of the VA on the way it manages and disciplines its employees.

12

59

AFGE supports of Section 101 of the bill which will improve training on how to process
adverse actions against employees at VA.  If managers are appropriately trained on how to
correctly implement discipline at the VA, including on how to correctly address issues related to
due process, civil service protections, and collective bargaining agreements, the VA will make
fewer mistakes in future, and lessen the number of appeals and ensuing litigation.  This will
better serve the VA, employees, and the veterans they serve.

In addition, AFGE approves of many of the studies and reports that the bill requires to
help the Congress perform its oversight function and craft legislation to improve the VA in the
future.

**Conclusion**

AFGE thanks the Senate Committee on Veterans' Affairs for the opportunity to submit a
Statement for the Record for today's hearing.  AFGE stands ready to work with the committee
and the VA to address the workforce issues currently facing the department and find solutions
that will enable VA employees to better serve our nation's veterans.

# Exhibit D

https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-in-windham-new-hampshire/630830

Sadly, Crooked Joe Biden and that's what he is. He's a stone cold thief. Crooked Joe Biden has been a disaster for American veterans. As one of his first acts in office Biden gutted my historic VA reforms. He gutted them out making it easier to remove bad VA employees from the job. And in a shocking act of betrayal of America's veterans, as well as the tens of thousands of dedicated professionals, and you do have great professionals at the VA, Crooked Joe Biden is in the process of not removing people but reinstating 5,000 of the 10,000 people that we fired, who were fired for good reason, including sadism and this, who were fired for very good reasons and they want to give them back their full pay, they want to give them their jobs back. And we were very careful about that. We didn't get rid of people haphazardly. We got rid of people that were not doing their job. Some really in bad cases and some they just weren't doing their job. They didn't care, they didn't show up to work and he wants to put at least half of them back the same people and it'll cost over $200 million to do that. I'd rather give the money to you directly. It's a lot better. It's amazing. I, I mean, it's amazing. It breaks your heart, it breaks your heart. That was such a big thing and now they want to put a lot of those people back. Joe Biden puts bureaucrats first. I put veterans first and I put America first. Thank you. Thank you very much. Thank you. Thank you very much. That's why today I'm announcing a number of specific actions I'll take to fulfill our sacred duty to our great American veterans. On day one of my new administration, I will fully restore the use of VA accountability. We're going to bring it back in full force. Full force. And we already have the legislation passed. So I don't have to go through Congress, which really, that's why it took 52 years because they couldn't get it passed. But we have it passed. All we have to do is make it work. So we have the, the hardest part is done and direct my Secretary of Veterans Affairs to fire every corrupt VA bureaucrat who Joe Biden is outrageously refused to remove from the job or put, or put back in the job. Then instead of providing more than $200 million in back pay to VA workers like Biden is doing, I will ask Congress to take every penny of those funds to finally build a brand new state of the art VA hospital right here in the great state of New Hampshire.

# Exhibit E

# Presidential Documents

Executive Order 14251 of March 27, 2025

## Exclusions From Federal Labor-Management Relations Programs

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 7103(b)(1) of title 5 and 4103(b) of title 22, United States Code, to enhance the national security of the United States, it is hereby ordered:

**Section 1**. *Determinations.* (a) The agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.

(b) The agency subdivisions set forth in section 3 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations.

**Sec. 2**. *Additional National Security Exclusions.* Executive Order 12171 of November 19, 1979, as amended, is further amended by:

(a) In section 1–101, adding ''and Section 1–4'' after ''Section 1–2'' in both places that term appears.

(b) Adding after section 1–3 a new section 1–4 that reads:

''1–4. *Additional Exclusions.*

1–401. The Department of State.

1–402. The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'

1–403. The Department of the Treasury, except the Bureau of Engraving and Printing.

1–404. The Department of Veterans Affairs.

1–405. The Department of Justice.

1–406. Agencies or subdivisions of the Department of Health and Human Services:

(a) Office of the Secretary.

(b) Food and Drug Administration.

(c) Centers for Disease Control and Prevention.

(d) Administration for Strategic Preparedness and Response.

(e) Office of the General Counsel.

(f) Office of Refugee Resettlement, Administration for Children and Families.

(g) National Institute of Allergy and Infectious Diseases, National Institutes of Health.

1–407. Agencies or subdivisions of the Department of Homeland Security:

(a) Office of the Secretary.

(b) Office of the General Counsel.

(c) Office of Strategy, Policy, and Plans.

(d) Management Directorate.

(e) Science and Technology Directorate.

(f) Office of Health Security.

(g) Office of Homeland Security Situational Awareness.

(h) U.S. Citizenship and Immigration Services.

(i) United States Immigration and Customs Enforcement.

(j) United States Coast Guard.

(k) Cybersecurity and Infrastructure Security Agency.

(l) Federal Emergency Management Agency.

1–408. Agencies or subdivisions of the Department of the Interior:

(a) Office of the Secretary.

(b) Bureau of Land Management.

(c) Bureau of Safety and Environmental Enforcement.

(d) Bureau of Ocean Energy Management.

1–409. The Department of Energy, except for the Federal Energy Regulatory Commission.

1–410. The following agencies or subdivisions of the Department of Agriculture:

(a) Food Safety and Inspection Service.

(b) Animal and Plant Health Inspection Service.

1–411. The International Trade Administration, Department of Commerce.

1–412. The Environmental Protection Agency.

1–413. The United States Agency for International Development.

1–414. The Nuclear Regulatory Commission.

1–415. The National Science Foundation.

1–416. The United States International Trade Commission.

1–417. The Federal Communications Commission.

1–418. The General Services Administration.

1–419. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

(a) Office of the Chief Information Officer.

(b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

1–499. Notwithstanding the forgoing, nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code:

(a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons;

(b) subdivisions of the United States Marshals Service not listed in section 1–209 of this order; or

(c) any subdivisions of the Departments of Defense or Veterans Affairs for which the applicable Secretary has issued an order suspending the application of this section pursuant to section 4 of the Executive Order

of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.' ''

**Sec. 3.** *Foreign Service Exclusions.* Executive Order 12171, as amended, is further amended by:

(a) In the first paragraph:

(i) adding "and Section 4103(b) of Title 22," after "Title 5"; and

(ii) adding "and Subchapter X of Chapter 52 of Title 22" after "Relations Program."

(b) Adding after section 1–102 a new section 1–103 that reads:

''1–103. The Department subdivisions set forth in section 1–5 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations. The subdivisions set forth in section 1–5 of this order are hereby excluded from coverage under Subchapter X of Chapter 52 of title 22, United States Code.''

(c) Adding after the new section 1–4 added by section 2(b) of this order a new section 1–5 that reads:

''1–5. Subdivisions of Departments Employing Foreign Service Officers. 1–501. Subdivisions of the Department of State:

(a) Each subdivision reporting directly to the Secretary of State.

(b) Each subdivision reporting to the Deputy Secretary of State.

(c) Each subdivision reporting to the Deputy Secretary of State for Management and Resources.

(d) Each subdivision reporting to the Under Secretary for Management.

(e) Each subdivision reporting to the Under Secretary for Arms Control and International Security.

(f) Each subdivision reporting to the Under Secretary for Civilian Security, Democracy, and Human Rights.

(g) Each subdivision reporting to the Under Secretary for Economic Growth, Energy, and Environment.

(h) Each subdivision reporting to the Under Secretary for Political Affairs.

(i) Each subdivision reporting to the Under Secretary for Public Diplomacy.

(j) Each United States embassy, consulate, diplomatic mission, or office providing consular services.

1–502. Subdivisions of the United States Agency for International Development:

(a) All Overseas Missions and Field Offices.

(b) Each subdivision reporting directly to the Administrator.

(c) Each subdivision reporting to the Deputy Administrator for Policy and Programming.

(d) Each subdivision reporting to the Deputy Administrator for Management and Resources.''.

**Sec. 4.** *Delegation of Authority to the Secretaries of Defense and Veterans Affairs.* (a) Subject to the requirements of subsection (b) of this section, the Secretaries of Defense and Veterans Affairs are delegated authority under 5 U.S.C. 7103(b)(1) to issue orders suspending the application of section 1–402 or 1–404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.

(b) An order described in subsection (a) of this section shall only be effective if:

(i) the applicable Secretary certifies to the President that the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations; and

(ii) such certification is submitted for publication in the *Federal Register* within 15 days of the date of this order.

Sec. 5. *Delegation of Authority to the Secretary of Transportation.* (a) The national security interests of the United States in ensuring the safety and integrity of the national transportation system require that the Secretary of Transportation have maximum flexibility to cultivate an efficient workforce at the Department of Transportation that is adaptive to new technologies and innovation. Where collective bargaining is incompatible with that mission, the Department of Transportation should not be forced to seek relief through grievances, arbitrations, or administrative proceedings.

(b) The Secretary of Transportation is therefore delegated authority under section 7103(b) of title 5, United States Code, to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration, from Federal Service Labor-Management Relations Statute coverage or suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia. This authority may not be further delegated. When making the determination required by 5 U.S.C. 7103(b)(1) or 7103(b)(2), the Secretary of Transportation shall publish his determination in the *Federal Register*.

Sec. 6. *Implementation.* With respect to employees in agencies or subdivisions thereof that were previously part of a bargaining unit but have been excepted under this order, each applicable agency head shall, upon termination of the applicable collective bargaining agreement:

(a) reassign any such employees who performed non-agency business pursuant to section 7131 of title 5 or section 4116 of title 22, United States Code, to performing solely agency business; and

(b) terminate agency participation in any pending grievance proceedings under section 7121 of title 5, United States Code, exceptions to arbitral awards under section 7122 of title 5, United States Code, or unfair labor practice proceedings under section 7118 of title 5 or section 4116 of title 22, United States Code, that involve such employees.

Sec. 7. *Additional Review.* Within 30 days of the date of this order, the head of each agency with employees covered by Chapter 71 of title 5, United States Code, shall submit a report to the President that identifies any agency subdivisions not covered by Executive Order 12171, as amended:

(a) that have as a primary function intelligence, counterintelligence, investigative, or national security work, applying the definition of "national security" set forth by the Federal Labor Relations Authority in Department of Energy, Oak Ridge Operations, and National Association of Government Employees Local R5–181, 4 FLRA 644 (1980); and

(b) for which the agency head believes the provisions of Chapter 71 of title 5, United States Code, cannot be applied to such subdivision in a manner consistent with national security requirements and considerations, and the reasons therefore.

Sec. 8. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

**Federal Register** / Vol. 90, No. 63 / Thursday, April 3, 2025 / Presidential Documents    **14557**

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 27, 2025.*

[FR Doc. 2025–05836
Filed 4–2–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit F

# Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements

whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements

March 28, 2025

[Fact Sheets](#)

The White House

March 27, 2025

**PROTECTING OUR NATIONAL SECURITY:** Today, President Donald J. Trump signed an Executive Order using authority granted by the Civil Service Reform Act of 1978 (CSRA) to end collective bargaining with Federal unions in the following agencies with national security missions:

- ***National Defense.*** Department of Defense, Department of Veterans Affairs (VA), the National Science Foundation (NSF), and Coast Guard.
  - VA serves as the backstop healthcare provider for wounded troops in wartime.
  - NSF-funded research supports military and cybersecurity breakthroughs.
- ***Border Security.*** Department of Homeland Security (DHS) leadership components, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, the Department of Justice's (DOJ) Executive Office of Immigration Review, and the Office of Refugee Resettlement within the Department of Health and Human Services (HHS).
- ***Foreign Relations.*** Department of State, U.S. Agency for International Development, Department of Commerce's International Trade Administration, and U.S. International Trade Commission.

  President Trump has demonstrated how trade policy is a national security tool.
- ***Energy Security.*** Department of Energy, Nuclear Regulatory Commission, Environmental Protection Agency, and Department of Interior units that govern domestic energy production.

  The same Congress that passed the CSRA declared that energy insecurity threatens national security.

- ***Pandemic Preparedness, Prevention, and Response.*** Within HHS, the Secretary's
  Office, Office of General Counsel, Centers for Disease Control and Prevention,
  Administration for Strategic Preparedness and Response, Food and Drug
  Administration, and National Institute of Allergy and Infectious Diseases. In the
  Department of Agriculture, the Office of General Counsel, Food Safety and Inspection
  Service, and Animal and Plant Health Inspection Service.
    - COVID-19 and the recent bird flu have demonstrated how foreign pandemics
      affect national security.
    - VA is also a backstop healthcare provider during national emergencies, and
      served this role during COVID-19.
- ***Cybersecurity.*** The Office of the Chief Information Officer in each cabinet-level
  department, as well as DHS's Cybersecurity and Infrastructure Security Agency, the
  Federal Communications Commission (FCC), and the General Services Administration
  (GSA).
    - The FCC protects the reliability and security of America's telecommunications
      networks.
    - GSA provides cybersecurity related services to agencies and ensures they do not
      use compromised telecommunications products.
- ***Economic Defense.*** Department of Treasury.
    The Federal Labor Relations Authority (FLRA) defines national security to include
    protecting America's economic and productive strength. The Treasury
    Department collects the taxes that fund the government and ensures the stable
    operations of the financial system.
- ***Public Safety.*** Most components of the Department of Justice as well as the Federal
  Emergency Management Agency.
- ***Law Enforcement Unaffected***. Police and firefighters will continue to collectively
  bargain.

**ENSURING THAT AGENCIES OPERATE EFFECTIVELY:** The CSRA enables hostile
Federal unions to obstruct agency management. This is dangerous in agencies with national
security responsibilities:

- Agencies cannot modify policies in collective bargaining agreements (CBAs) until they
  expire.
    The outgoing Biden Administration renegotiated many agencies' CBAs to last
    through President Trump's second term.
- Agencies cannot make most contractually permissible changes until after finishing
  "midterm" union bargaining.
    For example, the FLRA ruled that ICE could not modify cybersecurity policies
    without giving its union an opportunity to negotiate, and then completing midterm
    bargaining.

- Unions used these powers to block the implementation of the VA Accountability Act; the Biden Administration had to offer reinstatement and backpay to over 4,000 unionized employees that the VA had removed for poor performance or misconduct.

**SAFEGUARDING AMERICAN INTERESTS:** President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.
     The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
     For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.
- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.
- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

# Exhibit G

*Estimated Total Annual Burden Hours:* 6 hours.

The following paragraph applies to all the collections of information covered by this notice.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number. Books or records relating to a collection of information must be retained if their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

*Request for Comments:* Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval. All comments will become a matter of public record. Comments are invited on: (a) whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology; and (e) estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to provide information.

Approved: April 11, 2025.

**Kerry L. Dennis,**

*Tax Analyst.*

[FR Doc. 2025–06493 Filed 4–16–25; 8:45 am]

**BILLING CODE 4830–01–P**

# DEPARTMENT OF VETERANS AFFAIRS

## Order Suspending the Application of Section 1–402 or 1–404 of Executive Order 12171

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Notice.

**SUMMARY:** An Executive Order (E.O.), issued on March 27, 2025, provides the Secretary of the Department of Veterans Affairs (VA) with delegated authority to suspend the application of sections of a separate Executive Order to any subdivision of the VA that he supervises, thereby bringing those subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.

**DATES:** This suspension is effective upon publication.

**FOR FURTHER INFORMATION CONTACT:** Tracey Therit, Chief Human Capital Officer, Office of Human Resources and Administration/Operations, Security and Preparedness, Department of Veterans Affairs, 810 Vermont Ave. NW, Room 265, Washington, DC, Office: (202) 461–0235, Mobile: (202) 359–8960.

**SUPPLEMENTARY INFORMATION:** Pursuant to the authority provided to the Secretary of the VA in section 4 of E.O. 14251, *Exclusions from Federal Labor-Management Relations Programs,* the VA suspends the application of section 1–402 or 1–404 of Executive Order 12171, as amended, for employees represented by Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI; International

Association of Fire Fighters (IAFF–99) at the VA Medical Center, Little Rock, AR; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI thereby bringing such employees under the coverage of the Federal Service Labor-Management Relations Statute. The Secretary specifically concurs with the President's determinations as set forth in Executive Order 14251 Section 1(b). Specifically, the Secretary agrees the Department of Veterans Affairs has as a primary function national security work, and the requirements of Chapter 71 of title 5 cannot be applied to its operations consistent with national security requirements and considerations.

### Signing Authority

Douglas A. Collins, Secretary of Veterans Affairs, approved this document on April 11, 2025, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Michael P. Shores,**

*Director, Office of Regulation Policy & Management, Office of General Counsel, Department of Veterans Affairs.*

[FR Doc. 2025–06566 Filed 4–16–25; 8:45 am]

**BILLING CODE 8320–01–P**

# Exhibit H

# VA is selectively enforcing Trump's order stripping workers of union rights

G  govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694

Erich Wagner                                                                    April 18, 2025



Doug Collins speaks at his VA secretary confirmation hearing in front of the Senate's Veterans Affairs Committee in Washington, DC, United States on Jan. 21, 2025 Nathan Posner / Anadolu / Getty Image

[Workforce](#)

## VA Secretary Doug Collins this week issued a notice allowing employees at the department whose unions have not been involved with lawsuits against the Trump administration to retain their collective bargaining rights.

*Updated April 19 at 10:34 a.m. ET*

The nation's largest federal employee union reiterated its allegations that the Trump administration is retaliating against labor groups for challenging its workforce actions in court, after the Veterans Affairs Department moved to exempt a few small unions from a policy stripping two-thirds of the federal workforce of their collective bargaining rights.

Last month, President Trump signed an executive order citing a rarely used provision of the 1978 Civil Service Reform Act to declare wide swathes of the federal government ineligible for collective bargaining under the guise of national security. In addition to the Defense and

Homeland Security departments, Trump outlawed unions at agencies as far-flung as the Environmental Protection Agency and the Federal Communications Commission.

Prior to Trump's action last month, the CSRA's national security exemption applied almost exclusively to the intelligence community and some federal law enforcement. Since the edict, the administration and unions have traded lawsuits over the policy, and federal payroll processors surreptitiously ceased collecting union dues from employees' paychecks last week.

In a notice filed to the Federal Register Thursday, VA Secretary Doug Collins said that he "concurred" with the president that his department, whose mission is to provide health care and other support services to former military service members,  "has as a primary function national security work" precluding employees from having collective bargaining rights.

But the same notice, without explanation, exempts eight small labor groups within the VA from Trump's edict, effectively allowing them to retain their collective bargaining rights. Those unions include the Laborers International Union of North America, the Western Federation of Nurses and Health Professionals, the Veterans Affairs Staff Nurse Council Local 5032 in Wisconsin, the International Association of Firefighters in Arkansas, the Teamsters Union Local 115 in Pennsylvania and the International Association of Machinists and Aerospace Workers in Hawaii.

While Trump's order exempts law enforcement and firefighter unions from losing their collective bargaining rights, that exception would apply only to the IAFF local.

The American Federation of Government Employees said these exemptions are further evidence that the edict was retaliation for unions suing the administration to block various workforce policies and actions, from the Deferred Resignation Program and the mass firing of probationary workers to legal challenges seeking to block the closure of the U.S. Agency for international Development, the Consumer Financial Protection Bureau, as well as the reinstitution of Schedule F.

All of VA's unions that were not listed among Collins' exemptions, including AFGE, the National Federation of Federal Employees, the National Association of Government Employees, the Service Employees International Union and National Nurses United, have been engaged in at least one legal challenge against the administration's workforce policies.

"AFGE members at the VA, a third of whom are veterans themselves, have exercised their union rights through wars, terrorist attacks, a global pandemic and the entirety of Trump's first term without incident," said AFGE National President Everett Kelley. "[This] has nothing to do with national security and everything to do with retaliation against AFGE, the independent labor movement in America, and the veterans we serve at the VA. That's made clear by Secretary Collins' absurd, preposterous claim that AFGE-represented cemetery

workers, housekeepers, cooks, mechanics, nurses and other health care employees are engaged in national security work, but those same groups of employees represented by other unions are not."

In a statement, VA spokesman Pete Kasperowicz seemingly confirmed that the larger unions are being targeted for their lawsuits.

"The unions in the exempted units have posed no or minimal hinderance to VA operations," he said. "They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency."

AFGE's outcry comes as more lawmakers on both sides of the aisle emerged to criticize the effort to bust most federal employee unions. In a letter Thursday, Sens. Brian Schatz, D-Hawaii, Susan Collins, R-Maine, Lisa Murkowski, R-Alaska, and Mark Warner, D-Va., urged the president to rescind the order.

"In many federal agencies, collective bargaining has served to strengthen and advance the mission of the agency by providing a structured channel for communication and addressing employee concerns," they wrote. "The presence of collective bargaining rights has created a more stable and productive workforce and has allowed the federal government to better meet the needs of our constituents. Further, sudden changes to labor-management relations are disruptive to the work of the federal workforce and will result in the loss of valuable federal workers with knowledge and skills critical to completing their respective agency's missions."

**How are these changes affecting you? Share your experience with us:**
**Eric Katz:** ekatz@govexec.com, Signal: erickatz.28
ewagner@govexec.com; Signal: ewagner.47

# Exhibit I

An official website of the United States government    Here's how you know ⌄

Talk to the Veterans Crisis Line now ›

VA.gov    Locations    Business    VA Careers    Contact Us

**VA** | News

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# VA terminates union contracts for most bargaining-unit employees

FOR IMMEDIATE RELEASE

August 6, 2025  3:35 pm

**The move will ensure VA stays focused on Veterans instead of spending millions of taxpayer dollars and approximately 750,000 hours per year on union activities**

WASHINGTON — The U.S. Department of Veterans Affairs today announced the termination of collective bargaining agreements for most VA bargaining-unit employees, a move that will make it easier for VA leaders to promote high-performing employees, hold poor performers accountable, and improve benefits and services to America's Veterans.

The announcement comes in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs. In accordance with the same EO, VA on April 25 stopped withholding union dues from most employees' paychecks.

VA today notified the following unions that, effective immediately, pursuant to the EO their contracts with VA have been terminated for most bargaining-unit employees: American Federation of Government Employees, AFL-CIO (AFGE); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU).

Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions will remain in place, as those occupations are exempt from the EO.

This decision is good news for Veterans, families, caregivers and survivors for several reasons:

• VA staff will spend more time with Veterans: In 2024 alone, over 1,900 VA bargaining-unit employees spent more than 750,000 hours of work on taxpayer funded union time – including some who are paid more than $200,000 a year. With no collective bargaining obligations, those hours can now be used to serve Veterans instead of union bosses.
• VA facilities can focus on treating Veterans instead of hosting unions: More than 187,000 square feet of VA's office and clinical space is currently being used by union representatives, free of charge. This has cost VA millions of dollars in lost rent and expenses for union bosses' government phones and computer equipment. Today's decision will ensure VA facilities are fully focused on helping Veterans get the care and benefits they've earned, instead of serving as free regional offices for unions that oppose our efforts to improve VA.
• VA can manage its staff according to Veterans' needs, not union demands: Labor contracts have restricted managers' ability to hire, promote and reward high-performing employees, hold poor performers accountable and implement reforms to better serve Veterans. Today's decision frees VA managers to act in the best interests of Veterans rather than union bosses.

"Too often, unions that represent VA employees fight against the best interests of Veterans while protecting and rewarding bad workers," said VA Secretary Doug Collins. "We're making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform."

Background
VA-employee unions have repeatedly opposed significant, bipartisan VA reforms and rewarded bad employees for misconduct. Examples include:
• AFGE, NFFE opposed the MISSION Act, a law that makes it easier for Veterans to get health care.
• NFFE supports rescinding the VA Accountability and Whistleblower Protection Act,

a law designed to protect whistleblowers and hold employees accountable for misconduct.

• AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term.

 Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov

 Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA

 Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question

 Subscribe today to receive these news releases in your inbox.

**Topics**    bargaining-unit    union contracts

**LET OTHERS KNOW ABOUT THIS**

    

## More from the Press Room

NEWS RELEASES    SEPTEMBER 10, 2025

**VA dedicates new Southern Utah National Cemetery**

VA dedicates the Southern Utah National Cemetery in Cedar City, Utah.

NEWS RELEASES    SEPTEMBER 8, 2025

**VA cemeteries to hold national day of service and remembrance marking the 24th anniversary of 9/11**

Department of Veterans Affairs national cemeteries will host a day of service and remembrance to honor victims of the 9/11 attacks on Sept. 11, also known as Patriot Day.

NEWS RELEASES    AUGUST 29, 2025

**VA earns top scores in latest CMS hospital ratings report**

More than three-fourths of Department of Veterans Affairs hospitals that received an Overall Hospital Quality Star Rating earned four-or-five-star ratings as part of the Centers for Medicare and Medicaid Services 2025 hospital quality ratings.

Last updated August 6, 2025

  U.S. Department of Veterans Affairs

U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

VA News

An official website of the U.S. Department of Veterans Affairs

VA.gov
ChooseVA
DiscoverVA
DigitalVA
VA Outreach Events

VA Publications
About VA
VA mobile apps
Accessibility at VA
No FEAR Act data

Office of the Inspector General
VA plans, budget, finances, and performance
Agency Financial Report
Privacy policy
FOIA requests

Disclaimers
Open data
Vulnerability disclosure policy
Copyright policy

VA Forms                                    Whistleblower Protection

Looking for U.S. government information and services? Visit USA.gov

# Exhibit J

🇺🇸 An official website of the United States government   Here's how you know ⌄

🟥 **Talk to the Veterans Crisis Line now** ❯

VA.gov    Locations    Business    VA Careers    Contact Us

**VA** | News

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# VA redirects millions in wasteful union spending back to Veterans

FOR IMMEDIATE RELEASE

August 22, 2025   9:45 am

## VA spent more than $45 million supporting union activities in 2024. Resources will now be spent on care and services for Veterans

**WASHINGTON** — The Department of Veterans Affairs is redirecting tens of millions of dollars in taxpayer funds away from subsidizing federal unions and back to the Veterans, families, caregivers and survivors VA serves.

On Aug. 6th, VA announced the termination of union contracts for most bargaining-unit employees, reducing the number of VA bargaining unit employees from about 375,000 down to about 7,000. As a result of that decision, VA is redirecting nearly $45 million per year in federal funds from unions to America's Veterans by:

- **Generally ending taxpayer-funded union time:** In 2024, VA spent $39.75 million by allowing 1,961 VA employees to spend nearly 750,000 hours working on behalf of government unions rather than VA beneficiaries.
  - The vast majority of these employees are now back working full time for VA in the positions they were hired to do – rather than performing work on behalf of the union. This includes more than 1,000 employees serving Veterans in direct patient-care roles.
- **Reclaiming VA office space:** VA has reclaimed over 180,000 square feet of office space worth approximately $5.4 million that had been provided to unions free of charge. This space will be repurposed to serve VA beneficiaries. VA will use this reclaimed space to expand administrative and clinical services in several facilities across the country.
- **Reclaiming VA IT equipment:** Since Aug. 6, VA has reclaimed from union representatives more than 2,000 pieces of IT equipment worth approximately $600,000, which VA had been providing free of charge.

There are many egregious examples of how taxpayer-funded union time enabled senior, skilled VA staff to collect taxpayer-funded salaries for doing union business instead of working on behalf of Veterans. In FY24, the following VA employees were on taxpayer-funded union time, performing work for unions instead of providing care for Veterans:

- More than 1,000 VA employees in direct patient-care roles.
- Six registered nurses who collectively earned nearly $1.2 million per year in wages and benefits.
- Five attorneys who collectively earned $1.25 million per year.
- Four pharmacists who collectively earned more than $700,000 per year.
- One physician's assistant who earned $225,000 per year.
- One Veterans claims examiner who earned $190,000 per year.

Under President Trump, VA is bringing tens of thousands of employees back to the office, where they can work better as a team to serve Veterans. Now VA employees will have hundreds of thousands more square feet of office space in which to work, including at:

- The Salem VA Medical Center, where union leadership relinquished control of a


⬆ Top

7,500 square foot office space that encompassed the entire wing of a building.

- The James H. Quillen VA Medical Center in Tennessee, where union leadership relinquished control of a 3,800 square foot office space.
- Eleven other VA medical facilities across the country, where union leadership relinquished control of offices larger than 2,000 square feet apiece.

"VA staff will now get to spend more time with Veterans, VA facilities can focus on treating Veterans, and VA can manage its staff according to Veterans' needs and national security requirements, not union demands," **said VA secretary Doug Collins.**

---

 Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov

 Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA

 Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question

 Subscribe today to receive these news releases in your inbox.



Topics    Benefits    federal unions    Health Care    taxpayer

---

**LET OTHERS KNOW ABOUT THIS**

    

## More from the Press Room

NEWS RELEASES    NOVEMBER 20, 2025

### VA provides Veterans relief from Biden-era backlogged medical bills

VA relieves Veterans of more than $272 million in potential medical bills that accrued after the Biden Administration stopped certain copayment claims processing and collections in early 2023.

NEWS RELEASES    NOVEMBER 20, 2025

### VA extends caregiver support program eligibility for "legacy" Veterans, caregivers

VA extends Program of Comprehensive Assistance for Family Caregivers eligibility for certain Veterans and their family caregivers through Sept. 30, 2028.

NEWS RELEASES    NOVEMBER 19, 2025

### VA pulls the plug on Biden's $77M EV-charger earmark

VA terminates a Biden-Administration mandate to spend $77 million on electric vehicle charging stations at VA facilities.

Last updated August 22, 2025

 

**U.S. Department of Veterans Affairs**

VA | of Veterans Affairs

810 Vermont Ave., NW
Washington, DC 20420

1-800-698-2411

**VA** News

**An official website of the U.S. Department of Veterans Affairs**

VA.gov

ChooseVA

DiscoverVA

DigitalVA

VA Outreach Events

VA Forms

VA Publications

About VA

VA mobile apps

Accessibility at VA

No FEAR Act data

Whistleblower Protection

Office of the Inspector General

VA plans, budget, finances, and performance

Agency Financial Report

Privacy policy

FOIA requests

Disclaimers

Open data

Vulnerability disclosure policy

Copyright policy

Looking for U.S. government information and services? Visit USA.gov

# Exhibit K

🇺🇸 An official website of the United States government  Here's how you know ⌄

🔴 ⊞ Talk to the Veterans Crisis Line now  ›

VA.gov    Locations    Business    VA Careers    Contact Us

**VA** | News

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# Ahead of Veterans Day, Sec. Collins vows to keep improving VA services

FOR IMMEDIATE RELEASE

November 10, 2025  10:13 am

**WASHINGTON** — VA Secretary Doug Collins released the following statement ahead of Veterans Day 2025:

"America's Veterans have made our country – and our military – the greatest in the world. On Veterans Day, we honor these patriots, celebrate them for protecting our freedoms and salute them for keeping us safe.

"Keeping the promises America has made to its Veterans is the sole purpose of the Department of Veterans Affairs. I am proud of the work we've done under President Trump to transform VA from a bureaucratic organization to a service organization, cutting red tape and placing Veterans at the center of everything we do along the way. And we're just getting started."

Key VA accomplishments during the second Trump Administration include:

- The backlog of Veterans waiting for VA benefits is down more than 49% since Jan. 20, 2025, after it increased 24% during the Biden Administration.
- VA is processing record numbers of disability claims, reaching an all-time fiscal-year high of three million claims processed by Sept. 30.
- VA has opened 20 new health care clinics, expanding access for Veterans around the country.
- Since Jan. 20, VA has offered Veterans more than 1.4 million appointments outside of normal operating hours. These early-morning, evening and weekend appointments are giving Veterans more timely and convenient options for care.
- VA is spending an additional $800 million on infrastructure improvements to ensure department facilities provide safe and effective patient care.
  - The additional funds will come from savings gleaned from various VA reform efforts.
- VA has made it easier and faster for VA-enrolled Veterans to access care from non-VA providers at the department's expense.
- VA has implemented major reforms to make it easier for survivors to get benefits, after serious problems during the Biden Administration.
- VA is accelerating the deployment of its integrated electronic health record system, after the program was nearly dormant for almost two years under the Biden Administration.
- VA partnered with the Centers for Medicare and Medicaid Services to identify and recover $106 million in duplicate billing.
- In fiscal year 2025, VA permanently housed 51,936 homeless Veterans – the most since FY2019.
- VA has brought tens of thousands of employees back to the office, where we can work better as a team to serve Veterans.
- VA has terminated union contracts for most bargaining unit employees and redirected millions in wasteful union spending back to Veterans.
- VA ended DEI at the department, reversing the divisive Biden-era policies and stopping more than $14 million in DEI spending.
- VA is phasing out treatment for gender dysphoria. Frankly, this commonsense

- VA is phasing out treatment for gender dysphoria. Frankly, this commonsense reform should have been done years ago.



Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov



Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA

Top



Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question



Subscribe today to receive these news releases in your inbox.

**Topics**    Secretary Collins

## Link Disclaimer

This page includes links to other websites outside our control and jurisdiction. VA is not responsible for the privacy practices or the content of non-VA Web sites. We encourage you to review the privacy policy or terms and conditions of those sites to fully understand what information is collected and how it is used.

### LET OTHERS KNOW ABOUT THIS

   

## More from the Press Room

NEWS RELEASES    NOVEMBER 20, 2025

### VA provides Veterans relief from Biden-era backlogged medical bills

VA relieves Veterans of more than $272 million in potential medical bills that accrued after the Biden Administration stopped certain copayment claims processing and collections in early 2023.

NEWS RELEASES    NOVEMBER 20, 2025

### VA extends caregiver support program eligibility for "legacy" Veterans, caregivers

VA extends Program of Comprehensive Assistance for Family Caregivers eligibility for certain Veterans and their family caregivers through Sept. 30, 2028.

NEWS RELEASES    NOVEMBER 19, 2025

### VA pulls the plug on Biden's $77M EV-charger earmark

VA terminates a Biden-Administration mandate to spend $77 million on electric vehicle charging stations at VA facilities.

Last updated November 10, 2025



U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

   

**VA** News

**An official website of the U.S. Department of Veterans Affairs**

VA.gov

ChooseVA

DiscoverVA

DigitalVA

VA Outreach Events

VA Forms

VA Publications

About VA

VA mobile apps

Accessibility at VA

No FEAR Act data

Whistleblower Protection

Office of the Inspector General

VA plans, budget, finances, and performance

Agency Financial Report

Privacy policy

FOIA requests

Disclaimers

Open data

Vulnerability disclosure policy

Copyright policy

Looking for U.S. government information and services?  Visit USA.gov

# Exhibit L

**Frequently Asked Questions**

**Executive Order 14251:**
**"Exclusions from Federal Labor-Management Relations Programs"**

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2: No,** agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions. Upon the conclusion of the litigation as conveyed by the White House Counsel's Office and OPM, agencies may file decertification clarifying that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. The statement should mention, and agencies should identify for the appropriate FLRA regional office, the Administration's position that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order. Under that position, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised                    of                    other                    occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security

guards, and firefighters, provided that these unions continue to be recognized consistent with *Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including by continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, may he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes. Agencies may transfer a grievance initially filed under a negotiated grievance procedure to its internal administrative grievance procedure provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests to transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." *See* 5 C.F.R. Part 251 (emphasis added). A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation, meaning bargaining sessions should be placed on hold along with implementation of changes to conditions of employment that were being bargained. Where agencies need only execute an agreement through a ministerial act (e.g., signing an agreement), agencies may proceed to do so provided that any such agreement is consistent with the policy priorities of the Trump Administration.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO). (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (*see* 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices

3

under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

## April 22, 2025 Additional Questions and Answers

**Q18:** How should agencies handle union time and office space provided to union representatives who are no longer in a recognized unit?

**A18:** Agencies and subdivisions covered by *Exclusions* must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by labor unions for representational activities and repurpose those resources for agency business only. Employees of covered agencies and subdivisions who were previously authorized to use taxpayer-funded union time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time. Supervisors should not approve any time and attendance records that include requests for and use of taxpayer-funded union time. For agencies and subdivisions not subject to exclusion from collective bargaining, agencies can allow for use of union time and office space as they normally would.

**Q19:** What if an arbitration is already scheduled for an agency or subdivision now excluded under Executive Order 14251?

**A19:** The agency should request that the arbitrator hold the case in abeyance pending the outcome of litigation regarding *Exclusions*. If unable to delay the hearing, the agency should take the position that in accordance with *Exclusions,* the union is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

**Q20:** How does *Exclusions* impact unions' consultation rights under the FSLMRS?

**A20:** The FSLMRS grants labor unions consultation rights under 5 U.S.C. §§ 7113 and 7117(d) on substantive changes to conditions of employment at the national, subnational, and government-wide basis, respectively. Agencies should assess and determine whether labor unions meet the requirements under 5 C.F.R. Part 2426 and take appropriate action with the appropriate FLRA Regional Office where it believes labor unions no longer meet the eligibility criteria for consultation rights. Before taking action, agencies should consult their General Counsel and coordinate with the Department of Justice.

**Q21:** Section 7 of *Exclusions* requires all agency heads with employees covered by Chapter 71, to identify any agency subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work, that are not covered by Executive Order 12171, as amended. Does this only apply to agencies defined in 5 U.S.C. 101?

**A21:** Section 7 is not limited to those agencies defined under 5 U.S.C. 101 or those listed in *Exclusions*. Rather, every agency head should review their respective missions and identify any

4

subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work.

**Q22:** Some employees no longer have union dues or other fees deducted from their government paychecks for union-provided benefits/insurance (e.g., dental, vision, etc.). Is this cessation of payroll deductions considered a life-changing event that would allow employees to opt into federal benefits coverage?

**A22:** Employees should consult with the union or insurance provider from whom they were receiving benefits (i.e., non-FEDVIP plans) regarding coverage questions. If confirmed to have lost coverage, this would be considered a Qualifying Life Event that allows enrollment in a FEDVIP plan outside of Open Season. The individual has from 31 days before to 60 days after the event to enroll.  More information is available here: Dental and Vision | BENEFEDS.

**Q23:** May agencies communicate with unions representing employees who are still recognized under Executive Order 14251 (e.g., police officers, security guards, firefighters) or otherwise still recognized under 5 U.S.C. 71?

**A23:** Yes. Unions who have bargaining unit employees that are not excluded under the Executive Order, maintain recognition under Chapter 71 of Title 5, U.S. Code. Therefore, normal labor-management communication and engagement should continue.

**Q24:** How should an agency handle an impending change in conditions of employment for employees now excluded by the Executive Order? How should an agency respond to a union inquiry regarding a change in conditions of employment?

**A24:** An agency or subdivision covered by *Exclusions*, can implement the change without completing negotiations. Agencies may respond to a demand to bargain by a labor union by acknowledging receipt and informing the union that it will hold in abeyance their request pending the outcome of litigation over Executive Order 14251.

**Q25:** What should an agency do if it receives a grievance from the union for an individual or unit that is no longer recognized in accordance with *Exclusions*?

**A25:** For units that are no longer recognized within a covered agency or subdivision, agencies should acknowledge receipt, inform the union that the grievance is being held in abeyance pending litigation for *Exclusions*, and provide a date the agency plans to update them. For grievances that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct their negotiated grievance procedures as they normally would.

**Q26:** Should an agency continue to allow union representation in Weingarten meetings and formal discussions with employees excluded under Executive Order 14251?

**A26:** No. Agencies should continue to invite unions to formal discussions and honor requests for Weingarten meeting representation only for employees <u>not</u> excluded from collective bargaining under Executive Order 14251.

**Q27:** If a CBA is set to rollover for units no longer recognized, but the agreement has also not

been terminated, what do we do?

**A27:** In this circumstance, the agency may notify the union that it is terminating the CBA and that any negotiations regarding a successor agreement are being held in abeyance due to *Exclusions* and associated litigation.

**Q28:** If an agency notified a union prior to *Exclusions* that it was terminating a labor-management forum and the union requests to negotiate, how should the agency respond?

**A28:** On March 27, 2025, OPM issued guidance requiring agencies to abolish labor-management forums, committees, and councils at the agency-wide and organizational levels. Many of these forums were established under Executive Order 14119, which was rescinded under Executive Order 14236 in March 2025. The guidance also noted that where the establishment or use of labor-management forums, committees, and councils are incorporated into the terms of any CBA, agencies should seek to renegotiate those terms at the earliest practicable juncture consistent with the policies of this Administration. If a unit that is no longer recognized under *Exclusions* seeks to negotiate over the termination of a forum, the agency should deny the request to bargain since the unit is no longer recognized.

**Q29:** The agency has received unsolicited messages from unions requesting consideration under Section 4 of *Exclusions*, which requires the Departments of Defense and Veterans Affairs to submit any suspensions of *Exclusions* application to the Federal Register within 15 days of the order. How should the agency respond?

**A29:** The agency should acknowledge receipt only and not make any statements regarding the substance of the communication.

**Q30:** Are all OCIOs or equivalents excluded from collective bargaining?

**A30:** Executive Order 14251 excludes the OCIO in "agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code," and in the Social Security Administration and OPM.

**Q31:** Should agencies respond to union Requests for Information (RFIs) from units that are now excluded in accordance with the *Exclusions* order?

**A31:** If the RFI is filed as a request under 5 U.S.C. 7114(b)(4), agencies should hold the request in abeyance pending the outcome of the litigation.

**Q32:** How should agencies respond to questions regarding union dues?

**A32:** If an excluded employee asks about continuing union dues, the agency should inform the employee that union dues allotments through a government payroll provider are not authorized at this time and that if they wish to continue paying union dues nonetheless, they may contact their union.

**Q33:** How should agencies handle union dues allotments?

**A33:** In taking steps to implement *Exclusions*, agencies may pause the collection of union dues

6

allotments for those agencies or subdivisions identified in *Exclusions* while litigation is ongoing. However, agency payroll providers should not unilaterally terminate all union dues allotments without first consulting with their customer agencies. Instead, agency payroll providers should contact their customer agencies to identify which labor unions and employees are excluded from collective bargaining by *Exclusions* and limit the termination of dues allotments to those unions and employees.

# Exhibit M

# Congress of the United States

## Washington, DC 20515

April 2, 2025

The Honorable Doug Collins
Secretary of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC  20420

Dear Secretary Collins,

We are writing to urge you to request a waiver for the entire Department of Veterans Affairs (VA) from President Trump's March 27, 2025, executive order (EO) titled "Exclusions from Federal Labor-Management Relations Programs," which would otherwise eliminate labor rights for all of the dedicated public servants at VA. This EO allows you to request an exemption for any groups within the Department that should be allowed to retain their union representation – it is imperative that you do so before more harm is done to veterans and the employees who deliver their high-quality care and benefits at VA. The right to join a labor union and the right to collectively bargain are bedrock American principles, principles our veterans fought for, and we stand with the hardworking civil servants who are the backbone of the VA. We are deeply opposed to this effort to outlaw unions and unilaterally strike down collective bargaining agreements (CBAs).

Seventy-nine percent of VA employees, many of whom are veterans themselves, are represented by organized labor unions, and every one of them is key to VA's ability to deliver on its sacred mission. Under this directive, up to 425,000 veterans across the government have been stripped of their union bargaining rights and protections. When combined with your plans to fire an additional 80,000 members of the VA workforce, this new assault would decimate the federal workforce and exacerbate the crisis you have created at VA.

Without its unionized workers, VA would not have been able to provide historic levels of care and benefits when implementing the *Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics (PACT) Act,* or reach an all-time high veteran trust score of 80.4% in 2024. VA and Congress also benefitted from protections in CBAs and bargaining unit employees in the investigations into the Phoenix wait times scandal.

This EO also runs contrary to your purported goals through the Department of Government Efficiency (DOGE) to reduce fraud, waste, and abuse. The destruction of workforce protections at VA discourages employees from speaking up and pushes key information on waste, fraud, and abuse into the shadows. In fact, the order specifically calls out dedicated VA employees and the unions representing them for their pushback on this Administration's shameful and illegal attacks on federal employees and VA. By eliminating union protections for whistleblowers who are at risk of retaliation after reporting waste, fraud, and abuse, you will empower bad actors and wrongdoing by discouraging employees from speaking up.

This EO cloaks itself in the false cover of "national security." In fact, this EO will make it harder for VA to accomplish its mission, thereby deteriorating the pact our country makes with the men and women who raise their hands to serve in the military. Unions have long existed in national security agencies and at VA, and Congress has consistently found that unions and national security are not incompatible. They strengthen our national security by providing stability and a well-trained, professional workforce.

Ironically, the order also subjects VA to the risk of higher costs to taxpayers. This EO specifically encourages the Department to resume use of the provisions in the 2017 VA accountability law, which continue to cost taxpayers millions in legal costs. Unions have only been helpful during this costly, drawn-out legal process, as negotiations with unions over poor implementation and execution of the 2017 VA accountability law during President Trump's first term resulted in nearly $1 billion in savings for VA and taxpayers. This executive order further subjects VA to additional lawsuits and costs as it terminates any ongoing grievance processes aimed at keeping VA out of court. This diverts resources and distracts employees from delivering care and benefits to veterans and their families. Labor organizing and collective bargaining expedites conflict resolution and reduces associated legal costs, while improving employee morale. This leads to a more accountable, productive, and dedicated workforce.

We expect this EO will immediately become subject to legal action due to its likely violation of the Federal Service Labor-Management Relations Statute (FSLMRS). Under FSLMRS, you must demonstrate that the agency has as a "primary function intelligence, counterintelligence, investigative, or national security work" in order to exempt them from CBAs. The assertion that thousands of VA nurses, crisis line coordinators, or employees processing veteran benefits fall into this exempted category is clearly false. Consequently, this executive order runs counter to the promotion of our national security.

Mr. Secretary, given all the reasons why such an order will be detrimental to VA's ability to deliver for our nation's veterans, we can only conclude that this directive is primarily retaliatory in nature. This Administration's goal seems aimed at silencing dissent, paving the way for mass firings, discouraging whistleblowers, and retaliating against unions that have stepped up to defend employees' rights in the face of DOGE attacks. As such, we urge you to act quickly and decisively to defend the VA workforce from this EO by requesting a waiver for all Department employees.

Sincerely,

Richard Blumenthal
Ranking Member
Senate Committee on
Veterans Affairs

Mark Takano
Ranking Member

Patty Murray
United States Senator

Debbie Wasserman Schultz
Ranking Member,
Subcommittee on Military
Construction, Veterans
Affairs, and Related Agencies

Delia C. Ramirez
Member of Congress

Eleanor Holmes Norton
Member of Congress

Stephen F. Lynch
Member of Congress

Sydney Kamlager-Dove
Member of Congress

Henry C. "Hank" Johnson, Jr.
Member of Congress

Bennie G. Thompson
Member of Congress

Nikki Budzinski
Member of Congress

Nanette Diaz Barragán
Member of Congress

Sheila Cherfilus-McCormick
Member of Congress

Chris Deluzio
Member of Congress

Haley M. Stevens
Member of Congress

Salud Carbajal
Member of Congress

Shri Thanedar
Member of Congress

Timothy M. Kennedy
Member of Congress

Donald Norcross
Member of Congress

Greg Landsman
Member of Congress

Kristen McDonald Rivet
Member of Congress

Morgan McGarvey
Member of Congress

Angie Craig
Member of Congress

Veronica Escobar
Member of Congress

Greg Casar
Member of Congress

Marc A. Veasey
Member of Congress

Lloyd Doggett
Member of Congress

Brendan F. Boyle
Member of Congress

Jill Tokuda
Member of Congress

Val Hoyle
Member of Congress

Emanuel Cleaver, II
Member of Congress

Jan Schakowsky
Member of Congress

Paul D. Tonko
Member of Congress

Frank Pallone, Jr.
Member of Congress

Joseph D. Morelle
Member of Congress

Chris Van Hollen
United States Senator

Glenn Ivey
Member of Congress

Bernard Sanders
United States Senator

Sarah McBride
Member of Congress

Laura Friedman
Member of Congress

Herbert C. Conaway, Jr.
Member of Congress

Jeffrey A. Merkley
United States Senator

Brad Sherman
Member of Congress

Adam Smith
Member of Congress

Chrissy Houlahan
Member of Congress

William R. Keating
Member of Congress

Julie Johnson
Member of Congress

Sheldon Whitehouse
United States Senator

Gabe Amo
Member of Congress

Richard E. Neal
Member of Congress

Jennifer L. McClellan
Member of Congress

Lucy McBath
Member of Congress

Ro Khanna
Member of Congress

Eric Swalwell
Member of Congress

Rashida Tlaib
Member of Congress

Suzanne Bonamici
Member of Congress

James P. McGovern
Member of Congress

Betty McCollum
Member of Congress

Nikema Williams
Member of Congress

Eugene Simon Vindman
Member of Congress

Andrea Salinas
Member of Congress

Nydia M. Velázquez
Member of Congress

Jacky Rosen
United States Senator

Robin L. Kelly
Member of Congress

Derek T. Tran
Member of Congress

Sanford D. Bishop, Jr.
Member of Congress

Robert Garcia
Member of Congress

Mikie Sherrill
Member of Congress

Yassamin Ansari
Member of Congress

Julia Brownley
Member of Congress

Catherine Cortez Masto
United States Senator

Dwight Evans
Member of Congress

George Whitesides
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Robert C. "Bobby" Scott
Member of Congress

Dina Titus
Member of Congress

Tim Kaine
United States Senator

Greg Stanton
Member of Congress

Jack Reed
United States Senator

Maggie Goodlander
Member of Congress

Mark DeSaulnier
Member of Congress

Mike Levin
Member of Congress

Mazie K. Hirono
United States Senator

Josh Gottheimer
Member of Congress

Judy Chu
Member of Congress

Seth Magaziner
Member of Congress

Seth Moulton
Member of Congress

Kevin Mullin
Member of Congress

Thomas R. Suozzi
Member of Congress

Mary Gay Scanlon
Member of Congress

Kelly Morrison
Member of Congress

LaMonica McIver
Member of Congress

Chellie Pingree
Member of Congress

Diana DeGette
Member of Congress

Terri A. Sewell
Member of Congress

Angela Alsobrooks
United States Senator

Tammy Duckworth
United States Senator

Gilbert Ray Cisneros, Jr.
Member of Congress

Sylvia R. Garcia
Member of Congress

Madeleine Dean
Member of Congress

Steve Cohen
Member of Congress

Chris Pappas
Member of Congress

Troy A. Carter, Sr.
Member of Congress

Mike Thompson
Member of Congress

Al Green
Member of Congress

André Carson
Member of Congress

Edward J. Markey
United States Senator

Ron Wyden
United States Senator

Sean Casten
Member of Congress

Raja Krishnamoorthi
Member of Congress

Doris Matsui
Member of Congress

Norma J. Torres
Member of Congress

Alma S. Adams, Ph.D.
Member of Congress

Cory A. Booker
United States Senator

Lateefah Simon
Member of Congress

Kweisi Mfume
Member of Congress

Richard J. Durbin
United States Senator

Linda T. Sánchez
Member of Congress

Maxine Dexter
Member of Congress

Kathy Castor
Member of Congress

Alex Padilla
United States Senator

Ted W. Lieu
Member of Congress

Elissa Slotkin
United States Senator

Martin Heinrich
United States Senator

Yvette D. Clarke
Member of Congress

Danny K. Davis
Member of Congress

Frederica S. Wilson
Member of Congress

Gary C. Peters
United States Senator

Adam B. Schiff
United States Senator

# Exhibit N

## DEPARTMENT OF VETERANS AFFAIRS

### Rescission of Order Suspending the Application of Section 1–402 or 1–404 of Executive Order 12171

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Notice.

**SUMMARY:** On April 17, 2025, the Department of Veterans Affairs (VA), published a notice in the **Federal Register** announcing the suspension of the application of section 1–402 or 1–404 of Executive Order (E.O.) 12171 for certain employees, thereby bringing those employees under the coverage of the Federal Service Labor-Management Relations Statute. VA is rescinding the aforementioned order of suspension of the application of section 1–402 or 1–404 of E.O. 12171.

**DATES:** This rescission of the April 17, 2025 order of suspension is effective upon publication.

**FOR FURTHER INFORMATION CONTACT:** Tracey Therit, Chief Human Capital Officer, Office of Human Resources and Administration, Department of Veterans Affairs, 810 Vermont Ave. NW, Room 265, Washington, DC 20420, Office: (202) 461–0235.

**SUPPLEMENTARY INFORMATION:** Pursuant to the authority provided to the Secretary of VA in section 4 of E.O. 14251, *Exclusions from Federal Labor-Management Relations Programs,* on April 17, 2025, VA published a notice suspending the application of section 1–402 or 1–404 of E.O. 12171, as amended, for employees represented by Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI; International Association of Fire Fighters (IAFF–99) at the VA Medical Center, Little Rock, AR; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI, thereby bringing such employees under the coverage of the Federal Service Labor-Management Relations Statute. 90 FR 16427.

Having further considered the delegation of authority provision under Section 4 of E.O. 14251 and the statutory authority under 5 U.S.C. 7103(b)(1), VA's order of suspension of the application of section 1–402 or 1–404 of E.O. 12171 published at 90 FR 16427 is hereby rescinded.

### Signing Authority

Douglas A. Collins, Secretary of Veterans Affairs, approved this document on November 7, 2025 and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Nicole Cherry,**

*Alternate Federal Register Liaison Officer, Department of Veterans Affairs.*

[FR Doc. 2025–19867 Filed 11–12–25; 8:45 am]

**BILLING CODE 8320–01–P**