UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL**<br><br>**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305**<br><br>      *Plaintiffs,*<br><br>      **v.**<br><br>**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS**<br><br>**DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs**<br><br>      *Defendants.* | **Case No. 1:25-cv-00583-MRD-PAS** |

## DECLARATION OF MARY-JEAN BURKE

I, Mary-Jean Burke, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a physical therapist at Richard L. Roudebush VA Medical Center in Indianapolis, Indiana ("Roudebush VAMC"). I was hired to provide in-patient physical therapy in an acute care setting and have since worked in several units. In total, I have worked for the Department of Veterans Affairs for 30 years.

3.      I am President of the American Federation of Government Employees, AFL-CIO National Veterans Affairs Council ("NVAC"). I have served in this position since November 2025. Previously, I served as the NVAC First Executive Vice President from 2007 to 2025 and NVAC Health and Safety Representative from 2003 to 2007.

4.      There are approximately 170 local unions representing AFGE bargaining unit employees at the VA. These 170 local unions fall under the representational jurisdiction of the NVAC and are covered by the 2023 Master Collective Bargaining Agreement.

5.      I am also the Vice President of AFGE Local 609 at the Roudebush VAMC. I previously served as Secretary-Treasurer of AFGE Local 609.

**NVAC Bargaining Unit**

6.      NVAC represents nationwide bargaining units covering approximately 300,000 professional and non-professional employees who work at nearly every VA administration and component, including the Veterans Health Administration, Veterans Benefits Administration, National Cemetery Administration, and operational components such as, but not limited to, the Office of Information & Technology, Office of Finance, Office of Emergency Management, and the VA History Office. Hospitals and clinics under the Veterans Health Administration employ

2

the largest number of NVAC-represented workers; these employees include physicians, dentists,

registered nurses, pharmacists, physical and occupational therapists, housekeepers, engineers,

custodians, cooks, and numerous other healthcare and support staff. NVAC-represented workers

in other VA administrations and components include, for example, cemetery workers, attorneys,

gardeners, archivists, security officers, claim processors, clerical workers, IT professionals,

bookkeepers, and a number of other civil servants.

7.      NVAC's mission is to support and advocate for the federal employees who take

care of our nation's veterans, including working towards a safe and fair workplace for all members.

Almost 40 percent of NVAC's members are themselves veterans. As the exclusive bargaining

representative of these workers, NVAC provides numerous services to all bargaining unit

employees. Core functions of NVAC include working in a mutually respectful partnership with

the VA to secure a fair and reasonable master collective bargaining agreement; negotiating

implementation of new policies during the term of the Master Agreement; filing and prosecuting

grievances (locally and nationally) against the VA to enforce the terms and conditions of the

Master Agreement; representing workers in arbitration and before professional standards boards;

participating in safety inspections and negotiating safety abatements; and providing guidance and

support to members navigating USERRA, EEO, and other federal processes.

8.      I served on the NVAC negotiating teams for the 2011 Master Agreement and 2023

Master Agreement. I am a signatory to both agreements. The 2011 Master Agreement negotiations

lasted nearly 8 years. The 2023 Master Agreement negotiations lasted more than 6 years, from

December 2017 to August 2023, and cover the largest consolidated bargaining unit of federal

employees, not only in the VA but in any agency or department within the Executive Branch.

//

**Health and Safety**

9. As union representatives, one of our core responsibilities is to ensure that VA employees have a safe work environment. As the nation's largest health care institution, the VA is no stranger to the outbreak of infectious, and sometimes deadly, bacteria and disease.

10. For example, in 2013, there was a deadly outbreak of Legionnaires' disease at the Pittsburgh VAMC that took the lives of five veterans. AFGE and NVAC were at the forefront of the union's response to the outbreak, advising employees of applicable standards and guidelines under the Occupational Safety and Health Administration (OSHA) and ensuring that proper remedial steps were taken to protect employees and veterans. In February 2013, the President of AFGE Local 2028 testified before the House Veterans' Affairs Committee Subcommittee on Oversight and Investigations to answer questions about this deadly outbreak and the union's response.

11. In 2021, custodial staff at the Louisville VAMC were required to mop floors directly next to floor level outlets with the risk of electrocution. AFGE Local 1133 filed an OSHA complaint, which was later substantiated and forced the VA facility to correct this safety issue and additional electrical hazards in violation of applicable standards.

12. Several AFGE local unions have prevailed in grievance and arbitration to secure environmental differential pay or hazardous duty pay for bargaining unit employees who are exposed to virulent biologicals and toxic chemicals without proper personal protective equipment and training, resulting in back pay for affected VA workers. Recent examples include AFGE Local 910 at the Kansas City VAMC and AFGE Local 1061 at the Greater Los Angeles VAMC.

13. During the COVID-19 pandemic, VA hospitals and clinics remained open to the public, veterans, and their families and caregivers. Every single day, NVAC representatives and

union officials across the country were scrambling to assist and protect employees however and whenever we could. We worked with management officials to ensure that employees had adequate personal protective equipment, access to free testing, and that they understood their rights under the American Rescue Plan Act, the Families First Coronavirus Response Act, and the Federal Employees' Compensation Act. We held emergency town halls and union meetings during lunch breaks to educate employees on their collective bargaining rights under the Master Agreement. Though the precise number cannot be known with certainty, more than 25,000 VA employees contracted COVID-19 at work, and tragically, at least 203 dedicated VA employees lost their lives.

14.     In furtherance of NVAC's mission to protect and safeguard VA employees, Article 29 (Safety, Health, and Environment) is one of the strongest, most important sections of the Master Agreement. Article 29 aims to secure a healthy and safe workplace for bargaining unit employees, entitling the union to representation and participation in national, intermediate, and local safety committees tasked with jointly developing specific procedures for "preventing and abating safety and health hazards" in conjunction with the VA. *See* Master Agreement, Article 29, Section 1(C); Article 29, Sections 2 and 3.

15.     Under Article 29, NVAC is contractually entitled to five National Safety and Health Representatives whose responsibilities included serving as points of contact for health and safety initiatives, developing joint training programs and materials in health and safety for bargaining unit employees, and visiting facilities within the bargaining unit to work with local unions on health and safety matters, among others. *See* Master Agreement, Article 29, Section 3(A).

16.     Local unions were also empowered to designate a local Safety and Health Representative whose myriad functions included conducting joint inspections, participating in inspections conducted by non-VA governmental authorities, receiving a variety of reports related

to health and safety matters at the facility, and developing and monitoring abatement plans needed to correct local conditions. See Article 29, Section 3(G).

17.     NVAC also negotiated stricter procedures and more generous employee protections in the Master Agreement than those required by relevant law and regulations. For example, in Article 29, the VA agreed to:

a.  Conduct a comprehensive analysis to better understand and remedy patterns of injuries and illnesses at each facility. *See* Master Agreement, Article 29, Section 6.

b.  Allow a local union representative to be present during a facility safety inspection to ascertain whether a particular working condition qualified as an "imminent danger." *See* Master Agreement, Article 29, Section 7.

c.  Provide additional and more specialized safety and health training for union Safety and Health Representatives. *See* Master Agreement, Article 29, Section 8.

d.  Refrain from the application of insecticides/chemicals during working hours with the exception of sensitive hospital areas, and provide the Union advance notice of the use of any pesticides in a larger scale application. *See* Master Agreement, Article 29, Section 11.

e.  Provide individuals with workstation modifications to ensure an ergonomic environment through a process negotiated with the Union. *See* Master Agreement, Article 29, Section 20.

f.  Ensure safe indoor air quality by maintaining ventilation efficiency, minimizing the impact of contamination from outside sources, eliminating sources of microbial contaminants, and cleaning and disinfecting surfaces. *See* Master Agreement, Article 29, Section 22.

g.  Develop a wellness program that allows employees to use wellness/fitness centers during duty hours, among other things. *See* Master Agreement, Article 29, Section 24.

h.  Ensure equipment, machinery, and furniture is ergonomically compatible with employees who use them, by agreeing to work with the local union to select and purchase such items. *See* Master Agreement, Article 29, Section 25.

i.  Develop a policy and plan with the local union on the prevention of workplace violence, with annual training offered to all employees. *See* Master Agreement,

Article 29, Section 26.

    j.  Establish and maintain procedures with the Union for the medical surveillance of employees who occupy positions that carry potential risks to their health. *See* Master Agreement, Article 29, Section 27.

    k.  Make appropriate arrangements for employees exposed to individuals with known communicable diseases such as tuberculosis, at no cost to the employee. *See* Master Agreement, Article 29, Section 29.

    l.  Select lifting equipment to ensure ergonomic lifting and safe lifting with input and participation from the Union. *See* Master Agreement, Article 29, Section 33.

18.    Bargaining unit employees benefit from the negotiated provisions of Article 29. They are entitled to union representation at any time involving a work-related injury or illness. *See* Master Agreement, Article 29, Section 10(B). Employees who worked in and around areas with extreme temperature conditions were also entitled to have a written plan for appropriate emergent cooling or heating procedures. *See* Master Agreement, Article 29, Section 13. Employees working with Video Display Terminals ("VDT") were entitled to breaks during the day in addition to their regularly scheduled rest periods. *See* Master Agreement, Article 29, Section 20(F). Other VDT-related benefits concerning lighting, keyboards and screens, printers, chairs and desks and training and VDT-related vision benefits (which include monetary and leave-related entitlements), are also found in Article 29, Sections 20(G-K) and 21. Employees with temporary work restrictions were entitled to accommodations. *See* Master Agreement, Article 29, Section 34.

19.    Following Secretary Collins' termination of the Master Agreement, VA facilities are no longer honoring the terms of Article 29. The VA no longer recognizes the need to consult with health and safety representatives at the national level, and am I aware that local VA management is also refusing to consult with local health and safety representatives. Therefore, employees are left without the crucial health and safety protections negotiated by NVAC in Article

29.

### *NVAC Legislative Advocacy*

20.     I have served as Chair of the NVAC Legislative Committee since 2003. In this role, I am responsible for directing and implementing NVAC's legislative priorities on Capitol Hill. This includes working with executive leadership, staff members, and subject matter experts to assess and determine whether NVAC will support, oppose, endorse, or reject legislative and regulatory proposals that may impact VA workers. NVAC's legislative portfolio covers a wide and dynamic range of issues that include, for example, legal entitlements governing medical care and services for patients and beneficiaries, VA staffing and hiring requirements, mandated training and education, changes to licensure and certification requirements, employee due process rights and collective bargaining rights, pay and retirement programs, and much more. NVAC will also join AFGE and other unions in their efforts to support legislation with government-wide effect outside of the VA, such as the "Rights for the TSA Workforce Act," which would codify Title 5 collective bargaining rights for federal employees at the Transportation Security Agency.

21.     When NVAC takes a position on proposed legislation or regulations, NVAC often announces our position publicly via press releases, news releases, written statements, social media posts, email communications, sign-on letters, petitions, and more. To support our legislative and regulatory priorities, we ask our members and allies to work with us to accomplish these goals. We call on our union members to support NVAC's position. We lobby members of Congress to support NVAC's position. We advocate alongside veterans service organization and other labor unions to support NVAC's position.

22.     In the past, NVAC strongly advocated against the legislative priorities of President Trump that would would weaken the delivery of care and services to veterans and negatively

impact the working conditions of VA employees.

23.     One example from President Trump's first term was NVAC's opposition to the Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (VA Accountability Act). The VA Accountability Act created a new disciplinary authority for VA to take adverse actions against VA employees, weakened due process protections, and expedited appeal deadlines to challenge unlawful adverse actions. President Trump signed the VA Accountability Act into law on June 23, 2017. At the signing ceremony, he praised the legislation, saying, "This is one of the largest reforms to the VA in its history. It's a reform that I campaigned on, and now I am thrilled to be able to sign that promise into law."

24.     In the months following its passage, NVAC began challenging the VA's unlawful implementation of the VA Accountability Act, which violated the Master Agreement and the Federal Service Labor-Management Relations Statute, 5 U.S.C. Chapter 71. For example, NVAC filed two grievances against the VA after it unilaterally implemented the Act without meeting its bargaining obligations and in breach of its contractual obligation to provide performance improvement plans. NVAC prevailed in both matters, and the VA was found to have violated its legal obligations to NVAC. In March 2023, following extensive litigation in administrative forums and federal court, former VA Secretary Denis McDonough announced that VA would not utilize its disciplinary authority under the VA Accountability Act.  VA announced that it would not utilize this authority because of its losses in court and in arbitration.

25.     Four months later, in July 2023, NVAC and the VA settled their dispute over the VA's implementation of the VA Accountability Act, resulting in thousands of former VA employees being offered monetary relief, and in some cases, reinstatement.  The settlement was the result of more than eight months of FLRA-mediated negotiations between the VA and NVAC.

NVAC, the VA, the FLRA, and members of Congress all issued statements announcing the historic settlement agreement, with the VA announcing that through the settlement it would make payments totaling "hundreds of millions of dollars" compensating nearly 5,000 former employees who had improperly been subjected to discipline.

26.     Another example of NVAC's opposition to the legislative priorities of the first Trump Administration is NVAC's opposition to the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act of 2018 (VA MISSION Act). The VA MISSION Act privatized large segments of VA healthcare services and thus undermined the quality and accessibility of care available to veterans, resulting in the further privatization of the VA to for-profit "community care" providers who consistently underperform compared to VA employees. NVAC, in partnership with AFGE, lobbied against the VA MISSION Act and participated in legislative hearings and submitted testimony to Congress.

27.     On, May 17, 2017, then-AFGE National President J. David Cox testified during a legislative hearing before the Senate Committee on Veterans' Affairs, in which he criticized the VA MISSION Act: "None of the personnel provisions of this bill are really about veterans or accountability. It is about politics. It is about 'you are fired' as an easy way to shift blame of wrongdoing from executives and political appointees onto the rank and file." The statement is publicly available as part of the legislative record. A true and correct copy of Mr. Cox's May 17, 2017 statement is attached hereto as **Exhibit A**.

28.     On July 11, 2017, AFGE and NVAC submitted a statement for the record during a legislative hearing before the Senate Committee on Veterans' Affairs opposing various pending pieces of legislation, including the VA MISSION Act. The statement is publicly available as part of the legislative record. A true and correct copy of the July 11, 2017 statement is attached hereto

as **Exhibit B**.

29.     On October 24, 2017, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs. In the statement, AFGE and NVAC made clear that they "strongly oppose[d]" the VA MISSION Act, which "would serve the agenda of privatizers but ignore the needs and preferences of veterans to receive the vast majority of their care from a fully-funded, fully-staffed, world-class integrated VA health care system." The statement is publicly available as part of the legislative record. A true and correct copy of the October 24, 2017 statement is attached hereto as **Exhibit C**.

30.     On March 15, 2018, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs Subcommittee on Health regarding President Trump's Fiscal Year 2019 budget request for the VA. In the statement, AFGE and NVAC called out "outrageous understaffing" at the VA, noting that approximately 35,000 positions needed to be filled within the department. The statement took issue with channeling funds toward subsidizing unaccountable private sector care for veterans rather than adequately funding and staffing the VA.  The statement is publicly available as part of the legislative record. A true and correct copy of the March 15, 2018 statement is attached hereto as **Exhibit D**.

31.     On May 22, 2018, AFGE, along with 16 other labor organizations, urged the Senate to reject the VA MISSION Act because it "does nothing to help build up the internal capacity at the VA" and instead "outsources primary care to the private sector[.]" A true and correct copy of the letter opposing the VA MISSION Act is attached hereto as **Exhibit E**.

32.     President Trump signed the VA MISSION Act into law on June 6, 2018. At the signing ceremony, he praised the legislation and criticized the unions who opposed his agenda, saying, "For 40 years they've been trying to pass this — Phil [Roe], you know that. Forty

years. And they couldn't. Made so much sense. But it was hard. You have civil service, you have

unions. Of course they'd never do anything to stop anything, but they had a very great deal of

power. And in the end, they came along.  Everybody came along because they knew it was right."

A true and correct copy of President Trump's remarks are attached hereto as **Exhibit F**.

33.     On June 21, 2018, AFGE and NVAC submitted a statement for the record during a

legislative hearing before the House Committee on Veterans' Affairs called "More Than Just

Filling Vacancies: A Closer Look at VA Hiring Authorities, Recruiting, and Retention." A true

and correct copy of that June 21, 2018 statement is attached hereto as **Exhibit G**. In that statement,

AFGE and NVAC continued to criticize efforts to privatize VA health care and called on the VA

to fill tens of thousands of vacant positions. AFGE and NVAC called for increased transparency

and accountability from the VA, citing Section 505 of the VA MISSION Act. "We were also

pleased to see Sec. 505 include a reporting requirement so that the Department will have to face

Congress and explain what steps it is taking to fully staff every VA facility across the country.

This new transparency requirement is important, and we ask that Congress make certain that the

VA complies with this section of the new law." In this statement, AFGE and NVAC expressed

support for H.R.6101 (VA Personnel Equity Act), which would have undone the damage caused

by the VA Accountability Act, a law that AFGE and NVAC "vociferously opposed."

34.     On July 17, 2018, AFGE and NVAC submitted a statement for the record during a

legislative hearing before the House Committee on Veterans' Affairs. In the statement, AFGE and

NVAC stated that the VA MISSION Act had "proven to be one of the most misguided and

counterproductive VA laws ever enacted" that "demoralized and harmed its dedicated workforce."

The statement is publicly available as part of the legislative record. A true and correct copy of the

July 17, 2018 statement is attached hereto as **Exhibit H**.

35.     On April 10, 2019, AFGE and NVAC submitted a statement for the record during a legislative hearing before the Senate Committee on Veterans' Affairs. The statement provided comments on the "state of the VA MISSION Act implementation as well as the harm expanded private sector intrusion will have on the VA's ability to deliver high quality, timely care to veterans." AFGE and NVAC reiterated their concerns about the law and its negative impact on the VA workforce to fulfill its duties, stating that "[T]he VA MISSION Act will lead to an irreversible dismantling and weakening of VA's exemplary, uniquely veteran-centric health care system." The statement is publicly available as part of the legislative record. A true and correct copy of the April 10, 2019 statement is attached hereto as **Exhibit I**.

36.     NVAC's opposition to the VA MISSION Act continued for years following its passage, and NVAC ultimately succeeded in stopping a key component of the legislation. NVAC, in partnership with AFGE and other labor unions, lobbied Senators to oppose any nominations to the Asset and Infrastructure Review Commission, which was created by the VA MISSION Act. This Commission was tasked by the VA MISSION Act to recommend and ultimately implement the largescale closure of VA hospitals and clinics, resulting in the further privatization of VA care and services and the elimination of VA jobs. As a result of NVAC and AFGE's advocacy, which included a lengthy "Save My VA" campaign that targeted specific Senators, in 2022 a bipartisan group of 12 Senators banded together to blockade all nominations to the Commission, effectively blocking the closure of several VA medical facilities.

37.     NVAC's opposition to the passage and subsequent implementation of the VA MISSION Act continued through 2022 and beyond. For example, NVAC continues to advocate against the access standards drafted and implemented by the VA under the authority of the VA MISSION Act during President Trump's first term. In the 119th Congress, NVAC is actively

13

opposing H.R.740 and S.275, the "Veterans' Assuring Critical Care Expansions to Support Service (ACCESS) Act," which would codify these access standards.

38.     In addition to opposing President Trump's legislative priorities, NVAC officials and AFGE members have testified before various committees of the United States House of Representatives and Senate. In my capacity as an NVAC representative and officer, I have personally testified before Congress on several occasions, seeking to improve working conditions and conditions of employment for VA employees on issues including market pay adjustments, parental leave, and retirement benefits for police officers. *See Investing in the Future of the Federal Workforce: Paid Parental Leave Improves Recruitment and Retention,* House Committee on Oversight and Government Reform and Joint Economic Committee (March 6, 2008); *"Building a Better VA: Addressing Healthcare Workforce Recruitment and Retention Challenges,"* House Committee on Veterans' Affairs (March 17, 2022); *"VHA Recruitment and Retention: Is Bureaucracy Holding Back a Quality Workforce?,"* House Committee on Veterans' Affairs Subcommittee on Oversight and Investigations and Subcommittee on Health (May 17, 2023); Legislative Hearing, House Committee on Veterans' Affairs Subcommittee on Health (December 17, 2024).

39.     NVAC has also submitted numerous statements for the legislative record that were critical of initiatives designed or supported by the Trump Administration, such as the privatization of veteran care and attacks on collective bargaining and due process rights. *See* Hearing on Pending Legislation, Senate Committee on Veterans' Affairs (July 11, 2017).

### *Political Endorsements*

40.     AFGE endorsed Joe Biden in the 2020 presidential election.  It endorsed Kamala Harris in the 2024 presidential election, and in that endorsement, AFGE stated "AFGE members

have made clear that their top priority in 2024 is defeating Donald Trump and stopping anti-worker efforts."

### *Membership and Association*

41.     Since the termination of the Master Agreement on August 6, 2025, Secretary Collins, senior VA executives, and other management officials across the country have engaged in an anti-union crusade designed to misinform federal employees of their rights and ridicule NVAC for its speech, lobbying, and other advocacy on behalf of VA employees.

42.     On a daily basis, based on my discussions with union officials around the country and email correspondence that I have reviewed, VA management officials are disseminating false information in an effort to mislead and intimidate bargaining unit employees, claiming that AFGE and NVAC cannot help them because "they no longer have a union" or collective bargaining rights. They are encouraging AFGE members orally and in writing to terminate their membership agreements with (and agreement to pay dues to) the union. Unlike management, employees and union representatives are prohibited from speaking with one another about union-related issues during work hours. They are further prohibited from communicating about union-related issues over VA email and on VA equipment.

43.     Many members have told me about emails, messages, and other oral and written communications disseminated by VA management and human resources officials that are falsely claiming that neither AFGE nor NVAC can protect, represent, or otherwise assist bargaining unit employees. These communications claim that "The union is gone," or "There is no union," or when referring to the termination of the Master Agreement and loss of collective bargaining rights, "Now VA sets the rules." These remarks have had the intended effect of intimidating bargaining unit employees and chilling their speech and association with the union. A specific example (a true and

correct copy of which is attached hereto as Exhibit J) involved a Nurse Manager at the Michael E.
DeBakey VA Medical Center in Houston, Texas responding to an employee's request for union
representation at a mandatory meeting with, "there is not a Union anymore, a representative is not
included in the meeting."

44.     As a result of the decisions of Secretary Collins and the anti-union campaign waged
at his behest, AFGE members and represented employees are scared to be seen with union officials
at the worksite. They are afraid to speak about union-related issues and employment concerns with
their coworkers. For instance, at the Indianapolis VAMC, employees have asked to speak with me
in storage rooms and closets to avoid even being seen associating with the union. They fear that
meeting, associating with, or publicly supporting the union will result in retaliation, reprisal,
discrimination, or other adverse consequences. Other national NVAC leaders and local union
leaders have told me that, since the termination of the Master Agreement, they have had similar
experiences communicating with their membership.

45.     As a result of the decisions of Secretary Collins and the anti-union campaign waged
at his behest, NVAC has experienced significant reputational harm. Notably, the VA has falsely
claimed that NVAC is not working in the best interests of veterans and bargaining unit employees.
For example, the VA news release accompanying Secretary Collins' termination of the Master
Agreement on August 6, 2025 refers to labor organizations, like NVAC, as "union bosses" who
are working against the interests of veterans. Secretary Collins is quoted in that release saying,
"Too often, unions that represent VA employees fight against the best interests of Veterans while
protecting and rewarding bad workers." The release misleadingly portrays AFGE's efforts to
obtain recompense, and in some instances reinstatement, for employees who were improperly
terminated from VA employment during "the first Trump Administration" as work done on behalf

of employees who committed misconduct. The release, a true and correct copy of which is attached

hereto as **Exhibit K**, ridicules VA labor unions, and AFGE and NVAC specifically, as follows:

> **Background**
>
> VA-employee unions have repeatedly opposed significant, bipartisan VA reforms
> and rewarded bad employees for misconduct. Examples include:
>
> • AFGE, NFFE and NNOC/NNU opposed the MISSION Act, a law that makes it easier
> for Veterans to get health care.
>
> • NFFE supports rescinding the VA Accountability and Whistleblower Protection Act,
> a law designed to protect whistleblowers and hold employees accountable for
> misconduct.
>
> • AFGE worked hand-in-hand with the Biden Administration to reinstate more than
> 100 former employees fired for misconduct during the first Trump Administration
> and pay nearly $134 million to some 1,700 former VA employees who were fired for
> misconduct during President Trump's first term.

46.     On or about August 8, 2025, VA Central Office directed the distribution of an email

to more than 300,000 AFGE bargaining unit employees across all VA facilities titled

"Implementation of Executive Order 14251." That email, a true and correct copy of which is

attached hereto as **Exhibit L**, announced the termination of the Master Agreement and caused

reputational harm to NVAC. It generated thousands of emails, messages, and phone calls from

AFGE members and represented employees to their local unions and to NVAC. This email had

the intended effect of sowing chaos and division within the union. Members began asking to

terminate union membership out of fear of retaliation and targeting by the VA based on the anti-

union, misleading statements in this email. The relevant portion of this email reads as follows:

This notice is to inform you of an important change in your bargaining unit status and your union representation. As you may be aware, in response to President Trump's March 27, 2025, Executive Order (EO), *Exclusions from Federal Labor-Management Relations Programs*, that excluded certain federal agencies and agency subdivisions from the Federal Service Labor-Management Relations Statute, on August 6, 2025, VA announced the termination of collective bargaining agreements for most of VA's bargaining unit employees. This announcement begins a new chapter that will eliminate barriers and increase focus on the world class care and services Veterans deserve.

Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

You may see changes to some of the processes and procedures in your workplace that were previously contained in a collective bargaining agreement that is now terminated. Managers have been directed to exclusively follow VA policy for all matters, including things like promotions, alternative work schedules, details, hours of work, telework, leave usage, etc. You should also expect to see an updated SF-50 form in your personnel file, which will reflect the change to your bargaining unit status code.

47.    Also on August 8, 2025, every AFGE local representative at the VA, received a letter titled "Order to Return to Duty." The letter cited the termination of the Master Agreement and instructed representatives that they were no longer "serving in an occupation exempted from EO 14251" and, as a result, representatives "are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities." A true and correct copy of this letter is attached hereto as **Exhibit M**.

48.    In NVAC town hall and membership meetings held in the evenings or weekends since these events, local union presidents and other leaders from across the country have expressed fear of retaliation. Due to Secretary Collins' termination of the Master Agreement and collective bargaining rights for AFGE bargaining unit employees, union leaders are no longer covered by Chapter 71, including the right of union representatives to engage in "robust and meaningful debate" with VA management and human resources officials on behalf of employees without the fear of discipline, interference, discrimination, or reprisal.

49.     As a result, this has resulted in fewer union representatives who are willing to file grievances (which NVAC-affiliated local unions continue to do through the negotiated grievance procedure and the VA administrative grievance procedure, notwithstanding the termination of the Master Agreement), sign and send emails to management officials, communicate with members, represent employees in statutory and administrative appeals, attend rallies and mobilization events, and more. This has negatively impacted the ability of NVAC to fully and effectively represent the interests of our bargaining unit employees.

50.     Within two weeks of NVAC initiating this lawsuit, the VA began emailing AFGE officials and stewards to threaten discipline in connection with ongoing union activity.  A true and correct copy of one such email is attached hereto as **Exhibit N**, which is representative of other, recent correspondence that AFGE officials have shown me.  This email states that "[it] has been reported that there may be instances of union activities being conducted using government resources," without elaborating on the "reports."  In this email, the VA further states: "[i]t is important to emphasize that misuse of government property or resources for union business can lead to disciplinary action . . . up to and including removal from federal service."

51.     NVAC had more than 140,000 members in March 2025. However, our membership has dropped by nearly half to 72,000 members as of November 2025.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of November 2025, in Indianapolis, Indiana.


_____

Mary-Jean Burke

# Exhibit A

S. Hrg. 115–299

# HEARING ON PENDING LEGISLATION

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

———————

MAY 17, 2017

———————

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.fdsys.gov

———————

U.S. GOVERNMENT PUBLISHING OFFICE

25–981 PDF                    WASHINGTON : 2018

103

as doctors, nurses and other VA medical personnel can access paid sick leave in their first year, that they would otherwise have to accrue, to undergo medical treatment for their service-connected disabilities, as their counterparts in other Federal agencies are permitted. IAVA supports this legislation.

Mr. Chairman, many of these provisions are easy fixes, and some will require hard work and additional funds. When my soldiers and I were sent twice to face combat in Iraq, the Army and U.S. taxpayers spared no expense, with the goal of providing us with an overwhelming advantage in war. Veterans are proud to have served our country and we need Congress to know that the care we receive as a result of our service is a cost of war, and just as important as properly equipping those deploying downrange as we speak. We have got to spare no expense in caring for them after they return. Veterans are not a special interest—they answered the call when more than ninety-nine percent of American did not.

Chairman Isakson, Ranking Member Tester, and Members of the Committee, thank you again for inviting me to be here today, and on behalf of IAVA, I thank and remember our veterans who have served before us and those who are deploying now, again, to fight around the globe.

Chairman ISAKSON. Thank you, Ms. Jaslow.
Mr. Cox?

### STATEMENT OF J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO

Mr. COX. Thank you for the opportunity to testify today. It is astounding that while the Secretary says there is over 45,000 unfilled health care vacancies in the Department, we are here today talking about firing rather than hiring. Does anyone here believe that the firing that has been in the news during the last week is an unusual occurrence? Does anyone here believe that an executive firing a subordinate to cover up his or her own misdeeds never happens in the Department of Veterans Affairs? I tell you what—when it happens where workers have due process rights, the innocent are protected.

At workplaces with a process for weighing evidence and making decisions based solely on facts, no one gets fired without just cause. If this bill passes, you can strike VA from that list. The innocent will be fired without good cause, the appeals will be a humiliating joke, and the executives will continue to ruin the lives of workers and hurting veterans.

So, let us be honest. None of the personnel provisions of this bill are really about veterans or accountability. It is about politics. It is about "you are fired" as an easy way to shift blame of wrongdoing from executives and political appointees onto the rank and file.

We have a bill that reeks of the—wrecks the apolitical civil service and is justified only by pretending that the most extreme examples of misconduct are occurring all over the place. In fact, instances of outrageous misconduct are rare.

AFGE has no use for people who abuse the public trust, who engage in unlawful conduct, or are poor performers, or violate government rules or our collective bargaining agreements, or the EEO laws. We want them out of the agency. They make everything more difficult for the vast majority who perform very well. In addition, this bill would supersede existing collective bargaining agreements and impose unworkable timeframes on the firing processes.

We have asked the Committee to at least show some respect for the integrity of the collective bargaining process by agreeing that

104

the provisions that affect the current contract go into effect only after a new contract is negotiated, and I, again, ask for that change to be made.

We understand that bashing Federal employees and taking away their rights makes for good politics, and it does make for bad government. And I promise you that under this bill, more employees will be fired for bad reasons than for good reasons.

You want to make it easy for VA managers to fire people. You have bought into complaints that firing is too hard for them, when every single study shows that current laws provide them all the authority they need to remove anybody who is actually a poor performer or engages in misconduct.

Our objections to the specifics of the bill are as follows. The first is lowering evidentiary standards for adverse actions for misconduct allegations. Replacing the preponderance standard with substantial evidence eviscerates due process. With misconduct charges, there needs to be a finding of fact. With proposed change, there will no longer be a finding of fact with misconduct. As with Mr. Comey, it will be enough for the boss to simply want someone gone.

The second and equally irresponsible provision of the bill is to prohibit administrative judges at the MSPB from mitigation of penalties. The VA will be able to fire with scant evidence of wrongdoing and reviewing authority will have no ability to correct the injustices by making the penalty match the offense. The prohibition on mitigation throws four decades of jurisprudence out the window. No more progressive discipline or consideration of whether the penalty is appropriate. No consideration of the nature of the seriousness of the offense, the level of the job, the employee's record, or whether others have committed the same offense and received a similar penalty. No rehabilitation and no consideration of the circumstances.

This bill is a serious mistake. We will all miss the apolitical professional civil service when it is gone, and this bill will have made a major role in its demise.

[The prepared statement of Mr. Cox follows:]

PREPARED STATEMENT OF J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

INTRODUCTION

MR. CHAIRMAN, RANKING MEMBER TESTER, AND MEMBERS OF THIS COMMITTEE, My name is J. David Cox, and I am the National President of the American Federation of Government Employees, AFL–CIO (AFGE). On behalf of the 700,000 Federal and District of Columbia employees represented by our union, including over 250,000 at the Department of Veterans Affairs (VA), I thank the Committee for the opportunity to present AFGE's views on the subject of this hearing: the "Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017." In AFGE's view, this bill not only decreases accountability at the VA, it eviscerates the agency it is supposed to improve, and ensures that no employee ever gets a fair shake on any proposed adverse action. Its name should be changed to the "2017 Scapegoating VA Rank and File Employees for Political Expediency Act."

In my nearly five years as president of AFGE, I have never testified at a more important hearing than this one. It is important, not only for the VA and the veterans that we serve, it is also important for the men and women I am proud to represent. Finally, it is important because passage of this horrible bill would undermine the apolitical American civil service, perhaps the least appreciated and most threatened pillar of our democracy.

105

At issue is whether the United States, the most advanced country in the world and the leading democracy, will continue to have a merit-based career civil service, selected, promoted and retained on the basis of ability and competence, or whether we will descend back into 19th century corruption and all the maladministration of government that brought us.

Before I was elected to national office in AFGE, I worked for 22 years at the Salisbury, North Carolina VA Medical Center as a Registered Nurse. I love the VA and the veterans we serve, and the future of the agency means the world to me. I also care deeply about our democracy, and I am appalled at the political cynicism and short-sightedness that this bill represents.

While today we are focusing on the VA, much more than just the VA is at stake. The Veterans Health Administration is somewhat of a microcosm of the many ideas and institutions whose future is being hotly debated in politics today. I will discuss three: The first is health care. The second is the role of the Federal Government in providing essential services and on what terms these commitments will be met. The final issue is the status of the career civil service, and whether we will continue to administer government programs with apolitical professionals hired by the government, or whether most of what the VA does should be contracted out to favored private-sector firms, or even abandoned altogether.

First, let's deal with the backdrop—the American health care system. The VA operates the country's largest integrated healthcare system. The military veterans it serves are the most deserving group one can imagine. The commitment we have made to veterans is to care for those who have borne the battle. The VA cares for aging Vietnam-era veterans, veterans from the Korean War era and even some surviving WW II veterans. In the past 15 years we have added many more veterans who have served this country in Iraq and Afghanistan and other more recent conflicts. Almost all of these veterans often have ongoing service-connected illnesses and wounds, emotional and physical.

The VA has always been there to serve them. The economic cost of caring for these veterans is high and budget politics have been an ever-present threat to quality and accessibility. It is astounding that while there are reportedly up to 45,000 unfilled positions in VA healthcare, Congress has chosen to focus on attacking the rank and file employees who are have made the choice to spend their careers caring for this cherished group. Rather than addressing the critical need to fill thousands of urgently needed positions at VA in order to better serve veterans, this cynical, ideologically driven bill seeks to fire more VA personnel. Talk about misplaced priorities.

Why punish the VA's rank and file? Why punish the employees of VHA? There is no question that VA healthcare is of the highest quality. And that high quality healthcare is provided by the same VA employees this bill attacks. Every independent study has confirmed that the outcomes of VA provided healthcare are at least as high, and frequently higher than care provided by any other hospital system. Veterans know this and numerous surveys show that they very much like their VA-provided health care. They want more of it, not less.

Ever since the Phoenix waitlist scandal, the future of the VA became fodder for 24 hour cable news, largely fed by the right-wing. The focus of discussion for many politicians has been how to dismantle the VA piece-by-piece and outsource it to the private sector. Well-funded and therefore politically powerful groups have seized the opportunity to cement a narrative that the VA is "broken." Their purpose is to discredit the VA by blaming its problems on its rank and file employees and the fact that it is a government agency. Their real objection is that few are able to make profits on VA care.

I challenge anyone on this Committee to find a major healthcare provider, private or public, that doesn't face significant challenges. Most don't make the news because they are not answerable to the public the way the VA is, and most are able to fire or otherwise silence whistleblowers with ease. But anyone who has gone to a private hospital or even an emergency room can tell you about long waits, enormous bureaucracy, and waste, fraud and abuse. They can tell you about how getting an appointment with a specialist takes at least three months. That is sadly part and parcel of our healthcare system, including private sector providers. Just look at any hospital bill, or talk to any physician or nurse, and they will tell you of the complexities and contradictions of America's healthcare system.

Fortunately veterans have the VA, a system that does not charge them and that covers them extremely well. It is so much more than just a healthcare system. It is also a community that understands the unique needs of those who have served this country. Whatever ails VA healthcare delivery reflects America's overall healthcare system—and in most cases, the faults are more severe among private hospitals and healthcare facilities. The critics of the VA will never admit this, so

106

I will tell you. There is big money in VA healthcare and the privatizers salivate at the opportunity to gain access to those dollars. They try to hide their avarice with platitudes about "serving veterans," the "broken" VA and the miracles of the market, but the reality is that they hate the idea that a large government agency so successfully provides care to veterans, and they want a "piece of the action."

The VA may not be perfect, but it is better than any other healthcare system at serving veterans with special needs associated with service-connected illness, injury, or disability. The VA makes no money off veterans. Its facilities may not be glamorous. Yet every important indicator of quality of care strongly confirms that the VA is a success. The Committee should recall that the Phoenix scandal began with a wait times issue. I will not defend the manipulation of wait time data, but that was not an issue of quality of care. It was an issue of resources, combined with a performance bonus system for executives that incentivized lying and cheating. It is absolutely unconscionable that from those facts has come the deplorable legislation before you today that undermines the foundation of the civil service.

So let's be honest. None of this is really about veterans or the VA or accountability. It's about politics. I do believe that everyone wants the best care for veterans. I wish we were having a debate on how to provide that care and to ensure accountability for all those who are charged within doing so. But that is definitely not what is happening here.

We are here today because politicians understand that "You're FIRED!" is popular as a way to address complex issues. "You're FIRED!" is popular as a way to deflect responsibility from management decisionmakers and place it on the rank and file. We have before us a bill that wrecks the civil service and is justified only by reference to the false claim that the most extreme examples of misconduct are occurring all over the place. In fact, outrageous instances of misconduct are exceedingly rare. It must also be noted that some authors of this bill have a long track record of denigrating virtually every known government program except those that personally benefit them. No one who values the VA or respects veterans should support this legislation.

I have been specifically asked by this Committee to address the changes to the civil service due process provisions contained in the scapegoat/firing bill, the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017.

Before I address the specifics of these proposals, let me state that AFGE and its members have no use for people who abuse the public trust, who engage in unlawful conduct, who violate government rules, and who are demonstrably poor performers. We want those people out of the VA every bit as much as anyone—maybe more so. Employees who engage in misconduct or who are genuinely poor performers ruin the reputation of the agency and add more work for those who perform well and play by the rules. So you will not hear me or anyone in this union defend a person who steals drugs or watches pornography while on duty. In fact, AFGE counsels such employees to resign. We certainly will not defend their matters in arbitration.

The bill before you is a regressive piece of legislation. It takes us backward, not forward. Although marketed as a bill to make it easier to fire bad employees, the proposals are designed to kill off and bury the apolitical civil service. It makes it just as easy to fire a good employee, an innocent employee, as it will be to fire a bad employee. No one should pretend otherwise. The VA can and should terminate people whose conduct or performance justifies termination. But it is absolutely not necessary to destroy the foundation of the civil service in order to allow them to do so.

The legislation takes time-tested procedures for civil service removals and turns them on their head in order to accomplish a clearly political agenda. Every single study or report of civil service removal procedures has stated that the principle reasons poor performers are not removed expeditiously are management ignorance and aversion to conflict, i.e. incompetence. It has nothing to do with the underlying laws.

Federal managers, including those at the VA, do not lack adequate authority or tools to discipline those who engage in misconduct or who are poor performers. The Government Accountability Office (GAO), the Merit Systems Protection Board (MSPB) and the Office of Personnel Management (OPM) have all issued reports and analyses that have come to the same conclusion: When poor performers are not dealt with it is not because the civil service laws or procedures are too difficult to utilize. It is because managers do not want to put forward the effort to properly document poor performance so that they can remove or demote these people.

A recent GAO report, "Improved Supervision and Better Use of Probationary Periods Are Needed to Address Substandard Employee Performance," (GAO–151–191), February 6, 2015, found four main reasons why agencies do not use the already substantial tools they have available to them to remove poor performers. All four reasons related to management failures and/or unwillingness to properly identify and

107

document poor performance. Had this Committee taken GAO's well thought-out recommendations into consideration, the bill before us would never have been written.

Instead we have a cynical effort to ride the wave of public outrage over some legitimate problems that union whistleblowers and the VA Inspector General have brought forward and use it to destroy yet another union and the civil service. We continue to hear whining from management that civil service due process procedures are just too difficult to follow. They sound just like the President whining that his new job is too hard. S. 1094 accommodates these pitiful managers completely. Firing is too hard for you? Don't worry, we'll make it easy. We'll rig the system so no matter what you do, you'll be called a huge success. We'll let you fire the employee right away, and deal with due process in the future, if ever.

To call this a dangerous precedent is an understatement. To anyone who cares about the apolitical and objectively qualified civil service this bill is a disgrace.

The premise that the procedural hurdles for removing poorly performing employees are too high is simply untrue. When an employee invokes his/her rights to a formal adjudicatory hearing before the Merit Systems Protection Board (MSPB), the agency almost always prevails. For example, in 2013 only 3% of employees appealing their dismissal to the MSPB prevailed on the merits. In contrast, agencies were favored at a rate five times that of employees when formal appeals were pursued. The notion that the MSPB makes it impossible to fire a Federal employee is simply a myth.

GAO reviews and reports (e.g., GAO–15–191) have consistently found that the underlying reasons for permitting poor performers to remain in Federal service are managers' failure or unwillingness to document poor performance in accordance with due process procedures available to them under the Civil Service Reform Act. The bottom line of the GAO report is that lack of performance management by supervisors is the underlying reason why poor performers are not dealt with. Indeed, the preponderance of the evidence points in only one direction: the complaint that "it's too hard to fire a Federal employee" is not supported.

Let me address some of the most egregious and shameful aspects of the bill:

### EVIDENTIARY STANDARD FOR MISCONDUCT

S. 1094 replaces the current evidentiary standard for misconduct removals (and other adverse actions) from a "preponderance of the evidence" standard (meaning more than 50% of the evidence must support the agency's recommendation) to a "substantial evidence" standard (meaning the agency only needs, among other things, more than "a mere scintilla of the evidence" to meet its burden of proof). The substantial evidence standard, with strong advance notice safeguards, is currently only used for performance-based firings, suspensions, and demotions. Applying this standard to misconduct cases would mean that even when the majority of the evidence supports the employee, he/she will lose.

With the current preponderance of the evidence standard, agencies win about 80% of all contested cases before the Merit Systems Protection Board (MSPB). Lowering the standard of review would mean that actual misconduct would need to be established before an employee could be fired. This upends nearly 140 years of civil service law, and makes VA employees very close to "at will" (which seems to be the real objective of the drafters of this provision).

There is a good reason why Congress has required different evidentiary standards for performance and conduct. When an employee receives a notice of a proposed adverse action related to performance, he or she has the opportunity to repair any performance failures through a Performance Improvement Plan (PIP). In contrast, allegations of misconduct must be validated with a higher standard of evidence because the question is only whether the alleged misconduct occurred.

This lower evidentiary standard is virtually pro forma, not a standard associated with the genuine administration of justice. It is yet another example of the cynicism that underlies this legislation, providing a false notion that due process is being upheld, when in fact, it is being eviscerated.

### MITIGATION OF PROPOSED PENALTY

S. 1094 would prohibit MSPB administrative judges (AJs) from mitigating management's proposed penalty for misconduct. Under current law, MSPB AJs can reduce a proposed penalty for misconduct if the facts of the case warrant a lesser penalty. Removing the ability of MSPB AJs to mitigate a proposed penalty is not only unjust, but will also result in "penalty overcharging," meaning that a proposed penalty need not actually reflect the underlying charge. Combining a lower evidentiary standard of review to sustain a misconduct charge along with no ability to mitigate a proposed penalty means that employee appeal rights will be effectively neutered.

108

The VA will be able to fire employees with scant evidence and no ability for the reviewing entity to correct these injustices. This provision is the antithesis of justice and undermines not only the rights of the employee, but also the independence of the MSPB.

This provision also jettisons almost four decades of jurisprudence that followed the MSPB's 1981 decision in Douglas vs. Veterans Administration which gave rise to the use of progressive discipline in Federal personnel management. The basic principle of justice, that the punishment must fit the offense which was enshrined in the Douglas decision, has served the government well, and if S. 1094 becomes law, the Department of Veterans Affairs will have abandoned this management "best practice" altogether for an "Apprentice" TV-show type of system (You're FIRED!).

I ask you to consider these "Douglas Factors" for a moment and decide whether your intention is actually to throw away this eminently reasonable set of considerations. The Douglas Factors allow mitigation of proposed penalty after the following are considered:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. The potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

These factors are designed to ensure that the penalty selected by the agency fits the employee's alleged offense. Why are these controversial? Perhaps it is because those who genuinely wish to see this legislation enacted really don't care about the civil service or due process, and are particularly enraged that a government program such as VA healthcare actually works. Or perhaps, they just see political expediency in not challenging well-funded ideology-based advocacy courtesy of the Koch brothers and their allies.

PENSION FORFEITURE

The proposed legislation authorizes pension forfeitures for certain felony convictions for every VA employee. This would include Wage Grade 2 housekeepers and cemetery workers, virtually all of whom are veterans with service-connected disabilities. Private employer pension plans under the Employee Retirement Security Act of 1974 (ERISA) do not authorize pension forfeitures except for fraud against the pension plan. AFGE recognizes that there is precedent for Federal employee pension forfeiture, but these forfeitures have always involved involve espionage and treason, not drunk driving convictions.

It is curious that people who usually promote following private sector practices for Federal Government personnel have suddenly abandoned this principle when it comes to taking away earned pensions.

SUPERSEDES COLLECTIVE BARGAINING AGREEMENTS AND IMPOSES UNWORKABLE TIME FRAMES ON THE REMOVAL PROCESS

The proposed legislation supersedes the timeframes specified in current active collective bargaining agreements (CBAs). It also imposes unworkably short timeframes on grievance procedures and non-grievance based adverse actions. That Congress would summarily upend collective bargaining agreements in the middle of the term

109

of the agreement is an unprecedented attack on the integrity of the collective bargaining process and union contracts.

The proposed legislation provides that from date of first notice to the employee until actual removal that not more than 15 business days elapse. Employees are given only 7 business days to respond to the notice. Following removal, employee have only 10 business days to appeal the VA's decision to the MSPB.

Contrast these timeframes with the rights given to VA contractors. They have a minimum of 90 days to appeal a contracting officer's adverse decision to the Board of Contract Appeals (BCA), and one year to appeal to the U.S. Court of Federal Claims, if they decide to forego a BCA appeal. It is absolutely stunning, and a very sad commentary on the state of Federal agency priorities that employees are given such short response and appeal times, while favored Federal contractors are given months, and even up to a year to appeal VA decisions to the BCAs and a Federal court.

A merit-based civil service system is a cornerstone of a democratic society. It ensures that technical expertise is brought to bear on performing government agency work, without the threat of overt partisan agendas driving day-to-day operations. Agency career employees remain accountable to politically-appointed officials, but those appointees, and supervisors who serve under them, may not take actions against career employees for misconduct or poor performance without at least providing some level of due process to the employee, including third-party review by neutral decisionmakers. Career employees are only supposed to be fired for good cause, and "good cause" means reasons supported by evidence.

The Civil Service Reform Act (CSRA) of 1978 provides the modern-day basis for both selection of most career civil servants, and their protection from unwarranted personnel actions, including firings motivated by politics, bias, or other non-merit-based reasons. This CSRA protects the public from having their tax dollars used for hiring political partisans for non-political jobs, and helps ensure the efficient and effective governance of Federal agencies.

The CSRA provides that employees may be removed for either misconduct or poor performance. The employee merely needs to be informed of his or her alleged deficiency and the reason that management proposes to take an action against him or her, whether it be firing, demotion, or suspension.

Forty years of case law shows unambiguously that the CSRA does not give unfair advantages to Federal employees. Agencies prevail in 80%–90% of all cases at the MSPB administrative judge (AJ) level, and only about 18% of all AJ decisions are appealed to the full Board. AJs are upheld by the full MSPB in about 90% of all appealed cases.

It is very important to note that following an agency's adverse decision against an employee, the agency's decision is automatically effected. For example, the employee is removed from the agency's rolls the day of issuance of the decision or within several days following the decision. An employee removed by an agency receives no pay during the appeal process.

During the debate on VA firing I have heard several lawmakers and others argue that it takes forever to get rid of a bad VA employee. This is simply untrue. In almost all cases, an employee may be fired within 30 days of the first notice. Even when an arbitration procedure under a collective bargaining agreement is invoked the agency can fire the employee after 30 days, and the employee receives no pay during the entire appeal or arbitration process. They are off the agency's payroll. Attempts to portray removed employees appealing their removals as somehow lounging on the dole while their appeal is processed are simply untrue, and frankly dishonest. It doesn't matter whether the appeal route chosen is the MSPB or arbitration. The employee receives no pay. Anyone who says otherwise is lying or ignorant or both.

The importance of maintaining a nonpartisan, apolitical civil service in an increasingly partisan environment cannot be overstated. First, most Federal jobs require technical skills that cannot simply be obtained through non-merit based appointment. Second, career employees must be free to perform their work in accordance with objective professional standards. Those standards must remain the only basis for evaluating employee performance or misconduct.

Bills like S. 1094 that decrease due process rights are "dog whistles" for politicizing the civil service, subjecting the Federal workforce to partisan or personal whims of supervisors and political appointees. Whatever lack of public confidence in government exists today will be magnified a hundredfold if all civil servants become de facto political appointees, serving at the whim of supervisors. And that is exactly what this horrible piece of legislation will do.

Federal managers are already empowered under existing civil service laws to take appropriate action when employees are underperforming or engaged in misconduct.

110

There is no group who objects more to the continuing presence in the workplace of those who are not performing well or who engage in misconduct than fellow Federal employees. When someone doesn't perform up to speed, it simply means more work for the rest of the people who do perform well.

THE REAL ISSUE—AGENCY RELUCTANCE TO DOCUMENT EMPLOYEE PERFORMANCE IN ACCORDANCE WITH DUE PROCESS PROCEDURES

In 1978, Congress enacted the CSRA, which is the modern-day statute governing civil service protections. In considering the law, Congress was specifically concerned about balancing employee rights and maintaining a non-partisan civil service with the need for management to deal with poor performers, or unacceptable conduct.

To help agency managers deal with poor performers, the CSRA included a new section, Chapter 43, specifically addressing performance issues. As previously mentioned, this chapter set a lower standard of review of agency decisions with respect to performance issues among employees, and restricts the MSPB from modifying agency determinations regarding removal of poorly performing personnel.

The GAO report previously mentioned (GAO–15–191) suggests many reasons why managers are sometimes reluctant to address performance issues. It also explores the many myths surrounding removal of poor performers. GAO's report echoed findings of the MSPB in its reported entitled, "Addressing Poor Performers and the Law" (September 2009). The fact is that the laws governing the firing of poor performers, primarily Chapters 43 and 75 of title 5, are straightforward and not unduly burdensome to agencies. However, the due process procedures inherent in these laws require documentation between the supervisor and the employee that addresses the performance or conduct issues. This can be very difficult for some supervisors. Nevertheless, the law is clear, agency supervisors have many tools available to them to address performance issues, and to fire poor performers.

CONTINUED DENIGRATION OF VA EMPLOYEES

As Members of this Committee are undoubtedly aware, continuing partisan attacks on the work of VA employees only fuels a self-reinforcing feedback loop. Employees know they are punching bags. Morale plummets as a continuous stream of anti-Federal worker proclamations, almost all false or highly exaggerated, emanate from elected or appointed leaders. Not long ago, the majority leader in the House of Representatives wrote an op-ed in the Wall Street Journal describing the "Federal bureaucracy" as the entity that "poses the greatest threat to America's people, economy and Constitution." Such criticism is not only false, but misleads people into thinking that career civil servants create statutes and regulations wholly apart from supervision by elected leaders and political appointees. Anyone who has worked in Federal service will tell you that employees follow direction, whether that direction comes from Congress, the President or other politically-appointed officials. In other words, career Federal workers respond to and implement duly enacted laws and policies. They do not create these policies.

In all my years as an elected official of AFGE, I have never seen fit to denigrate my own staff. No leader should do that. There have been situations where employees have been disciplined or dismissed. But taking a battle axe to all employees and describing them in broad terms as "threats" to the American people heralds a new low in misinformation and outright dishonesty. As I told several news outlets at the time, "To call civil servants—one-third of whom are veterans—a 'threat to America's people, economy and Constitution' is an insult to the men and women who dedicate their lives to the programs and services that benefit all Americans."

HOLDING THE VA ACCOUNTABLE

AFGE agrees that VA employees should be held accountable, and we also believe that includes VA managers, supervisors and political appointees. Statements implying that employees cannot be fired for months or years, or that fired employees remain on the government payroll for long periods while pursuing appeals following removal demand accountability every bit as much as an employee who is chronically late to work.

These are dishonest statements and VA leadership should be held to account for this dishonesty. If they can't fire, demote or properly discipline employees under current civil services rules, AFGE questions their competence to manage and lead such a large and complex organization. If they cannot hire for 45,000 health care vacancies, the same is true. They lack the competence to manage and lead the agency. Seeking the easy way out is not leadership. It is a politically-motivated response to fecklessness and incompetence.

111

Regardless of the outcome of the debate on this legislation, AFGE calls on this Committee to demand from the VA Secretary the following data on the number of employees fired, suspended or demoted ("adverse actions") by the VA under applicable statutory or regulatory authority; more specifically the following:

1. The number of employees proposed for and actually subject to adverse actions;
2. The veterans status of employees subject to adverse actions;
3. Locations, demographics and grades, and reasons for adverse actions; and
4. Periods of time to effect adverse actions from date of first employee notice until final agency decision.

We have yet to see this data, and we believe it will better inform the debate, not only as to whom the VA is disciplining, but also as to the level of competence within the agency in managing its personnel functions. We also believe that the Committee should focus more of its attention on the failure of the agency's leadership to fill the reported 45,000 healthcare vacancies. Firing should not be your only concern. Hiring deserves at least as much attention.

A BETTER WAY FORWARD

History is replete with examples of public service corrupted by unfettered, politically-based employment decisions. That's why we continue to support a merit-based civil service system with appropriate due process, and checks and balances to ensure that both hiring and firing decisions be merit-based, and subject to meaningful review.

AFGE strongly supports improvements in agency performance management systems, and we look forward to working with lawmakers and other interested stakeholders to see this carried-out. AFGE also supports better training of both VA supervisors and employees so that clear expectations are established, performance is measurable, and appropriate steps are taken to either remedy performance problems, or to remove poor performers from the workplace.

AFGE vehemently opposes S. 1094, one of the worst pieces of legislation of the modern era. This legislation is an affront to hard working VA employees, more than a third of whom are veterans, directly lowers objective standards of review of proposed adverse actions, impinges on the union's ability to defend meritorious cases, and unfairly penalizes employees for what could be trivial offenses. S. 1094 will corrupt and ultimately destroy the professional civil service and return the country to the days of the "spoils system" of government employment.

CONCLUSION

Attacks on government employees and the civil service in general may make for good politics, but they make for bad government. AFGE is aware that dealing with problem employees is essential to sound public administration. But the vast majority of employees at the VA perform well. Agency systems and the laws and regulations governing employee performance are well-thought-out. The issue is not whether the laws or regulations governing the civil service are adequate, but whether agencies, including VA managers and supervisors have the tools, training and will to effectively implement current rules. The current mindset of the VA and supporters of this legislation in Congress seems to be that fast and easy firing of employees will magically solve the VA's problems. Think again. This will cause far more problems than it will solve.

I urge the Committee to reconsider the very dangerous and ultimately destructive personnel provisions of this firing bill.

Thank you for your time and consideration and I will be happy to answer any questions you may have.

Chairman ISAKSON. Thank you, Mr. Cox. I will start and take 5 minutes, and then go to the Ranking Member for 5 minutes.

Let me first of all, Mr. Atizado, in your introduction of yourself, or the introduction of your statement, you made the reference to your organization being the largest claims organization in the world. Is that correct?

Mr. ATIZADO. In the Nation. I do not know about the world.

Chairman ISAKSON. In the Nation.

Mr. ATIZADO. Yes, sir.

Chairman ISAKSON. The nation is big enough so we will take that.

112

Mr. ATIZADO. Yes, sir.

Chairman ISAKSON. I think in your testimony, that caught my ear because that is what this appeals process is all about, making sure that people are treated right that are injured and have an appeal for a benefit and have a right to a benefit. I appreciated the time that you took to explain the effort you all went through to examine the appeals bill, and I appreciated the comments that you made. Would you thank your organization for that?

Mr. ATIZADO. I am sorry. What was the question?

Chairman ISAKSON. Be sure to thank your organization for that.

Mr. ATIZADO. Definitely, sir. I will be honest. We have a lot more intelligent people than in our organization, that have worked hand-in-hand with the VA for this bill, so the thanks goes to the VA as well.

Chairman ISAKSON. DAV is a great organization and our disabled veterans bear a scar for the rest of their lives, and we owe them a tremendous obligation. One of those obligations is to see to it that appeals of any claim that they have made are handled expeditiously and quickly. Now with this bill passing, hopefully in the next few weeks, they will be doing exactly that, and that will be a great day forward.

Ms. Jaslow, thank you for mentioning Memorial Day. Unless I missed it, of all of us on the Committee that asked questions and made opening statements, and of all of you who made statements, yours was the one that made reference to not forgetting that next week is Memorial Day, or within a week or so is Memorial Day, which is a very important day for our country.

I would just encourage all the Members—I cannot ask anybody or tell anybody to do anything, but I hope all the Committee Members will take time during the Memorial Day break to spend at least a little bit of time each day making sure our young people and our supporters and our voters understand the value that we have in the sacrifice that was made by the veterans of America who died so that we could have the liberty and the freedom that we are enjoying today.

I always tell the story, when I make Memorial Day speeches, about Roy C. Irwin, a veteran from World War II, in 1944. When I went to the Margraten Cemetery in the Netherlands and walked down the rows of crosses, on row 24 I came to the last cross in the row, and I go to each one and look at the dates and the place and the name of the individual who is buried there. The last grave in row 24, Roy C. Irwin of New Jersey, died December 28, 1944, was interred. I stopped in my tracks for a second, took a deep breath, and realized that the day I was born was December 28, 1944, I was standing on the grave of an American soldier from New Jersey who died on the same day I was born, so that I could enjoy the life that I have enjoyed over the last 72 years.

So, I think when all of us take a moment to talk about Memorial Day, we can talk about that sacrifice those soldiers made so that all of us who are here today, living and enjoying the freedoms of the United States of America, realize that, in large part and measure, that was paid for by singular American efforts who volunteered on our behalf, sacrificed their lives, and died for our freedom and our ability.

113

So, I just wanted to throw that in. I hope everybody will take a second to tell their own stories during that time.

I want to thank the input that everybody has given to the appeals process. We are excited about trying to get something fixed that has been broken for a long time and I appreciate the VA's attitude toward helping us to do that. I understand there is some concern and input on the accountability portion, but I think we have done a good job of hearing from everybody and putting together a piece of legislation that works for the Veterans Administration, the employees of the Veterans Administration, and the taxpayers of the United States of America, who pay for the Veterans Administration. I also appreciate the Ranking Member's cooperation in working with all of us on all these pieces of legislation, to make them happen.

Last, I will make a comment. Of all the legislation we have talked about today, everybody left out the one piece of legislation that a lot of people would have thought we would have mentioned first, but I think it shows the integrity of these organizations and the integrity of our vets and the integrity of the VA. But nobody mentioned the cost-of-living (COLA) increase that Senator Tester and I have put in, because they are taking it—that maybe we were going to make sure that happens. That shows we have got a good self-interest in part of all our people testifying here today.

Ranking Member, would you like to ask a question?

Senator TESTER. Yeah. Thank you, Johnny. I think we all have our Veterans Day memories of what has transpired and what that day is all about, and, quite frankly, what every day should be about. Every day should be Memorial Day for the people of this country.

I will just pass along a little story. When I was a seventh-grader I got tabbed to be the VFW bugler, which was kind of a big deal because everybody in the whole damn town would show up for Memorial Day. They would do the roll call, and at that moment in time—this is the late '60s so there were still a few World War I guys around. It was always an amazing experience.

I will never forget what one of them said to a 13-year-old kid, which was that we never want to forget that war is a god-awful thing, and you do not put people in harm's way without knowing what you are doing. You know, those are old World War II guys that knew what it was like. They knew getting your arm blown off was not something that was a pretty sight. Watching a guy die was not a pretty sight either. So, kind of interesting.

So, I thank you guys for your service and the folks you represent. I do want to thank—a couple of thank yous—number 1, to all five of you for the people you represent. Thank you for being here and representing them. For the VA staff sticking around and hearing this panel, I want to thank you for that. Oftentimes we have two panels and the first panel gets up and leaves, and I know you have got work to do, but you stuck around and I want to acknowledge that.

I know that Ms. Flanz is here. If there are any questions on MSPB, which Mr. Celli, you brought up, and their ability to make decisions, certainly utilize her.

114

I have got a couple of questions. Actually, I have got more than a couple. I want to start with Allison, with the IAVA. There was a GAO study that came out in December 2016, that found that across the VA system there was a significant lack of providers available for women veterans—I think you referenced it in your statement—as well as significant privacy issues.

I am interested to know how seriously you think, or IAVA thinks, that the Veterans Administration is taking these findings seriously, and if you have seen any changes since that report was issued.

Ms. JASLOW. Well, I certainly believe any person at the VA who I have talked to, and I believe many that you all have talked to, have very good intent. I think one of the reasons why we appreciate not only your leadership, sir, but why we are getting behind the Deborah Sampson Act is because, like many of the things at the VA, it is not happening fast enough.

I believe there was somebody on the panel ahead of me who said that she was able to quote how many VA facilities have gynecologists, but that clearly means that not all of them do, which means that you have VA health care centers that adequately support men and ones that inadequately support women.

We talk a lot about how the culture needs to be more welcoming, but one of the other barriers is women just do not think that they are going to get treated in the way that they need to be treated when they go into the VA.

To answer your question, sir, we are still talking to members. You know, I already told my story of running into snags when I walk into the VA. More work needs to be done, and what we really need to do is jump-start it. I think that, you know, our approach is not only raising awareness of this issue. I really do not think that you get the fuel in the tank that you really need to get this done until people really feel like it is an issue, so that is the first step. But the other step we have outlined in the bill.

Senator TESTER. OK. Very good.

Adrian, with DAV, you issued a fine report a few years ago titled "Women Veterans: A Long Journey Home." It had some compelling facts and findings about the challenges unique to women veterans. Have you or anybody within your organization spoke to the VA about this report, and what kind of reception have you received?

Mr. ATIZADO. Senator Tester, thank you for that question. VA has been more than welcoming of that report. If there is one thing I do find quite impressive about VA is that they are not shy about asking themselves what they are doing wrong and correcting those deficiencies. They are very much involved with trying to address those issues in our report, within their jurisdiction, because that report spans the entire Federal Government. We are trying to update that report now to reflect the abundant good work that VA has done.

I just want to tag on to what Allison had mentioned. You know, this bill—these two bills are good for a start, I think. It is important that we have these policies in place, these artifacts that show that VA's culture is, in fact, inclusive and respectful of women veterans and their service.

Senator TESTER. In their testimony, VA said they did not support compiling a report—and this is for any of the VSOs—a report on

115

how they are doing on providing prosthetics to women veterans. We hear, quite frequently, the VA's ability to provide gender-specific prosthetics is inconsistent, at best.

It does not have to be all of you, but it can. Can you share some insights from your membership on women veterans where it comes to prosthetics?

Mr. ATIZADO. So, if I can, for my colleagues, if you do not mind, we have a very active member of our organization and she had sought a prosthetic appliance from VA; at that time the only thing available was a male prosthetic. We thought that was falling a little short of what we expected of VA. They tried to make it work but clearly it did not.

We think these reporting measures are critically important. Our testimony says, though, that these reports should include a little bit more personalized reporting: how women veterans perceive these services and these programs, whether it speaks to them and their needs, whether it is respectful of them, and whether they are satisfied. I think adding those would make this bill just a little bit stronger, sir.

Senator TESTER. OK. Thank you. In closing, really quick, I just want to say that I met with about a dozen veterans, Vietnam veterans and veterans that have come back from the Middle East, up in Kalispell, MT, this last week, and we talked about many of these bills. I cannot tell you how committed they are to making the VA the best it can be and not privatizing the VA, which I think is important to be said here, because there are people around—I do not know around this dais, but maybe around this dais, certainly in the House, that want to privatize the VA. If we are not continually working to make the VA the best it can be, it will be privatized, and I do not want to see that happen, personally.

So, we thank you for your advocacy, and we look forward to working with everybody to try to make the VA the best it can be. It is an important backstop for our veterans.

Thank you, Mr. Chairman.

Chairman ISAKSON. Senator Blumenthal.

Senator BLUMENTHAL. Thank you, Mr. Chairman. Thank you all for being here and for all your tireless work for our veterans. If you were here earlier you may have heard my questions about the Veterans PEER Act, and I would like to reiterate them to you, without going through all the provisions which I am sure you know. I would like to know from you whether you think that these kinds of support specialists are necessary, whether they perform a function, and whether they ought to be an integral part of our mental health care service and primary care team for our veterans.

Mr. CELLI. Well, I can tell you that The American Legion has long been a supporter of peer support. We find that it is the best way especially for veterans who are new to the VA system to become comfortable with the system and to integrate well. Incorporating them into the PACT model is really the right thing to do. I just do not think that there is any—we believe in it so much we actually passed a resolution specifically supporting it.

Senator BLUMENTHAL. Thank you. I would welcome other comments.

116

Ms. KELEHER. The VFW has long been very supportive of expansion of peer support specialists, and as we said, we very, very adamantly support it, not just for gender-specific care but for mental health care and many other areas. It is something that we look forward to continuing to work on.

Senator BLUMENTHAL. Great.

Ms. JASLOW. I would be happy to chime in, sir. Specifically related to women, you know, I think something that I would encourage you to think about, as you are working within this chamber, if people do not feel like they can navigate the VA system, whether they are welcome at the VA, whether it is even a place that does not overwhelm them, they are not going to take advantage of no matter how great of care that you try to provide for them.

So, simply having somebody, especially somebody who can help somebody through foreign territory, which, if you are a woman walking in there, not only is there for most of our generation a generational divide, but a gender divide. So, we are strongly supportive of it as well.

Senator BLUMENTHAL. Great. Mr. Cox?

Mr. COX. Senator Blumenthal, I think that peer support is really important, and also I think the greatest peer support is that at the VA, over one-third of the employees are veterans themselves. They are the shining star. They work there. They get their care there. They believe in it. They are committed to it. I see that committed staff every day as they find veterans that are struggling to maneuver the system, that, hey, they reach out, they share, even if they are in VHA, about VBA, and other benefits, and the coaching and mentoring. I think there is no bond greater than what you find amongst veterans, and I believe every one of the veteran service organizations would join with me in saying, you know, peer support, let us support it, but let us also fill those 45,000 vacancies at the VA so that every veteran gets all the care they fully deserve.

Senator BLUMENTHAL. Well said, and points well taken. We tend to overlook the fact, all too often, that a vast number of the VA employees are veterans themselves, and they care more than anyone about keeping faith with our veterans. I think that peer support is extremely important and we should recognize, as all of you have said that veterans are often the best source of care for other veterans, because they tend to understand their brothers and sisters, and it is the reason why veterans want the VA health care system to continue to exist. I think of all the reasons that veterans support the VA health care system, that may include the best equipment, medicine, care, but it is also the fact that it is provided, often, by veterans, with other veterans at their side.

I want to just say, finally, in the few seconds that I have left, I have been working very, very hard on this Appeals Improvement and Modernization Act of 2017. This backlog and delay in addressing claims by veterans—many, many of them justified and deserving—is a scandal for our Nation. The present backlog and delay is unacceptable, and I hope that you will join me in pursuing the bill, which is based on a framework that the VSOs have helped to devise. I want to give you credit for it because you have participated, along with experts and the VA itself, in the appeal process. It would consolidate the current appeals process into distinct lanes

117

that can be pursued more efficiently and effectively and fairly for our veterans. So, thank you for your help on it and I hope we can get it across the finish line.

Thanks so much. Thank you, Mr. Chairman.

Chairman ISAKSON. Thank you, Senator Blumenthal. I want to thank all our witnesses from the VSOs for your testimony today. Thank all your membership for their support in continuing with the Veterans Administration and this Committee's work. I thank the VA employees who were here earlier. I think their comments made about the value of those employees cannot be overstated. They are a tremendous asset for our country. And as Mr. Cox said, in the VA I think about one-third of employees are veterans themselves, and it means a lot to them to make sure they are providing that service as veterans, to the veterans who have served this country.

I appreciate all your testimony and input. We will leave the record open for 10 days, if there are additional submissions any of you may have. If there are no further questions, the Committee will stand adjourned. Thank you all for your attendance.

[Whereupon, at 4:38 p.m., the Committee was adjourned.]

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. BILL CASSIDY TO JENNIFER S. LEE, M.D., DEPUTY UNDER SECRETARY FOR HEALTH FOR POLICY AND SERVICES, VETERANS HEALTH ADMINISTRATION, U.S. DEPARTMENT OF VETERANS AFFAIRS

In your prepared remarks, you note that the Veterans Administration would like to require the use of ISBT–128 for all biological implants. However, I have several concerns with this position, as noted below. Could you address these in turn?

*Question 1.* The VA defines biological implants to include xenografts (animal-derived grafts) and not just those products of human origin. ISBT–128 (International Standard for Blood and Transplantation) is only suitable for products of human origin. How do you intend to track xenografts that are biological implants? What system will you use for those?

Response. The VA does not intend to use ISBT–128 for all biological implants. Only those implants of human origin would be required to have a distinct identifier such as provided by ISBT–128. Currently, ISBT–128 is the only available identifier for this purpose. VA would accept a distinct identifier for HCT/P (Human Cell and Tissue Products) from any Food and Drug Administration (FDA) approved source. VA's system will be robust enough to track any biologic implant including both allografts and xenografts. ISBT–128 will only be used for products of human origin.

Non-human products will be able to use GS1 (Global Standard One), HIBCC (Health Industry Business Communications Council) or other FDA UDI (Universal Device Identifiers) as appropriate.

*Question 2.* My understanding is that there are only 20 tissue processors within the U.S. that produce Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/P's) regulated as devices. According to a recent survey, of those 20, only 2 currently use ISBT–128. Have you checked with your vendors to ensure that you could have access to HCT/Ps if you move forward with your proposal to limit your issuing agency only to ISBT–128?

Response. VA has checked with its human tissue contractors and has been assured that they can provide ISBT–128 labeled tissue. Those who currently do not use ISBT–128, have indicated that they will be able to do so within a year if requested, at a minimal cost. As a result, VA intends to allow for up to a year for a vendor to come into compliance when it negotiates its contracts if they are not already using ISBT–128. It should be emphasized that a distinct identifier like ISBT–128 is essential to prevent the entry of prohibited tissue sources into the VA supply chain. It allows for the readily auditable trail necessary to ensure that only properly sourced tissue is in use by VA; the underlying intent expressed in the legislation.

While mechanical implants are regulated differently than human or animal derived implants, they could use the same tracking system for blood and biologics. A

118

common system would also be useful with the emergence of composite devices which combine both mechanical and biologic components.

*Question 3.* Obviously, track and trace efforts should be improved for all implants—not just biological ones. What efforts are you doing to maintain traceability in those areas? My understanding is that the vast majority of medical device companies within the U.S. are opting to use GS1 (barcodes) for labeling their devices. Does the VA have a process for utilizing GS1?

Response. VA does not have a process for utilizing GS1 at this time. Prosthetic & Sensory Aid Services is currently serving as a member of a VA cross-functional workgroup led by the Office of Strategic Integration (OSI) Veterans Engineering Resource Center (VERC) for implant tracking. This workgroup will identify and develop processes and process requirements that will meet all requirements established by FDA, The Joint Commission, and Congress for the tracking of implantable devices by September 30, 2017.

———

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. MAZIE K. HIRONO TO JENNIFER S. LEE, M.D., DEPUTY UNDER SECRETARY FOR HEALTH FOR POLICY AND SERVICES, VETERANS HEALTH ADMINISTRATION, U.S. DEPARTMENT OF VETERANS AFFAIRS

S. 899 VA VETERAN TRANSITION IMPROVEMENT ACT

*Question 4.* Deputy Under Secretary Lee, could you comment on the VA's current policies related to paid medical leave for your disabled veteran employees and how S. 899 would improve on that?

Response. Current disabled Veteran employees employed in the Veterans Health Administration (VHA) may request and use leave for medical purposes in accordance with established agency leave procedures. The proposal would require VA to establish a leave transfer program for the benefit of health care professionals appointed under 38 U.S.C. §7401(1) and authorize the establishment of a leave bank program for the benefit of such health care providers. Inclusion of this provision would ensure that disabled Veteran employees performing health care services in Title 38 occupations have the same opportunity to schedule medical appointments and receive medical care related to their disability without being charged leave as employees in Title 5 and Hybrid Title 38 occupations.

According to January 2017 data from the VA, there are over 13,000 Title 38 critical medical vacancies in the positions not currently subject to the Wounded Warrior Federal Leave Act (these are physicians, physician assistants, registered nurses, chiropractors, podiatrists, optometrists, dentists, and expanded—function dental auxiliaries).

*Question 5.* Does VA have a goal to hire veterans for these positions and if so, could you comment on the impact of the additional paid medical leave provided in S. 899 on efforts hire disabled veterans?

Response. VHA continues to encourage the hiring of Veterans for healthcare occupations, as well as other administrative, technical, professional, and clerical occupations. When filling Title 38 positions, VHA also needs to ensure the best qualified individuals are hired to meet the health care needs of our Veteran patients, as well as support our health care mission. The proposed legislation may assist in the hiring of Veterans for Title 38 occupations. Extending the current provisions of 5 United States Code (U.S.C.) section 6329, Disabled Veteran Leave, to Title 38 employees appointed under 38 U.S.C. §7401(1) would provide an opportunity for our disabled Veteran employees performing health care services in Title 38 occupations to have the same opportunity to schedule medical appointments and receive medical care related to their disability without being charged leave as employees in Title 5 and Hybrid Title 38 occupations. This will provide disabled Veteran employees an opportunity to undergo medical treatments for their disabilities without having to consider their leave balances or work-life issues to obtain such services outside of scheduled work hours. Although the disabled Veteran employees would be eligible for paid medical leave, the proposal is considered cost neutral as it will not increase VHA full-time employee equivalent levels or salaries of the employees.

S. 1094, DEPARTMENT OF VETERANS AFFAIRS ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT OF 2017

We all agree that more can be done to increase accountability for those at the VA who have betrayed the trust they have been given to serve our Nation's veterans.

While there are some good provisions in S. 1094, I am deeply concerned on the implications of the bill's provision lowering the evidentiary standard for misconduct

119

removals from a "preponderance of the evidence" standard (meaning more than 50% of the evidence) to a "substantial evidence" standard (meaning the agency only needs, among other things, more than a "mere scintilla of the evidence") as the Supreme Court defined in its 1971 decision in *Richardson* v. *Perales*. This new standard would mean that even when the majority of the evidence supports the employee, he/she will lose.

*Question 6.* Deputy Under Secretary Lee, can you explain how the VA can ensure due process for its employees under this bill when it says if the majority of the evidence supports the employee, he/she will lose?

Response. Employees at VA are entitled to constitutional due process and will continue to be entitled to constitutional due process even if S. 1094 is enacted into law. A change to the burden of proof from preponderant evidence to substantial evidence does not change an employee's right to constitutional due process.

At its simplest, constitutional due process requires that an individual receive notice of an action affecting the individual's interests and a reasonable opportunity to contest that action. Sometimes the notice and opportunity to contest must precede the action (pre-deprivation); sometimes it may come after (post-deprivation), in the form of a post-decisional appeal, whether to a third-party forum like the Merit Systems Protection Board (MSPB) or to the courts. Under S. 1094, this constitutional due process will not be adversely impacted. Under S. 1094, employees will continue to receive notice of a proposed disciplinary action, the ability to respond before a decision is made, and the ability to go to the MSPB or a court.

With regard to the burden of proof, a substantial evidence standard does not mean that an employee will lose, even if the majority of the evidence supports them. The MSPB defines "substantial evidence," the standard proposed under S. 1094, as the "degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree." 5 CFR § 1201.4(p). Substantial evidence is "a lower standard of proof than preponderance of the evidence." *Id.*

The MSPB's definition of "substantial evidence" is echoed in *Richardson* v. *Perales*, a case that pertains to a social security disability claim rather than the Federal civil service. *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971) citing *Consol. Edison Co.* v. *Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938) (substantial evidence is "more than a mere scintilla [of evidence and it] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). But, the MSPB further explains that, in the Federal civil service context, substantial evidence "obliges the presiding official to determine only whether, in light of the relevant and credible evidence[,] a reasonable person could agree with the agency's decision (even though other reasonable persons including the presiding official might disagree with that decision). *Parker* v. *Def. Logistics Agency*, 1 M.S.P.B. 505, 531 (M.S.P.B. 1980).

The MSPB currently uses the substantial evidence standard to adjudicate agency actions taken based on performance. See 5 U.S.C. § 7701(c)(1); 5 CFR § 1201.56(b)(1)(i). Even with this lower burden of proof, there are numerous cases where the MSPB and its reviewing court have determined that the agency failed to meet this lower burden of proof. See, e.g., *Parkinson* v. *Dep't of Justice*, 815 F.3d 757, 766 (Fed. Cir. 2016); *Thompson* v. *Dep't of the Army*, 122 M.S.P.R. 372, 381–82 (M.S.P.B. 2015); *Smith* v. *Dep't of Veterans Affairs*, 59 M.S.P.R. 340, 342–43 (M.S.P.B. 1993); *Cranwill* v. *Dep't of Veterans Affairs*, 52 M.S.P.R. 610, 616 (M.S.P.B. 1992). Consequently, it is doubtful that, even with a lower evidentiary burden, the MSPB would always agree with an action taken by VA or that, even if the majority of the evidence supports an employee, he or she will not succeed in a disciplinary appeal before the MSPB.

————

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. MAZIE K. HIRONO TO J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

S. 1094, DEPARTMENT OF VETERANS AFFAIRS ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT OF 2017

*Introduction:* President Cox, in your testimony you reference the unworkable timeframes for appeals using the Grievance and Arbitration Procedures in the Collective Bargaining Agreement.

*Question 1.* Can you explain how the short timeframes would threaten the reliability of the collective bargaining process?

120

*Question 2.* Can you share with the Committee any real-life examples of how this would impact your rank and file employees and possibly even reverse some removal decisions that were in favor of the employee due to the lowering of the evidentiary standard?

[Responses were not received within the Committee's timeframe for publication.]

# Exhibit B


S. Hrg. 115–320

# HEARING ON PENDING LEGISLATION

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

————

JULY 11, 2017

————

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.fdsys.gov

————

U.S. GOVERNMENT PUBLISHING OFFICE

28–513 PDF                   WASHINGTON : 2018

137

In addition to helping veterans find employment after they separate from military service, the GOOD pilot program would help alleviate the provider shortage for PAs that the VHA is currently facing, thus removing a barrier to care for the veterans who rely on the VHA for their medical needs.

Additionally, we are particularly pleased that the GOOD Pilot Program will provide priority to veterans who are from rural communities or who are willing to commit to providing care as PAs in VA facilities located in rural communities. This program would mirror the National Health Service Corps, a successful model that has been educating PAs and other healthcare professionals for decades in exchange for a commitment to serve in medically underserved areas.

Competitive Pay for PAs

A critical component of S.426 is its requirement that the VHA implement a long overdue update for PA compensation. Under the current system, VA compensation for PAs simply does not compete with the salaries offered outside the VA.

In the private sector, PAs are highly regarded and in-demand healthcare providers who command competitive salaries. According to the National Certification Commission for the Physician Assistant, the average salary of PAs in the United States for 2016 was $104,131. According to the 2015 VHA Workforce Planning Report, in 2015 starting pay for new PA graduates was usually 20-30% higher in the private sector than it was in the VA. This same report recommended that the VA update its compensation practices for PAs in order to become more competitive with the private sector. It is hard for the VA to recruit, hire, and retain PAs when the starting salary being offered for many PA positions is often significantly lower than what can easily be found in the private sector. The private healthcare market has embraced and rewarded the use of PAs to alleviate healthcare provider shortages; it is time for the VA to do so as well.

To AAPA's knowledge, the VHA has not expanded recruitment and retention initiatives related to fair compensation for PAs in response to the identification of PAs as one of the VA's top five critical occupation shortages. The VA has the authority to include PAs in the Locality Pay for Nurses and other Healthcare Professionals pay scale, but thus far has not taken action to do so. The addition of PAs to the VA locality pay system could assist the VA in recruiting PAs to replenish the ranks of approximately 40 percent of the VA PA workforce eligible for retirement within the next several years.

Additionally, PAs and nurse practitioners (NPs) employed by the VA frequently perform nearly identical functions and are employed in the same manner, but PAs are often paid significantly less than NPs for performing the exact same job. Because of inconsistencies in pay scales, NPs often start at a higher salary than PAs, and it is not uncommon for NPs in the VA to be compensated by as much as $30,000 more than PAs while providing similar, if not identical, medical services.

Examples of this pay discrepancy are unfortunately very easy to find. A job posting on 3/16/2017 for a position at the Chillicothe (Ohio) VA Medical Center, for a position that could be filled by either PA or a NP, advertises a salary range of $69,207-$82,185 for PA candidates, while the salary range for an NP was $93,065-$123,766. At the William Jennings Bryan Dorn VA Medical Center, in Columbia, SC, a position posted on 5/18/2017 was open to both PAs and NPs, with the salary range for a PA starting at $49,626 and the starting salary range for an NP starting at $76,992. In addition to these recent listings, there are disparities in pay ranging from $13,000 to $26,000 per year for PAs versus NPs in cities such as Augusta, GA, New Orleans, LA, and Las Vegas, NV. Ensuring compensation for PAs takes into consideration local wages, as the VA does for NPs, is critical to improving access to care by ensuring the VA is able to better recruit and retain PAs.

Conclusion

S. 426, the "Grow Our Own Directive: Physician Assistant Employment and Education Act of 2017," represents a significant step forward in building and strengthening the VA's PA workforce through proposals to create a five year pilot program to educate veterans as PAs and to require the VA to adopt standards leading to competitive pay for PAs employed by the VA. As the Committee moves forward with efforts to improve the quality of care available at the VHA, AAPA would be pleased to continue to serve as a resource. Thank you again for the opportunity to submit a statement for the record in support of S. 426.

2318 Mill Road, Suite 1300  |  Alexandria, VA 22314  |  P 703.836.2272  |  F 703.684.1924  |  aapa@aapa.org  |  www.aapa.org

———

Prepared Statement of American Federation of Government Employees, AFL–CIO

The American Federation of Government Employees, AFL–CIO and its National VA Council (AFGE) appreciates the opportunity to submit a statement for the record on the bills under consideration today. AFGE represents nearly 700,000 employees in the Federal and D.C. government including 250,000 rank and file employees at the Department of Veterans Affairs who provide vital care and services for our veterans.

138

### S. 1153—VETERANS ACCESS ACT

S. 1153 would bar providers from participating in VA purchased care programs if they have been fired from the VA for certain misconduct, violated requirements of their medical license, lost a VA credential, or committed certain crimes.

AFGE supports S. 1153. When VA privatizes care, the standards must be as high as they are inside the VA.

### S. 1261—VETERANS EMERGENCY ROOM RELIEF ACT

AFGE opposes S. 1261 as currently written. Absent specific guidelines for when veterans can use non-VA urgent care centers, this bill could lead to more fragmented and uncoordinated care, and lead the VA further down the road of privatization. In addition, too many veterans are already subjected to harsh collection practices through Choice and through VA third party collection processes.

AFGE urges the Committee to first conduct an inventory of emergency departments and urgent care centers within VA medical centers; a number of facilities have closed emergency departments over the years without adequate justification. This study should also examine the feasibility of expanded urgent care centers within VA medical centers. Urgent care provided directly by the VA will be far more veteran-centric than urgent care provided in the private sector.

### S. 1266—ENHANCING VETERAN CARE ACT

This bill would give the VA authority to contract with non-VA entitles to investigate deficiencies at VA medical centers.

AFGE opposes S. 1266. The VA has adequate internal capacity to investigate its medical centers, alone or in conjunction with other independent governmental entities. Contracting out this responsibility is likely to be used to lay the groundwork for further privatization.

### S. 1279—VETERANS HEALTH ADMINISTRATION REFORM ACT OF 2017

AFGE opposes S. 1279 because the criteria that would be used to determine if a veteran can seek care outside the VA are too vague (e.g. clinical best interest, undue burden, not economical). VA medical centers across the Nation continue to be deprived of adequate staff and resources to provide all veterans with the timely, veteran-centric care they have earned and that they prefer. The conditions resulting from chronic underfunding and short staffing need to be addressed by strengthening the VA rather than further depleting resources away from the VA to provide more fragmented, nonspecialized care to veterans.

### S. 1325—BETTER WORKFORCE FOR VETERANS ACT OF 2017

AFGE concurs that it is critical to fill the reportedly 49,000 vacancies at the VA. However, in AFGE's view, some of the provisions in the underlying bill—as currently written—fall short of improving hiring, recruiting, and training efforts within the VA and may have unintended consequences

Sections 101 and 102 of the bill gives the Secretary more direct-hire authority to fill current staff level vacancies. AFGE has serious concerns about how this increase in direct-hire authority will impact current Federal employees. If this bill were to become law, AFGE fears that an unintended consequence could be preferential treatment given to outside candidates, thereby bypassing current VA employees who seek a promotion. Without adequate protections in place for current Federal workers who have worked diligently to move up the VA ladder, the bill could have a negative impact on efforts to strengthen the VA workforce.

Section 106 of the underlying bill directs the VA to collect data on hiring effectiveness and Section 107 calls for the VA to design a standardized exit survey that would be voluntarily administered to outgoing employees. AFGE wants to stress the importance of having stakeholder input throughout the process of developing these mechanisms. It is critical that the VA consult with labor organizations who represent their employees as well as the many Veterans Service Organizations (VSOs) whose members rely on the VA for vital care and services when developing these survey tools. By incorporating input from both labor and the VSO community, the VA will be able to develop tools that adequately address issues at the worker, manager, and patient level.

One goal that appears throughout the underlying bill is the notion of transparency. AFGE appreciates the inclusion of this provision in the bill and the acknowledgment that the VA should be more transparent as it relates to staffing levels and vacant positions. With that in mind, AFGE would like to see the bill go further by posting not just nurse staffing levels, but all staffing levels at every VA fa-

139

cility. In addition to the VA being transparent with its current workforce, AFGE would like to see the VA be transparent with posting job openings. AFGE highlighted its concern with new direct-hire authority above, and in that vein, wants to express its desire that necessary oversight is exercised so that the Secretary does not use this new direct-hire authority to fill positions without those jobs being publicly posted with an open announcement.

Another area where AFGE has significant concern with the underlying bill relates to the proposed use of non-Federal employees to provide care and services to our Nation's veterans. As it's currently written, Section 202 of the bill would allow the VA and private sector companies to essentially swap employees for a period that can range from three months to four years. AFGE has long opposed allowing the private sector to enter the Federal Government and then return to their original job outside of the government. This is an unnecessary step down the path to privatization, and AFGE opposes the section in its entirety.

AFGE also opposes Section 204 as currently written. Section 204 establishes a two-tier payment system of base pay and market pay for directors of medical centers and Veterans Integrated Service Networks (VISN). The bill would set market pay for directors on a case-by-case basis through a process that requires the Secretary to consult at least two national surveys and takes into account managerial experience, complexity of the facility, and labor market conditions among other considerations.

Under Section 204, medical center and VISN directors—who would no longer have to be physicians themselves (as a result of Section 203)—would gain a significant right that was taken away from every VA physician and dentist last year. Public Law 114–315 repealed the requirement enacted in 2004 that "the Secretary shall consult two or more national surveys of pay" (Public Law 108–445).

In addition, Public Law 114–315 eliminated the requirement to set market pay through peer-based compensation panels, a valuable system for ensuring pay fairness, that protected providers from abuse of discretion by managers. According to reports from our physician members, the Secretary has not established any new policies to replace the compensation panels.

AFGE is ready and willing to work with the Committee to amend Section 204 to ensure that VA physicians and dentists reacquire adequate market pay protections, which in turn will strengthen recruitment and retention and enable the VA to provide medical care to more veterans on a timely basis.

AFGE also opposes Section 207 of the bill that would allow the Secretary to enter into a Memorandum of Understanding (MOU) with the Surgeon General to allow not less than 500 Public Health Service (PHS) commissioned officers to enter the VA. Allowing PHS to come into the VA would erode frontline workers collective bargaining rights and move the VA one step closer to privatization. PHS does not appear to have any significant expertise in treating veterans. In addition, Congress has provided VA with ample tools over the last two decades to recruit and retain nurses within the Federal workforce. The VA should be focused on recruiting, hiring, and retaining high quality medical professionals who will make a career out of serving veterans, not finding creative stop-gap measures. The United State Government must keep the promise it made to our veterans by rewarding their dedication and sacrifice with the best care and services imaginable, and the only way to do that is through hiring staff at every level who will be there long-term to care and provide for our veterans. AFGE opposes this section of S. 1325 in its entirety.

AFGE opposes Section 212 as currently written. Section 212 would require a review of the job descriptions, position classifications and grades for all VA police officers and firefighters to ensure compliance with Office of Personnel Management (OPM) classification standards. This section also mandates the development of staffing models and an audit of recruitment and retention efforts for both positions, and a report to Congress regarding the Department's use of special pay to address its critical shortage of police officers.

AFGE shares the concerns of lawmakers and veterans' groups that the outdated police officer job duties increase safety risks to the VA community. However, after consultation with classification experts, AFGE strongly urges the Committee to adopt a more comprehensive and aggressive approach to modernizing the VA police officer position, i.e. mandating that the Secretary exercise his existing statutory authority to convey law enforcement officer (LEO) status to all VA police officers. Only this major overhaul of VA police officer positions will ensure that VA has the capacity to adequately respond to the wide range of violent and non-violent incidents that arise on a regular basis at its facilities.

A recent expert analysis of VA police officer duties indicates that VA police officers already meet the statutory definition of law enforcement officer based on their primary duties and training requirements (5 CFR 831.902; 5 CFR 842.802).

140

AFGE previously requested that former VA Secretary Robert McDonald exercise this authority. AFGE stands ready to work with bill sponsors and other Members of the Committee to develop a stronger statutory solution to this significant VA safety issue.

### S. _____—DISCUSSION DRAFT, THE VETERANS CHOICE ACT OF 2017

AFGE strongly opposes the Veterans Choice Act of 2017. This bill would vastly increase the use of non-VA care through a massive expansion of the Choice Program. Like the Concerned Veterans of America plan that was soundly rejected by the Commission on Care, this bill would erode the critical core of the VA health care system and put such an enormous financial strain on the VA so as to threaten its very survival.

The bulk of veterans' care, and all primary care and mental health care must continue to be provided within the VA system, to ensure that veterans continue to receive the world-class integrated care they have earned and prefer. Only the VA, as the coordinator of care, can ensure that non-VA care is used in a smart way to ensure that veterans can receive the most appropriate care for their circumstances.

In contrast, this bill would not result in a smart use of non-VA care but rather an unlimited use of non-VA care that would likely lead to worse care for veterans in both the short and long term, and the severe weakening of our Nation's leader in health care training and research.

AFGE also opposes this bill because it would not ensure the VA is the primary coordinator and arranger of non-VA care.

### S. _____—DISCUSSION DRAFT, IMPROVING VETERANS ACCESS TO COMMUNITY CARE ACT OF 2017

AFGE generally supports the Improving Veterans Access to Community Care Act of 2017. This bill enables the VA to modernize its services, which will both allow the VA to better integrate a truly smart use of non-VA care with VA's own world class services, but also allow the VA to meet increased demand from higher functioning and consolidated non-VA care programs.

AFGE also supports this bill's provisions for ensuring that the VA is the primary coordinator of non-VA care. The integrated networks created by this bill would allow veterans to more seamlessly move between the VA and non-VA providers when the use of non-VA care to supplement VA's own care is warranted.

The VA has made great progress in making needed improvements to its health care system and other operations over the past three years. This bill ensures that veterans will continue to be well served by the VA and integrated networks providing non-VA care when the VA cannot meet the need itself. This bill also is the far better option for protecting the critical resources that the VA must retain in order to keep its promise to veterans.

### S. _____—THE DEPARTMENT OF VETERANS AFFAIRS QUALITY EMPLOYMENT ACT OF 2017

AFGE does not support this bill as a whole, though it includes several positive management improvement provisions included in previous legislation.

Like some of the provisions that raised concerns from AFGE in S. 1325, as already discussed, this bill relies too heavily on the private sector to improve the Department. For example, Section 3 would provide management training to VBA and VHA employees in a private sector setting. VA managers need to learn the best practices of other VA managers and when applicable, exemplary managers from other agencies. That is why AFGE supports management improvement provisions that strengthen VA's own managers through better training and performance evaluation.

AFGE supports a public database on vacancies, but the database in Section 6 of this bill has too narrow a scope. Veterans, the public, employee representatives, and all stakeholders need access to complete data about vacancies throughout the Department, not just vacancies that are determined to be critical by the Secretary.

The human resources training proposed by Section 7 is greatly needed, but to ensure that it is truly effective, labor representatives, and other stakeholders must have regular input in the design and delivery of training curriculum. Without the perspective of front line employees, any H.R. training will continue to fall short.

AFGE has similar concerns in this bill regarding provisions for exit surveys and succession planning studies as we have for S. 1325, i.e. it is essential that these workforce improvement efforts reflect the regular input of representatives of front line employees.

Thank you for the opportunity to share the views of AFGE.

# Exhibit C

**STATEMENT OF**


**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**


**BEFORE THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**


**LEGISLATIVE HEARING**


**OCTOBER 24, 2017**

Mr. Chairman and Members of the Committee:

The American Federation of Government Employees (AFGE) appreciates the opportunity to submit a statement for the record on pending legislation under consideration today. AFGE represents nearly 700,000 federal employees across the nation, including 250,000 employees at the Department of Veterans Affairs on the front lines providing health care and other critical services for veterans.

**Draft legislation to amend title 38, United States Code, to establish a permanent Veterans Choice Program, and for other purposes**

AFGE strongly opposes this draft legislation.  It would establish a permanent Choice program that would continue to divert funding away from VA's internal capacity to pay for a costlier non-VA care services even when private sector wait times are higher and quality is lower. The bill is also likely to result in unsustainable costs by elimination of all wait time and distance eligibility restrictions.  Increased use of non-VA primary care providers will deprive veterans of critical screenings for wounds of war and essential integrated care.

This bill lacks provisions for strengthening the VA's own capacity or for sending veterans back to the VA even when private sector primary care or specialty care is no longer necessary or adequate.  It imposes new case manager duties on VHA staff without additional resources; Choice has already diverted staff away from direct care of veterans to handle overwhelming numbers of consults for non-VA care and to "clean up" after Choice clinical and bureaucratic problems.

Proposed market assessments lack transparency and rely too heavily on a private sector health care model and do not require an adequate focus on staffing and infrastructure needs.

Choice providers would continue to receive less scrutiny than VA's own providers under this bill. It does not require the same transparency about wait times for non-VA care as is required for VA care.  It also makes it too easy for non-VA providers to receive certifications that allow them to participate in networks regardless of whether their skills and training are equivalent to those of VA's own providers.

In short, this bill would serve the agenda of privatizers but ignore the needs and preferences of veterans to receive the vast majority of their care from a fully-funded, fully-staffed, world-class integrated VA health care system. Rather than continue to expand a broken non-VA care program, we urge the Committee to provide the mandate and funding needed to fill the nearly 50,000 vacancies reported by Secretary Shulkin and finally address the modernization and infrastructure needs of the VA that have been neglected for too long.

**Draft legislation to modify the authority of the Secretary of Veterans Affairs to enter into agreements with state homes to provide nursing home care to veterans, to direct the Secretary to carry out a program to increase the number of VA graduate medical education residency positions, and other purposes**

AFGE has no specific position on this legislation.

## H.R. 1133

AFGE has no specific position on this legislation.

## H.R. 2123

This bill would extend federal preemption of state licensing requirements to all licensed VHA personnel using telemedicine to provide treatment.  Last year, the Department amended its provider regulations to apply federal preemption to certain advanced practice registered nurses (APRN), relying on the federal supremacy clause of the Constitution.

AFGE opposes H.R. 2123.  This bill could have unintended consequences, including an adverse impact on recruitment and retention of licensed medical personnel who are already in critical shortage occupations. The licensed health care personnel we represent have expressed serious concerns about the risks to their state licenses (and therefore their entire livelihoods) if management is allowed to mandate the performance of duties outside their scope of practice.  These clinicians have received no assurances that the Department will assist them when their licensing boards pursue disciplinary actions against them for violating state licensing requirements.

This proposed change is premature.  The new APRN rule has only been in effect for less than a year.

Therefore, AFGE urges the Committee to delay possible changes to current law until completion of a study of the workforce implications of a broader application of federal preemption. Current bill provisions for a telemedicine study fail to address any workforce issues. We recommend a study that focuses on the impact of federal preemption on the state licenses of APRNs and other licensed personnel, and the Department's ability to remain competitive with other health care employers who do not operate under federal preemption.

## H.R. 2601

AFGE has no specific position on this legislation.

## H.R. 3642

This bill would establish a three-year private sector pilot program for the treatment of military sexual trauma (MST). At the completion of the three-year period, the Secretary would have permanent authority to approve non-VA treatment of MST on a case-by-case basis.

AFGE strongly opposes H.R. 3642. In fact, it is hard to contemplate a more inappropriate combat-related condition to outsource to the private sector than MST. This proposed pilot project is unnecessary and represents another back-door attempt to dismantle the VA's comprehensive, integrated health care system, like almost every other VHA private sector pilot project previously implemented.

VHA is a world leader in the screening and treatment of MST and provider training and research in this area. VHA requires that every veteran receive screening for MST and screening also plays a critical role in data collection on the treatment of this widespread condition. All VA mental health and primary care providers are required to complete initial and continuing MST training. MST specialists are available at every medical center and many outpatient clinics.  The VA's National Center for PTSD plays an integral role in the VA's treatment of MST.

Rather than proceed with another wasteful pilot project that sends MST sufferers out into a broken, fragmented private health care system that does not understand their unique needs, AFGE urges the Committee to review existing direct care resources and telemedicine capacity within the VA to identify ways to increase access for treatment in hard-to-serve areas.

**VA Legislative Proposal – Veteran Coordinated Access & Rewarding Experiences (CARE) Act**

AFGE strongly opposes the non-VA care provisions in Titles I and II and has concerns about some of the personnel provisions in Title III.

*Non-VA Care*

The VA's proposal to replace the Choice program would greatly accelerate privatization of its health care system through virtually open-ended access to non-VA care and the absence of any mandates to address short staffing and deteriorating infrastructure.  It is absurd that non-VA programs would continue to rely on mandatory funds while VA's own funding would remain discretionary and therefore continue to have to close funding gaps on the backs of veterans through such proposals as COLA round-downs.

The bill's non-VA provisions are as problematic for what they say as for what they don't say. The lack of specificity through the bill will allow the VA to continue to engage in stealth privatization as illustrated by recent agency initiatives to convert specific purpose allocations to general purpose allocations and creation of pilot projects that send veterans out to CVS Minute Clinics without Congressional authorization.

AFGE strongly opposes the proposed replacement of the 30-day/40-mile restrictions with a vague patient-provider veteran's "best interest" evaluation process and criteria such as "clinically acceptable" wait times (Section 201).

We also strongly object to the expanded use of non-VA urgent care facilities already undertaken through pilot projects in numerous locations. This seems totally unnecessary considering Secretary Shulkin's recent announcements that the VA is providing same-day service at every medical center and significant increases in access to urgent care provided directly by the VA.

*Personnel Practices*

Section 301:

AFGE objects to the proposed expansion of "federal supremacy" that would extend federal preemption of state licensing requirements to all licensed VHA personnel. (In contrast to Chairman Roe's proposal, the VA's draft does not limit federal preemption to telemedicine.)

As already noted with regard to Chairman Roe's draft bill, this provision could have unintended consequences, including an adverse impact on recruitment and retention of licensed medical personnel who are already in critical shortage occupations. AFGE believes that this proposed change is premature as the new APRN rule has only been in effect for less than a year.

Therefore, AFGE urges the Committee to delay possible changes to current law until completion of a study of the workforce implications of a broader application of federal preemption.

Section 302:

This section repeals VA's longstanding statutory authority to contract for "scarce medical specialist services".

AFGE opposes this proposed change because it appears to broaden VA's authority to contract out medical services even when VA's own health care system can provide the care (and there is no scarcity). This will further erode VA's critical capacity to provide comprehensive, integrated, specialized care to veterans that has already been weakened by the Choice program.

Section 304
This section repeals the annual caps on VA bonuses across the entire VA workforce that were imposed by the Choice Act in 2014 and later modified downward through subsequent legislation.

AFGE supports elimination of annual dollar caps. AFGE appreciated the Sense of Congress language in the Choice Act that required fair allocation of bonuses to lower wage employees under the caps. AFGE urges Congress to continue to address the issue of lower wage employees' bonuses through a study of how bonus dollars have been allocated over the last five years and whether bonuses are used properly to incentivize high-performing non-management employees.

Section 305:

This section extends the statutory reimbursement right for continuing education from doctors and dentists to Advanced Practice Registered Nurses.

While AFGE supports the expansion of this critical medical professional benefit to other professions, we object to this provision as currently drafted. Reimbursement for continuing medical education is a critical recruitment and retention tool but AFGE opposes setting this benefit (for any professional group) at $1000 per year. This amount has not been updated since the legislation was first enacted *almost twenty years ago.* With each new year, VA becomes less competitive with private sector employees who adjust their reimbursement rates to match actual costs of attending these courses.

AFGE also objects to limiting this benefit to APRNs. It should also be available to physician assistants as they too are independent providers in the VA. Finally, AFGE urges a study of the reimbursement needs of all other VHA licensed professionals.

Thank you.

# Exhibit D

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**PROVIDED TO THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**SUBCOMMITTEE ON HEALTH**

**"FY 2019 DEPARTMENT OF VETERANS AFFAIRS BUDGET REQUEST FOR THE
VETERANS HEALTH ADMINISTRATION"**

**MARCH 15, 2018**

Chairman Wenstrup, Ranking Member Brownley, Members of the Subcommittee,

The American Federation of Government Employees (AFGE), appreciates the opportunity to submit a statement for the record for this hearing regarding President Trump's FY 2019 budget request for the Department of Veterans Affairs (VA). AFGE represents nearly 700,000 federal employees, including 250,000 employees at the VA, and more specifically, the overwhelming majority of non-management frontline VA employees who provide direct medical and mental health services to our nation's veterans. It is imperative that Congress give VA employees the resources they need to succeed, and that means investing money into the VA and its staff instead of sending precious resources to the private sector.

One issue that needs an immediate remedy is chronic understaffing across the VA system. AFGE has repeatedly raised the issue of the outrageous understaffing at the Department. It seems that VA has a policy of not filling positions that even they acknowledge should be filled. We would like to use this statement to once again point out that there are approximately 35,000 positions that need to be filled. But instead of seeking to hire for these positions, the Department proceeds without any sense of urgency. Pushing veterans to the unaccountable private sector while the Department needs 35,000 additional front line personnel is a national disgrace. If the White House and VA want to fix internal problems at the Department they absolutely must get serious about staffing the agency. Anything short of a firm hiring commitment is yet another Band-Aid on a multi-year problem. As the Independent Budget Veterans Service Organizations state in the Independent Budget, every expansion in the temporary CHOICE Program has increased demand for VA in-house services. Front line clinicians and support staff now have additional demands to manage Choice referrals, assist overwhelmed veterans and ensure continuity of care as veterans are shuttled between the two systems.

On January 17, 2018, Secretary Shulkin testified before the Senate Veterans' Affairs Committee and was asked directly about the Department's hiring plans. When asked about vacancies Secretary Shulkin said, "I just want to understand what they are,

35,000 vacancies, we have 370,000 employees, a 9 percent vacancy rate which is not overly high. So you're always going to have 40,000 vacancies during the course of the year." We respectfully disagree with this sentiment. The VA provides critical care and services to a special population, our nation's heroes, and we should not accept the status quo when it comes to serving their needs. Surely, we can all agree that the brave men and women who have worn the uniform and borne the battle deserve more than simply the bare minimum when it comes to adequate staffing of health care providers. AFGE continues to urge Congress and the Administration to address VA staffing and hire 35,000 additional and necessary front-line personnel.

Sadly, instead of addressing the internal problems with understaffing, leadership at the VA has opted to privatize core functions of the VA. The Department is opting to send care and services to costly, unaccountable private contractors instead of hiring adequate staff to perform these functions at the VA. A central topic last year was the notion of "accountability" yet the VA continues to send veterans outside of the VA to contractors who are held to no accountability standard. While VA employees must meet quality standards and have their performance scrutinized, no such oversight is conducted on private providers who operate in the CHOICE program. As Congress considers the VA budget, it must demand that the Department stop outsourcing vital functions.

AFGE continues to be concerned about the way money allocated to the VA is being spent. Specifically, as part of the larger budget deal in February there was a bipartisan agreement to allocate $4 billion to the VA over the course of two years. The intent was that this money would be used for the VA to address infrastructure needs. However, the White House has insinuated that they would like to see part of this money diverted from the VA and used to patch the CHOICE Program. We urge Congress to oppose any change in the way this funding is used and allocated. Leadership on both sides of the aisle agreed that the entire $4 billion – $2 billion in FY 18 and $2 billion in FY 19 – would be used for the VA and its internal needs.

The Senate and House VA Committees have spent a considerable amount of time debating and considering CHOICE funding and possible replacements. It is inappropriate to use the appropriations process to circumvent the Committees and send VA-specified money to CHOICE. The Department and the White House must be transparent in their dealings with Congress, VA employees, and veterans. It's disingenuous to accept money for the Department but then attempt to syphon that money off for other purposes. This smoke-and-mirrors approach to funding the VA is inappropriate, bad for veterans, and bad for employees. We urge Congress to adequately oversee how appropriated dollars are spent by the Department.

Finally, AFGE has serious reservations about using medical service dollars as a slush fund to subsidize unaccountable private sector care. Specifically, the President's

Budget recommends "combining the Medical Community Care and Medical Services accounts" in order to, supposedly, streamline operations.  AFGE unequivocally opposes this recommendation and urges Congress to reject it outright.  These are two separate and distinct accounts that should not be forced together for the Administration's convenience.  We further oppose any change in funding streams that could divert resources from the VA and send that money to contractors.  As can be seen by the 35,000 positions the VA needs to hire, the agency must have funding devoted to its own direct operations; and Congress must hold the Department accountable in the way the VA spends taxpayer money entrusted to it.

Thank you.

# Exhibit E

May 22, 2018

Dear Senator:

The undersigned labor organizations are writing today to vehemently oppose S. 2372, the VA MISSION Act. Our brothers and sisters at the American Federation of Government Employees (AFGE) tried to make this bill better; but none of their modest, reasonable changes have been incorporated into this text. As a result, we have no choice but to stand together with frontline employees at the Department of Veterans Affairs (VA) and oppose this legislation.

S. 2372, which passed the House last week, gives the VA Secretary the authority to privatize and dismantle broad swaths of the VA health care system. Sadly, while S. 2372 is titled the VA MISSION Act, it does nothing to help the VA fulfill its mission to veterans. The underlying bill does nothing to help build up internal capacity at the VA and assures that once care and services leave the VA they will not return. This bill outsources primary care to the private sector, authorizes the outsourcing of entire service lines, and fails to address the chronic and prolonged issue of understaffing that is currently plaguing the VA.

What is equally troubling is that included in S. 2372 is the authorization to establish a Base Realignment and Closure (BRAC)-style commission to evaluate the VA's infrastructure needs. This goes much further than prior BRACs that addressed only facility closures through its application to decisions over which facilities to build and repair. This bill also allows the BRAC process to deplete the VA medical services account without restrictions, which is especially troubling given the enormous cost overruns associated with military BRACs.

With that in mind, we must unequivocally oppose S. 2372, the VA MISSION Act. Too much is at stake for veterans, their families and everyone who benefits from the VA's extraordinary accomplishments to succumb to political pressures to hurriedly pass potentially damaging changes with many unknown consequences. We urge you to please vote no when the Senate considers S. 2372, the VA MISSION Act.

American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)
American Federation of Government Employees, AFL-CIO (AFGE)
Bakery, Confectionary, Tobacco Workers International Union
Association of Flight Attendants-CWA
Maritime Trades Department
IFPTE
AFSCME
UNITE HERE
Department for Professionals Employees
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
United Mine Workers of America
United Steel Workers of America
Professional Aviation Safety Specialists, AFL-CIO (PASS)
National Federation of Federal Employees
Union Veterans Council, AFL-CIO
UFCW International Union
National Association of Letter Carriers

# Exhibit F

Case 1:25-cv-00583-MRD-PAS   Document 14-4   Filed 11/25/25   Page 60 of 108 PageID #: 1347

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**REMARKS**

# Remarks by President Trump at Signing of the VA Mission Act of 2018

**VETERANS**   |   Issued on: **June 6, 2018**



Rose Garden

12:28 P.M. EDT

THE PRESIDENT:  Well, thank you very much.  This is a very big day.  Choice.  We've been looking for choice for a long time, and today is the day.  So it's very important.  Very happy.

Thank you all for being here.  This is truly a historic moment, historic time for our country.  I'll be signing landmark legislation to provide healthcare choice — what a beautiful word that is, "choice" — and freedom to our amazing veterans.

I want to welcome every veteran — we have many veterans here today — every caregiver, and servicemember who has joined us on this very momentous occasion.  All during the campaign, I'd go out and say, "Why can't they just go see a doctor instead of standing in line for weeks and weeks and weeks?"  Now they can go see a doctor.  It's going to be great.

You fulfilled your duty to our nation with tremendous loyalty and courage. And with the signing of this veterans choice legislation, we take one more crucial step in fulfilling our duty to you.

We're pleased to be joined today by our great Vice President, Mike Pence, along with my nominee to lead the VA, Robert Wilkie. Wherever Robert — Robert. Stand up, Robert. (Applause.) We're going to do a great job. And working along with Robert is Acting VA Secretary Peter O'Rourke. So, Peter, thank you. Peter. Where's Peter? (Applause.) That's a great team.

I also want to thank some of our many leaders. I call them leaders because on this legislation they are indeed leaders. You know, they said that it would be very slow. It's a political season. We have an election coming on November 6th. So they said it would be very, very slow this period of time.

And I was just telling Mike, "You know, Mike, this hasn't been very slow." If you look, we passed Dodd-Frank, Right to Try. We just got $700 billion for our military. (Applause.) That's a big one. We needed to get that. The military is going to be stronger, bigger, better than it ever was before. Hopefully we won't have to use it very much, but the fact that we have it so strong means we probably won't have to use it as much. And I want to thank all of the great people in the audience that helped us so much.

On December 22nd, which doesn't quite fit into the January 1st date, but on December 22nd we signed the biggest tax cuts in the history of our country. That's a big one. (Applause.) And we got $1.6 billion — we've already started the wall on the southern border. The wall has started. $1.6 billion. So important.

I also have to recognize some of the people that have worked so hard to make all of this happen. And Johnny Isakson — you're here. Where's Johnny? Boy, has Johnny been working — (applause) — have you worked with Jerry Moran and the whole group. You and Jerry. Where's Jerry? Where's Jerry? Hi, Jerry. Good job. Good job. (Applause.) Bill Cassidy, John Bozeman, Dean Heller, Tom Cotton — all here — Thom Tillis, Lindsey Graham. I see Lindsey sitting right up there. Hi, Lindsey. Good job. Todd Young. Todd,

Case 1:25-cv-00583-MRD-PAS    Document 144    Filed 11/25/25    Page 62 of 108    PageID #: 1349

thank you.  Joni Ernst.  Where's Joni?  Because I did you a good favor for the farmers yesterday.  Right?  We love the farmers.  Right, Joni?  Good.  Good.  I'm glad it worked out.  John Hoeven, Steve Daines.  All here.

We have on the House of Representatives, Mike Coffman, Brian Mast, Jack Bergman, Buddy Carter.  Did I introduce you, Senator?  What's going on?  Huh?  I hope so.  If I didn't introduce you, I'm in trouble.  (Laughter.)  You know, the problem with this, there will be four people that we didn't introduce and they'll never speak to me for the rest of my life.  (Laughter.)  They'll make sure I suffer, right?  So please, I apologize.  Jenniffer González Colón.  Peter King.  Where's Peter?  Oh, stand up, Peter.  You have been so nice to me.  (Laughter.)  Well, he should; he comes from New York.  I mean, he should.  Right, Peter?  (Applause.)  Thank you, Peter.  Jack Bergman.  Our Chair, Phil Roe.  Phil.  What a great job.  (Applause.)  That was a lot tougher than we thought, right?  You would think it would have been easy.  It makes sense.  But you would have thought.

Kevin Cramer, Jim Banks, Andy Barr, Claudia Tenney, Martha McSally.  I hear you're doing very well, Martha, wherever you may be.  (Applause.)  I hear Martha is doing very well in the great state of Arizona.  That's what the word is.  Don Bacon, Brad Wenstrup, Jason Lewis, Cathy McMorris Rodgers — who's terrific.  Cathy?  (Applause.)  Hi, Cathy.  Representative Neal Dunn, Representative Lee Zeldin, Ann Kuster, and Julia Brownley.  I want to just thank, and I assume we have a couple of others out there that — anybody I didn't announce?  You want to stand and we'll announce you?  You deserve it.  Thank you all very much.  Really, it's incredible.  (Applause.)

And finally, I want to thank the fantastic veteran service organizations that helped us push today's Choice legislation across the finish line.  Whenever I spoke, this was one of the most important things, and it was something I got the biggest hand for.  People want to take care of our great vets.  They are a great people.

Four years ago, our entire nation was shocked and outraged by stories of the VA system plagued by neglect, abuse, fraud, and mistreatment of our veterans.  And there was nothing they could do about it.  They couldn't do anything about it.  Good people that

Case 1:25-cv-00583-MRD-PAS   Document 14-4   Filed 11/25/25   Page 63 of 108 PageID
#: 1350

worked there, they couldn't take care of the bad people.  Meaning, you're fired; get the hell out of here.  (Laughter.)

With us today are many brave veterans who endured that grave injustice, including Steve Cooper and Laura Vela.  They served their country with honor, only to be denied the medical treatment they desperately needed.  To Steve and Laura: No one should suffer what you suffered.  They suffered gravely.  No one who defends our country in uniform should have to fight for their lives when they come back, when they come to their home.

We commend your strength and courage in the face of hardship.  And we pledge to act in your name, and in the name of every other veteran who has been so badly wronged, neglected, and mistreated.

To those who serve our nation, who risk life and limb for country, we must never be denied care, access, or treatment that they need.  That is why we are here today and that is why we are signing this most important bill.  It made so much sense.  It's been so long.  They've been working on it for years and years and years.  And it wouldn't happen.  And accountability is the other one.

As a candidate for President, I promised to make reforming the VA one of my absolute highest priorities.  And from the first day of my administration, that is exactly what we've done.

Last year, I signed the historic VA Accountability legislation, meaning you now can immediately get rid of people that don't treat our veterans right; that rob us, or cheat us, or aren't good to our great vets.  You can get them out.  You couldn't do it.

For 40 years they've been trying to pass this — Phil, you know that.  Forty years.  And they couldn't.  Made so much sense.  But it was hard.  You have civil service, you have unions.  Of course they'd never do anything to stop anything, but they had a very great deal of power.  And in the end, they came along.  Everybody came along because they knew it was right.

Case 1:25-cv-00583-MRD-PAS    Document 14-4    Filed 11/25/25    Page 64 of 108 PageID #: 1351

So we passed something that hasn't been that recognized, and yet I would put it almost in the class with Choice.  Almost in the class with Choice.  VA Accountability — passed.  And now, if people don't do a great job, they can't work with our vets anymore.  They're gone.  (Applause.)  So we're very proud of Accountability.

In the campaign, I also promised that we would fight for Veterans Choice.  And before I knew that much about it, it just seemed to be common sense.  It seemed like if they're waiting on line for nine days and they can't see a doctor, why aren't they going outside to see a doctor and take care of themselves, and we pay the bill?  It's less expensive for us, it works out much better, and it's immediate care.  And that's what we're doing.  So we're allowing our veterans to get access to the best medical care available, whether it's at the VA or at a private provider.

In a few moments, I will keep that promise that I've been making ever since the first day of my campaign — seems like a long time ago — and I'm going to sign legislation that will make veterans choice permanent.

And I just can't stress — the people here, the people in the audience, senators, congressmen, the great people working at the VA, and soon-to-be Secretary Wilkie, and everybody — the work that they've done to get this through is really inspirational to me.  I've learned so much from the standpoint that I actually see how hard these people work.  And this was very important.  And Phil and Mike, and everybody, I really appreciate what you've done.  It's been incredible.  It's been incredible.

This has been for years; for 30, 40 years, they've been trying to get this done, and they haven't been able to.  And we got it done.

If the VA can't meet the needs of a veteran in a timely manner, that veteran will have the right to go right outside to a private doctor.  So simple and yet so complex.  This legislation also expands access to the caregiver program for seriously injured veterans.  Because no matter where you served or when you fought, if you were in uniform — at some point, if you wore that uniform, then you deserve our absolute best.  And that's what we're doing.  (Applause.)  Right?

Case 1:25-cv-00583-MRD-PAS    Document 14-4    Filed 11/25/25    Page 65 of 108 PageID
#: 1352

This bill speeds up the claims process, increases the health services, expands access to walk-in clinics, and fights opioid addiction.  These are sweeping, historic changes.  There's never been anything like this in the history of the VA — never been anything close — and we will not rest until the job is fully done.

My administration has also taken action to ensure veterans can seamlessly transition their medical records from the Department of Defense into the VA.  And I've heard so many stories — how difficult it is, almost impossible.  I said, "How is that possible?"  It was almost impossible to do.  It took years to do.  We'll do it immediately now.  We're set up.  We have the right systems.  After years and years of waiting, the two departments will now finally use the same system.  They're matching.

Today we also mark another milestone, the 74th anniversary of D-Day, the Allied invasion of Normandy.  On June 6, 1944, more than 70,000 brave young Americans charged out of landing craft, jumped out of airplanes, and stormed into hell.  They gave their hearts, their blood, and their very lives on those beaches to drive out the enemy and strike a lasting victory for our country and for freedom.

In every generation there have been heroes like them, patriots who answer the call to serve, who do whatever it takes, wherever and whenever we need them to defend America.  They put everything on the line for us.  And when they come home, we must do everything that we can possibly do for them.  And that's what we're doing. (Applause.)

And they can be very proud of their country because, literally, this week, we have gotten the best financial numbers, the best economic numbers, the best numbers on unemployment and employment that we've ever had as a country.  Strongest economy we've ever had.  It's so good, because we can do so many more things when that happens, including, of course, jobs.

Among the best job numbers ever, in the history of our country.  African American unemployment, the lowest it's ever been in history.  Hispanic unemployment, the lowest it's ever been in history.  Women unemployment, lowest it's been in 21 years, and soon

to be history.  A little bit more, it's going to be history.  Numbers that nobody has ever seen.

We've added $7 trillion since the election; $7 trillion to our country's worth, our country's — the value.  The value.  We've added $7 trillion to our country's worth.  We've never had anything like this.  And I'll tell you what — it's going to get better.  Cutting regulations, cutting taxes.  It's just starting.

So it's now my great honor to sign the VA Mission Act, or as we all know it, the Choice Act, and to make veterans choice the permanent law of our great country.  And nobody deserves it more than our veterans.  Thank you all very much.  Thank you.  (Applause.)

Thank you very much.

(The bill is signed.)

END

12:47 P.M. EDT

The White House

   

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Council of Economic Advisers

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright    Privacy Policy

# Exhibit G



# CONGRESSIONAL TESTIMONY

**STATEMENT FOR THE RECORD BY**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**BEFORE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**ON**

**"MORE THAN JUST FILLING VACANCIES: A CLOSER LOOK AT VA HIRING AUTHORITIES, RECRUITING AND RETENTION"**

**JUNE 21, 2018**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W., Washington, D.C. 20001   (202) 737-8700   www.afge.org

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**PROVIDED TO THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**SUBCOMMITTEE ON HEALTH**

**"MORE THAN JUST FILLING VACANCIES: A CLOSER LOOK AT VA HIRING AUTHORITIES, RECRUITING AND RETENTION"**

**JUNE 21, 2018**

Chairman Dunn, Ranking Member Brownley, and Members of the Subcommittee:

The American Federation of Government Employees, AFL-CIO (AFGE) and its National VA Council (NVAC) appreciate the opportunity to submit a statement for the record for the June 21, 2018 hearing titled, "More Than Just Filling Vacancies: A Closer Look at VA Hiring Authorities, Recruiting and Retention." AFGE and NVAC represent more than 700,000 employees in the federal and D.C. government, including 250,000 front line employees at the Department of Veterans Affairs (VA) providing comprehensive benefits, health care, and other critical services for veterans.

As numerous studies, reports, and anecdotal evidence have shown, veterans receive the best care for their conditions in a system that is specifically designed for the treatment in veterans, the VA. In turn, it is not surprising that the preferred "CHOICE" of veterans regarding where to receive care is also the VA. Because of these preferences, and the nation's commitment to those and the families of those who have served, Congress must do all in its power to staff the VA to a point where capacity meets the VA's exceptional demand, and where veterans receive the VA care they have earned. If proper staffing is not accomplished and positions are not filled, the VA will continue down the path of privatization, and veterans will instead have a "CHOICE" made for them by being sent to non-VA care.

AFGE and NVAC welcomes the opportunity to comment on several components that have an impact on the future of VA staffing, including:

**<u>Office of Inspector General Report on Staffing</u>**

For years AFGE and NVAC have urged Congress to take a real look at hiring at the VA. With over 33,000 unfilled positions currently on the books at the VA, this hearing is timely. It is impossible for us to keep the promise made to our veterans without adequately funding and staffing the VA. The VA provides world-class, comprehensive, veteran-centric care and services that simply are unavailable elsewhere and that is a system which must be preserved. We hope that the end result of the hearing today is with an even greater interest in staffing and a desire to fill all 33,000 vacant VA positions.

*Additional data on nonclinical staffing needs:* Last week the VA Office of Inspector General (OIG) released its annual report on staffing at the VA. Unlike past years, Congress directed the OIG to now include the top five clinical and non-clinical occupations which are the most short

staffed.  To comply, the OIG released data from 140 VA facilities nationwide and rank ordered the data based on how frequently the facilities cited an occupation as short staffed.

AFGE and NVAC were pleased to see the OIG provide a more thorough and complete review of facility staffing deficiencies including additional data on nonclinical staffing needs. This information will be useful to all stakeholders as we attempt to identify how to best staff the VA and fill these vacancies with fulltime federal employees who will make a career out of serving our veterans.

AFGE and NVAC are pleased to see an increased spotlight on the need for adequate staffing of nonclinical positions. Staffing levels for VA police ensure the safety of patients and employees, and staffing the VA with an appropriate number of custodial workers reduces the risk of hospital-acquired infections.  These are life and death issues.

Given the enormous burden that Choice and other non-VA private care programs have placed on VA's own support staff who are handling consults, medical records and requests for assistance from patients trying to navigate the private care maze, AFGE and NVAC strongly recommend that additional staffing data be collected to reflect staffing needs for these support positions as the Mission Act is rolled out.

*Mental health staffing needs:* Sadly, once again mental health topped the list of difficult to fill positions in the OIG report.  Of the 140 facilities surveyed, 98 facilities listed psychiatrist as the position which is most difficult to fill.  This made mental health the top category of those reported in the surveys.  At a time when private sector entities are hoping to carve out mental health care as a primary avenue for privatization, this finding is particularly disturbing.  The VA does veteran-centric mental health care better than any comparable entity in the private sector, and those professionals work every day to make sure our veterans get the help that they need.

AFGE and NVAC urge Congress to work to increase internal capacity within the VA's mental health practices instead of supplementing this care with the private sector.  AFGE and NVAC are very troubled by field reports from our locals who have observed that there appears to be widespread noncompliance with VA's own mental health staffing ratios. Chronic short staffing of clinicians providing mental health treatment to our wounded warriors will directly undermine VA's continued ability to provide the exemplary specialty mental health care and Primary Care Mental Health Integration that are  a national model.

## Direct Hire Authority

The VA has long called for, and the Congress has consistently provided, direct hiring authority to bypass the regular civil service process and fill positions within the VA.  Less than a year ago, in August of 2017, the "VA Choice and Quality Employment Act of 2017" was enacted into law. This law goes beyond traditional direct hiring authority, and exclusively grants the VA additional direct authority when "there exists a severe shortage of highly qualified candidates" (Sec. 213). Furthermore, just as recently as last month, the VA MISSION ACT was signed into law, making two distinct references to how the VA should use direct hiring authority.  Specifically, it says it

2

should be used as a part of the remediation of closed medical service lines (Sec. 109), as well as for addressing the problems facing underserved facilities (Sec. 401).

Currently, tens of thousands of vacancies exist throughout the VA, and short staffing requires some veterans to receive non-VA care despite their preference to be treated within the VA. While the aforementioned laws address VA's direct hire authority, we must ask how the VA is using these hiring tools to address staffing challenges.

**Accountability Act**

Since the day of its introduction, AFGE and NVAC have vociferously opposed the "Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017." AFGE opposed this law with the belief that it would lead to a purge of frontline employees at the VA, including many veterans continuing their service to the nation within the VA, while failing to address managers who have failed in their ability to lead staff and serve the mission of the VA. While the VA has made collection of data related to terminations under the powers granted by the Accountability Act difficult to say the least, AFGE and NVAC have worked to compile and analyze data from these terminations. Through February 2018, 1646 individuals were removed under the Accountability Act, including 44 physicians, 100 Registered Nurses, 51 Licensed Practical Nurses, 40 Nurses, and eight Physicians Assistants, while only 18 Supervisors were terminated. With so many veterans requiring care, it is counterproductive to arbitrarily terminate medical personnel in short supply, while simultaneously failing to hold supervisors accountable. AFGE and NVAC are very pleased that a bipartisan bill, the VA Personnel Equity Act of 2018 (HR 6101) has just been introduced to restore critical workplace rights that the 2017 law severely weakened or eliminated. Regarding staffing, passage of this legislation will enable the VA to restore a more just and fair workplace that will enable it to be on a more level playing field in competing with other health care employers,

**Transparency**

AFGE and NVAC have urged Congress to seriously address VA staffing in a way that is transparent to patients, workers, and job seekers. We were pleased to see Congress include new transparency language in the VA MISSION Act, which is now law. Specifically, Sec. 505 of the new law requires the VA to submit a report to Congress outlining how many unfilled positions exist by occupation and by facility. This information will be posted on a publicly available website so that all interested parties will have access to the information. This section of the new law is an important step forward in staffing transparency at the Department. For entirely too long we have allowed the public to only see one side of the VA story: wait times. Now the public will be able to see how many unfilled positions exist at these facilities and ask questions about why those positions are going unfilled. We were also pleased to see Sec. 505 include a reporting requirement so that the Department will have to face Congress and explain what steps it is taking to fully staff every VA facility across the country. This new transparency requirement is important, and we ask that Congress make certain that the VA complies with this section of the new law.

3

**<u>Other comments: Physician Assistant Pay</u>**

As the OIG noted in its June 14, 2018 report, VHA has consistently faced a shortage of physician assistants (PA) in its workforce.  Section 212 of the VA Choice and Quality Employment Act of 2017 (VCQEA) added the requirement that physician assistants employed by VHA receive competitive pay through the same locality pay setting process already in place for registered nurses.

AFGE and NVAC have monitored the implementation of this new PA pay requirement. Our locals in multiple locations report problems with the types of surveys used. Management at some facilities are using 2016 contract wage surveys and they appear unwilling to consider any other options.  Given that the Medical Center Director has total discretion over the salary levelswhen converting to the new salary schedule and is only required to notify the Secretary of his decision, this leaves little recourse for the PAs adversely affected by the choice of survey, or their employee representatives to challenge unfair salary schedules.

As a result, despite these new provisions in the law, PAs working for the VA are paid significantly less than other PAs in the same local market; some report a $20,000 pay gap.  PAs with longstanding tenure with the VA are facing some of the worst pay gaps due to the VA's current pay ceilings for PAs.

PAs also report that their years of experience are undervalued relatives to VA advanced practice registered nurses (APRNs).  For APRNs working at the VA, nursing years of experience are counted as years of experience towards their APRN salary determination.  This practice results in APRN's receiving higher salaries than PAs with the same or less APRN experience.

AFGE and NVAC appreciate the opportunity to comment on these important staffing issues.

# Exhibit H



# CONGRESSIONAL TESTIMONY

**STATEMENT BY**

**J. DAVID COX, SR.**
**NATIONAL PRESIDENT**
**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**BEFORE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**ON**

**THE VA ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT:  ONE YEAR LATER**

**JULY 17, 2018**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W., Washington, D.C. 20001   (202) 737-8700   www.afge.org

Chairman Roe, Ranking Member Walz and Members of the Committee:

Thank you for the opportunity to present the views of the American Federation of Government Employees, AFL-CIO (AFGE) and its National VA Council (NVAC) regarding the implementation of the Department of Veterans Affairs (VA) Accountability and Whistleblower Protection Act of 2017 (Accountability Act). AFGE and NVAC represent over 250,000 front line employees who honor our nation's veterans every day by providing exemplary services at VA medical centers, benefits offices, vet centers and other VA entities.  It should be noted that AFGE and NVAC do not represent any VA management employees, the workforce segment targeted by bills leading up to the Accountability Act.

The Accountability Act has proven to be one of the most misguided and counterproductive VA laws ever enacted. It has demoralized and harmed its dedicated workforce, including a disproportionately large share of the 115,000 veterans who have the honor of taking care of other veterans as proud members of the VA workforce. It has deprived veterans who depend on the VA for health care and benefits of the services of employees with extensive training and experience who have been fired under the Act's new authorities without a fair chance to improve their performance or defend their jobs, as well as others who have left the VA or chose not to apply because of its uniquely harsh firing laws and hostile workplace. The Act has also squandered taxpayer dollars through unnecessary job turnover and litigation by empowering managers to go straight to the nuclear option of removal on the first alleged offense.

*Who is getting fired under the Accountability Act?*

Here's what "accountability" looks like under the new firing law.  The VA has tried to hide the true harm that Act has caused by publishing limited firing data and denying information requests from Members of Congress and AFGE. Notwithstanding the VA's intentional lack of transparency, its own published data still illustrates the Act's severe unintended consequences and its failure to hold management accountable for mismanagement and misconduct.

For example, of the 2,742 VA employees fired in 2018, only 18 were supervisors (less than 1 percent). Housekeeping aides were the largest number fired, followed by nursing assistants, registered nurses, food service workers and medical support assistants.  In contrast, supervisors (across the entire Department) ranked in *19th place.*

AFGE and NVAC attorneys discovered the perverse impact of this firing law soon after enactment, through individual cases involving positions historically held by veterans, including large numbers of service-connected disabled veterans. These include housekeeping aides, cemetery caretakers, police officers and Veterans Benefits Administration (VBA) veterans service representatives, claims examiners and claims assistants. Other cases highlighted the Act's greater impact on low wage VA employees generally, such as food service workers, nursing assistants and scheduling clerks.

The first set of VA published data confirmed what we were seeing at the facility level, i.e. that extremely few managers were being held accountable under a law that was justified largely as a management accountability tool.

2

After we learned that the VA's published data masked the disproportionate effect of this harsh law on the veterans and other vulnerable segments of the VA workforce, we filed a Freedom on Information request for data on *veteran status, age, gender and race* (Attachment A).  The VA has not responded with the data requested for nine months, forcing us to file an appeal.  Similarly, Members of Congress have not gotten a response to their data requests (Attachment B).

Despite the limited published data, the Act's disproportionately large impact on VA's low wage workforce and veterans is undeniable.  Currently, the Veterans Health Administration (VHA) has a national job posting for **housekeeping aides** at 13 medical centers.  <u>All</u> the openings are restricted to preference eligible veterans and all pay less than $35,000 annually. The salaries for VHA **nursing assistant** positions currently posted start at $30,449. All current food service national postings list hourly wages below $13 an hour.

The Act's adverse impact on the VA health care system is also evident from the large number of removals of employees in nursing positions.  VA Inspector General (IG) Michael J. Missal testified before this Committee last month that the IG has consistently included **registered nurses and other nursing occupations** in its top five determinations of VHA occupational staffing shortages.

*The VA cannot fire its way to success*

This destructive law was enacted despite warnings from experts that mismanagement, not job protections for front line employees, was undermining the VA's capacity to deliver

services to veterans. Health care experts repeatedly presented evidence that the VA health care system, the primary target of proponents of this firing law, outperforms the private sector.

First hand statements by VA scheduling personnel confirmed that wait list gaming was caused by severe shortages of providers and distorted management incentives, not incompetent or heartless employees who were too easy to fire.

Surveys by veterans' groups and other entities indicated that the VA remains a leader in customer satisfaction and that veterans using the VA health care system overwhelmingly prefer the VA's own providers to private providers and want the VA to increase its own staff.

Wait list gaming and its causes did not first make headlines in 2014.  When post-9/11 veterans started returning home with complex medical needs over 15 years ago, AFGE and veterans' groups cautioned Congress that chronic short staffing was causing wait list manipulation and severe access problems at VA medical centers.

Similarly, every year, the Independent Budget recommends additional staff to reduce claims backlogs at the Veterans Benefits Administration (VBA).  The VA's 2018 firing data reveals that four essential claims processor positions – veterans service representative, rating specialist, claims examiner and claims assistant – were among the 20 largest groups of fired employees in 2018.

Nonetheless, assaults on federal employee due process rights and collective bargaining rights have remained the vehicle of choice for those intent on destroying the civil service and starving the VA into further privatization and reduced health care services and benefits.  The Accountability Act was the culmination of three years of VA employee bashing and

4

misrepresentation about the quality and access of care provided by the VA as compared to the private sector.

*Impact of the new management authorities provided by the Accountability Act*

The new authorities caused severe cuts in the due process and existing collective bargaining rights of all VA frontline employees, as well as supervisors. These changes made it easier for managers to fire employees for any reason, good or bad and incentivized them to rush to fire without providing employees with an opportunity to improve.

The Act made changes in three major areas: the standard of evidence that the agency must meet to prove its case; shorter timeframes for employees to respond to the agency's proposal to remove or discipline; and elimination of the right of the Merit System Protection Board to impose a lower penalty when the evidence does not support removal.

*Lower evidentiary standard:* The Act requires the Merit System Protection Board (MSPB) administrative judges (AJ) and the Board to apply the *substantial evidence* standard to determine if the agency has proved its case instead of the higher, more widely applied *preponderance of the evidence* standard. The *substantial evidence* standard only requires the agency to produce some evidence (or in the words of the U.S. Supreme Court, a "mere scintilla" of the evidence) to win, even if more of the evidence favors the employee. Before this bill became law, the VA had to meet the preponderance standard that requires that the majority of evidence had to weigh against the employee. When managers know that the agency will easily prevail before the Merit System Protection Board, they are encouraged to skip over reprimands, suspensions and demotions and instead, propose removal in response to a single

5

alleged offense.  (This change applies only to Title 5 and Hybrid Title 38 employees. It does not apply to physicians, RNs and other Full Title 38 health care personnel as they do not appeal adverse actions to the MSPB).

*Elimination of the MSPB's authority to lower the penalty sought by the agency:*    Civil service case law has historically required that the MSPB AJs and the Board adjust the penalty to reflect that severity of the underlying misconduct or performance deficiencies.  If the Board or AJ concluded that the evidence did not support removal, he or she could apply a demotion, suspension or other lesser penalty instead of being forced to either carry out a removal or dismiss the entire case. The Act has been interpreted to eliminate the ability of the employee to argue that the penalty is too harsh in light of the seriousness of the charge or his or her prior good record. (This change also applies only to Title 5 and Hybrid Title 38 employees.)

Additionally, for all employees including Full Title 38 employees, the Act significantly reduced the amount of time that an employee facing a proposed removal or other major adverse action had to prepare a response to the agency and file an appeal.  Previously, employees had 14 calendar days to respond to the agency's notice of proposed removal.  Now, they must respond within 7 business days.  The timeframe for appealing a final agency decision to the MSPB (in the case of Title 5 and Hybrid Title 38 employees) has been reduced from 30 calendar days to 10 business days. Similarly, for Full Title 38 health care personnel, the timeframe for appealing a removal or other major adverse action involving professional conduct or competence to the agency Disciplinary Appeals Board has been reduced from 30 calendar days to 7 business days.

*Inadequate statutory whistleblower protections:* One of the strongest arguments made by proponents of this law to reduce rights was that it would provide stronger protections for "deserving" employees who are agency whistleblowers.  However, the Act has a flawed, inequitable and confusing process for protecting whistleblowers from retaliatory firings.  It is important to note that none of Full Title 38 health care personnel listed above are protected by the requirement in the new law that the Office of Special Counsel (OSC) approve the removal of whistleblowers proposed by the agency.  The VA can fire these clinicians unilaterally even if they have strong whistleblower claims, except in extremely limited cases.

This gap in the law has led to inequities and confusion. Recently, management proposed to remove an RN who had registered as a whistleblower with the Office of Special Counsel (OSC). VA management initially informed her (incorrectly) that OSC approval was required; then management proceeded to remove her because she did not have a right to review by the OSC to save her job.

This gap in the Accountability Act will result in significant inequities. For example, if a Hybrid Title 38 psychologist (with both Title 5 and Title 38 rights) files with OSC as a whistleblower, he or she cannot be fired unless OSC approves the action. In contrast, a psychiatrist (who is covered only by Title 38) providing similar mental health treatment in the same clinic who also reports deficiencies in mental health services who files for whistleblower status will receive no OSC review prior to removal.

*Effect of the Accountability Act on Performance Improvement Plans:*  Prior to enactment of this law, the VA routinely offered employees with time limited opportunities to improve their

performance through Performance Improvement Plans (PIPs) prior to removing them for poor performance under Chapter 43 of Title 5. (Misconduct actions are covered by Chapter 75 of Title 5).

Since enactment, the Agency has incorrectly interpreted the Accountability Act as removing the requirement (found in federal statutes and the AFGE NVAC Master Agreement at Article 27) to give employees an opportunity to improve before they can be subject to a performance-based action under Chapter 43. While the Act does state that the procedures of Chapter 43 do not apply to an action under the Act, the reasonable interpretation of this provision is that the Act shortened the timelines in Chapter 43 performance actions similar to Chapter 75 misconduct actions *but did not eliminate the requirement to provide employees with an opportunity to improve.*

We recently grieved the elimination of PIPs in a VBA case. The arbitration hearing was held on April 26, 2018. Briefing was completed on June 18, 2018 and we are currently awaiting a decision from the arbitrator.

CASE EXAMPLES

AFGE and NVAC have handled and/or identified numerous examples of the harsh and counterproductive effects of the Accountability Act.

**Whistleblower cases**

- An employee out of the Overton Brooks VA Medical Center (Shreveport) reported a management official for improperly accessing her personnel medical records. A few weeks after management learned of the employee's whistleblowing activity, she was given a proposed removal for conduct that occurred four months earlier. The

conduct in question involved a dispute between two union officers about union matters.  She had received no prior discipline.  The employee has filed a whistleblower retaliation complaint with OSC, which is currently pending.

- A local union officer in Pittsburgh was featured in an article about the Accountability Act where he made disclosures about Management's abuse of authority. Management immediately expressed their dissatisfaction with his statements. On June 13, 2018, the VA proposed his removal under the Accountability Act. He has filed a whistleblower retaliation complaint with OSC, which is currently pending.

**Disabled veteran seeking accommodation:**

- A disabled veteran with a chronic condition requested a reasonable accommodation for telework to accommodate his condition. The accommodation would have obviated the alleged conduct. The Agency never responded to his request, then issued a proposed removal.

**VBA Performance Actions:**

AFGE and NVAC have serious concerns about the validity of VBA performance standards and whether employees know how these numbers are calculated or understand how to adjust their work flow in response. It is not sufficient to tell an employee that he or she is not "meeting the standards"; the employee also needs to know what is needed to meet them – which is exactly what a PIP would have provided.

Other VBA cases illustrate management's willingness to remove long term employees with valuable claims processing experience on the first offense for failure to meet questionable performance periods during brief evaluation periods.

- An employee with modest performance problems was denied a PIP prior to dismissal to attempt improvement.  Instead, the supervisor repeatedly told the employee that

9

he was not meeting the standards. The supervisor did not discuss why the employee was not meeting the standards.

- Another employee who had modest performance issues was proposed for removal after 9 years with the VA. The VA held the employee accountable for performance standards prior to the employee receiving them. The notice stated the employee failed to meet standards over a 6-month period when in fact he only received the standards 4 months in that time. Despite the VA's claims that the employee's problems were severe, it kept the employee on board for an additional 3 months yet refused to offer him a PIP or any other assistance prior to firing him.

- A career VA employee with approximately 28 years worked at the Philadelphia VBA and held various positions in the Insurance Center before being promoted to the Pension Management Center.   She was not performing regular VSR work because she was moved around within the PMC by multiple assignments for several years. When she was moved back to her regular VSR position, she was unfamiliar with the new PMC rules and regulations. She asked for retraining but was told by PMC Management that she was "fully trained" and they would not provide her with any additional training.  She was proposed for removal under the new law for failing to meet her performance standards.

- After working for more than 12 years for the VA, a Philadelphia VBA employee with two advanced degrees who teaches part time at a local community college was forced into retirement under the new law. When the performance standards underwent drastic changes, he repeatedly asked for help, but management refused to provide them. He was forced into a lower graded position. Instead of risking a termination or further downgrade, he chose to retire early.

**VHA Performance Action:** (*Walls v. VA*, 118 LRP 10484):

- This VHA claims assistant was fired for poor performance as a document scanner. The agency used flawed data to makes its case. The MSPB overturned the removal but the disruption of the employee's livelihood had already occurred.  This case also demonstrates the benefits of a PIP; it informed the employee of exactly what she was doing wrong and ways to improve, but because of its interpretation of the Act, the agency cut her PIP short and failed to give her the complete 90 days to improve.

**HOW THE OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION WORKS**

The AFGE NVAC legal team has had mixed experiences working with the Office of

Accountability and Whistleblower Protection (OAWP).  OWAP appears to have met some of its

requirements including establishing and staffing its office, creating a form for disclosures and

10

conducting investigations.  However, there are some significant items that have not been implemented.

For example, the Accountability Act requires that the OAWP include as a critical element in each supervisor's performance plan how he or she deals with whistleblowers. The VA has yet to do this. When questioned about this, they say they are working on a handbook to accomplish this but over a year has passed with no action.

In addition, the Act requires that OAWP have a toll-free phone number for anonymous whistleblower complaints. The VA does have a toll-free number (855-4AWONOW or 855-429-6669), but it is difficult to find because it is not posted on their site (va.gov/accountability). When asked about this, the VA stated that the number is available internally and that the intent was that they only receive disclosures from employees.

A third concern relates to the VA's policy on reports of wrongdoing. Wouldn't the VA want reports of wrongdoing from other groups with knowledge of the activity, such as the Union, contractors, or veterans service organizations? In fact, nothing in the Act requires that disclosures come exclusively from VA employees. Yet, the OAWP site describes its own disclosure form as follows: *This form is only for use by VA Employees or Applicants for Employment.*

In addition, it appears that OAWP has overstepped its bounds by ordering investigations of matters filed with OSC. As previously noted, under Section 714(e) of the Act, if an employee seeks corrective action from OSC for a whistleblower retaliation complaint, the VA cannot exercise its new authorities to remove the employee. What is supposed to happen in order to

11

stop the action is that OSC reaches out to its contact in OAWP, who then reaches out to the

facility. Then OSC does its own investigations of whistleblower retaliation.  While OAWP has

been taking the necessary steps to proactively stop the actions, they have also been taking the

information from OSC and doing their own investigations, and in some cases, retaliating *again*

by subjecting the whistleblower to an additional mandatory investigation.

Our legal team is also concerned about the relationship between OAWP and the General

Counsel. The Act states that OAWP is not an element of the General Counsel and the Assistant

Secretary may not report to the General Counsel. In practice, these two offices work hand-in-

hand. If the intention was that there be some semblance of independence, that has clearly not

been given effect.

*Other concerns about OAWP:*

- The Accountability Act requires that OAWP have an internet website to receive anonymous whistleblower disclosures. The VA has yet to do this. They have an email address *VAAccountabilityTeam@va.gov* which is not anonymous.
- The Accountability Act requires the VA to provide training, in person (to the greatest extent practicable) regarding what whistleblowing is, how to make disclosures, and an explanation that they will not be reprised against. No such training has occurred.
- The Accountability Act requires the OAWP to take actions against senior leaders under Section 713. Based on their own "CY 2018 VA Accountability Report Details," https://www.va.gov/accountability/Accountability_Report_062618_1.pdf in the year since the Act was passed, they have done so in *one* case. This is out of the 1,044 disclosures and whistleblower retaliation complaints the office received. (It is unclear if this report includes referrals from OSC (https://www.va.gov/accountability/Whistleblower-Disclosures-Summary_070518_1.pdf)
- OAWP is required to have an Assistant Secretary; it currently has an Executive Director. VA's reason for this is that Congress has specified the number of Assistant Secretaries they could have. When they passed the Accountability Act, they did not simultaneously increase the VA's allotment. Assistant Secretaries report directly to

the Secretary, while Executive Directors must report to a Management official along the chain below the Secretary.

CONCLUSION

AFGE urges lawmakers to take immediate steps to curb the devastating impact of the Accountability Act and restore the essential VA employee rights it stripped away by supporting H.R. 6101, the VA Personnel Equity Act, a bipartisan bill that will restore the higher standard of evidence, longer timeframes and authority to provide appropriate penalties that will ensure fairness and true accountability.

We also urge lawmakers to enact legislation to mandate greater transparency of VA firing data.  Similar to the VA Mission Act, which requires greater transparency of VA *hiring* data, it seems very reasonable to impose a legislative mandate to publish full *firing* data.  The VA's refusal to respond properly to multiple requests for firing data confirms that this additional legislative authority is needed.  The Committee should also insist that the VA provide it with the data on veterans and other fired groups that has been requested to date.

Finally, any additional whistleblower protections afforded to VA employees should also apply to the entire workforce and not exclude VA Full Title 38 health care personnel.

Thank you.

13

# Exhibit I



S. Hrg. 116–205

# VA MISSION ACT: IMPLEMENTING THE VETERANS COMMUNITY CARE PROGRAM

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

—————

APRIL 10, 2019

—————

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.govinfo.gov

—————

U.S. GOVERNMENT PUBLISHING OFFICE

40–570 PDF          WASHINGTON : 2020

# **A P P E N D I X**

—————

PREPARED STATEMENT OF AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL–CIO

CHAIRMAN ISAKSON, RANKING MEMBER TESTER, AND MEMBERS OF THE COM-
MITTEE, On behalf of the over 700,000 Federal and D.C. employees represented by
the American Federation of Government Employees (AFGE), AFL–CIO, including
the over 250,000 frontline employees of the Department of Veterans Affairs (VA)
represented by AFGE, we write today to provide our comments on the state of the
VA MISSION Act implementation as well as the harm expanded private sector in-
trusion will have on the VA's ability to deliver high quality, timely care to veterans.
We want to take this opportunity to repeat our concerns about the VA MISSION
Act, its proposed access standards, expansion of walk-in clinics, and the negative
impact this law will have on the VA workforce and the veteran patient population
across the country. Without taking substantially more time to analyze the large-
scale impact of this law, including the proposed access standards and new walk-in
clinic program, the VA MISSION Act will lead to an irreversible dismantling and
weakening of VA's exemplary, uniquely veteran-centric health care system.

While there are significant problems with the substance of the new law that must
be considered, the first and most obvious problem is the secretive, unacceptable na-
ture of the rule writing process. For example, the proposed access standards were
created behind closed doors without any input from Congressional leadership, the
veterans service organization (VSO) community, or representatives of the in-house
frontline workforce. By writing this proposal without input from stakeholders the
VA has made even more controversial an already controversial issue. Problems that
are entirely foreseeable could have been mitigated if Congress, VSOs, and the VA
workforce had been permitted to participate in the drafting process. That did not
happen and, therefore the VA should withdraw the proposed rule and redraft the
proposal in a more inclusive manner.

One of the most serious shortcomings of the access standards created by the
CHOICE program was the arbitrary 30 day/40-mile rule. Under this program if a
veteran's VA had a 30 day wait, or if s/he lived 40 miles or more away from the
nearest VA, that veteran was authorized to seek care in the private sector. Under
the CHOICE standards, approximately 8 percent of veterans were eligible to go into
the private sector.

Unfortunately, the new proposed standards drastically increase the diversion of
more VA care into the private sector. Under the proposed rule, if a veteran's nearest
VA has a 20-day wait time for primary care (including mental health) or a 28-day
wait time for specialty care the patient will be sent to the private sector. We also
have strong concerns that if a veteran finds the wait time is too long outside of the
VA, that veteran will have to go through an unnecessarily burdensome process to
come back inside of the VA. This is not "choice" or "access;" it is a one-way ticket
to a fully outsourced VA. Similarly, if a veteran can certify that he or she has an
average drivetime of 30-minutes for primary care and one-hour drivetime for spe-
cialty care, that also triggers a private sector referral. According to the VA's own
Economic Regulatory Impact Analysis the total number of veterans eligible to re-
ceive private sector care is estimated to increase from 8 percent to 39 percent if this
proposed rule goes into effect. The Committee must demand that the VA withdraw
and re-write this proposed rule.

Equally troubling is that if these new access standards are implemented, they will
perpetuate the egregious double standard already inflicted upon VA providers (who
have to meet stricter competency standards than private sector providers treating
veterans). The private sector will not have to meet the same or even similar access
standards. There is no metric in place that will guarantee that a veteran who quali-
fies for a private sector referral will not be sent out into the "community" to wait

(85)

86

20 days or more for primary care or drive 30 minutes or longer. Without providing an equal playing field the VA is setting itself up to fail and continues the push toward outright privatization.

Another major aspect of this law that is problematic is the expanded access to walk-in clinics for a veteran to receive their care. It's important to look at the Department's past performance with walk-in clinics to articulate our fears with this new proposal. For example, when then-Secretary Shulkin authorized the use of CVS Minute Clinics as a pilot program in 2017 the Department exercised virtually no oversight of the providers. It is premature to allow open access to walk-in clinics without studying the cost associated with these walk-in providers and the quality of care they provide. Since the CVS pilot has at least a year of data for examination, at a minimum, an estimate of how much this program will cost is needed, as well as information compiled on patient outcomes. Yet, unfortunately, no such study has been conducted prior to pushing implementation.

The thought that veterans could use walk-in clinics for mental health services gives AFGE significant pause. We cannot conceive of any appropriate instance when mental health treatment would be suitably provided in a walk-in clinic. The VA is the national leader in integrating primary care and mental health; walk-in clinics will result in inferior, fragmented mental health care by providers with significantly less veteran centric training and accountability. This will most certainly lead to negative health outcomes for veterans. Instead of outsourcing this vital component of veteran care, the VA should be working to build internal mental health capacity.

While it is encouraging to see the Department move toward placing a copayment on walk-in clinics after the third visit in a calendar year, more needs to be done to show this will be a deterrent. Currently there is no insight into how copayments will impact utilization or harm the veteran population. The underlying law also gives the Secretary full discretion to waive copayments. This poses a problem: if the Secretary routinely waives the copayments there will be no disincentive to using these clinics.

Ultimately, none of this would be necessary if the VA would commit to building internal capacity and provide adequate money for staffing and internal resources. In order for the VA to be fully operational it must be fully staffed. In addition to creating a new, permanent private sector care program, the VA MISSION Act also requires the Department to publish data on vacancies and hiring. Since the first set of data was published on August 31, 2018, the number of vacant positions at the VA has steadily increased. As of the most recent reporting the total number of unfilled positions at the VA is nearly 49,000—with nearly 43,000 of those positions located in VHA. Instead of finding ways to justify sending patients outside of the VA to receive their care, the VA should be laser focused on hiring more fulltime professionals who want to make a career out of serving the veterans.

AFGE insists that the VA stop rushing to implement the MISSION Act and start over, with more provisions in place to ensure the integrity of the program and more oversight of cost and quality. The VA MISSION Act represents a truly massive change to the future of the VA, and its rollout should not be fast tracked, and implementation should not proceed before critical data on market capacity, provider quality and wait times are collected.

Thank you for the opportunity to explain our concerns as it relates to implementing the VA MISSION Act and we look forward to working with the Committee to ensure that the VA workforce is able to grow, thrive, and continue providing world-class care and services to our Nation's heroes.

———

PREPARED STATEMENT OF DAN CALDWELL, EXECUTIVE DIRECTOR,
CONCERNED VETERANS FOR AMERICA

TESTIMONY

Five years ago to the day, we learned that dozens of veterans died on secret wait lists waiting to receive health care appointments at the Phoenix VA Medical Center.

In the weeks that followed, the media reported alarming details about how the Phoenix VA and other VA facilities across the United States used secret wait lists to game the system and hide the number of veterans left waiting weeks and months to receive medical care.

That summer, Concerned Veterans for America along with dozens of other veterans organizations agreed an alternative option for veterans to access care in the community was necessary.

This led to the passage of the Veterans Access, Choice, and Accountability Act of 2014 which created the Veterans Choice Program. The temporary new program was

# Exhibit J



**From:** <span>Redaction - Privacy</span> @va.gov>
**Sent:** Wednesday, October 8, 2025 9:45 AM
**To:** <span>Redaction - Privacy</span> @va.gov>
**Subject:** RE: AWOL

Good morning <span>Redaction - Privacy</span>,

Thanks for the reply. This meeting is mandatory; there is not an option to decline it. If you fail to come to the meeting, you could face corrective action, including disciplinary action. Also, there is not a Union anymore, a representative is not included in the meeting. Please meet with me tomorrow, 9/9/25 @ 11:45 am. I have an emergency meeting today @ 3pm, so unable to meet you today.

Thank you so kindly,

<span>Redaction - Privacy</span> **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**

**Houston,Texas**
**Veterans Health Administration**

████████████ Redaction - Privacy

██████████ @va.gov

---

**From:** ████████ Redaction - Privacy ████████ @va.gov>
**Sent:** Wednesday, October 8, 2025 8:57 AM
**To:** ████████ Redaction - Privacy ████████ @va.gov>
**Subject:** AWOL

Hi ██ Redaction - Privacy ,

I apologize but I have to decline the meeting.

Thanks,
██ Redaction - Privacy

**From:** ████████ Redaction - Privacy ████████ @va.gov>
**Sent:** Tuesday, October 7, 2025 8:14 AM
**To:** ████████ Redaction - Privacy ████████ @va.gov>
**Subject:** RE: RE:AWOL

Thanks for the reply. Please see me 10/8/25 @3 pm in my office.

Thank you so kindly,

████████ Redaction - Privacy ████ **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**
████████ Redaction - Privacy

██████████ @va.gov

---

**From:** ████████ Redaction - Privacy ████████ @va.gov>
**Sent:** Friday, October 3, 2025 3:54 PM
**To:** ████████ Redaction - Privacy ████████ @va.gov>
**Subject:** RE: RE:AWOL

Hi ██ Redaction - Privacy ,

I apologize I don't have a union representative available to witness the meeting. I have psychotherapy on Tuesday @ 3:00 P.m.

Thanks.

[Redaction - Privacy]

**From:** [Redaction - Privacy] @va.gov>
**Sent:** Wednesday, October 1, 2025 2:42 PM
**To:** [Redaction - Privacy] @va.gov>
**Subject:** RE: RE:AWOL

Please come see me in my office next Tuesday, 10/9/25 @ 3PM.

Thank you so kindly,

[Redaction - Privacy] **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**
[Redaction - Privacy]
**@va.gov**

**From:** [Redaction - Privacy] @va.gov>
**Sent:** Tuesday, September 30, 2025 8:13 AM
**To:** [Redaction - Privacy] @va.gov>
**Subject:** RE: RE:AWOL

Good morning.

I apologize. I forgot to enter my time before I left for vacation. Please advise any remedy to the situation.

Thanks,

[Redaction - Privacy]

**From:** [Redaction - Privacy] @va.gov>
**Sent:** Monday, September 29, 2025 11:30 AM
**To:** [Redaction - Privacy] @va.gov>
**Subject:** RE:AWOL
**Importance:** High

Good morning, ,

Since there is no approved Anuel Leave recorded in VATAS for you, the following days have been marked as AWOL: September 17- September 26.

Thank you so kindly,

**Redaction - Privacy** **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**
Redaction - Privacy
**@va.gov**

# Exhibit K

An official website of the United States government    Here's how you know ⌄

Talk to the Veterans Crisis Line now ›

VA.gov    Locations    Business    VA Careers    Contact Us

**VA | News**

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# VA terminates union contracts for most bargaining-unit employees

FOR IMMEDIATE RELEASE

August 6, 2025  3:35 pm

**The move will ensure VA stays focused on Veterans instead of spending millions of taxpayer dollars and approximately 750,000 hours per year on union activities**

WASHINGTON — The U.S. Department of Veterans Affairs today announced the termination of collective bargaining agreements for most VA bargaining-unit employees, a move that will make it easier for VA leaders to promote high-performing employees, hold poor performers accountable, and improve benefits and services to America's Veterans.

The announcement comes in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs. In accordance with the same EO, VA on April 25 stopped withholding union dues from most employees' paychecks.

VA today notified the following unions that, effective immediately, pursuant to the EO their contracts with VA have been terminated for most bargaining-unit employees: American Federation of Government Employees, AFL-CIO (AFGE); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU).

Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions will remain in place, as those occupations are exempt from the EO.

This decision is good news for Veterans, families, caregivers and survivors for several reasons:

• VA staff will spend more time with Veterans: In 2024 alone, over 1,900 VA bargaining-unit employees spent more than 750,000 hours of work on taxpayer funded union time – including some who are paid more than $200,000 a year. With no collective bargaining obligations, those hours can now be used to serve Veterans instead of union bosses.
• VA facilities can focus on treating Veterans instead of hosting unions: More than 187,000 square feet of VA's office and clinical space is currently being used by union representatives, free of charge. This has cost VA millions of dollars in lost rent and expenses for union bosses' government phones and computer equipment. Today's decision will ensure VA facilities are fully focused on helping Veterans get the care and benefits they've earned, instead of serving as free regional offices for unions that oppose our efforts to improve VA.
• VA can manage its staff according to Veterans' needs, not union demands: Labor contracts have restricted managers' ability to hire, promote and reward high-performing employees, hold poor performers accountable and implement reforms to better serve Veterans. Today's decision frees VA managers to act in the best interests of Veterans rather than union bosses.

"Too often, unions that represent VA employees fight against the best interests of Veterans while protecting and rewarding bad workers," said VA Secretary Doug Collins. "We're making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform."

Background
VA-employee unions have repeatedly opposed significant, bipartisan VA reforms and rewarded bad employees for misconduct. Examples include:
• AFGE, NFFE opposed the MISSION Act, a law that makes it easier for Veterans to get health care.
• NFFE supports rescinding the VA Accountability and Whistleblower Protection Act,

a law designed to protect whistleblowers and hold employees accountable for misconduct.

• AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term.

---

 Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov

 Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA

 Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question

 Subscribe today to receive these news releases in your inbox.

Topics    bargaining-unit    union contracts

---

**LET OTHERS KNOW ABOUT THIS**

    

## More from the Press Room

 Top

NEWS RELEASES    SEPTEMBER 10, 2025

### VA dedicates new Southern Utah National Cemetery

VA dedicates the Southern Utah National Cemetery in Cedar City, Utah.

NEWS RELEASES    SEPTEMBER 8, 2025

### VA cemeteries to hold national day of service and remembrance marking the 24th anniversary of 9/11

Department of Veterans Affairs national cemeteries will host a day of service and remembrance to honor victims of the 9/11 attacks on Sept. 11, also known as Patriot Day.

NEWS RELEASES    AUGUST 29, 2025

### VA earns top scores in latest CMS hospital ratings report

More than three-fourths of Department of Veterans Affairs hospitals that received an Overall Hospital Quality Star Rating earned four-or-five-star ratings as part of the Centers for Medicare and Medicaid Services 2025 hospital quality ratings

Last updated August 6, 2025

   

  U.S. Department of Veterans Affairs

U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

**VA** News
An official website of the U.S. Department of Veterans Affairs

| | | | |
|---|---|---|---|
| VA.gov | VA Publications | Office of the Inspector General | Disclaimers |
| ChooseVA | About VA | VA plans, budget, finances, and performance | Open data |
| DiscoverVA | VA mobile apps | Agency Financial Report | Vulnerability disclosure policy |
| DigitalVA | Accessibility at VA | Privacy policy | Copyright policy |
| VA Outreach Events | No FEAR Act data | FOIA requests | |

VA Forms                                    Whistleblower Protection

Looking for U.S. government information and services? Visit USA.gov

# Exhibit L

| | |
|---|---|
| **From:** | Redaction - Privacy |
| **To:** | Redaction - Privacy |
| **Subject:** | Change in Bargaining Unit Status |
| **Date:** | Friday, August 8, 2025 8:14:36 AM |

Dear Team Member,

This notice is to inform you of an important change in your bargaining unit status and your union representation. As you may be aware, in response to President Trump's March 27, 2025, Executive Order (EO), *Exclusions from Federal Labor-Management Relations Programs*, that excluded certain federal agencies and agency subdivisions from the Federal Service Labor-Management Relations Statute, on August 6, 2025, VA announced the termination of collective bargaining agreements for most of VA's bargaining unit employees. This announcement begins a new chapter that will eliminate barriers and increase focus on the world class care and services Veterans deserve.

Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

You may see changes to some of the processes and procedures in your workplace that were previously contained in a collective bargaining agreement that is now terminated. Managers have been directed to exclusively follow VA policy for all matters, including things like promotions, alternative work schedules, details, hours of work, telework, leave usage, etc. You should also expect to see an updated SF-50 form in your personnel file, which will reflect the change to your bargaining unit status code.

You are encouraged to discuss all workplace matters directly with your supervisor. We thank you for your continued service and dedication to Veterans.


**Sending for and on behalf of**
Redaction - Privacy **FACHE**
**Medical Center Director**
**Alexandria VA Health Care System**

# Exhibit M

Attachment A

# ORDER TO RETURN TO DUTY

Date:   August 8, 2025

From:   Redaction - Privacy Medical Center Director

Subj:   Order to Return to Duty

To:   Mary Jean Burke

1. On March 27, 2025, President Trump signed Executive Order (EO) 14251: *Exclusions from Federal Labor-Management Relations Programs,* exempting the Department of Veterans Affairs (VA) from Chapter 71 of title 5 of the United States Code, the Federal Service Labor-Management Relations Statute (hereinafter referred to as Statute). EO 14251 exempted police officers, firefighters, and security guards from its coverage, and further delegated authority to the VA Secretary to exempt VA organizational components from the EO. On April 17, 2025, Federal Register Notice 16427 was published, exempting certain non-national unions from EO 14251's coverage.

2. On August 6, 2025, pursuant to EO 14251, the Secretary terminated master collective bargaining agreements, and all amendments, local supplemental agreements, and memoranda of understanding at all levels (collectively referred to as CBAs) with the American Federation of Government Employees (AFGE), the National Association of Government Employees (NAGE), the Service Employees International Union (SEIU), the National Nurses Organizing Committee/National Nurses United (NNOC/NNU), and the National Federation of Federal Employees (NFFE), except insofar as those agreements cover exempted employees.

3. As a designated representative of AFGE, not serving in an occupation exempted from EO 14251, you are hereby notified that you are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities.

4. Accordingly, you are instructed to return to your position of record no later than the start of your tour, August 7, 2025. You should report to your supervisor.

5. You must remove any personal belongings from union office spaces at your VA facility and coordinate with the Office of Information and Technology to return all Government-Furnished Equipment provided for the purpose of union duties, no later than August 12, 2025. Any union information contained on the agency local area network or other similar agency networks may, upon your specific written request, be saved and provided to you or a designated union representative currently covered by the Statute.

6. Failure to follow the instructions above could lead to appropriate administrative action up to and including removal from Federal service. Upon return to your position

of record, your supervisor will assess and determine whether training is necessary for you to perform your assigned duties.

7. If you have any questions, please contact ( [Redaction - Privacy] *ER/LR Specialist,* [Redaction - Privacy] *@va.gov or (317) 372-4864).*

[Redaction - Privacy]

[Redaction - Privacy] MHA, FASHCE

**Medical Center Director**

# Exhibit N

Jennifee D.

From:
Sent:                    Redaction - Privacy
To:                      Friday, November 14, 2025 2:18 PM
Cc:                      Redaction - Privacy
Subject:                 Redaction - Privacy
                         Important Notice: Compliance with Executive Order 14251 Regarding Union Activities

Dear Former AFGE Union Official/Steward,

I hope this e-mail finds you well. I am writing to address significant concerns that have recently been reported regarding ongoing union activities utilizing government resources. As you are aware, the implementation of Executive Order (EO) 14251, signed on March 27, 2025, by President Trump, has exempted the Department of Veterans Affairs (VA) from Chapter 71 of Title 5 of the United States Code, the Federal Service Labor-Management Relations Statute. This order has significantly altered our operations concerning union activities.

It has been reported that there may be instances of union activities being conducted using government resources. These activities potentially violate the provisions of EO 14251. Use of government property, office space, information technology resources, and other government facilities for union purposes is strictly prohibited under the current guidelines.

It is important to emphasize that misuse of government property or resources for union business can lead to disciplinary action. Any violation of these provisions may lead to disciplinary action up to and including removal from federal service. It is imperative that all personnel adhere strictly to these guidelines to avoid any adverse outcomes.

Furthermore, the Department has stopped authorizing TFUT (official time) for union officials who are not otherwise exempt. All employees who were on official time have transitioned back to performing Agency work 100% of their paid time in their position of record.

Finally, the Department will only participate in negotiated grievance or arbitration procedures that cover the Exempted Employees or bargaining unit employees represented by one of the Exempted Unions. We will not respond or participate in any grievance or arbitrations involving AFGE or NAGE (unless they are Police or Fire). Negotiated grievance and arbitration procedures shall be limited for use by unions which still represent Police and Fire.

We are committed to ensuring compliance with EO 14251 and maintaining the integrity of VA operations. We appreciate your cooperation and understanding during this transition.

Thank you for your attention to this critical issue and for your continued dedication to our mission and our Veterans.

Redaction - Privacy

HR Specialist, TEAM 1 | ER/LR Strategic Business Partner | Altoona Strategic Business Unit
Human Resources Management Service | VISN 4
(Office)      Redaction - Privacy
Chat with me on MS TEAMS
(Email)    Redaction - Privacy  @va.gov
(TEAM 1 email) Redaction - Privacy rteam1@va.gov

1