# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305;<br><br>      Plaintiffs,<br><br>          *v.*<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs;<br><br>      Defendants. | Civil Action No.<br>25-CV-583-MRD-PAS |

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................III

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................... 5

    I.   The FSLMRS Framework and Related Executive Orders ............................ 5

    II.  Executive Order 14,251 ................................................................................ 7

    III. The VA's National Security Work................................................................ 8

    IV. The VA's Implementation of the Executive Order ...................................... 10

    V.  The Statutory Channeling Requirement....................................................... 12

    VI. Other Cases Challenging Executive Order 14,251 ...................................... 13

    VII.The Instant Action and Plaintiffs' Motion for Preliminary Injunction ........ 14

ARGUMENT ....................................................................................................... 15

    I.   This Case Should Not Proceed Because It Constitutes Impermissible Claim Splitting. ........................................................................................... 15

    II.  Alternatively, Plaintiffs' Request for a Preliminary Injunction Should be Denied. .................................................................................................. 19

        A.  Legal Standard ...................................................................................... 19

        B.  Plaintiffs do not satisfy any of the preliminary injunction factors......... 19

            1.  Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims......................................................................................... 20

                a.  The FSLMRS precludes district court jurisdiction over Plaintiffs' claims................................................................ 21

                    i.   The *Thunder Basin* exception to the channeling requirement does not apply here. ................................. 24

                b.  Plaintiffs are unlikely to succeed on the merits of their First Amendment claims................................................ 31

                    i.   Plaintiffs' First Amendment retaliation claim fails...... 31

                    ii.  Plaintiffs' First Amendment viewpoint discrimination claim also fails................................................................ 38

c.  Plaintiffs are unlikely to succeed on the merits of their APA claim.......................................................................40

i.   APA review is unavailable because of potential alternative remedies. ....................................................40

ii.  The APA bars judicial review in this case because the challenged action is committed to Agency discretion by law..................................................................................41

iii. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted arbitrarily or capriciously. ...............................................42

iv.  Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted contrary to the First Amendment...................................47

2.  Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction ....................................................................47

3.  The Balance of the Equities and the Public Interest Favor the Government .......................................................................50

III. Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, the Injunction Should be Accompanied by a Bond.......................................54

CONCLUSION ...........................................................................................56

# TABLE OF AUTHORITIES

## Cases

*AFGE v. Loy,*
　367 F.3d 932 (D.C. Cir. 2004) ............................................................ 26, 29

*AFGE, AFL-CIO v. Loy,*
　281 F. Supp. 2d 59 (D.D.C. 2003) ............................................................ 39

*AFGE v. Sec'y of Air Force,*
　716 F.3d 633 (D.C. Cir. 2013) ............................................................ 23, 24

*AFGE, AFL-CIO v. Trump,*
　148 F.4th 648 (9th Cir. 2025)............................................................ passim

*AFGE v. Trump,*
　929 F.3d 748 (D.C. Cir. 2019) ............................................ 22, 24, 26, 27, 28

*AFGE v. Trump,*
　No. 4:25-cv-3070 (N.D. Cal. June 24, 2025) .......................... 2, 13, 16, 17

*AFSA v. Trump,*
　2025 WL 1742853 (D.C. Cir. June 20, 2025) ...................... 14, 20, 48, 51

*Akebia Therapeutics, Inc. v. Azar,*
　976 F.3d 86 (1st Cir. 2020)............................................................ 20-21

*Axon Enter., Inc. v. FTC,*
　598 U.S. 175 (2023) .................................................... 21, 22, 24, 25, 26

*Babbitt v. United Farm Workers Nat'l Union,*
　442 U.S. 289 (1979) ............................................................ 39

*Bd. of Cnty. Comm'rs v. Umbehr,*
　518 U.S. 668 (1996) ............................................................ 37

*Bureau of Alcohol, Tobacco and Firearms v. FLRA,*
　464 U.S. 89 (1983) ............................................................ 5-6, 28

*Bowen v. Massachusetts,*
　487 U.S. 879 (1988) ............................................................ 40

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004)....................................................................... 47

*Crowley v. Loc. No. 82, Furniture & Piano Moving,*
    679 F.2d 978 (1st Cir. 1982)................................................................. 54, 55

*D.B. ex rel. Elizabeth B. v. Esposito,*
    675 F.3d 26 (1st Cir. 2012)......................................................................... 31

*Department of Defense v. AFGE,*
    No. 6:25-cv-00119 (W.D. Tex. Mar. 27, 2025)................................... 18, 30

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ............................................................................... 27, 29

*Esso Standard Oil Co. v. Monroig-Zayas,*
    445 F.3d 13 (1st Cir. 2006).......................................................................... 20

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .................................................................................... 43

*Fed. L. Enf't Officers Ass'n v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023).................................................................... 25

*Federal Education Association v. Trump,*
    2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ......................................... 20

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.,*
    391 F. Supp. 2d 1 (D.D.C. 2005) .............................................................. 39

*Gattineri v. Town of Lynnfield,*
    58 F.4th 512 (1st Cir. 2023) ................................................................ 32, 35

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
    607 F.3d 453 (7th Cir. 2010) .................................................................... 54

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................ 41, 42

*Heckler v. Ringer,*
    466 U.S. 602 (1984) .................................................................................. 25

*Henderson for NLRB v. Bluefield Hospital Co., LLC,*
    902 F.3d 432 (4th Cir. 2018) .................................................................... 49

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ...................................................................................... 38

*Kale v. Combined Ins. Co. of Am.*,
    924 F.2d 1161 (1st Cir. 1991) ................................................................. 15

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ........................................................................ 33, 34

*Laccinole v. MRS BPO, LLC*,
    2023 WL 22136 (D.R.I. Jan. 3, 2023) .................................... 15, 16, 17, 18

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................ 49

*Local 1498, AFGE v. AFGE, AFL/CIO*,
    522 F.2d 486 (3d Cir. 1975) ................................................................. 5

*Magellan Tech., Inc. v. FDA*,
    70 F.4th 622 (2d Cir. 2023) ............................................................ 43, 46

*Maine v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 200 (D. Me. 2025) ....................................................... 54

*Manhattan-Bronx Postal Union v. Gronouski*,
    350 F.2d 451 (D.C. Cir. 1965) ............................................................... 5

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) ................................................................. 47

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................ 43

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ....................................................................... 31, 36

*Munaf v. Geren*,
    553 U.S. 674 (2008) .......................................................................... 19

*Narragansett Indian Tribe v. Guilbert*,
    934 F.2d 4 (1st Cir. 1991) .............................................................. 21, 47

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) .......................................................................... 38

*New York v. Kennedy*,
    789 F. Supp. 3d 174 (D.R.I. 2025) ....................................................... 30

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) .......................................................................... 32

*NIH v. Am. Ass'n of Public Health,*
    606 U.S. ---, 145 S. Ct. 2658 (2025) ................................................................ 53, 55

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................. 19, 20, 50-51

*NTEU v. Trump,*
    2025 WL 561080 (D.D.C. Feb. 20, 2025) .............................................. 22

*NTEU v. Trump,*
    2025 WL 1441563 (D.C. Cir. May 16, 2025).................................... passim

*NTEU v. Reagan,*
    1981 WL 150530 (D.D.C. Sept. 3, 1981) ............................................ 32, 39

*NTEU v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025)............................................................27-28

*Ohio Adjutant General's Department v. FLRA,*
    598 U.S. 449 (2023) .......................................................................... 28

*Padilla-Garcia v. Rodriguez,*
    212 F.3d 69 (1st Cir. 2000)................................................................ 31

*Philip Morris USA Inc. v. Scott,*
    561 U.S. 1301, (2010) ................................................................... 53, 55

*Police Ass'n of the District of Columbia v. Dep't of Treasury,*
    No. 78-0236 (D.D.C. May 19, 1980) .................................................. 32, 39

*Pub. Serv. Co. v. Town of W. Newbury,*
    835 F.2d 380 (1st Cir. 1987)............................................................... 47

*Respect Maine PAC v. McKee,*
    622 F.3d 13 (1st Cir. 2010).................................................................. 21

*Rubacky v. Morgan Stanley Dean Witter Credit Corp.,*
    104 F. App'x 757 (1st Cir. 2004) ........................................................ 48

*SEIU Local 1996 v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012)................................................................... 21

*Smith v. Ark. State Highway Emps., Local1315,*
    441 U.S. 463 (1979) ........................................................................... 39

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ........................................................................... 19

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................ 24

*TikTok Inc. v. Garland,*
    122 F.4th 930 (D.C. Cir. 2024) ........................................................ 37

*Trump v. Boyle,*
    606 U.S. ---, 145 S. Ct. 2653 (2025) ............................................. 20

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................... 51

*Trump v. Hawaii,*
    585 U.S. 667 (2018) .................................................................... 33, 51

*U.S. Dep't of Defense v. AFGE,*
    No. 6:25-cv-00119 (W.D. Tex. Apr. 21, 2025) ........................... 18

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376,*
    60 F.L.R.A. 202 (2004) ..................................................................... 27

*Union of Concerned Scientists v. Wheeler,*
    954 F.3d 11 (1st Cir. 2020)............................................................. 44

*United States Department of Defense Ohio National Guard & AFGE Local 3970,*
    71 F.L.R.A. 829 (2020) ..................................................................... 27

*Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.,*
    618 F. Supp. 2d 134 (D.R.I. 2009).............................................. 40

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...................................................................... 19, 49

## Statutes

Administrative Procedure Act ("APA"),
    5 U.S.C. §§ 500-596
        § 701(a)(2) .................................................................................. 41
        § 705.............................................................................................. 14

Federal Service Labor-Management Relations ("FSLMRS"),
    5 U.S.C §§ 7101-7135 .................................................................... 21
        § 7101 ...................................................................................... 5, 55
        § 7103.......................................................................................... 33
        § 7103(a)(3) .................................................................................. 6

§ 7103(a)(9) ......................................................................................... 26

§ 7103(a)(12) ......................................................................................... 6

§ 7103(b)(1) ........................................................................ 1, 32, 36, 39

§ 7105(f) ............................................................................................... 12

§ 7105(f)–(g) ....................................................................................... 48

§§ 7107–35 ............................................................................................ 3

§ 7111(b)(2) ................................................................................. 25, 27

§ 7116 ................................................................................................... 12

§ 7116(a) ............................................................................................... 28

§ 7116(a)(8) ......................................................................................... 26

§ 7116(d) ............................................................................................... 25

§ 7118 ................................................................................................... 48

§ 7118(a)(1) ......................................................................................... 12

§ 7121(a)(1) ......................................................................................... 26

§ 7123(a) .................................................................... 13, 23, 24, 31

VA/DoD Health Resources Sharing and Emergency Operations Act; Pub. L. No. 97-174, 96 Stat. 70 (1982) ........................................................... 8, 9

38 U.S.C. §§ 8111A .......................................................................... 9

**Executive Orders**

Exec. Order No. 10,988 ..................................................................... 5

Exec. Order No. 11,491 ..................................................................... 5

Exec. Order No. 11,616 ..................................................................... 5

Exec. Order No. 11,636 ..................................................................... 5

Exec. Order No. 11,838 ..................................................................... 5

Exec. Order No. 12,171 ..................................................................... 6

Exec. Order No. 13,039 ..................................................................... 6

Exec. Order No. 13,252 ..................................................................... 6

Exec. Order No. 13,480 ..................................................................... 7

Exec. Order No. 13,760 ..................................................................... 7

Exec. Order No. 14,251 ............................................................... passim

Exec. Order No. 14,343 ................................................................. 1, 28, 37, 39

**<u>Regultaory</u>**

5 C.F.R. §§ 2423.3–2423.6 ............................................................................. 12

U.S. Office of Personnel Management, Frequently Asked Questions: Executive
    Order 14251 "Exclusions from Federal Labor-Management Relations Programs"
    (Sept. 10, 2025) ........................................................................................ 45

**<u>Federal Rules</u>**

Federal Rule of Civil Procedure 17(a) ......................................................... 16

Federal Rule of Civil Procedure 65 ....................................................... 14, 56

Federal Rule of Civil Procedure 65(c) ............................................... 54, 55, 56

**<u>Other Authorities</u>**

6A Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure Civ.* § 1543 (3d ed. 1998) ....................... 16

11 Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure* § 2954 (3d ed. 1998) .............................. 54

**INTRODUCTION**

The Federal Service Labor-Management Relations ("FSLMRS") authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that (A) "the agency . . . has as a primary function intelligence, counterintelligence, investigative, or national security work," and (B) the provisions of the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). On March 27, 2025, President Trump issued such an order. Specifically in Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs*, the President made the required determinations, thereby excluding from statutory coverage the identified agencies and agency subdivisions, including as relevant here, the U.S. Department of Veterans Affairs ("VA" or "Agency").

Plaintiffs in this case argue that the VA unlawfully terminated the collective bargaining agreement ("CBA") between the VA and the American Federation of Government Employees ("AFGE"), with which Plaintiffs are affiliated. But the VA's termination decision flowed directly from Executive Order 14,251, which Plaintiffs do not challenge here. Executive Order 14,251 excluded the VA from collective bargaining. Executive Order § 2. It also included a provision specifying that "nothing in this" Executive Order shall exempt from FSLMRS coverage "the immediate, local employing offices of any agency police officers, security guards, or firefighters." *Id.* On August 6, 2025, the Secretary of Veterans affair notified the AFGE that "pursuant to EO 14251," the "VA is terminating the VA-AFGE [Master

1

CBA] . . . for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by AFGE." Amended Compl. for Declaratory and Injunctive Relief ("Am. Compl."), Ex. C, ECF No. 13-3 (Letter from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE (Aug. 6, 2025)). Plaintiffs assert that the termination violates their First Amendment rights and the Administrative Procedure Act ("APA").

At minimum, this case should not proceed because it constitutes impermissible claim splitting. While Plaintiffs bring this action here, their claims are already being litigated in the Ninth Circuit case, *American Federation of Government Employees v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025) ("*AFGE II*"). In *AFGE II*, labor organizations (including the AFGE) seek a preliminary injunction against the VA and other government agencies to prohibit the agencies from implementing Executive Order 14,251. Notably, the CBA at issue in this case was entered into by the AFGE itself, not by the two affiliates who nominally appear as plaintiffs here (AFGE National VA Council and AFGE Local 2305). The AFGE has raised a First Amendment claim already in *AFGE II*. And although Plaintiffs attempt to articulate APA claims here, their claims at bottom challenge the VA's implementation of Executive Order 14,251. Thus, their claims arise out of the same series of connected events as in *AFGE II*, and those claims could have and should have been brought in that case. On these facts alone, this case should be dismissed.

Moreover, Plaintiffs have failed to demonstrate that preliminary injunctive relief is warranted. Plaintiffs' delay in seeking such relief is reason alone to deny their motion. Moving for emergency relief nearly nine months after the Executive Order was issued (March 27, 2025) and nearly three months after the subject CBA was terminated (August 6, 2025) belies the need for such relief. Indeed, Plaintiffs did not even request a preliminary injunction concurrently with their original complaint; only after amending that complaint three weeks later did Plaintiffs move for a preliminary injunction. But should this Court nevertheless consider Plaintiffs' request, the elements for an injunction are not supported by the record.

First, Plaintiffs fail to establish a likelihood of success on the merits of their claims. Congress intended claims under the FSLMRS, 5 U.S.C. §§ 7107–35, to be covered by the comprehensive remedial scheme set forth in that statute. Plaintiffs' assertion that the VA is violating obligations under the FSLMRS by terminating the CBA with the AFGE does not fall within the narrow exception to such preclusion articulated in *Thunder Basin* and its progeny. Moreover, Plaintiffs fail to establish that Defendants terminated the CBA based on animus towards Plaintiffs' First Amendment speech, not the mandate of Executive Order 14,251. Further, while APA review is unavailable, even if Plaintiffs could proceed on this basis, Plaintiffs fail to demonstrate that the VA's decision to terminate the CBA was either arbitrary or capricious or a violation of the First Amendment.

Second, Plaintiffs fail to establish likelihood of irreparable harm absent preliminary relief. Plaintiffs' alleged harms purportedly arise from (1) the loss of

certain benefits and privileges Plaintiffs previously enjoyed under the CBA, and (2) an alleged "chilling" effect on their First Amendment speech. Neither type of harm qualifies as "irreparable." Rather, as recognized by two courts of appeals in other EO 14,251-related litigation, there is a greater likelihood Defendants will suffer irreparable harm if Plaintiffs' request for preliminary relief is granted because it would "tie[] the government's hands … in the national security context." *AFGE II*, 148 F.4th at 656 (quoting *Nat'l Treasury Emps. Union*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) ("*NTEU II*")). Thus, Plaintiffs are unable to show irreparable harm caused by the termination of the CBA.

Third, the balance of the equities and the public interest favor Defendants because a preliminary injunction would interfere with the VA's implementation of an Executive Order that the President lawfully issued to ensure the VA operates consistently with its primary national security purpose. Considering the prior significant disruptive impacts directly caused by collective bargaining requirements, as detailed in the declaration of Tracey Therit, the Chief Human Capital Officer for Human Resources and Administration in the Department of Veterans Affairs, attached as Exhibit A, forcing the VA to reinstate the CBA, with all its obligations, would only exacerbate those impacts and divert important resources away from the VA's critical emergency preparedness work.

Thus, the Court should dismiss Plaintiffs' claims or alternatively deny their motion.

# BACKGROUND

## I.    The FSLMRS Framework and Related Executive Orders

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. This power includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Before Congress enacted the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Local 1498 v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations in 1962 when he issued Executive Order No. 10988, *Employee-Management Cooperation in the Federal Service*, 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*ATF*"). Multiple Presidents subsequently amended that Order.[1]

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The Statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *ATF*, 464

---

[1] *See* Exec. Order No. 11,491, *Labor-Management Relations in the Federal Service*, 34 Fed. Reg. 17,605 (Oct. 31, 1961), as amended by Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971), Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743 (Feb. 7, 1975).

U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. *See, e.g.*, 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others); 5 U.S.C. § 7103(a)(12), (14) (defining "collective bargaining" as a good-faith effort to reach agreement with respect to "conditions of employment"—a term that is defined as excluding, for example, "policies, practices, and matters relating to the classification of any position"). The FSLMRS also empowers the President to exempt additional agencies and their subdivisions from its requirements. Specifically,

> The President may issue an order excluding *any* agency or subdivision thereof from coverage under [the Statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since, with the sole exception of President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving, complex national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan.

6

7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 17, 2017).

## II.    Executive Order 14,251

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order—Executive Order 14,251—which directly led to the CBA termination that Plaintiffs challenge here. *Executive Order 14251 of March 27, 2025*, 90 Fed. Reg. 14553 (Apr. 3, 2025) (the "Executive Order" or "EO"). In Sections 1 and 2 of the Executive Order, the President determined that certain agencies—including the VA—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations. *Id.* §§ 1, 2(c).

In addition to excluding the VA and other agencies from the FSLMRS's coverage, the Executive Order contained two other provisions relevant here. First, it contained a carve-out from its coverage for "the immediate, local employing offices of any agency police officers, security guards, or firefighters," which remained subject to Chapter 71. Executive Order, § 2(b). Given its decentralized structure, the VA has interpreted this carve-out as applying only to employees holding one of the three occupations specified in the Executive Order: police officers, security guards, and firefighters. Therit Decl. ¶ 11.

Second, the Executive Order contained a delegation-of-authority provision authorizing the Secretary of the VA to issue orders suspending application of the Executive Order to any subdivision the Secretary supervises, "thereby bringing such

subdivisions under the coverage of the Federal Service Labor-Management Relations statute," if the Secretary determined that doing so would be "consistent with national security requirements and considerations." Executive Order § 4. There are no such suspension orders currently in effect.[2]

## III.    The VA's National Security Work

The VA has national security work as a primary function, as the President determined in the Executive Order. Therit Decl. ¶ 4; Executive Order §§ 1-2. Indeed, it plays an indispensable role in the United States's national emergency preparedness strategy.

The VA's emergency response capabilities have evolved since the 1980s. Prior to that time, the VA focused on just three primary missions: to deliver clinical care to veterans; to conduct research benefiting veterans and all Americans; and to educate future health professionals. Therit Decl. ¶ 4. In 1982, the VA and Department of Defense ("DoD") Health Resources Sharing and Emergency Operations Act assigned it a fourth primary mission: to improve the nation's preparedness for national emergencies, including war, terrorism, and natural

---

[2] In April 2025, the Secretary initially issued an Order suspending the application of the Executive Order for VA employees represented by certain local unions, but after further considering the Executive Order's delegation-of-authority provision, the Secretary rescinded that Order in its entirety. *See Rescission of Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171*, 90 Fed. Reg. 50950 (Nov. 13, 2025) ("Rescission of Order") (Silva Decl., Ex. N). Plaintiffs incorrectly assert that the VA relied on the April 2025 Order when terminating the CBA at issue in this case. *See, e.g.*, Pls.' Mem. at 1. But the VA's notice of termination neither referenced nor relied on the April 2025 Order. Am. Compl., Ex. C. That notice solely cited and relied on Executive Order 14,251. *Id.*

disasters. *Id*.; VA/DoD Health Resources Sharing and Emergency Operations Act; Pub. L. No. 97-174, 96 Stat. 70 (1982). Specifically, that Act designated the VA as the primary backup for any health care services needed by the Department of Defense (now known as the Department of War) in the event of war or national emergency that involves armed conflict. *See* VA/DoD Health Resources Sharing and Emergency Operation Act, Pub. L. No. 97-174, 96 Stat. 70 (1982).

Congress further amplified the VA's role in homeland security and response to domestic emergencies in the Public Health Security and Bioterrorism Preparedness Response Act of 2002. Pub. L. No. 107-188, 116 Stat. 594. That law reorganized the National Disaster Medical System ("NDMS") to create an interagency partnership between the Department of Health and Human Services ("HHS"), the Department of Homeland Security, the Department of War, and the VA. 42 U.S.C. §§ 300hh-11(a)(1)-(2). Through the NDMS, the VA serves as the principal medical care backup for the Department of War during and immediately following a period of national emergency or war. 38 U.S.C. §§ 8111A. The statute also requires the VA to coordinate with HHS to maintain a stockpile of drugs, vaccines, medical devices, and other biological products and emergency supplies. Pub. L. No. 107-188, § 121(a)(1).

Today, the VA's "Forth Mission" involves developing plans and taking actions to ensure continued service to veterans, as well as supporting national, state, and local emergency management efforts. Therit Decl. ¶ 4. The law provides for the sharing of healthcare resources, including facilities, equipment, and personnel,

between the VA and the Department of War, even during peacetime. *Id.* ¶ 4(e)(ii). The VA also integrates its emergency response into the National Response Framework ("NRF"), which is coordinated by the Federal Emergency Management Agency ("FEMA"). *Id.* ¶ 5(b). For these reasons and others described in detail in the Therit Declaration, the VA clearly has, as a primary function, national security work.

## IV.    The VA's Implementation of the Executive Order

On August 6, 2025, the VA announced the termination of the national CBAs for most VA bargaining unit employees. *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/pressroom/va-terminates-union-contracts-for-most-bargaining-unit-employees/ ("VA press release") (Silva Decl., Ex. I). In a press release announcing the termination, the VA explained that the Agency had cancelled the union contracts "in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs." *Id.* The press release clarified that "Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions will remain in place, as those occupations are exempt from the EO." *Id.* The press release also listed examples of how the decision would benefit veterans, families, caregivers, and survivors, including the following:

- allowing VA staff to spend more time with veterans instead of collective-bargaining obligations;

- reclaiming VA facilities to focus on treating veterans instead of hosting unions;

- managing VA staff according to veterans' needs—not union demands; and

- ensuring millions of taxpayer dollars are spent, not on union activities, but veteran care.

*Id.*

AFGE was among the labor organizations that received notice from the VA on August 6, 2025, that its CBA was being terminated. Am. Compl. ¶ 10 & ex. C, ECF No. 13.

The VA also communicated the change, and the reason for it, in an email sent to employees who would no longer be covered by the CBA. Burke Decl., Ex. L, ECF No. 14-4. The change, the VA explained, would allow the VA to focus on its core mission of providing care to America's veterans:

> Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

*Id.* In sum, the VA widely publicized that terminating the CBA pursuant to the Executive Order would improve the VA's ability to execute and implement the President's initiatives.

Contemporaneously with cancelling the national union contracts, VA took three additional steps to implement the Executive Order:

1. The VA began advising representatives of AFGE that, pursuant to the Executive Order and the CBA termination, the VA would not engage in grievance and arbitration proceedings if the proceedings related exclusively to employees covered by the Executive Order.

11

2.      The VA began reclaiming government resources and space previously allocated to NVAC and local unions and repurposing those resources and space to meet VA's mission needs.

3.      The VA began denying requests for taxpayer-funded union time if the request came from a union representative who was also an employee subject to the Executive Order.

Therit Decl. ¶ 16(e)-(g).

## V.      The Statutory Channeling Requirement

In the FSLMRS, Congress established a dedicated review scheme for resolving federal labor disputes that provides multiple channels for a union to challenge conduct it alleges violates the FSLMRS. For example, an employee or union may file a "charge" with the Federal Labor Relations Authority ("FLRA") alleging that an agency has engaged in an unfair labor practice ("ULP"), which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision. *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6. The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)–(2); *see also id.* § 7104(f)(2). Alternatively, an employee or union may file a "grievance" to challenge violations of CBAs or to pursue "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* § 7103(a)(9)(C)(ii); *see also id.* § 7121. An employee or union may also file a "petition" with the FLRA "seeking clarification of … a certification [that a union is the exclusive bargaining representative of employees] then in effect or a matter relating to representation." *Id.* § 7111(b)(2). The FLRA is broadly authorized to order appropriate relief. 5 U.S.C. §§ 7105(f)–(g), 7118. The FLRA's final orders from

these various routes, with few exceptions not relevant here, are subject to judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals for the District of Columbia." *Id.* § 7123(a).

## VI.    Other Cases Challenging Executive Order 14,251

Labor organizations have brought multiple other suits seeking to enjoin the implementation of Executive Order 14,251.[3]

In one of those cases—*AFGE II*—the VA and Secretary Collins are named defendants. *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025). And the lead plaintiff is the AFGE. *Id.* (NVAC is a bargaining council of the AFGE, and AFGE Local 2305 is a subdivision of the AFGE. Pls.' Mem. at 19 n.14; *see also id.* at 5.) In *AFGE II*, the Ninth Circuit recently stayed a preliminary injunction seeking, as Plaintiffs do here, to prevent the VA from implementing the Executive Order. *Am. Fed. of Gov't Emps. v. Trump*, 148 F.4th 648, 648 (9th Cir. 2025) ("*AFGE II*").

In two cases filed in the District of Columbia involving substantially the same issues as those involved in the instant matter, courts of appeals have also

---

[3] *See, e.g.*, *Am. Fed. of Labor & Congress of Indus. Orgs. v. Trump*, No. 1:25-cv-2445, Dkt. No. 1 (D.D.C. Sept. 29, 2025); *Am. Foreign Serv. Assoc. v. Trump*, No. 1:25-cv-01030, Dkt. No. 1 (D.D.C. Apr. 7, 2025); *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. Apr. 3, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25-cv-01362, Dkt. No. 1 (D.D.C. May 5, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 1:25-cv-00935, Dkt. No. 1 (D.D.C. Mar. 31, 2025).

stayed pending appeal preliminary injunctions similar to what Plaintiffs seek here.[4] The D.C. Circuit recently held oral argument in the preliminary injunction appeals in those cases. The panel asked many questions regarding the district court's jurisdiction given the FSLMRS's channeling scheme. A decision in those cases is forthcoming.

## VII. The Instant Action and Plaintiffs' Motion for Preliminary Injunction

Plaintiffs are two affiliates under the AFGE: (1) NVAC; and (2) the American Federation of Government Employees Local 2305 ("AFGE Local 2305"). Am. Compl. ¶¶ 1, 24-25.

Nearly nine months after the President issued the Executive Order and nearly three months after the VA terminated the CBA, Plaintiffs filed the current suit challenging the VA's action. Compl. for Decl. & Injunctive Relief, ECF No. 1. Three weeks later, Plaintiffs amended their complaint and moved for a preliminary injunction. Am. Compl. at 35; Pls.' Mot. for Prelim. Injun. and Relief Under 5 U.S.C. § 705 ("Pls.' Mot."), ECF No. 14.[5] Plaintiffs assert that Defendants' decision to terminate the CBA violates their First Amendment rights and the APA. Pls.' Mot. 1.

---

[4] *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025), *reh'g en banc denied* (July 30, 2025) ("*AFSA II*"); *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 20ll 25), *reh'g en banc denied* (July 16, 2025) ("*NTEU II*").

[5] Plaintiffs request two, distinct types of relief: (1) an injunction under Federal Rule of Civil Procedure 65, and (2) a stay under 5 U.S.C. § 705. Pls.' Mem. at 4 n.2. Plaintiffs make no argument in support of relief under § 705. For ease of reading, this brief adopts the same convention as Plaintiffs' supporting brief: this brief refers to both of Plaintiffs' requests collectively as a preliminary injunction. *See* Pls.' Mem. at 4 n.2.

# ARGUMENT

## I.    This Case Should Not Proceed Because It Constitutes Impermissible Claim Splitting.

The doctrine of claim splitting safeguards judicial economy and protects litigants from "the vexation of concurrent litigation over the same subject matter." *Laccinole v. MRS BPO, LLC*, No. CV 22-233, 2023 WL 22136, at *2 (D.R.I. Jan. 3, 2023). The doctrine applies when a plaintiff files a second suit concerning the same subject matter before the first suit has reached final judgment. *Id.* A litigant with multiple related claims must not separate, or split, the claims into multiple successive cases, but must include in the first action all claims that fall within the court's jurisdiction. *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1165 (1st Cir. 1991). That "single suit" requirement applies even if the subsequent suit is based on events that occurred after the filing of the initial suit when those subsequent events are part of a "connected, related transaction." *Laccinole*, 2023 WL 22136, at *2 (explaining that a creditor's multiple actions to collect a debt were connected, related transactions).

To determine whether a later-filed suit constitutes impermissible claim-splitting, district courts in the First Circuit consider how the potential outcome of the first suit would impact the second suit and the factual overlap between the suits:

> [C]ourts ask "whether the first suit, assuming it were final, would preclude the second suit." Under the First Circuit's "transactional approach," the essential inquiry is whether "the causes of action arise out of a common nucleus of operative facts," in particular, "whether the facts are related in time, space, origin, or motivation, whether they

15

form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations."

*Id.* (internal citations omitted).

Here, Plaintiffs filed the instant suit before the outcome of an earlier-filed suit arising out of the same transaction or occurrence. Specifically, on April 3, 2025, six major unions sued in the Northern District of California to enjoin the Executive Order. *AFGE II*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025). The AFGE is the lead plaintiff in that case. *Id.* ¶ 17. The AFGE is a party to the CBA at issue in this case, whereas the nominal plaintiffs here—the AFGE affiliates NVAC and AFGE Local 2305—are not. Am. Compl., Ex. A at 2 § 1, ECF No. 13-1 (Master Agreement between the VA and AFGE (Aug. 8, 2023)). Indeed, the AFGE has held recognition to act as "the sole and exclusive representative" of the VA's bargaining unit employees. *Id.* Plaintiffs have not. *Id.* Plaintiffs are affiliated sub-divisions of the AFGE. *See* Pls.' Mem. at 19 n.14; *see also id.* at 5. Any legal claims they have regarding the VA's termination of its CBA with the AFGE are at minimum either shared by or derivative of the AFGE's interests as a party to that CBA.[6] Both Defendants here are also defendants in *AFGE II*. Any decision in *AFGE II* will have a direct impact on Plaintiffs' rights and the VA's obligations to Plaintiffs.

---

[6] Although the AFGE appears to be the "real party in interest" here, *see* Fed. R. Civ. P. 17(a); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Civ.* § 1543 (3d ed. 1998), the Court need not make that determination to find that Plaintiffs are engaging in improper claim splitting. *See, e.g.*, *Laccinole*, 2023 WL 22136, at *2 (setting forth the standard for the claim-splitting doctrine).

Both *AFGE II* and the instant case arise from a common nucleus of operative fact: the VA's implementation of the Executive Order. *Compare AFGE II*, 148 F.4th at 653 (describing the case as seeking a preliminary injunction "to enjoin the government from implementing EO 14,251") *with* Am. Compl. ¶ 3 (describing the instant case as one challenging Secretary Collins' decision to terminate the CBA "based on President Donald J. Trump's March 27, 2025 Executive Order 14251"). Specifically, the VA's cancellation of the CBA is one of a series of connected, related transactions implementing Executive Order 14,251. As noted above, the doctrine of claim splitting prohibits a plaintiff from splitting claims where, as here, the defendant's actions are part of a "connected, related transaction." *Laccinole*, 2023 WL 22136 at *2. That prohibition against claim splitting applies even when, as here, the subsequent connected, related event occurs after the plaintiff files the first lawsuit. *Id.*

The outcome of *AFGE II* has the potential to be either outcome dispositive for the instant case or, at the very least, to significantly narrow the issues to be decided. It would be outcome dispositive if the *AFGE II* plaintiffs prevail because the VA would be enjoined from implementing the Executive Order. At the very least, *AFGE II* has the potential to narrow the issues in dispute, given the common legal issues in both suits. *Compare* Am. Compl. ¶¶ 100-111, 116 *with Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025) (both asserting First Amendment retaliation claims to challenge the VA's implementation of the Executive Order).

17

Where, as here, a plaintiff engages in claim splitting, the district court has at least four options: it "may exercise its discretion to dismiss a duplicative later-filed action, to stay that action pending resolution of the previously filed action, to enjoin the parties from proceeding with it, or to consolidate both actions." *Laccinole,* 2023 WL 22136 at *2. Any of the first three options would be appropriate here.

Plaintiffs cannot credibly argue otherwise. The AFGE proposed the same approach in a related case concerning the Executive Order filed in the Western District of Texas. *Department of Defense v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. filed Mar. 27, 2025). In that case, the AFGE asked the district court not to proceed with the case given the ongoing proceedings in *AFGE II*:

> There is another lawsuit pending in the Northern District of California, filed by AFGE and several other national unions affected by the Executive Order. The plaintiffs in that case have already moved for a preliminary injunction and submitted evidence in support. That case will provide for full adjudication of the validity and effect of the Executive Order—including constitutional claims under the First and Fifth Amendments that are not before this Court, and the claims of the vast majority of AFGE affiliates, as well as other unions, who are not party to this suit.

*U.S. Dep't of Defense v. AFGE*, No. 6:25-cv-00119, Dkt. No. 41 at 16 (W.D. Tex. Apr. 21, 2025). The AFGE elaborated that allowing the case to proceed would waste judicial resources, contribute to "duplicative or piecemeal litigation," and pose an "obvious" risk of "confusing and/or conflicting judgements." *Id.* at 18. The same rationale applies here with greater force given that, in the eight months since the AFGE first made that argument, *AFGE II* has progressed even further. Most recently, the Ninth Circuit stayed a preliminary injunction seeking, as Plaintiffs do

here, to prevent the VA from implementing the Executive Order. *AFGE II*, 148 F.4th at 648.

In sum, after failing to obtain the relief sought in their original chosen forum, Plaintiffs now attempt with the action in this Court to get a second bite. For that reason and reasons the AFGE articulated in the Western District of Texas case, this case should not proceed.

## II.   Alternatively, Plaintiffs' Request for a Preliminary Injunction Should be Denied.

### A.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Under the test in *Winter*, the moving party must "make a clear showing" on *each* of four factors: that the party is "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [the party's] favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter*, 555 U.S. at 20, 22); *see New Jersey v. Trump,* 131 F.4th 27, 33 (1st Cir. 2025) (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B.   Plaintiffs do not satisfy any of the preliminary injunction factors.

Plaintiffs are unable to "make a clear showing" on *any* of the four preliminary injunction factors, let alone "each" of them. *See Starbucks Corp.*, 602 U.S. at 345. Particularly given the "substantial overlap between" the factors courts use to assess

a stay "and the factors governing preliminary injunctions," *Nken*, 556 U.S. at 434, it is instructive that both the D.C. Circuit and the Ninth Circuit assessed each prong of the stay factors in the Government's favor in three cases challenging the implementation of the Executive Order: *AFGE II*, *NTEU II*, and *AFSA II*. *See AFGE II*, 148 F.4th at 654-56; *NTEU II*, 2025 WL 1441563, at *1–3; *AFSA II*, 2025 WL 1742853, at *1.[7] The reasoning of the appellate courts in those related cases should inform this Court's disposition of the pending motion. *See Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025) (although "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases").

### 1.    Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor[,]" using "any relevant evidence" to support its conclusions. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18, 19 (1st Cir. 2006). In evaluating whether Plaintiffs have demonstrated a likelihood of success on the merits, the merits need not be "conclusively determine[d];" instead, at this stage, decisions "'are to be understood as statements of probable outcomes' only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st

---

[7] Although the court of appeals did not stay the preliminary injunction in *Federal Education Association v. Trump*, No. 25-5303, 2025 WL 2738626, at *1 (D.C. Cir. Sept. 25, 2025), the only portion of that decision that commanded a majority concerned the Government's failure to demonstrate irreparable harm absent a stay, a burden the Government does not bear when opposing a preliminary injunction motion, *id*.

Cir. 2020) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

Plaintiffs cannot establish a likelihood of success on the merits of their claims for at least two reasons. As an initial matter, this Court lacks jurisdiction to hear Plaintiffs' claims because their claims are statutorily channeled away from district court review and must be brought to the FLRA in the first instance followed by review in a court of appeals. Even if this Court could reach the merits of Plaintiffs' claims, those claims fail.

> ### a.    The FSLMRS precludes district court jurisdiction over Plaintiffs' claims.

The Court lacks subject-matter jurisdiction over this lawsuit because Congress has implicitly precluded district courts from reviewing the agency action at issue—i.e., the cancellation of a CBA negotiated under the FSLMRS—"by specifying a different method to resolve" a dispute concerning that type of action. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). As explained below, Congress has channeled the dispute Plaintiffs raise in this case to the Federal Labor Relations Authority ("FLRA").

The FSLMRS, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978), codified at 5 U.S.C. §§ 7101-7135, "establishes a scheme of administrative and

judicial review" for labor relations disputes between the Executive Branch and unions representing federal employees. *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE I*"). That scheme is the exclusive avenue for raising and adjudicating legal challenges within its scope. *Id.* at 755. Thus, if a dispute is of the type Congress intended to fall within the ambit of the FSLMRS's special scheme, an aggrieved union is confined to that scheme and cannot proceed instead, or in parallel, with an action in district court. *AFGE I*, 929 F.3d at 754; *see generally Axon*, 598 U.S. at 185. A district court presented with such a dispute lacks subject-matter jurisdiction and must dismiss the case. *AFGE I*, 929 F.3d at 754; *Axon*, 598 U.S. at 185.

Under the FSLMRS, the FLRA is the exclusive entity charged with reviewing covered disputes in the first instance. *See, e.g.*, *AFGE I*, 929 F.3d at 752; *NTEU v. Trump*, No. 74-2181, 2025 WL 561080, at *4 (D.D.C. Feb. 20, 2025). Judicial review of the FLRA's decisions is thereafter available in the courts of appeals. *Id.*; 5 U.S.C. § 7123(a). When hearing a petition for review of an FLRA decision, the courts of appeals may review broad statutory and constitutional claims even if the FLRA lacked the authority to consider such claims in its proceedings. *AFGE I*, 929 F.3d at 759.

Here, Plaintiffs challenge Secretary Collins' decision to cancel the CBA for most VA employees. Am. Compl. ¶ 11. That challenge is plainly the type of dispute Congress channeled to the FLRA. Indeed, Plaintiff NVAC has already filed eight national grievances that challenge the VA's implementation of the Executive Order

22

and the termination of union agreements. *See* Therit Decl. ¶ 17. The following three examples illustrate that the issues before this Court overlap with the pending, national grievances filed by NVAC:

1. The AFGE has filed a national grievance over the termination of the CBA provision that allowed the union to use Government property, facilities, and equipment. *Id.* ¶ 17(a).

2. The AFGE has filed a national grievance over the termination of the CBA provision permitting taxpayer-funded union time. *Id.* ¶ 17(c).

3. The AFGE has filed a national grievance over the VA's purported unilateral changes to the CBA's grievance and arbitration procedures. *Id.* ¶ 17(f).

In each of those proceedings, NVAC has the benefit of FLRA review, followed by the opportunity for subsequent judicial review in the court of appeals.

Even beyond those grievances, Plaintiffs could file a case with the FLRA seeking clarification of a matter related to representation. *See* 5 U.S.C. § 7111(b)(2). Indeed, Plaintiffs could obtain FLRA review of its challenge to the termination of the bargaining contracts simply by filing such a petition with the FLRA and seeking to clarify their right to represent employees at the VA. If the FLRA dismissed the petition by, for example, citing its lack of jurisdiction given the EO, that would result in a "final order" of the FLRA appealable to a court of appeals. 5 U.S.C. § 7123(a); *see Eisinger v. FLRA*. 218 F.3d 1097, 1102 (9th Cir. 2000).

In sum, the FLRA's review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *AFGE v. Sec'y of Air Force*, 716 F.3d 633,

23

637–38 (D.C. Cir. 2013). Accordingly, this Court lacks jurisdiction to review Plaintiffs' claims alleging that the VA has acted contrary to the provisions of the FSLMRS by terminating the CBA for most VA employees.

### i. The *Thunder Basin* exception to the channeling requirement does not apply here.

There is an exception to the channeling requirement, but it does not apply here. Under that exception, channeling is not required when the claim is not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE I*, 929 F.3d at 755 ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). The *Thunder Basin* factors, which determine whether district-court review nevertheless is available despite a statutory review scheme, compel that conclusion. *See Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–13). Those factors are: (1) the existence of meaningful relief without district court review, (2) whether a claim is "wholly collateral" to the statute's review scheme, and (3) the relevance of agency expertise. *Id.*

First, a finding of preclusion of district court jurisdiction here would not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve (even on jurisdictional grounds) will be addressed by a circuit court on appeal through the FSLMRS's exclusive statutory review process. *See* 5 U.S.C. § 7123(a); *AFGE I*, 929 F.3d at 759; *Sec'y of Air Force*, 716 F.3d at 637–40 (describing "multiple paths" within the FSLMRS's "exclusive remedial regime" through which a union can obtain

FLRA and then federal circuit court review). As noted above, the AFGE has already started the administrative review process by filing eight purported grievances challenging the VA's cancellation of the CBA and implementation of the Executive Order. Therit Decl. ¶ 17. There is no reason for Plaintiffs to be able to proceed in multiple fora and potentially receive preclusive judgments about the lawfulness of the VA's cancellation of the CBA and its other steps to implement the EO from different adjudicating bodies (from the FLRA, a court of appeals on review of an FLRA order, and a district court) when Congress has created an exclusive statutory review process in the FSLMRS. *See, e.g.*, 5 U.S.C. § 7116(d) (barring a party from filing both a ULP and a grievance or statutory appeal over the same issue). And regardless, Plaintiffs could seek clarification of their right to represent VA employees from the FLRA. *See* 5 U.S.C. § 7111(b)(2); *supra* p. 23.

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. This Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Supreme Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* at 193–94. Nor were

they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge the termination of the CBA that they negotiated under the FSLMRS. *See, e.g.*, Am. Compl. ¶¶ 11, 92-116. The loss of these collectively bargained rights and privileges fall well within the Statute's broad definition of "grievance," which the CBA and FSLMRS provide the exclusive procedures for resolving.[8] 5 U.S.C. §§ 7103(a)(9), 7121(a)(1). Indeed, as contemplated by the FSLMRS, Plaintiffs have already filed eight different grievances arising from the termination of the CBA and implementation of the Executive Order. *See* Therit Decl. ¶ 17. Plaintiffs also broadly complain here that by following the Executive Order and terminating the CBA, the VA has violated FSLMRS requirements. Am. Compl. ¶¶ 28-33, 39. That is a quintessential ULP charge, which the FLRA General Counsel prosecutes, 5 U.S.C. §§ 7116(a)(8), 7118, and is central to the FLRA's work. Plaintiffs' claim is not collateral by any stretch. *See AFGE I*, 929 F.3d at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated."); *Loy*, 367 F.3d at 935

---

[8] The FSLMRS defines a "grievance" as including, inter alia, "any complaint[] . . . by any labor organization concerning any matter relating to the employment of any employee; or . . . by any labor organization . . . concerning . . . the effect or interpretation, or a claim of breach, of a collective bargaining agreement." 5 U.S.C. § 7103(a)(9). Also included within the definition is "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability[,]" and except for narrow circumstances provided for in the Statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."

(holding that federal district courts lack "concurrent jurisdiction over matters within the [FLRA's] exclusive purview"). In any event, Congress has also entrusted to the FLRA the ability to clarify Plaintiffs' right to represent employees at the VA—an avenue Plaintiffs have not pursued. *See* 5 U.S.C. § 7111(b)(2).

Plaintiffs may not evade the exclusive administrative scheme by raising a constitutional claim. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (holding that whether a claim is precluded under the Civil Service Reform Act does not "turn on the constitutional nature . . . but rather on the type of the employee and the challenged employment action"). In *AFGE I*, for example, numerous federal unions asserted broad constitutional and statutory challenges to Executive Orders issued by President Trump during his First Term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed the district court's decision on jurisdictional grounds, holding that the comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction away from federal district courts. *AFGE I*, 929 F.3d 748, 761 (D.C. Cir. 2019). The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals.[9] *Id.* at 754–61; *see also, e.g.*, *NTEU v. Vought*,

---

[9] The FLRA has "consistently" resolved constitutional claims, including First-Amendment-retaliation claims. *See U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases). For example, in *United States Department of Defense Ohio National Guard & AFGE Local 3970*, 71 F.L.R.A. 829 (2020), the FLRA addressed several constitutional provisions including the Militia Clause to resolve a jurisdictional dispute, *id.* at 853 n.13, 855–62 (citing and analyzing arguments regarding U.S. Const. art. I, § 8, cls. 15 & 16,

27

149 F.4th 762, 774 (D.C. Cir. 2025) (concluding that the district court lacked jurisdiction over the unions' claims because "a specialized-review scheme governs such claims").

Plaintiffs' claim is clearly within the expertise of the FLRA—the third *Thunder Basin* factor. The FLRA is the federal authority on matters of federal labor relations. *E.g.*, *ATF*, 464 U.S. at 97 ("[T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act." (citation omitted)). And Plaintiffs' claim of improper denial of collectively bargaining rights is exactly the type of claim the FLRA regularly hears. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. The same is true of any claim filed seeking to clarify Plaintiffs' ability to represent VA employees. *Id.* § 7111(b)(2). For example, in concluding that the unions had to first bring their constitutional claims before the FLRA in *AFGE I*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE I*, 929 F.3d at 761 (citation omitted). As discussed above, *supra* at 27 n.9, the FLRA regularly hears constitutional claims. And in any event, the FLRA "can apply its expertise" to Plaintiffs' statutory claims and may well offer an interpretation of the statute or Executive Order 14343 that "obviate[s] the need to address" some of Plaintiffs'

---

art. II § 2, cl. 1, and Amend. X), and this case was eventually appealed to the Supreme Court in *Ohio Adjutant General's Department v. FLRA*, 598 U.S. 449 (2023).

broader "constitutional challenge[s]." *See Elgin*, 567 U.S. at 22–23. In sum, the *Thunder Basin* factors establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claim.

Plaintiffs neither invoke *Thunder Basin* nor distinguish *AFGE I* or other decisions where courts have found that they lack jurisdiction over federal labor disputes. Pls.' Mem. at 14. Instead, Plaintiffs make three arguments—none of which is compelling.

First, Plaintiffs contend that the FLRA's authority does not extend to disputes about whether an agency is covered by Chapter 71. Pls.' Mem. at 14. But the D.C. Circuit has held that the FSLMRS precludes district court review *even where federal employees were excluded from FSLMRS bargaining rights*. In *AFGE v. Loy*, the D.C. Circuit held that despite (a) the Transportation Security Administration's determination that airport screeners could not collectively bargain, and (b) the FLRA's agreement that the employees could not engage in collective bargaining, the union-plaintiffs' only pathway to assert their bargaining rights in federal court was in an appeal to a circuit court after FLRA proceedings. *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004). The FLRA has "exclusive authority to render judgment on the question" whether the exclusion of employees from collective bargaining rights is valid. *Id.* at 936; *see also id.* at 935 ("[D]istrict courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA."). Plaintiffs' first attempt to evade the FRLRA's jurisdiction therefore should be unavailing.

Second, Plaintiffs argue that because certain federal agencies brought a separate, affirmative lawsuit regarding the Executive Order, Defendants' channeling argument constitutes an "inconsistent position." Pls.' Mem. at 14. However, this Court has an independent duty to determine whether it has subject-matter jurisdiction notwithstanding lawsuits brought in other courts, and the claims brought in that affirmative lawsuit, *Department of Defense v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. filed Mar. 27, 2025), were different. Here, the Plaintiffs' theory is based on the alleged unlawfulness of Secretary Collins' decision to terminate the CBA for most VA employees. Am. Compl. ¶ 11. The FLRA administrative review scheme provides the exclusive channel for that claim. 5 U.S.C. §§ 7118, 7123. By contrast, in the affirmative suits, the federal agencies contended that the FSLMRS was inapplicable and so recourse to its process would not make sense. Accordingly, and consistent with that position, the Government's claims do not have to be channeled through the FLRA's administrative scheme.

Third, Plaintiffs point out, in a footnote, that this Court rejected a channeling argument in *New York v. Kennedy*, 789 F. Supp. 3d 174, 199 (D.R.I. 2025). Pls.' Mem. at 14 n.11. But the reason the Court rejected the channeling argument in *New York* was because channeling the claims there would have foreclosed all meaningful judicial review. *New York*, 789 at 199. That is not the case here because Plaintiffs' do have meaningful judicial review—i.e., the FLRA's final orders, with few exceptions not relevant here, are subject to judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts

business or in the United States Court of Appeals for the District of Columbia."
5 U.S.C. § 7123(a). The Court's decision in *New York* is therefore no basis for
allowing Plaintiffs to evade the FLRA's jurisdiction.

In sum, none of Plaintiffs' anti-channeling arguments is compelling.
Plaintiffs' claims must be channeled to the FLRA because the Court lacks
jurisdiction over those claims.

Even if the Court were to entertain Plaintiffs' claims, however, Plaintiffs
cannot show that they are likely to succeed on either their First Amendment or APA
claim, for the reasons explained in the next two sections.

**b.    Plaintiffs are unlikely to succeed on the merits of their First Amendment claims.**

**i.    Plaintiffs' First Amendment retaliation claim fails.**

To prevail on a claim of First Amendment retaliation, Plaintiffs must prove
three elements: that "(1) [they] engaged in constitutionally protected conduct,
(2) [they] w[ere] subjected to an adverse action by the defendant, and (3) the
protected conduct was a substantial or motivating factor in the adverse action." *D.B.
ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). "The defendant may
then avoid a finding of liability by showing that it would have reached the same
decision . . . even in the absence of the protected conduct." *Id.* (cleaned up); *accord
Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)
(establishing a two-part burden-shifting analysis for evaluating free speech claims);
*Padilla-Garcia v. Rodriguez*, 212 F.3d 69, 74 (1st Cir. 2000) (applying the *Mt.
Healthy* analysis). To establish a causation link, a plaintiff must show that his or

31

her constitutional speech was the "'but-for' cause" of the defendants' retaliatory action. *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 515 (1st Cir. 2023); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

**First element: Protected conduct.** As for the first element, Plaintiffs allege that the AFGE and NVAC engaged in conduct protected by the First Amendment by advocating against the President's agenda. Pls.' Mem. at 15-16. Specifically, they lobbied against legislation that the Administration supported (such as the VA Accountability Act), testified before Congress in opposition to such legislation, filed grievances, endorsed the President's political opponent during the most recent Presidential campaign, and filed lawsuits challenging the Administration's actions. *Id.* at 15-16.

**Second Element: Adverse action.** Plaintiffs allege that the VA's decision to cancel the CBA pursuant to Executive Order 14,251 is retaliation for their First Amendment speech. Am. Compl. ¶ 3, 102-103, 116.

**Third Element: Substantial or Motivating factor.** At its heart, Plaintiffs' suit is a challenge to the VA's implementation of Executive Order 14,251. Courts have repeatedly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g.*, *NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Most recently, in *AFGE II*, the Ninth Circuit concluded that "the government has shown that it is likely to succeed on the merits

of the [First Amendment] retaliation claim" challenging the Executive Order. *AFGE II*, 148 F.4th at 654.

Plaintiffs fail to establish that Secretary Collins' motivation for terminating the CBA was animus based on Plaintiffs' First Amendment conduct. The Secretary terminated the CBA in response to the President's Executive Order, as reflected in the VA's press release announcing the termination and termination letters to Plaintiffs and other labor organizations—both expressly advising that the termination was "pursuant to EO 14251." VA Press Release (Silva Decl., Ex. I); *also* Am. Compl., Ex. C (Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025)).

Rather than demonstrating that Secretary Collins acted in response to Plaintiffs' protected conduct, Plaintiffs ask the Court to infer animus on Secretary Collins' part by second-guessing the *President's* motives in issuing the Executive Order. Pls' Mem. at 17. Setting aside that the President is not a party to this action, and Plaintiffs must overcome the VA's argument that Secretary Collins would have terminated the CBA regardless of Plaintiffs' protected conduct, the Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). The President wields significant constitutional and statutory authority over both matters of national security and federal labor-management relations. *See, e.g.,* 5 U.S.C. § 7103. Thus, "when the

33

Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against a plaintiff's asserted constitutional interests. *Mandel*, 408 U.S. at 770. The President has acted within the bounds of his clear authority over VA employees. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 496–97 ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)).

To the extent Plaintiffs address Secretary Collins' motives, Plaintiffs are similarly unable to show that their protected First Amendment speech was a "substantial or motivating factor" in the Secretary's decision to terminate the CBA. As noted above, Secretary Collins' decision to cancel the Agency's union agreements was in response to and directly flowed from the Executive Order. *See supra* p. 33. He did not single out Plaintiffs' union contract for termination; rather, he terminated all national union contracts, including contracts with four other national unions. Silva Decl., Ex. I (VA press release). Secretary Collins explained, in the press release announcing the terminations, how they would further the VA's mission—i.e., by "making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform" as opposed to resisting union efforts to "fight against the best interests of Veterans while protecting and rewarding bad workers." *Id.* In sum, the facts show that Secretary Collins cancelled the CBA based on the Executive Order—not based on any animus directed at Plaintiffs for First Amendment speech.

Attempting to show otherwise, Plaintiffs rely on three statements—one made by a VA spokesperson and two made by Secretary Collins. Pls.' Mem. at 18. None evidences that Secretary Collins retaliated against Plaintiffs for their protected conduct. In those statements, the VA spokesperson and Secretary Collins explain how the unions were frustrating the Administration's ability to manage the Agency—such as by diverting nearly $134 million to settle collective-bargaining grievances brought by employees who were fired for misconduct. *Id.*; Silva Decl., Ex. I (VA press release). Plaintiffs characterize these explanations as "political" and not "narrowly tailored to national security concerns." Pls.' Mem. at 18. (emphasis omitted). But Plaintiffs' characterizations are not sufficient to show animus. Rather, their burden, as the party seeking a preliminary injunction, is show that their constitutional speech was the "'but-for' cause" of the VA terminating their particular union agreement. *Gattineri*, 58 F.4th at 514. Moreover, Plaintiffs' characterization is wrong. Secretary Collins' statements are, in fact, directly tied to national security concerns. For example, spending 750,000 hours of VA staff on union activities and $134 million on union payments necessarily means that those resources are not available to put toward the VA's critical emergency preparedness work.

Plaintiffs also attempt to show that Secretary Collins harbored animus toward them based on his since-rescinded order pursuant to his delegated authority under the Executive Order. Pls.' Mem. at 20. *See* Rescission of Order (Silva Decl., Ex. N). The Secretary has stated his legitimate, non-retaliatory motive for the

rescission; namely, the Secretary decided to rescind the exemption based on further consideration of "the delegation of authority provision under Section 4 of E.O. 14521 and the statutory authority under 5 U.S.C. 7103(b)(1)." 90 Fed. Reg. at 50950. Plaintiffs speculate that the real reason Secretary Collins made the change was because they filed the present suit. Pls.' Mem. at 13, 20. They base that speculation on nothing more than the timing of events—i.e., that they filed the present suit on November 4 and, three days later, the Secretary approved the Notice for publication in the *Federal Register*. *Id.* at 13. But officials within the VA had been contemplating the rescission for several weeks before the rescission was published in the *Federal Register* and made the final decision to rescind the Notice before November 4, 2025 (the day Plaintiffs filed suit). Therit Decl. at 3 n.1. Clearly then, Secretary Collins' decision to issue the Notice is not evidence of the Secretary's improper motivation.

In the end, Plaintiffs are simply unable to show that Secretary Collins' stated reason for cancelling the CBA is a pretext for retaliation based on Plaintiffs' First Amendment activities.

**Final step: Defendants would have reached the same decision regardless.** In any event, even if the Plaintiffs could demonstrate that their First Amendment speech were a substantial or motivating factor in Secretary Collins' decision to terminate the CBA, Plaintiffs' claim still fails on the merits. That is because Defendants can show that they would have taken the same action even in the absence of the protected conduct. *See Mt. Healthy*, 429 U.S. at 287 (explaining

the "same decision" analysis). Again, Secretary Collins cancelled the CBA based on the Executive Order, and plainly the Secretary would have complied with the Executive Order regardless of any animus he allegedly harbored against Plaintiffs.

And to the extent Plaintiffs question whether *the President* would have issued the Executive Order anyway, he would have. The Ninth Circuit concluded as much when considering a similar First Amendment claim brought by the AFGE. *AFGE II*, 148 F.4th at 654–55. The Executive Order states on its face that the President took the challenged action for national security reasons. To find otherwise would require this Court to draw every inference against the President and ignore record evidence of the President's national security concerns. *See AFGE II*, 148 F.4th at 655 ("On its face, the [Executive] Order does not express any retaliatory animus," but rather "conveys the President's determination that the excluded agencies have primary functions implicating national security and cannot be subjected to the FSLMRS consistent with national security"). To find otherwise would also fly in the face of First Amendment caselaw requiring that this Court defer to the Government's interest in national security and employment matters when balancing First Amendment freedoms. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 685 (1996) (recognizing the Government's "legitimate interests as contractor [or employer], deferentially viewed," can sometimes "outweigh [any] free speech interests at stake"); *see also TikTok Inc. v. Garland*, 122 F.4th 930, 953 (D.C. Cir. 2024) (affording great weight to the Government's "evaluation of the facts" because the Act "implicates sensitive and weighty interests of national security and

foreign affairs" (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010)).

The White House Fact Sheets, which are not attributable to the President let alone the Secretary of Veterans Affairs, but which Plaintiffs rely on nonetheless (Pls.' Mem. at 17), reiterate the national security concerns that motivated the Executive Order and in turn the VA's implementation of it.

###### ii. Plaintiffs' First Amendment viewpoint discrimination claim also fails.

To the extent that Plaintiffs raise a First Amendment viewpoint discrimination claim, *see* Am. Compl. ¶¶ 16, 103, 104, 114-15,[10] that claim is merely a repackaged version of their retaliation claim and should be dismissed as duplicative. "[D]etermining whether government action violates the First Amendment requires [the] application of different doctrines that vary depending on the circumstances." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 201 (2024) (Jackson, J. concurring). The allegations in Plaintiffs' Complaint are best addressed within the retaliation framework discussed above, and this Court should refuse to entertain a separate, duplicative viewpoint discrimination claim.

Plaintiffs' viewpoint discrimination claim would nonetheless fail on the merits. Plaintiffs argue that the VA terminated the CBA based on the unions' viewpoints. Pls.' Mem. at 20. But Plaintiffs lack a First Amendment right to collective bargaining. "[T]he First Amendment does not impose any affirmative

---

[10] The Amended Complaint contains one count (Count 4) asserting a "Violation of the First Amendment," which appears to encompass both their retaliation claim and their viewpoint discrimination claim. *See* Am. Compl. ¶¶ 114-15.

obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979) (Arizona's recalcitrance to negotiate with union posed "no First Amendment problems"). Likewise, courts recognize that "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8–9 (D.D.C. 2005); *see also AFGE, AFL-CIO v. Loy*, 281 F. Supp. 2d 59, 65 (D.D.C. 2003). Courts have thus uniformly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g., NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Nor does the VA's termination of the CBA otherwise impinge on any protected activity: it does not bar Plaintiffs from recruiting employees to join their unions, petitioning the Government, or engaging in any other protected First Amendment activity.

The Executive Order and the VA's termination are facially neutral and silent as to any speech or viewpoint. Neither the VA's termination nor the Executive Order itself distinguish between unions, let alone draw lines based on unions' viewpoints. Instead, the Executive Order distinguishes *agencies or subdivisions*, and the VA implemented the viewpoint-neutral Executive Order by cancelling union contracts in alignment with how those distinctions apply to the VA's organizational

structure. Tellingly, Plaintiffs fail to identify any *viewpoint* that either the

Executive Order or the VA's termination prohibits or targets. Pls.' Mem. at 20.

Instead, they reiterate arguments that they are being "punished" for filing

grievances. *Id*. But the effect of such grievances on the VA's national security

functions is a valid consideration within the scope of § 7103(b)(1). Plaintiffs'

viewpoint discrimination claim must therefore fail.

In sum, Plaintiffs are unlikely to succeed on the merits of their First

Amendment claims because Plaintiffs fail to establish that the VA terminated the

CBA with the AFGE in retaliation against Plaintiffs, that the termination targeted

any particular viewpoints, or that the VA would not have independently taken such

action to implement the Executive Order based on the President's independent

national security considerations as encompassed in the Executive Order.

**c.     Plaintiffs are unlikely to succeed on the merits of
their APA claim.**

**i.     APA review is unavailable because of
potential alternative remedies.**

Review under the APA is available only where "there is no other adequate

remedy in a court." 5 U.S.C. § 704. That requirement reflects that "Congress did not

intend the general grant of review in the APA to duplicate existing procedures for

review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The

alternative remedy need not provide relief identical to relief under the APA or the

precise equitable relief the plaintiff seeks. *Vill. W. Assocs. v. Rhode Island Hous. &*

*Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139 (D.R.I.), *judgment entered*, 641 F. Supp.

2d 135 (D.R.I. 2009). Accordingly, if there exists an alternative adequate remedy, a

40

plaintiff lacks a cause of action under the APA. *See id.* (dismissing putative APA claim because plaintiffs had an adequate remedy through the Claims Court).

As explained *supra* Part II(B)(1)(a), Plaintiffs have an alternative adequate remedy under the FSLMRS: initial review before the FLRA followed by an appeal to a circuit court. The existence of that alternative adequate remedy precludes them from filing suit under the APA.

>### ii. The APA bars judicial review in this case because the challenged action is committed to Agency discretion by law.

Judicial review is unavailable here for a second reason. Namely, the APA bars judicial review when the challenged action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* When considering whether a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("[S]uch a decision

41

has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

In this case, the action Plaintiffs seek to challenge under the APA the VA's termination of the CBA—an action committed to the VA's discretion by a lawful Executive Order issued by the President. Specifically, the Executive Order contained a delegation-of-authority provision giving the Secretary of the VA authority to make additional carve-outs if the Secretary determined that doing so would be "consistent with national security requirements and considerations." *Id.* § 4. In the Executive Order, the President committed to the Secretary's discretion the authority to issue orders suspending application of the Executive Order to any subdivisions of the departments the Secretary supervises if the Secretary certifies to the President that the provisions of the FSLMRS "can be applied to such subdivisions in a manner consistent with national security requirement and considerations." *Id.* § 4. Whether to issue such exemptions is thus lawfully committed to Secretary's discretion by law and, as such, exempt from APA review.

### iii. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted arbitrarily or capriciously.

Even if the APA permits review, Plaintiffs are unlikely to prevail on the merits of their claim that the VA's termination of the CBA was arbitrary and capricious. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the

42

agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 628 (2d Cir. 2023) (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43), *cert. denied*, 145 S. Ct. 1920 (2025). "Under the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow. A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency." *Magellan Tech, Inc.*, 70 F.4th at 628-29 (internal quotation marks omitted). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness." *Prometheus Radio*, 592 U.S. at 423.

Here, Secretary Collins clearly "acted within a zone of reasonableness" when terminating the CBA. None of Plaintiffs' five arguments to the contrary withstand scrutiny.

*First*, Plaintiffs assert that the Secretary "failed to offer a reasonable explanation for the Termination." Pls.' Mem. at 23. That is incorrect. The Secretary publicly stated, and the Plaintiffs acknowledge, that the Secretary's "basis for ordering the Termination was the Executive Order." *Id.* Plaintiffs criticize the Secretary's explanation by contending that the Secretary both acted too slowly and

43

too quickly when cancelling the CBA and by pointing out that other federal agencies have not yet terminated all their union contracts. Pls.' Mem. at 24. But Plaintiffs' dissatisfaction with the timing of the cancellation of the CBA does mean that the Secretary did not offer a reasonable explanation for terminating the CBA. Nor does the fact that other federal agencies have not yet terminated their union agreements demonstrate that the Secretary's explanation is unreasonable because Secretary Collins has no authority over those other agencies.

Given the President's statutorily authorized determination in the EO that most of the VA should not be subject to the requirements of the FSLMRS—which is not at issue here—the cancellation of the CBA because of the EO cannot be arbitrary and capricious or not reasonably explained. In fact, the terminations were *required* by law not contrary to it. And it is unclear what "judicially manageable standards" the Court could apply here to evaluate the propriety of the cancellation of the CBA here, where the Secretary relied on a statutorily authorized Presidential determination. *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21-22 (1st Cir. 2020). There is simply no law to apply for a court to determine how long after the EO's publication would be too short or too long to cancel the CBA, as Plaintiffs ask this Court to do.

*Second,* contrary to Plaintiffs' argument, cancelling the CBA was not contrary to the Executive Order's provision that excluded "the immediate, local employing officers of any agency police officers, security guards, or firefighters." Executive Order § 2. Consistent with the plain intent of the Executive Order, the VA kept the

44

CBA in place for police officers, security guards, and firefighters. Am. Compl., Ex. C (Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025)). Plaintiffs acknowledge that, given how the VA is organized, to do otherwise would have caused the exception to swallow the rule by exempting "hundreds of thousands of NVAC-represented employees, from doctors to registered nurses to housekeepers to social workers." Pls.' Mem. at 25.

Guidance from the U.S. Office of Personnel Management to the VA supports the reasonableness of the VA's application of the Executive Order to agency police officers, security guards, and firefighters. In an FAQ issued on September 10, 2025, OPM provided guidance about how to interpret that carve out:

> **Q8:** What is meant by Section 2 of Executive Order 14251 (Exclusions) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"
>
> **A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

U.S. Office of Personnel Management, Frequently Asked Questions: Executive Order 14251 "Exclusions from Federal Labor-Management Relations Programs" (Sept. 10, 2025).

*Third,* Plaintiffs raise a red herring by pointing to the Secretary's rescinded order that initially exempted VA employees covered by certain unions. Pls' Mem. at 25. The Secretary rescinded that order after further consideration of his Section 4

authority. *See* 90 Fed. Reg. 50950. If anything, the Secretary's rescission demonstrates the Secretary's commitment to compliance with the Executive Order's delegation-of-authority provision. Tellingly, Plaintiffs do not disagree with the Secretary's rescission or the Secretary's stated basis for it. Pls.' Mem. at 25.

*Fourth*, Plaintiffs repeat their opinion that the Secretary, when implementing the Executive Order failed to consider "national security requirements." Pls.' Mem. at 26. Their opinion is misguided, *see supra* p. 35, and in any event, their opinion does not prove that the Secretary's determination violated the APA. Plaintiffs' argument essentially asks the Court to substitute its judgment for the that of the Agency's, which a reviewing court may not do." *Magellan Tech, Inc.*, 70 F.4th at 628-29 (internal quotation marks omitted).

*Fifth*, Plaintiffs repeat their theory that the timing of Secretary's decision to rescind the initial exemptions shows retaliatory animus—i.e., that it was approved by the Secretary for publication in in the *Federal Register* three days after Plaintiffs filed their initial complaint. Pls.' Mem. at 27. But, as Defendants point out above, Plaintiffs' theory ignores the reality that the VA had already decided to issue the notice of rescission *before* Plaintiffs' filed suit. *See supra* at 36 (citing Therit Decl. at 3 n.1).

Accordingly, Secretary Collins' reasonable decision to implement the Executive Order by cancelling the CBA for most VA employees was not arbitrary and capricious, and Plaintiffs are unlikely to succeed on that claim, even if the APA permitted such review.

> iv. **Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted contrary to the First Amendment.**

Plaintiffs' APA claim that the Secretary "acted contrary to the First Amendment" is merely a repackaged version of their First Amendment retaliation claim, as Plaintiffs' acknowledge in their brief. Pls.' Mem. at 27. This APA claim fails on the merits for the same reasons as their First Amendment retaliation claim, as explained *supra*, Part II(B)(1)(b).

> 2. **Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction**

A motion for a preliminary injunction motion can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)). Additionally, a plaintiff must demonstrate that the harm is both "immediate" and "irreparable." *Rubacky v. Morgan Stanley Dean Witter Credit Corp.*, 104 F. App'x 757, 759 (1st Cir. 2004).

47

First, the timing of Plaintiffs' own litigation conduct undercuts their purported need for a preliminary injunction. Plaintiffs waited nearly three months after the VA cancelled the CBA to file suit. Compl. 1 and ¶ 10. Then, Plaintiffs waited an additional three weeks to seek a preliminary injunction. Surely if they faced a harm that was truly "immediate" and "irreparable," Plaintiffs would have acted more quickly.

Second, the types of harms Plaintiffs allege are not "irreparable." Their alleged harm falls into two categories: (1) the loss of certain collective-bargaining benefits and privileges (such as allowing union officials to use the VA's facilities to conduct union business and providing union officials with paid time during the workday to perform union business); and (2) an alleged "chilling" of the Plaintiffs' and their members' pro-union speech. Pls.' Mem. at 27-33.

As for the first category, any loss of collective-bargaining benefits and privileges could be remedied upon a favorable ruling later in this case because the FLRA has broad authority to issue remedial relief. 5 U.S.C. §§ 7105(f)–(g), 7118. If Plaintiffs prevail, they can seek relief from Defendants for any violations of their rights conferred by the FSLMRS or the parties' CBA, including those pertaining to disciplinary proceedings. *See AFSA II*, 2025 WL 1742853 at *3 ("To the extent the [Union] or its members will suffer irreparable harm directly traceable to the Executive Order, as opposed to separate agency actions, the balance of [the] equities favors the Government. The competing interests—union representation versus national security—were already weighed by Congress when it passed the

[FSLMRS].") And "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE II*, 148 F.4th at 656.

An alleged loss of collective bargaining rights alone does not constitute irreparable harm. While Congress in the FSLMRS may have recognized that collective bargaining provides benefits in the federal workforce, "it does not follow that" absent a preliminary injunction the "public's interest in industrial peace is likely to be irreparably harmed during the time it takes to [adjudicate this case]." *Henderson for NLRB v. Bluefield Hosp. Co.,* 902 F.3d 432, 441 (4th Cir. 2018). And it is not enough that this alleged harm strikes at the union's primary mission. *See* Pls.' Mem. at 33 (citing *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). The *League of Women Voters* court found such arguments persuasive because the plaintiff's primary mission—registering people to vote—would be pointless after the subject election occurred. *League of Women Voters*, 838 F.3d at 9. Plaintiffs have not identified any such deadline or constraint here and fail to show irreparable harm stemming from the alleged temporary loss of collective bargaining rights. To hold such a loss irreparable merely because Congress deemed such rights valuable or because those rights go to the primary mission of unions would negate the irreparable harm requirement in all cases involving unions and collapse the *Winter* test to a determination of whether Plaintiffs are likely to succeed on the merits. This is an insufficient basis to grant the extraordinary relief of a preliminary injunction.

The second type of harm that Plaintiffs allege is a chilling effect on Plaintiffs' and their members' enthusiasm for engaging in First Amendment speech. Pls.' Mem. at 31-32. But Plaintiffs fail to demonstrate that they are prevented from exercising their First Amendment rights. The termination of the CBA does not impinge on any activity protected by the First Amendment: it does not bar Plaintiffs or their members from recruiting employees to join their unions, lobbying the Government, or engaging in any other protected First Amendment activity. Rather, Plaintiffs and their members can express themselves and petition the Government, as they plainly continue to do.

Finally, any asserted irreparable loss of members, Pls.' Mem. at 32-33, is speculative. *See AFGE II*, 148 F.4th at 656 (finding it "speculative whether Plaintiffs will experience harm through 'weakened support for unions'" (citation omitted)). It is uncertain whether employees will choose to give up their union membership now and refuse to rejoin upon a favorable ruling in this case restoring the CBA.

In sum, Plaintiffs fail to establish irreparable harm absent preliminary injunctive relief.

### 3.   The Balance of the Equities and the Public Interest Favor the Government

A preliminary injunction is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]here factors merge when the Government is the opposing party."). A preliminary injunction would inflict harm on the public and the

President by interfering with the national-security determinations regarding the VA entrusted to the President by Congress. *See* Therit Decl. ¶¶ 18-19; *AFSA II*, 2025 WL 1742853, at *3. As the D.C. Circuit recognized, the clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. *See NTEU II*, 2025 WL 1441563, at *3 (holding that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest" because holding otherwise "would give to the courts what the Constitution gave to Congress and the President"). "As the Supreme Court recently reiterated, '[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *AFGE II*, 148 F.4th at 656 (quoting *Trump v. CASA, Inc.,* 606 U.S. 831, 860 (2025)). To that end, the public has an interest in ensuring that agencies with a primary national security function, including the VA, operate effectively and without delay to protect the American people. A preliminary injunction would displace and frustrate the President's decision about how best to address issues of national security, matters on which the courts typically defer to the President's judgment. *See Hawaii*, 585 U.S. at 703–05; *AFSA II*, 2025 WL 1742853, at *3 ("[O]ur review must be exceedingly deferential. When a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for [the] court to review."). The President has long been charged with directing the Executive Branch workforce, and he has

51

determined that the VA has a primary national security function that is hamstrung by restrictive terms of union agreements that frustrate his ability to safeguard the interests of the American people. *See* Executive Order § 1; Therit Decl. ¶¶ 6, 13-15. For example, restrictive CBA provisions interfere with the VA's ability to execute and implement the President's initiatives related to national security. Therit Decl. ¶¶ 13-15. They also obstruct the VA's ability to address employees with performance or conduct issues. *Id.* ¶ 15. The President determined that the FSLMRS is inconsistent with national security requirements and considerations, and his determination in this sphere is entitled to deference.

The VA has taken extensive actions to implement the Executive Order. Therit Decl. ¶ 16. If forced to comply with Plaintiffs' requested preliminary injunction by reinstating the CBA, the VA would have to undo those actions by reestablishing withholding of union dues; returning approximately 1,961 employee union representatives to their previous taxpayer funded union time allocations (with some employees spending up to 100 percent of their duty hours on taxpayer funded union time); reengaging in collective bargaining under the FSLMRS and in accordance with the provisions of the CBA; reissuing over 180,000 square feet of government office space and 2,000 pieces of information-technology equipment to union representatives (much of which has already been repurposed for mission-related needs), and otherwise reverting back to the same practices that the Executive Order found to be inconsistent with the VA's primary national-security work. *Id.* ¶¶ 18-19. These actions would require significant resources to accomplish,

including manhours on the part of Human Resources and legal staff, payroll providers, and supervisory personnel, as well as arbitration-related expenses. *Id.* ¶ 18(g). These are resources that otherwise could be devoted to the implementation of Administration priorities related to improving benefits and services to America's veterans—efforts which serve to strength the VA's ability to meet its critical national security mission. *Id.*

These lost resources are more concerning given that Plaintiffs have not agreed to repay any costs stemming from a wrongful injunction and are seeking to avoid the requirement of posting a bond. Pls.' Memo. at 34. Unless the Court requires Plaintiffs to post a bond, the cost of implementing any injunction will be unrecoverable even if Defendants ultimately prevail. And while the loss of money is not typically considered irreparable harm, here the lost funds "cannot be recouped" and are thus "irrevocably expended." *See NIH v. Am. Ass'n of Public Health*, 606 U.S. ---, 145 S. Ct. 2658, 2659 (2025) (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304, (2010) (Scalia, J., *in chambers*)).

For these reasons, the balance of the equities and the public interest weigh in Defendants' favor, and the Court should deny Plaintiffs' requested preliminary injunction.

53

### III. Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, the Injunction Should be Accompanied by a Bond

Under Rule 65(c), the Court may issue a preliminary injunction "*only if* the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). The Court should enforce that rule here and require Plaintiffs to post security.

"(T)he conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2954, at 524 (3d ed. 1998) (quoted in *Crowley v. Loc. No. 82, Furniture & Piano Moving*, 679 F.2d 978, 999 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984)); *see also NTEU II*, 2025 WL 1441563, at *3 n.4 (clarifying that "injunction bonds are generally required"). "[T]he district courts in this circuit have generally required a bond to be posted." *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 237 (D. Me. 2025). Because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a government agency is subject to a preliminary injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.,* 607 F.3d 453, 459 (7th Cir. 2010).

The First Circuit has articulated an analysis for a district court to employ in deciding whether a particular case's circumstances are unusual enough that they would justify departing from Rule 65(c)'s bond requirement. *See Crowley*, 679 F.2d at 1000. "First, at least in noncommercial cases, the court should consider the

possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Id.* Here, the possible loss to the VA is $14 million. Therit Decl. ¶ 19. This is the minimum amount needed to cover the VA's costs and damages (for the first six months of a preliminary injunction) should it be later found that Defendants were wrongfully enjoined. *See* Fed. R. Civ. P. 65(c); Therit Decl. ¶ 19. This amount is supported in the Declaration of Tracey Therit, which explains the costs of restoring the bargaining relationship between the VA and Plaintiffs. Therit Decl. ¶¶ 18-19. Because Plaintiffs have not agreed to pay back any such costs should Defendants prevail, these funds would be unrecoverable absent a bond. *See Am. Ass'n of Public Health*, 145 S. Ct. at 2659 (citing P*hilip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). By contrast, Plaintiffs do not contend that a bond requirement poses a financial hardship for them. Pls.' Mem. at 34. The "plaintiffs' ability to pay" consideration therefore weighs in favor of requiring a bond here.

Second, under the First Circuit's analysis, district courts should consider the special nature of suits "to enforce important federal rights or 'public interests'" arising "out of comprehensive federal health and welfare statutes," particularly when the plaintiff in such a suit is an individual, indigent, or subject to the defendant's control. *Crowley*, 679 F.2d at 1000. When both parties are institutions, however, the "impact on plaintiffs' rights" factor is less of a consideration. *Id.* Here, neither the First Amendment nor Chapter 71 are "comprehensive federal health and welfare statutes." *See* 5 U.S.C § 7101 (stating the purpose of Chapter 71). And

the Plaintiffs are not individuals or indigents; rather, they are large labor organizations with over 300,000 members. Am. Compl. ¶¶ 24-25. This second consideration therefore does not support departing from Rule 65(c)'s bond requirement.

When determining the amount of the bond, this Court should require more than just a "nominal" amount. For the reasons explained by the D.C. Circuit in *NTEU II*, it is quite "doubt[ful]" a nominal bond is "appropriate" to pay the costs and damages sustained by a government agency should it be found that the requested preliminary injunction "'wrongfully enjoin[s] or restrains'" them. *NTEU*, 2025 WL 1441563, at *3 n.4 (quoting Fed. R. Civ. P. 65(c)). A bond in name only lacks justification in Rule 65(c).

## CONCLUSION

For these reasons, the instant case should not proceed because it constitutes impermissible claim splitting. Even if the Court entertains Plaintiffs' suit, Plaintiffs fail to establish that they are entitled to a preliminary injunction. And if the Court is inclined to grant any injunctive relief, Defendants request that any injunctive relief be secured by a bond.

Dated: December 19, 2025.                    Respectfully submitted,

                                             UNITED STATES DEPARTMENT OF
                                             VETERANS AFFAIRS; and DOUGLAS
                                             A. COLLINS, in his official capacity as
                                             U.S. Secretary of Veterans Affairs,

                                             By their attorneys,

                                             SARA MIRON BLOOM
                                             First Assistant United States Attorney

                                             /s/ *Andrea Hyatt*
                                             ANDREA HYATT
                                             TX Bar No. 24007419
                                             Assistant U.S. Attorney
                                             One Financial Plaza, 17th Floor
                                             Providence, RI 02903
                                             (401) 709-5000
                                             (401) 709-5001 (Fax)
                                             Andrea.Hyatt@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing document and the accompanying exhibits through this Court's Electronic Case Filing (ECF) system, which will serve it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

                                             /s/ *Andrea Hyatt*
                                             ANDREA HYATT
                                             Assistant U.S. Attorney