# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and** | |
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305** | **Case No. 1:25-cv-00583-MRD-PAS** |
| *Plaintiffs,* | |
| **v.** | **Oral Argument Requested (LR Cv 7)** |
| **UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;** | |
| **DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs** | |
| *Defendants.* | |

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

3942536

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................2

    A.    Defendants fail to carry their burden on their claim-splitting defense. ..................2

        1.    Legal standard ..........................................................................................3

        2.    Executive Order 14251 and the Termination are different transactions. ............................................................................................4

        3.    Even if the Executive Order and the Termination are parts of the same transaction, the Court should not apply the claim splitting rules....................................................................................................7

    B.    *Thunder Basin* and the channeling cases do not preclude jurisdiction in this Court....................................................................................................9

        1.    The *Thunder Basin* framework ...............................................................9

        2.    The FLRA's own jurisdictional orders support this Court's jurisdiction. ............................................................................................11

        3.    The District Court orders in *NTEU* and *AFGE II* and other recent authorities defeat Defendants' channeling argument................................12

        4.    Each of the *Thunder Basin* factors weighs in favor of this Court's jurisdiction. ............................................................................................13

    C.    Plaintiffs will succeed on their First Amendment claim........................................20

        1.    Defendants fail to rebut Plaintiffs' showing that Secretary Collins terminated the Master Agreement based on Plaintiffs' advocacy or to show that he would have done so regardless of his illicit motive..........20

        2.    Defendants fail to rebut Plaintiffs' viewpoint discrimination argument. ................................................................................................25

    D.    Plaintiffs are likely to prevail on their APA claims.............................................26

        1.    Defendants' alternative remedies argument is duplicative of their *Thunder Basin* argument.........................................................................26

        2.    The narrow Section 701(a)(2) exception does not apply here. ..................27

3942536

3.      Plaintiffs are likely to succeed on the merits of their arbitrary and capricious claim. ...................................................................................27

4.      Plaintiffs are likely to succeed on the merits of their APA claim challenging unconstitutional conduct. .......................................................30

E.      Defendants fail to rebut Plaintiffs' showing of irreparable harm. ........................31

F.      The third and fourth *Winter* factors favor granting relief. .....................................33

G.      No bond or a nominal bond is appropriate. ...........................................................34

CONCLUSION .....................................................................................................................35

3942536

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFGE v. Loy*,
   367 F.3d 932 (D.C. Cir. 2004) .......................................................................................17, 19

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
   785 F. Supp. 3d 833 (W.D. Wash. 2025) .................................................................................13

*Am. Fed'n of Gov't. Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) .................................................................................1, 9, 10, 18

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
   716 F.3d 633 (D.C. Cir. 2013) ...............................................................................................15

*Am. Fed'n of Gov't Emps. v. Trump*,
   139 F.4th 1020 (9th Cir. 2025) ..................................................................................12, 13, 19

*Am. Fed'n of Gov't Emps. v. Trump*,
   792 F. Supp. 3d 985 (N.D. Cal. 2025) ........................................................................... *passim*

*Am. Fed'n of Labor and Cong of Indus. Orgs. v. Trump*,
   No. 1:25-cv-02445-PLF (D.D.C.) ...........................................................................................35

*Am. Foreign Serv. Ass'n v. Baker*,
   895 F.2d 1460 (D.C. Cir. 1990) ..............................................................................................17

*Am. Foreign Serv. Ass'n v. Trump*,
   783 F. Supp. 3d 248 (D.D.C. 2025) .......................................................................................35

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*,
   788 F. Supp. 3d 106 (D. Mass. 2025) .....................................................................................27

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) ....................................................................................................... *passim*

*Bank of N.Y. v. First Millennium, Inc.*,
   607 F.3d 905 (2d Cir. 2010) .........................................................................................6, 21, 28

*Cent. United Life, Inc. v. Burwell*,
   128 F. Supp. 3d 321 (D.D.C. 2015) .......................................................................................32

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ...................................................................................................31

*City of Albuquerque v. Barr,*
    515 F. Supp. 3d 1163 (D.N.M. 2021) ........................................................................31

*Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.,*
    415 F. Supp. 3d 240 (D. Mass. 2019) ........................................................................4

*Davignon v. Hodgson,*
    524 F.3d 91 (1st Cir. 2008)........................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020)........................................................................27

*Dep't of Navy v. FLRA,*
    815 F.2d 797 (1st Cir. 1987)........................................................................16

*Dominguez-Cruz v. Suttle Caribe. Inc.,*
    202 F.3d 424 (1st Cir. 2000)........................................................................24

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012)........................................................................4, 18, 19

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................33

*Fed. Educ. Ass'n v. Trump,*
    795 F. Supp. 3d 74 (D.D.C. 2025)........................................................................35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)........................................................................10, 17, 20

*Jarkesy v. S.E.C.,*
    803 F.3d 9 (D.C. Cir. 2015)........................................................................9, 10

*Labranche v. U.S. Liberty Ins. Co.,*
    786 F. Supp. 3d 262 (D. Mass. 2025)........................................................................6

*Laccinole v. MRS BPO, LLC,*
    No. CV 22-233 WES, 2023 WL 22136 (D.R.I. Jan. 3, 2023)........................................................................6

*Lipscomb v. Fed. Lab. Rels. Auth.,*
    333 F.3d 611 (5th Cir. 2003)........................................................................19

*Maryland v. U.S. Dep't of Agric.,*
    770 F. Supp. 3d 779 (D. Md. 2025)........................................................................10

*Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n,*
    142 F.3d 26 (1st Cir. 1998)........................................................................3, 5, 6

iv

*Melone v. Coit,*
100 F.4th 21 (1st Cir. 2024)..................................................................24, 28, 29

*Mills v. Apfel,*
244 F.3d 1 (1st Cir. 2001).................................................................................27

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274 (1977)..................................................................................20, 25

*Murphy v. NSL Country Gardens, LLC,*
No. 19-CV-10145-RGS, 2019 WL 2075590 (D. Mass. May 10, 2019)...............33

*Pye ex rel. N.L.R.B. v. Excel Case Ready,*
238 F.3d 69 (1st Cir. 2001)...............................................................................33

*Nat. Resources Def. Council, Inc. v. Morton,*
337 F. Supp. 167 (D.D.C. 1971).......................................................................35

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel,*
606 F.3d 780 (D.C. Cir. 2010)..........................................................................15

*Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.,*
No. 25-cv-293-LM, 2025 WL 2807652 (D.N.H. Oct. 2, 2025)............................32

*Nat'l Rifle Ass'n of Am. v. Vullo,*
602 U.S. 175 (2024).........................................................................................25

*Nat'l Treasury Emps. Union v. Trump,*
780 F. Supp. 3d 237 (D.D.C. 2025)......................................................12, 14, 35

*Nat'l Treasury Emps. Union v. Trump,*
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ..............................4, 5

*New York v. Kennedy,*
789 F. Supp. 3d 174 (D.R.I. 2025).....................................................................13

*New York v. McMahon,*
784 F. Supp. 3d 311 (D. Mass. 2025) ................................................................32

*Pineda v. Skinner Servs., Inc.,*
22 F.4th 47 (2021)............................................................................................34

*President and Fellows of Harvard Coll. v. U.S. Dep't of Health and Hum. Servs.,*
798 F. Supp. 3d 77 (D. Mass. 2025) ..................................................................25

*Rhode Island Dep't of Env't Mgmt. v. U.S.,*
304 F.3d 31 (1st Cir. 2002)................................................................................9

3942536

*Rhode Island State Council of Churches v. Rollins,*
  No. 25-cv-569-JJM-AEM, 2025 WL 3111213 (D.R.I. Nov. 6, 2025) ...................................27

*Ridley v. Mass. Bay Transp. Auth.,*
  390 F.3d 65 (1st Cir. 2004)...........................................................................................26

*Russo v. Fed. Med. Servs., Inc.,*
  756 F. Supp. 3d 748 (N.D. Cal. 2024) ........................................................................4

*Sec. & Exch. Comm'n v. Chenery Corp.,*
  318 U.S. 80 (1943)..........................................................................................................24

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
  699 F.3d 1 (1st Cir. 2012)................................................................................................31

*Small v. Avanti Health Sys., LLC,*
  661 F.3d 1180 (9th Cir. 2011) ........................................................................................32

*Smith v. Ark. State Highway Emps., Local 1315,*
  441 U.S. 463 (1979)........................................................................................................25

*Taylor v. Sturgell,*
  553 U.S. 880 (2008)........................................................................................................3

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994)............................................................................................. *passim*

*Trump v. Am. Fed'n of Gov't Emps.,*
  145 S. Ct. 2635 (2025)....................................................................................................13

*Trump v. Hawaii,*
  585 U.S. 667 (2018)........................................................................................................22

*U.S. Dep't of Def. v. AFGE et al.,*
  No. 6:25-cv-00119 (W.D. Tex.).................................................................................8, 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
  586 U.S. 9 (2018)............................................................................................................27

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
  778 F. Supp. 3d 440 (D.R.I. 2025).............................................................................3, 5

**Administrative Decisions**

*Dep't of the Navy, Naval Telecomms. Ctr., Ward Circle and NAVTELCOM Unit*
  *Local No. 1, Am. Fed'n of Gov't Emps.,*
  6 F.L.R.A. 498 (1981)....................................................................................................12

*U.S. Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party)*,
   57 F.L.R.A. 750 (Apr. 25, 2002) ..........................................................................11, 14

*U.S. Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union)*,
   66 F.L.R.A. 589 (Apr. 20, 2012) ..........................................................................11, 14

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*,
   60 F.L.R.A. 202 (September 2, 2004)..........................................................................19

*United States Department of Defense Ohio National Guard & AFGE Local 3970 et al*,
   71 F.L.R.A. 829 (June 30, 2020) ..........................................................................19

**Statutes**

5 U.S.C. § 701 ..........................................................................27

5 U.S.C. § 706 ..........................................................................30, 31

5 U.S.C. § 7101 .......................................................................... *passim*

5 U.S.C. § 7103 .......................................................................... *passim*

5 U.S.C. § 7105 ..........................................................................18

5 U.S.C. § 7111 ..........................................................................15, 16, 17

5 U.S.C. § 7123 ..........................................................................15

**Other Authorities**

First Amendment .......................................................................... *passim*

Executive Order 13252 ..........................................................................11

Executive Order 14251 .......................................................................... *passim*

Executive Order 14343 ..........................................................................29

Fed. R. Civ. Proc. 65 ..........................................................................34

Fed. R. Evid. 602 ..........................................................................23

*Wright & Miller's Federal Practice & Procedure* § 2954 (3d ed.) (Sept. 2025 Update)..........................................................................34

3942536

## INTRODUCTION

Defendants stake their Opposition on two threshold justiciability arguments, both of which fail.

Defendants first argue that Plaintiffs have engaged in claim splitting. This is incorrect. The *AFGE II* case[1] in the Northern District of California challenges Executive Order 14251. The Executive Order was issued in March; *AFGE II* was filed in April; the *AFGE II* court issued a preliminary injunction and the government filed an appeal in June. This case, by contrast, challenges the Termination, which the Secretary ordered on August 6. Plaintiffs thus had no means of challenging the August 6 Termination in *AFGE II*. Defendants offer no case to suggest that the claim splitting rules apply when a later case challenges conduct that post-dates the filing of the complaint in an earlier case, nor do they offer any authority to support their apparent argument that a litigant must try to reopen an earlier-filed case that is on appeal (as *AFGE II* still is) when the litigant seeks to challenge subsequent conduct that is arguably related to the earlier-filed case. In any event, any application of the claim splitting rules is discretionary, and an evaluation of equitable considerations strongly tips in favor of this Court resolving Plaintiffs' preliminary injunction motion on the merits now. Appellate proceedings in *AFGE II* are far from their conclusion, and the district court is not proceeding in the interim, meaning that any opportunity to challenge the Termination in *AFGE II* is, at best, months away. By contrast, Plaintiffs have presented this Court with overwhelming and unrebutted proof of the irreparable harm they are suffering now as a result of the Termination, and Plaintiffs' motion is ripe for resolution. Nothing about the claim splitting rules makes this Court an improper forum for this case, and the Court should resolve Plaintiffs' claims on the merits.

Defendants next argue that this Court lacks subject matter jurisdiction because Congress channeled disputes of this type to the Federal Labor Relations Authority. Not so. The FLRA

---

[1] For ease of reading, Plaintiffs adopt Defendant's shorthand "*AFGE II*" name for *Am. Fed'n of Gov't Emps. et al., v. Trump, et al.*, No. 3:25-cv-3070 (N.D. Cal.), and its related appeal, No. 25-4014 (9th Cir.), and "*AFGE I*" for *Am. Fed'n of Gov't. Emps., AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). Further, in this Reply, Plaintiffs adopt the same defined terms used in their opening Memorandum of Points and Authorities (MPA).

itself has ruled, at least twice, that, as here, once a president withdraws an agency from Chapter 71 coverage, it thereafter lacks jurisdiction over disputes emanating from that agency; all district courts to consider this question have held likewise.  The government should not be able to invoke the channeling doctrine where the government's own channel says it is unavailable. Applying the factors set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994), it is plain that the FLRA process would not afford Plaintiffs a meaningful opportunity to seek judicial review of the Termination, that any such review is collateral to the FLRA's purpose, and that the FLRA has no expertise in disputes of this type.  Congress did not strip this Court of jurisdiction to hear Plaintiffs' constitutional and APA claims, and so the Court should reject Defendants' channeling argument.

On the merits, Defendants mount little defense to Plaintiffs' First Amendment claim. They fail to challenge Plaintiffs' retaliation evidence.  They offer no evidence to support their argument that the Secretary acted for some reason other than to punish Plaintiffs and to discriminate against their protected speech.  Defendants also offer little resistance to Plaintiffs' APA claim.  Defendants offer no relevant evidence or any administrative record.  They concede that the Termination is inconsistent with the plain text of a key limitation in Section 2 of Executive Order 14251 but beg the Court to overlook that fact.  Defendants ask the Court to defer to the Secretary's "national security" decisions but fail to offer even a single example of the Secretary saying that the Termination was motivated by national security concerns.  At bottom, Defendants offer nothing other than empty post hoc rationalizations for the Termination. Under the law, the Court should not consider, let alone defer to, such litigation-inspired arguments.

The Court should preliminarily enjoin the August 6 Termination.

## ARGUMENT

### A.    Defendants fail to carry their burden on their claim-splitting defense.

Defendants argue that *AFGE II* precludes this case under the "doctrine of claim splitting" because Plaintiffs' "claims could have and should have been brought in that case."  Defendants'

Opposition to Motion for Preliminary Injunction, Dkt. 17, ("Opp.") at 12.[2]  But, *AFGE II* and this case challenge different actions, and the administrative action challenged in this case—the August 6 Termination—occurred ***after*** *AFGE II* was filed, ***after*** the district court in *AFGE II* entered its preliminary injunction order, and ***after*** the government appealed the *AFGE II* preliminary injunction order.  On these facts, Defendants, who bear the burden of establishing this affirmative defense, cannot show that this case and *AFGE II* arise out of the same transaction.  Moreover, even if Defendants did make that showing, claim splitting is a discretionary doctrine, and the Court should permit this case to proceed because it is the most efficient way for Plaintiffs to seek judicial review of the Termination.

1.    **Legal standard**[3]

Claim splitting is an affirmative defense, and Defendants bear the burden of establishing that it should apply here.  *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 459-60 (D.R.I. 2025); *cf. Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("Claim preclusion, like issue preclusion, is an affirmative defense. Ordinarily, it is incumbent on the defendant to plead and prove such a defense and we have never recognized claim preclusion as an exception to that general rule.").[4]  To assess whether claim splitting rules might apply, courts use the "transactional approach" and ask "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations."  *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998)  Even if a defendant can show that two cases arise from the same transaction, a court applying "doctrines regarding claim splitting and preclusion . . . generally has discretion to decide whether to dismiss a suit when a similar suit is

---

[2] All pin cites to materials on the docket in this case refer to ECF document pagination, not internal pagination.

[3] Unless otherwise noted, all internal quotation marks, alterations, and citations have been omitted, and all emphases have been added.

[4] Res judicata cases are instructive because the "doctrine precluding claim splitting relates to—but differs from—the doctrine of res judicata.  The main difference is that claim splitting, unlike res judicata, applies where the second suit has been filed before the first suit has reached a final judgment."  *Woonasquatucket River*, 778 F. Supp. 3d at 459.

pending elsewhere." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012); *accord Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.*, 415 F. Supp. 3d 240, 242 (D. Mass. 2019) (doctrine is discretionary); *see also Russo v. Fed. Med. Servs., Inc.*, 756 F. Supp. 3d 748, 758 (N.D. Cal. 2024) ("the doctrine is discretionary"). Defendants concede that the claim splitting rules are discretionary. Opp. at 28.

> **2.    Executive Order 14251 and the Termination are different transactions.**

*AFGE II* and this case challenge different transactions. *AFGE II* challenged the lawfulness of Executive Order 14251, while this case challenges the lawfulness of the August 6 Termination. While there is a relationship between the Executive Order and the Termination, Defendants concede that they are separate actions. Opp. at 40 ("Here, the Plaintiffs' theory is based on the alleged unlawfulness of Secretary Collins' decision to terminate the CBA for most VA employees."); *id.* at 52 ("[T]he action Plaintiffs seek to challenge under the APA the VA's termination of the CBA."). Under the First Circuit's transactional approach, Defendants' concession is sufficient to dispose of their claim splitting defense.

In fact, the government has repeatedly emphasized that Executive Order 14251 is separate from, and does not require, termination of collective bargaining agreements. OPM's initial guidance about Executive Order 14251 advised that "Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination" and that "[A]gencies should not file any decertification petitions until litigation regarding [the Executive Order] has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority ("FLRA") petitions" (the government's original emphasis). Dkt. 14-2 ("Silva Decl."), Ex. L. Furthermore, the government persuaded the D.C. Circuit that there is a material distinction between the effect of the Executive Order and terminating a collective bargaining agreement. In *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025), the government obtained a stay pending appeal of a district court's preliminary injunction of Executive Order 14251. In seeking the stay, the

government argued that the union could not "establish any imminent loss of bargaining power because agencies ha[d] been advised not to terminate collective bargaining agreements" and that it was "speculative to think that employees . . . will leave the union even before their bargaining unit has been decertified." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, Dkt. 2113741, at 32 (D.C. Cir. April 30, 2025).  The D.C. Circuit accepted that argument and granted the government a stay pending appeal on that basis.  *Nat'l Treasury Emps. Union,* 2025 WL 1441563, at *1.  The government should not be allowed to conflate the Executive Order and the Termination in this case when it has chosen to call them distinct and unrelated actions, to its benefit, in other litigation.  Separate government actions should be amenable to separate legal challenges.

The comparative scopes of *AFGE II* and this case also reinforce that the Executive Order and the Termination are different transactions.  Executive Order 14251 withdrew Chapter 71 coverage from many government departments and agencies apart from the VA.  Consequently, the *AFGE II* plaintiffs include many unions other than AFGE, and the defendants include the Departments of State, Agriculture, Defense, Energy, Education, Health and Human Services, Homeland Security, Housing and Urban Development, Justice, Interior, Labor, Treasury, and Transportation, in addition to eight independent agencies.  By contrast, this case is only about the VA and its Master Agreement with NVAC, an affiliate of AFGE.  When considering an appropriate "trial unit," *Massachusetts Sch. of L. at Andover*, 142 F.3d at 38, it is unreasonable for the government to expect that the *AFGE II* court will address over a dozen agency-specific termination decisions (some of which have not yet even happened) simply because that court considered the unions' challenge to the Executive Order.  Yet, the implication of Defendants' claim-splitting argument is that the *AFGE II* court is the only court that should be available to consider any such claims brought by any union or local union affiliated with any *AFGE II* plaintiff.  Given that "[c]laim splitting is concerned with the district court's comprehensive management of its docket," the implications of Defendants' claim splitting position are unreasonable.  *Woonasquatucket River*, 778 F. Supp. 3d at 459.

5

The transactional approach requires the Court to assess the temporal proximity of the Executive Order and Termination. *Massachusetts Sch. of L. at Andover*, 142 F.3d at 38. The issuance of the Executive Order and the Termination, which occurred more than four months apart, are not temporally proximate, especially in the context of litigation. "One notable exception to the rule against claim splitting is where 'the evidence on which the second action is based was not reasonably discoverable during the pendency of the first action.'" *Labranche v. U.S. Liberty Ins. Co.*, 786 F. Supp. 3d 262, 275–76 (D. Mass. 2025) (quoting *Salvati v. Fireman's Fund Ins. Co.*, 368 F. Supp. 3d 85, 92 (D. Mass. 2019) and citing *Havercombe v. Dep't of Educ. of the Commonwealth of P.R.*, 250 F.3d 1, 8 n.9 (1st Cir. 2001)). Executive Order 14251 was issued on March 27. *AFGE II* was filed on April 3. The district court entered a preliminary injunction on June 24. The government appealed on June 26. The Termination was issued on August 6. Thus, there is no way that any litigant could have challenged the Termination at the time *AFGE II* was filed; no way that the district court could have considered the Termination as part of its resolution of the preliminary injunction motion; and no way that the Ninth Circuit—which is reviewing a record that does not include the Termination—could review the Termination as part of the still-pending *AFGE II* appeal. If the rule is that later-discovered **evidence** does not trigger the claim splitting rules, then a later-in-time **transaction** cannot trigger them either. *See Labranche*, 786 F. Supp. 3d at 275-76; *see also Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010) (res judicata "does not bar claims, even between identical parties, that arise after the commencement of the prior [case]").

The authority cited by Defendants does not compel a different result. The only case cited by Defendants is *Laccinole v. MRS BPO, LLC*, No. CV 22-233 WES, 2023 WL 22136 (D.R.I. Jan. 3, 2023), in which a pro se plaintiff pleaded claims under the Telephone Consumer Protection Act and the Fair Debt Collection Practices Act. The Fair Debt Collection Practices Act caps damages "at $1,000 per action per defendant regardless of how many violations occurred." *Id.* at *1. "To circumvent this limitation," the pro se plaintiff, "a frequent litigant in this district" filed three lawsuits and served them all at the same time. *Id.* The district court

dismissed one of the later-filed cases as an impermissible end-around to avoid the statutory damages cap. Those facts are a far cry from this case, where the action at issue in the second case had not occurred at the time the first case was filed or even when the district court issued its preliminary injunction order.

3.     **Even if the Executive Order and the Termination are parts of the same transaction, the Court should not apply the claim splitting rules.**

As Plaintiffs note above, even if the claim splitting rules might apply here—and they do not—the claim splitting rules, unlike some preclusion doctrines, are discretionary. *See supra*, p. 3-4. The Court should not exercise its discretion to deny a preliminary injunction, or anticipate that it might later dismiss the case, on claim splitting grounds.

This Court should resolve this case because this is the most efficient and prompt way for Plaintiffs to obtain judicial review of Defendants' actions. Plaintiffs' preliminary injunction motion is fully briefed, and it includes substantial evidence of the ongoing harm that NVAC and the employees it represents are suffering in light of the Termination. The Court can redress those harms by considering this case on the merits now. By contrast, in *AFGE II,* the district court has opted not to move the case forward while the preliminary injunction is on appeal, *see AFGE II*, Case No. 3:25-cv-03070-JD, Dkt. 71, 76 (N.D. Cal. Sept. 9, 2025), and appellate proceedings are likely to be lengthy. Considering the time needed for resolution at the panel stage, the time needed for potential en banc review,[5] and the time needed for potential Supreme Court review, it could easily take over a year for district court proceedings to resume. If this Court dismisses this case, NVAC and the employees it represents will continue to suffer harm without having access to the courts to seek judicial review.

Apart from its arguments about specifying the transactions at issue, Defendants make two arguments that relate to the Court's exercise of discretion. First, Defendants note that *AFGE II* has the "potential to be either outcome dispositive for the instant case or, at the very least, to

---

[5] The Ninth Circuit's order staying the *AFGE II* preliminary injunction pending appeal already drew an en banc call (that was subsequently withdrawn). *See AFGE II,* Case No. 25-4014, Dkt. 77.1 (9th Cir. Nov. 4, 2025). Oral argument before the panel is scheduled for January 12.

significantly narrow the issues to be decided." Opp. at 27. This is overstated. To be sure, Defendants concede that if the *AFGE II* plaintiffs prevail, Defendants could not implement the Executive Order. *See id.* But this argument is a poor fit for Defendants' preclusion theory; the government is talking here about the effects of a potential union ***win***, while as a general matter preclusion rules exist to prevent a litigant from avoiding the effects of a ***loss***. Moreover, even if *AFGE II* is resolved in the government's favor, Plaintiffs should still be able to assert their independent claims that challenge the Termination, a separate administrative action. Second, the government makes a kind of equitable argument, pointing to an out-of-context quotation from a motion-to-dismiss filed in a case in Texas.[6] *U.S. Dep't of Def. v. AFGE et al.*, No. 6:25-cv-00119 (W.D. Tex.) (hereinafter "the Texas Action"). There, the VA (among other agencies) sued NVAC (among other unions) seeking a declaration that they could lawfully terminate collective bargaining agreements. The motion papers that Defendants cite focus on dismissal, yet the excerpt that Defendants quote is a single paragraph noting that, if the Texas court were inclined to transfer the case in lieu of dismissing it, the Northern District of California would have made sense as a transferee district given that *AFGE II* was then pending in the district court. The defendants made no claim splitting or res judicata argument. Nothing about that short request suggests that this Court should exercise its discretion to abstain from hearing this case.

\* \* \*

The term "claim splitting" suggests that, at the point in time when the plaintiff filed the first case, there existed some claim that the plaintiff in fact split into two and that the plaintiff chose not to assert one portion of the claim. That cannot be the case here, where the later-filed case (this case) challenges an action that post-dates the first-filed case (*AFGE II*). Furthermore, *AFGE II* does not provide a reasonably available forum to assert Plaintiffs' claims about the Termination. Thus, Defendants have failed to carry their burden of showing that the claim splitting rules should apply.

---

[6] The District Court in the Texas Action ultimately dismissed the government's case for lack of standing.

3942536

B.      ***Thunder Basin* and the channeling cases do not preclude jurisdiction in this Court.**

Defendants assert that this Court lacks subject matter jurisdiction because Congress chose to channel this type of claim to the exclusive jurisdiction of the FLRA.  This argument is meritless.  The FLRA itself says that it lacks jurisdiction over this type of claim, a fact that should dispose of this argument.  Indeed, the two district courts to oversee challenges to the underlying Executive Order 14251 have rejected this argument.  Over the last year, many other courts have rejected the government's persistent efforts to assert this doctrine to preclude district courts from reviewing sweeping changes to the way government agencies do business.  This Court should too.

1.      **The *Thunder Basin* framework**

There is a "strong presumption that Congress intends judicial review of administrative action." *Rhode Island Dep't of Env't Mgmt. v. U.S.*, 304 F.3d 31, 41 (1st Cir. 2002). However, Congress may provide an "alternative scheme of review" that "preclude[s] district courts from exercising jurisdiction over challenges to federal agency action."  *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023).  In *AFGE I*, upon which Defendants rely, the D.C. Circuit stated that to "determine whether Congress has done so, we use the two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Under that framework, 'Congress intended that a litigant proceed exclusively through a statutory scheme when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"[7]  *AFGE I*, 929 F.3d at 754.

The first step asks if a channel is available generally.  *See*, *e.g.*, *Jarkesy v. S.E.C.*, 803 F.3d 9, 16 (D.C. Cir. 2015) ("We can fairly discern Congress's intent to preclude suits by respondents in SEC administrative proceedings in the mine-run of cases").  Here, it is

---

[7] Although *Thunder Basin* remains the governing framework, at least two Justices have expressed serious doubts about its continued viability. *See Axon*, 598 U.S. at 196 (Thomas, J., concurring) ("I have grave doubts about the constitutional propriety of Congress vesting administrative agencies with primary authority to adjudicate core private rights with only deferential judicial review on the back end."); *id.* at 217 (Gorsuch J., concurring) ("Respectfully, this Court should be done with the *Thunder Basin* project. I hope it will be soon.").

uncontested that the FLRA may provide an administrative channel for those disputes within its purview.  *See AFGE I*, 929 F.3d at 755 (FLRA's existence satisfied first step of *Thunder Basin* framework).

But that purview is limited: The second step of the *Thunder Basin* inquiry asks whether Plaintiffs' "claims are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. Agencies are not the arbiters of every claim tangentially related to the agency's operations, and district courts are often the proper forum for such challenges. *See, e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010) (applying *Thunder Basin* to hold that district court has jurisdiction to hear challenge to constitutionality of the agency itself); *Axon*, 598 U.S. at 180 (similar). *Thunder Basin* explains that, to determine whether a claim is "of the type" that Congress intended to channel away from the district courts, courts must consider "the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207, 212-13.  To make this determination, courts assess: (1) whether "a finding of preclusion could foreclose all meaningful judicial review" of the claims at issue; (2) whether the claims are "wholly collateral to a statute's review provisions"; and (3) whether the claims are "outside the agency's expertise."  *Id*. at 212-13. While an affirmative answer to all three inquiries indicates that Congress did not intend to limit jurisdiction, "the same conclusion might follow if the factors point in different directions." *Axon*, 598 U.S. at 186. "The ultimate question is . . . whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id*.[8]

---

[8] Defendants' suggestion that *Thunder Basin* establishes an "exception" to channeling and that Plaintiffs must fit their case within such an "exception," Opp. at 34, is thus inaccurate.  Defendants' own case, *AFGE I*, indicates that the channeling inquiry proceeds in two steps and that *Thunder Basin*'s "of the type" inquiry is the second step of the threshold inquiry, not an exception to a general presumption in favor of channeling.  *See* 929 F.3d at 754; *Jarkesy,* 803 F.3d at 15 (The "two-part approach set forth in *Thunder Basin*" asks at the second step whether "the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'") (quoting *Thunder Basin*, 510 U.S at 212); *Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 802 (D. Md. 2025) ("Second, if the reviewing court determines that a statute does channel certain claims away from the courts, it then considers whether the specific claims at issue fall within that category.").

2.      **The FLRA's own jurisdictional orders support this Court's jurisdiction.**

Defendants' channeling argument is defeated out of the gate by the FLRA itself, which has previously ruled that it "lacks jurisdiction" to review executive actions taken pursuant to Section 7103(b).  In 2002, President George W. Bush issued Executive Order 13252, which, like Executive Order 14251, withdrew Chapter 71 coverage.  Affected employees brought a challenge in the FLRA, and the FLRA issued an order concluding that it lacks jurisdiction to hear such challenges:

> In each of these cases, the Respondent is the United States Attorney's Office for the Southern District of Texas. On January 7, 2002, the President issued Executive Order 13252, "Exclusions From the Federal Labor-Management Program," exempting, as relevant here, United States Attorneys' Offices from coverage of the Federal Service Labor-Management Relations Statute (the Statute).

> Subsequently, the Authority requested and received submissions from the parties as to why these cases should not be dismissed for lack of jurisdiction in light of the Executive Order. In their submissions, the General Counsel and the Respondent agree that, since the Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases and should dismiss the complaints.[3]

> ***We agree*** that, in light of Executive Order 13252, ***the Authority lacks jurisdiction to decide these cases.*** Accordingly, we dismiss the complaints.

*U.S. Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party*), 57 F.L.R.A. 750, 750 (Apr. 25, 2002) (emphasis added, footnote omitted).  In other words, because Executive Order 13252 excluded the relevant agency subdivision from Chapter 71 coverage, it followed that Chapter 71's administrative review scheme—the FLRA—was unavailable to the party challenging the Executive Order.

Indeed, the FLRA has consistently dismissed cases for lack of jurisdiction where the President had acted to exclude an agency from Chapter 71 coverage.  For example, in 2012, the FLRA "determined that an exemption from coverage [under Section 7103(b)] constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute." *U.S. Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics*

*Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union)*, 66 F.L.R.A. 589, 598 (Apr. 20, 2012)*; see also Dep't of the Navy, Naval Telecomms. Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, Am. Fed'n of Gov't Emps.*, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency [] from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition.").

In short, under its own precedent, the FLRA lacks jurisdiction to hear this case.

**3.     The District Court orders in *NTEU* and *AFGE II* and other recent authorities defeat Defendants' channeling argument**

The first two cases to challenge the lawfulness of Executive Order 14251 were *NTEU* and *AFGE II*. *NTEU*, 780 F. Supp. 3d 237, 249 (D.D.C. 2025); *AFGE II*, 792 F. Supp. 3d 985, 998-99 (N.D. Cal 2025). In both cases, the government argued that the district courts lacked jurisdiction to hear the cases under *Thunder Basin*. Observing that Chapter 71 created the FLRA, the government argued that Congress intended to channel claims about presidential "determinations" made under Section 7103(b) (which is part of Chapter 71) to the FLRA. In both cases, the district court rejected the government's channeling argument for essentially the same reason given by the FLRA in 2002: The FLRA "is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here." *NTEU*, 780 F. Supp. 3d at 249; *accord AFGE II*, 792 F. Supp. 3d at 998-99. Consequently, these courts ruled, there was no *Thunder Basin* administrative alternative to district court review.

*AFGE II* and *NTEU* are consistent with other recent cases where courts have rejected the current Administration's muscular assertion of the channeling doctrine. Three examples illustrate the point. In *AFGE v. Trump*, the Ninth Circuit rejected the government's channeling argument in a case about government reductions in force. The district court had granted an injunction, and the government moved for a stay pending appeal, raising a channeling defense

12

that involved the FLRA.  Applying *Thunder Basin*, the Ninth Circuit held that the plaintiffs'

"ultra vires and APA claims plainly fall outside the scope of the CSRA's revision provisions,"

including the FLRA review process.  *Am. Fed'n of Gov't Emps.  v. Trump*, 139 F.4th 1020,

1030-31 (9th Cir. 2025).[9]  In *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F. Supp. 3d 833,

848-51 (W.D. Wash. 2025), the district court preliminarily enjoined the Department of

Homeland Security from terminating a collective bargaining agreement involving the

Transportation Security Administration.  Although the collective bargaining agreement at issue

there did not arise under Chapter 71, the district court, in rejecting the government's channeling

argument, noted that there "is little evidence that Congress implicitly intended the FLRA to

handle a dispute over an agency decision to rescind a CBA."  *Id*. at 851.  Finally, in *New York v.*

*Kennedy*, this Court confronted a channeling argument in a case brought by states to challenge

the Department of Health and Human Services' reduction in force plans.  789 F. Supp. 3d 174,

197-99 (D.R.I. 2025). The government asserted that only the FLRA and a similar agency, the

Merit Systems Protection Board, had initial jurisdiction over disputes related to the reductions in

force.  *Id*.  The Court rejected that argument in large part because the plaintiff states were not

government employees, but the Court also noted that the "States' APA and constitutional

challenges are more structural constitutional challenges than challenges to the decisions

stemming from the employment relationship," which made channeling improper.  *Id*. at 198.

In sum, *NTEU* and *AFGE II* rejected the government's channeling argument in the

context of a broader judicial rejection of the current Administration's effort to leverage the "very

limited jurisdictional preclusion theory announced in *Thunder Basin*" in every manner of case

challenging executive and agency action.  *Noem*, 785 F. Supp. 3d at 848.

    **4.**       **Each of the *Thunder Basin* factors weighs in favor of this Court's**

---

[9] The Supreme Court later stayed the injunction pending appeal.  The Supreme Court's order was based on its conclusion that "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum [at issue] are lawful—and because the other factors bearing on whether to grant a stay are satisfied— we grant the application."  *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025).  In other words, the Supreme Court's disposition looked at the merits of the case, suggesting that jurisdiction was in fact proper.

**jurisdiction.**

The *NTEU* and *AFGE II* courts correctly concluded that *Thunder Basin* does not require litigation involving agencies outside the scope of Chapter 71 to be channeled to the FLRA. The government offers no reason why that conclusion should be different simply because *NTEU* and *AFGE II* challenged the Executive Order, while this case challenges the August 6 Termination, and indeed, the FLRA's track record over the intervening months demonstrates that it is not a forum available to Plaintiffs.

**No "meaningful judicial review."** The first *Thunder Basin* factor asks whether the administrative scheme "could foreclose all meaningful judicial review." 510 U.S. at 212-13. This factor weighs against channeling Plaintiffs' claims because the FLRA would not offer any meaningful judicial review. As the *NTEU* and *AFGE II* courts noted and as discussed above, the FLRA has long held that it lacks jurisdiction to review agency action relating to Section 7103(b) determinations. *AFGE Local 987*, 66 F.L.R.A. 589 (2012) (dismissing ULP claim against Air Force Office of Special Investigations for lack of jurisdiction because an Executive Order had exempted that Office from the Statute); *AFGE, Local 3966,* 57 F.L.R.A. 750 (2002) ("[S]ince [an] Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases."). Thus, FLRA precedent firmly bars review of Plaintiffs' claims, as well. The current FLRA continues to adhere to that precedent. In fact, the FLRA ruled that it lacks jurisdiction to review agency actions stemming from Executive Order 14251, the very order that Defendant Collins cited when he terminated the Master Agreement. *See* Declaration of Taylor Reeves in support of Plaintiffs' Reply ("Reeves Decl."), Ex. A (*U.S. Dept. of Veterans Affairs VA Eastern Colorado Health Care System v. American Federation of Government Employees Local 2241*, 0-AR-6043 (F.L.R.A. July 8, 2025)) (suspending all pending deadlines in case because "[b]ased on the EO [14251], the Authority's jurisdiction in the above-captioned case is in question"). As the *NTEU* and *AFGE II* courts ruled, where the agency at issue itself says that it is not a proper channel, the statutory review scheme does not "reach[] the claim in question." *Axon*, 598 U.S. at 186; *see NTEU*, 780 F. Supp. 3d at 249; *AFGE II*, 792

14

F. Supp. 3d at 998-99.[10]

Defendants' response is to pluck isolated phrases from Chapter 71 and make it appear as though there is still some way for Plaintiffs to present their case to the FLRA. There is not. Defendants first make stray references to filing an unfair labor practice ("ULP") charge. *See* Opp. at 36. But only the FLRA General Counsel can issue a complaint and prosecute such charges, and the FLRA is currently invoking the Executive Order to indefinitely defer processing of any such charge arising from agencies excluded from the FSLMRS under the Executive Order. *See* Reeves Decl., Ex. B (Dec. 2, 2025 letter from FLRA Office of General Counsel deferring the processing of a ULP charge in light of Executive Order 14251). Moreover, the D.C. Circuit has held that the General Counsel's decision whether to issue a ULP complaint is not subject to judicial review. *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel,* 606 F.3d 780, 783 (D.C. Cir. 2010). Thus, Plaintiffs have no means of obtaining meaningful judicial review through a ULP charge and no recourse if the General Counsel decides not to issue a complaint.

Defendants next speculate that Plaintiffs could file a "clarification" petition under 5 U.S.C. § 7111(b)(2) (Opp. at 33). Defendants misread the statute. Section 7111(a) establishes that an "agency shall accord exclusive recognition to a labor organization" selected "by a majority of the employees in an appropriate unit." 5 U.S.C. § 7111(a). Section 7111(b) then sets forth the limited "mechanisms for the resolution of questions concerning representation"— petitions to certify, decertify, or clarify a representative, each culminating, where a question of

---

[10] Defendants claim that even if the FLRA dismissed Plaintiffs' claim for lack of jurisdiction, that dismissal would provide a meaningful avenue for appellate review. Opp. at 23-24. That is wrong for three reasons. First, under 5 U.S.C. § 7123, a Court of Appeal may review only "the proceeding" that took place before the FLRA "and [] the question determined therein." 5 U.S.C. § 7123(c). An appellate court cannot exercise "meaningful" judicial review where there is no underlying administrative proceeding. Second, while Defendants cite *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633 (D.C. Cir. 2013), for the proposition that the Court of Appeals can address an agency's jurisdictional dismissal, that case does not address or even mention that issue. Third, even if there existed some theoretical way for a Court of Appeal to review the FLRA's jurisdictional dismissal, that fact would not be dispositive. *See Axon,* 598 U.S. at 190-91 (rejecting *Thunder Basin* channeling argument even where plaintiffs "can (eventually) obtain review of their constitutional claims through an appeal from an adverse agency action to a court of appeals").

representation exists, in a secret-ballot election.  *Dep't of Navy v. FLRA*, 815 F.2d 797, 798 (1st Cir. 1987).  Read in its statutory context, Section 7111(b)(2)'s narrow authorization to seek "clarification of, or an amendment to, a certification then in effect or a matter relating to representation" is confined to questions concerning whether employees wish to be represented by an exclusive representative.[11]  Section 7111(b)(2) does not provide a means for adjudicating statutory or constitutional challenges to the wholesale termination of a bargaining relationship, but rather it presupposes the existence of such a relationship.  Moreover, the only remedy available under the statute is a new election, 5 U.S.C. § 7111(b)(2), a remedy that is plainly inapplicable to—and insufficient for—this situation.

Finally, Defendants suggest that this case falls within the statutory definition of "grievance" (Opp. at 36 & n.8).  Again, Defendants err.  Plaintiffs are not asking the Court to interpret the Master Agreement, nor do they allege a contractual breach.  *See* 5 U.S.C. § 7103(a)(9).  Plaintiffs allege that Defendants' termination of the Master Agreement, purportedly on **statutory** grounds, was unauthorized by **statute** and violated the **Constitution**.  In any event, Defendants' own witness concedes that Defendants have ceased participating in the grievance procedure, illustrating the inadequacy of this supposed "channel."  Dkt. 17-1 at ¶ 16(a), (b), (e); *see also* Opp. at 21-22.

Defendants point to post-Termination grievances filed by NVAC to claim that the FLRA is available to resolve this dispute.  Opp. at 22.  But Defendants mischaracterize the grievances, and the grievances do not aid Defendants' channeling argument.[12]  The Master Agreement provides a 30-day window for filing of national level grievances. Dkt. 14-3 ("Wetmore Decl."),

---

[11] The FLRA interprets the statute as Plaintiffs do.  The FLRA Office of the General Counsel Representation Proceedings Case Handling Manual notes two examples of petitions for clarification as to "any other matter relating to representation" under § 7111(b)(2): "questions relating to the continued appropriateness of an existing unit(s) due to a substantial change in the character and scope of the unit(s)" and "questions relating to the majority status of the currently recognized or certified labor organization."  *See* Reeves Decl., Ex. M (FLRA Office of the General Counsel Representation Proceedings Case Handling Manual) at 3-1. Neither example applies to Plaintiffs' claims.

[12] Defendants did not submit the grievances to the Court.  Plaintiffs do, so that the Court can assess Defendants' mischaracterizations.  *See* Reeves Decl., Exs. C through K

Ex. A at Art. 43 § 11A.  Plaintiffs filed these grievances to "preserv[e] [their] rights pending the outcome of federal litigation."  *E.g.*, Reeves Decl., Ex. E (NG-9/5/25) at 2.  Thus, many of the grievances were protectively filed so that Plaintiffs can litigate specific breaches of the Master Agreement once the Master Agreement is restored.  Other grievances were filed on behalf of what the VA calls "Exempted Employees" (*i.e.*, police officers, firefighters, and security guards), for whom the VA claims that it continues to observe the Master Agreement.  *E.g.*, Reeves Decl., Exs. C, D.  NVAC has a duty to protect these employees' collective bargaining rights—rights which even Defendants agree continue to exist—and NVAC's vigorous effort to do so does not demonstrate that the FLRA is an appropriate forum for this case.

Finally, Defendants cite *AFGE v. Loy*, 367 F.3d 932 (D.C. Cir. 2004), and *AFGE I* in support of their argument under the first *Thunder Basin* factor.  Both cases are easily distinguishable.  In *Loy*, the union sought to proceed simultaneously in front of the FLRA and in the district court on issues relating to organizing TSA airport screeners.  The FLRA ruled that a statute specific to airport screeners precluded the FLRA from ordering an election under Section 7111, and the district court ruled that it lacked jurisdiction because the FLRA was handling the matter.  *Loy*, 367 F.3d at 934–35.  The union appealed the district court's decision, but it did not appeal the FLRA's order.  *Id*.  All that the Court of Appeals held was that the district court had correctly ruled that it lacked subject matter jurisdiction, because the statute expressly specified that organizing an election fell within the FLRA's mandate.  *Id*. at 935–36.[13]  There is no such express statutory authorization here.  In *AFGE I*, the unions sued in district court to challenge

---

[13] Even if *Loy* were not distinguishable—and it is—the case is inconsistent with later Supreme Court rulings and its framing of the governing standard has never been adopted by the First Circuit. This Court should accordingly not follow *Loy*.  *Loy* says the governing standard for determining whether district courts are stripped of jurisdiction is whether a claim could "arguably" be litigated through an administrative review scheme.  367 F.3d at 936–37.  After *Loy* was issued, the Supreme Court issued its *Axon* and *Free Enterprise* decisions, where it reiterated that channeling does not extend to "to every claim concerning agency action," but rather to only those specific claims that are "of the type" that "Congress thought belonged within a statutory scheme."  *Axon*, 598 U.S. at 185, 188–89; *accord Free Enterprise Fund*, 561 U.S. at 489.  To the extent *Loy* can be read to suggest that a district court should resolve a close case in favor of agency jurisdiction, *Axon* and *Free Enterprise* overrule it.  Indeed, *Loy*'s "arguably within" standard was drawn entirely from a pre-*Thunder Basin* case—*Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460 (D.C. Cir. 1990)—which the *Loy* panel made no effort to reconcile with *Thunder Basin*'s requirements.

17

executive orders that, among other things, instructed agencies on how to bargain with unions. The D.C. Circuit held that the district court lacked jurisdiction because the unions could contest the agencies' actions "in the context of concrete bargaining disputes," over which the FLRA had jurisdiction, and that meaningful judicial review could then follow. *AFGE I,* 929 F.3d at 757, 759. Under the *AFGE I* executive orders, the government was still bargaining with unions and the FLRA was still available to address disputes that arose from those negotiations. *Id.* Those facts are not present here.

      **Challenge collateral to review scheme.** This second *Thunder Basin* factor also favors Plaintiffs. Even the FLRA thinks this case is collateral to its administrative role, as it has consistently declined jurisdiction over cases where the President withdrew the relevant agency from Chapter 71 coverage. *See supra*, p. 11. Even if the FLRA had not reached that conclusion itself, it would flow from the statute. The FSLMRS established the FLRA to resolve particular issues of fact in the context of labor-related disputes, including "issues relating to the granting of national consultation rights," "issues relating to determining compelling need for agency rules or regulations," "issues relating to the duty to bargain in good faith," and "complaints of unfair labor practices." 5 U.S.C. § 7105(a)(2). The specific enumeration of the FLRA's "powers and duties" in Section 7105(a) makes clear that the FLRA's authority does not extend to constitutional claims or broad agency-wide challenges. Defendants' own case, *Axon Enterprise*, reinforces this point. There, in rejecting a *Thunder Basin* argument, the Supreme Court noted in its "collateralism" analysis that the plaintiffs' constitutional arguments had "nothing to do with" the types of matters the agencies at issue typically address, a fact that cuts in favor of retaining district court jurisdiction. *Axon,* 598 U.S. at 192-93.

      Defendants assert that the FLRA handles constitutional claims generally, Opp. at 37, but the cases they cite do not support the argument. Defendants cite *Elgin*, in which the Supreme Court applied *Thunder Basin* to hold that the district court lacked jurisdiction to hear a specific employee's constitutional challenge to his termination. There, the Court noted that a "challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the

Federal Circuit within the CSRA scheme," and thus held that the constitutional nature of the employee's defense was insufficient to create district court jurisdiction. *Elgin,* 567 U.S. at 22; *see also id.* at 15 (analysis turns on "on the type of the employee and challenged employment action"). By contrast, Plaintiffs' case is not about a specific employee, or a particular bargaining practice, and so is distinguishable from *Elgin*.[14] *See Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th at 1031 ("Even assuming that the MSPB or FLRA could adjudicate, for example, an ultra vires claim within an individual employment dispute, such a constitutional challenge would be 'collateral' to the subject of that proceeding."). Defendants again rely on *Loy* and *AFGE I*, which are distinguishable. *See supra*, p. 17-18. Similarly, Defendants' other "collateralism" arguments—the assertions that that Plaintiffs could have filed grievances or filed a ULP charge—are recycled and fail for the reasons Plaintiffs give above. *See supra*, p. 15.

The best evidence of the government's views on this subject was revealed when Defendants themselves circumvented the FLRA to file the Texas Action where they were plaintiffs. The prayer for relief sought a declaration that the VA could terminate the Master Agreement. *U.S. Dep't of Def. v. AFGE et al.*, No. 6:25-cv-00119, Dkt. 1, at 36 (W.D. Tex. March 27, 2025). This case seeks substantially the opposite declaration, but the nature of the relief is the same. Defendants claim this case is "different," Opp. at 40, but they provide no explanation. Indeed, *AFGE II* rejected this same conclusory assertion, explaining that there the "government tried to sidestep this contradiction by saying the claims there [in Texas] 'are different,' but did not say why that might be so, or what the ostensible difference is." *AFGE II,* 792 F. Supp. 3d at 999. The *AFGE II* court rejected the government's "'heads, I win; tails, you

---

[14] Defendants include a footnote arguing that the FLRA "consistently" resolves constitutional claims, Opp. at 37 n. 9, but this assertion lacks support. In *U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (Sept. 2, 2004), the FLRA proceeded to review an arbitrator's First Amendment analysis, but only after self-consciously observing that no party had objected to administrative consideration of a constitutional claim. Defendants overread *United States Department of Defense Ohio National Guard & AFGE Local 3970 et al*, 71 F.L.R.A. 829 (June 30, 2020), where the FLRA adopted an arbitrator's order in a case involving the National Guard. The arbitrator merely accepted the federal courts' conclusions about the application of the Militia Clause and federal statutory law to the National Guard's labor obligations. In fact, the key case relied on by the arbitrator, *Lipscomb v. Fed. Lab. Rels. Auth*., 333 F.3d 611, 615 (5th Cir. 2003), is a case that originated in the district court, not at the agency, making the point that constitutional issues are addressed by district courts.

lose' proposition" as improper, and this Court, should too. *Id*. at 999 n.5.

     **No agency expertise.**  Defendants claim that this case is within the FLRA's expertise, Opp. at 38, but this argument stretches credulity in light of the FLRA's prior rulings that it lacks jurisdiction once the President has withdrawn Chapter 71 coverage.  Defendants say that a claim of "improper denial of collectively bargaining rights [sic] is exactly the type of claim the FLRA regularly hears," *id.*, but then it fails to cite a single case to support that argument.  Furthermore, as the Supreme Court has observed, "agency adjudications are generally ill suited to address structural constitutional challenges" and agencies know "nothing special" about constitutional issues.  *Axon,* 598 U.S. at 194-95 (rejecting *Thunder Basin* argument); *Free Enter. Fund,* 561 U.S. at 491 ("constitutional claims are . . . outside the Commission's competence and expertise" and rejecting *Thunder Basin* argument).

     A correct application of *Thunder Basin* shows that Congress never intended to channel systemic litigation, such as this case, into administrative agencies.  Constitutional and APA claims that challenge agencywide action are for the courts.

**C.**    **Plaintiffs will succeed on their First Amendment claim.**

    **1.**    **Defendants fail to rebut Plaintiffs' showing that Secretary Collins terminated the Master Agreement based on Plaintiffs' advocacy or to show that he would have done so regardless of his illicit motive.**

     Defendants concede, as they must, the first two steps of the First Amendment retaliation analysis under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  There is no question that Plaintiffs engaged in protected speech and that the Termination constitutes adverse action.  Defendants' arguments center on the final *Mt. Healthy* step, causation.  At the final step, Plaintiffs have an initial burden of showing that their advocacy was a "substantial" or "motivating factor" in the Secretary's termination of the Master Agreement.  *Id.* at 287.  Thereafter, the burden shifts to the Secretary to establish "by a preponderance of the evidence" that he would have implemented the August 6 Termination even in the absence of Plaintiffs'

protected speech. *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008) (citing *Mt. Healthy*, 429 U.S. at 287).

Defendants' causation arguments fail. Plaintiffs satisfied their burden by showing through Defendants' own statements and actions that Secretary Collins terminated the Master Agreement because of Plaintiffs' advocacy. As further evidence of Secretary Collins's improper motive, he also granted temporary leniency (which he later rescinded, mere days after this litigation was initiated) to unions that stayed quiet and were not a "hindrance." Defendants' attempts to obfuscate Secretary Collins's improper motives—by pointing to President Trump's motives for issuing Executive Order 14251 and asserting a *post hoc* rationale that the Secretary was motivated by national security concerns—miss the mark and are unsupported by the record. Defendants likewise fail to demonstrate that Secretary Collins would have terminated the Master Agreement regardless. They rehash rebutted arguments that Secretary Collins was just complying with the Executive Order—it is clear from OPM guidance and his reversals that he was not—and that the President would have issued the Executive Order notwithstanding the President's improper motive—an irrelevancy as Plaintiffs do not challenge Executive Order 14251 in this litigation. Ultimately, Defendants offer no argument or evidence showing that they would have terminated the Master Agreement in the absence of Plaintiffs' protected speech.

*First*, Defendants argue that Secretary Collins did not act with improper motives because the August 6 Termination was "pursuant to EO 14251" or otherwise "directly flowed from the Executive Order." Opp. at 43, 44. But this "just following orders" defense is simply untrue. To start, elsewhere in their brief, Defendants concede that this case is a "challenge under the APA [to] the VA's termination of the CBA," which Defendants characterize as "an action committed to the VA's discretion by a lawful Executive Order issued by the President." Opp. at 52. Indeed, the government's litigation position over the past months has been that the Executive Order did not necessarily require agencies to terminate collective bargaining agreements. *See supra*, p. 4. The facts bear this out. OPM initially instructed agencies not to terminate collective bargaining agreements while litigation over the Executive Order wended its way through the courts. Silva

Decl. ¶ 11, Ex. L.  The Secretary left *this* Master Agreement in place for over four months after Executive Order 14251 was issued.  Such agreements remain in place today at various agencies and agency subdivisions subject to Executive Order 14251.  Opp. at 54; MPA at 31.  The April 11 Suspension exempted one international union and six local unions from Executive Order 14251.  Silva Decl., Ex. G.  Those unions enjoyed the benefits of their collective bargaining agreements until the Secretary's November 7 Rescission took effect.  *See* Silva Decl. ¶ 13, Ex. N.  These actions confirm Defendants' independent choices to honor or abrogate collective bargaining agreements, including the Master Agreement, notwithstanding Executive Order 14251.

**Second**, Defendants assert that Secretary Collins's constitutionally deficient rationale for the Termination cannot be inferred by "second-guessing the President's motives in issuing the Executive Order." Opp. at 43, 47.  This is a red herring; this case challenges the Secretary's actions, not the President's, and the Secretary does not get to piggyback on whatever deference the President receives in the unrelated field of "[immigration] entry and national security." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018).  Plaintiffs offer into evidence the Fact Sheet issued concurrently with the Executive Order not because Plaintiffs challenge presidential action here, but because the Fact Sheet corroborates Plaintiffs' other evidence of the Secretary's improper purpose.  The Fact Sheet criticized unions that sought to "block the implementation of the VA Accountability Act" and have "declared war on President Trump's agenda" including through the filing of "national and local grievances."  Silva Decl., Ex. F.  These statements are consistent with Defendants' later statements relating to the April 11 Suspension and August 6 Termination, where they castigated Plaintiffs for, among other things, opposing the VA Accountability Act and "using their authority under the [FSLMRS] to broadly frustrate the [Trump] administration's [goals]."  *See* Silva Decl., Exs. H & I.

**Third**, by the time Defendants finally get around to trying to rebut Plaintiffs' prima facie showing, *see* Opp. at 44, all they accomplish is reinforcing Plaintiffs' case:

- Defendants repeat their argument that the Secretary was just following orders, Opp. at 44, but Plaintiffs explain above why that argument fails.  *See supra*, p. 21.

- Secretary Collins asserts he did not "single out Plaintiffs' union contract for termination," Opp. at 44, but Plaintiffs' opening papers painstakingly explain how the April 11 Suspension evinced the agency's intent to favor some unions over others.  MPA at 19. Defendants make no effort to explain how the April 11 Suspension could be viewed as anything other than evidence of retaliatory intent, other than to note its later, unexplained rescission.  Opp. at 46.[15]

- Defendants quote Secretary Collins's August 6, 2025, press statements (which Plaintiffs put into the record) without rebutting Plaintiffs' argument that the pretextual rationales offered by the Secretary in that document—even if considered by the Court—are inconsistent with Section 7103 and Executive Order 14251.  *Compare* Opp. at 45 *with* MPA at 33.

- Defendants never rebut Plaintiff's evidence that the Secretary was trying to pick and choose among unions for political reasons, MPA at 25.

- Defendants fail to address the fact that the President admitted that he would order the Secretary to act for an improper reason, MPA at 26.

- Defendants do not respond to the fact that the VA filed a politically motivated lawsuit, naming Plaintiff NVAC as a party, in Texas, MPA at 26.

---

[15] Defendants argue that VA officials had been "contemplating" the November 7 Rescission "for weeks" before Plaintiffs filed suit.  The evidence they rely upon is a single sentence in a footnote in the Therit Declaration.  *See* Dkt. 17-1 ¶ 3 n.1.  The declarant never explains the motivation for the November 7 Rescission, and neither does the Federal Register statement provide a rationale.  *See* Silva Decl., Ex. N.  Defendants have not asserted—not even in conclusory terms—that the November 7 Rescission was unmotivated by litigation considerations, instead, they merely assert that the VA decided to issue the November 7 Rescission before litigation—which was obviously forthcoming—commenced.  Furthermore, Ms. Therit fails to identify the officials who were "contemplating" the recission, whether she was one of them, or what their motivations were.  In short, she has no foundation to provide the testimony at footnote 1 of her Declaration, and Plaintiffs hereby object and move to strike it.  Fed. R. Evid. 602.

- Defendants never explain why the VA acted against OPM's then-existing guidance to leave collective bargaining agreements in place while litigation over Executive Order 14251 was pending.  *See* Silva Decl., Ex. L.

In short, Defendants offer no evidence of their own to rebut Plaintiffs' causation arguments.

Instead, Defendants ask for deference, claiming that the Secretary's press statements were "directly tied to national security concerns."  Opp. at 45.  The record flatly contradicts this assertion.  The press statement that Defendants cite, Silva Decl., Ex. I, talks about employee performance and accountability, veterans' benefits, "union bosses," and legislation that Plaintiffs had opposed, but it makes *no* reference to national security.  In fact, even after Plaintiffs filed this preliminary injunction motion, Defendants continued to make public statements making clear that they terminated the Master Agreement for reasons unrelated to national security.  A web page on the VA's website titled "VA Accomplishments: 2025" states that the "VA has terminated union contracts for most bargaining unit employees and redirected millions in wasteful union spending back to Veterans, and in a year-end video Secretary Collins personally explained that he ordered the Termination to end "wasteful union spending."  Reeves Decl., Exs. N & O.  Defendants fail to point to any government official, other than their litigation counsel, who actually says that national security concerns motivated the Termination.  Thus, all of the ink that Defendants spill about the VA's purported "national security work," Opp. at 18-20, is a post hoc rationalization that the Court should ignore.  *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.");  *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.");  *Dominguez-Cruz v. Suttle Caribe. Inc.*, 202 F.3d 424, 431 (1st Cir. 2000) (noting "inconsistent" justifications may be evidence of pretext).

24

***Finally,*** at the last, burden-shifting step, Defendants offer virtually no argument to satisfy their burden to show that Secretary Collins would have terminated the Master Agreement notwithstanding Plaintiffs' protected speech. Defendants regurgitate their "I was following the Executive Order" defense, Opp. at 46-47, which Plaintiffs have explained is contradicted by the government's own conduct, *see supra*, p. 21. Defendants then pivot back to their chosen red herring—whether the President would have issued the Executive Order—ignoring that this case challenges the Secretary's actions, not the President's. Opp. at 47-48. Defendants offer no resistance at this final piece of the *Mt. Healthy* inquiry.

### 2.    Defendants fail to rebut Plaintiffs' viewpoint discrimination argument.

Defendants suggest the Court should not consider Plaintiffs' viewpoint discrimination argument simply because Plaintiffs also make a First Amendment retaliation argument. This is wrong. Courts in the First Circuit allow parties to press alternative theories of First Amendment violations. *E.g.*, *President and Fellows of Harvard Coll. v. U.S. Dep't of Health and Hum. Servs.*, 798 F. Supp. 3d 77, 116–125 (D. Mass. 2025). And, Justice Jackson's non-binding concurrence in *Vullo* undermines Defendants' argument because there she noted that the plaintiff "alleges both censorship and retaliation theories for how [the Defendant] violated the First Amendment—theories that . . . deserve separate analyses." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 203 (2024) (Jackson, J., concurring).

Defendants argue that Plaintiffs' viewpoint discrimination claim is weakened because under *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979), unions do not have an affirmative First Amendment right to collective bargaining. Opp. at 48–49. This argument misreads Plaintiffs' First Amendment claim. The viewpoint discrimination claim challenges Defendants' choice to disfavor Plaintiffs (as compared to other unions) because of their speech; the claim is not about the extent to which the First Amendment protects collective bargaining generally. *See* MPA at 27. Defendants also argue that the Termination does not directly "bar Plaintiffs from recruiting employees . . . petitioning the government, or engaging in

any other [advocacy]."  Opp. at 49.  This argument also sidesteps the core issue that the Termination impermissibly punished Plaintiffs for views and positions taken by NVAC and AFGE in their public advocacy and petitions.  Furthermore, it is untrue; management officials at the VA have sought to intimidate and restrict the speech and association of bargaining unit employees represented by Plaintiffs.  *See, e.g.*, Dkt. 14-4 ("Burke Decl.") ¶¶ 42-43; Dkt. 14-6 ("Chaves Decl.") ¶¶ 20, 22; Dkt. 14-7 ("Kedson Decl.") ¶ 15; Dkt. 14-8 ("Mitchell Decl.") ¶ 19; Dkt. 14-5 ("Sacchi Decl.") ¶ 15-16.

Defendants' point to the purported "facial[] neutral[ity]" of the Executive Order and Termination.  Opp. at 49–50.  The Executive Order is not the subject of Plaintiffs' challenge in this litigation.  As to the Termination, courts look past allegedly "neutral justifications" where there is evidence of improper motive through "statements by government officials," disparate treatment on entities with the "same characteristic[s]," and "the fit between means and ends is loose or nonexistent."  *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).  Here, Defendants have publicly stated their disdain for Plaintiffs' advocacy against the Trump Administration, sought to reward unions that have stayed silent, and terminated the Master Agreement without any tailoring for supposed "national security" concerns.  The merits of Plaintiffs' viewpoint discrimination claim are clear against this backdrop.

**D.**    **Plaintiffs are likely to prevail on their APA claims.**

**1.**    **Defendants' alternative remedies argument is duplicative of their *Thunder Basin* argument.**

Defendants contend that Plaintiffs have an "alternative adequate remedy" available to them through FLRA review.  Opp. at 51-52.  This argument is duplicative of Defendants' *Thunder Basin* argument, and it should be rejected for the reasons Plaintiffs give above.  The two cases Defendants cite here are about the jurisdictional boundary between the district courts and the Court of Federal Claims where a case seeks money damages against the United States.  Neither case considers the role of the FLRA.

3942536

**2.      The narrow Section 701(a)(2) exception does not apply here.**

Citing 5 U.S.C. § 701(a)(2), Defendants argue that the Secretary's actions are unreviewable because they were "committed to agency discretion by law."  Opp. at 51 (quoting § 701(a)(2)).  To "honor the presumption of review," the Supreme Court has "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)).  "This limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020), and cases about "an agency's allocation of funds from a lump-sum appropriation, or an agency's decision not to reconsider a final action on the same record," *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 127 (D. Mass. 2025) (citing Supreme Court cases).  It "has been well established that a discretionary decision may be reviewable to the extent that it rests on an explicit mistake of law or other egregious error."  *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001).

The Section 701(a)(2) defense does not apply here.  Defendants fail to cite any case applying the Section 701(a)(2) exception to a case analogous to this one.  This is not a case about enforcement decisions, *see Weyerhaeuser*, 586 U.S. at 23, or about lump sum funding decisions, *see Ass'n of Am. Univs.*, 788 F. Supp. 3d at 127.  Defendants do not identify any statute that commits any decision to the Secretary, let alone explain how the statute is drawn in a way that precludes judicial review.  *See Rhode Island State Council of Churches v. Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3111213, at *6 (D.R.I. Nov. 6, 2025).  In fact, Defendants identify only an executive order, not a statute, as the purported source of the Secretary's discretion.  Defendants cite no case, and Plaintiffs are aware of none, in which a court applied the Section 701(a)(2) exception on such facts.  This Court should not be the first.

**3.      Plaintiffs are likely to succeed on the merits of their arbitrary and capricious**

3942536

**claim.**

The Court should reject Defendants' conclusory arguments in opposition to Plaintiffs' arbitrary and capricious claim.

***First***, Plaintiffs' opening papers show that the Secretary failed to provide an adequate rationale for his action, as required by the APA.  Defendants' response amounts to an argument that the Secretary merely needed to invoke the Executive Order, which made the Termination axiomatic and inevitable.  Opp. at 54.  However, this is simply not true.  As noted, Defendants concede that the Executive Order and the Termination are separate actions.  Opp. at 40, 52.  Defendants also concede that, even today, other agencies have not terminated existing collective bargaining agreements.  Opp. at 54.  The Opposition thus belies Defendants' own argument that the Secretary was necessarily obligated to order the Termination.

Defendants also have no answer to the fact that they acted contrary to then-existing OPM guidance instructing Defendants *not* to terminate the Master Agreement until litigation (including *AFGE II*) was concluded. *See* Silva Decl., Ex. L. Indeed, Defendants' August 6 Termination forced OPM to act eight days later to revise its guidance to conform (retroactively) to the Termination decision.  Reeves Decl., Ex. L (Dkt. 34.1, *AFGE II,* No. 25-4014 (9th Cir.)).  This inter-agency post hoc rationalization exercise is paradigmatic evidence of arbitrary and capricious decision-making.  *Melone*, 100 F.4th at 31 ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.").

At the end of the day, Defendants leave unanswered why they chose to terminate the Master Agreement.  They do not explain why NVAC and the employees it represents have lost collective bargaining rights now, while other government unions and employees continue to honor collective bargaining agreements even where no injunction is in place to prohibit the government from implementing the Executive Order.  Given this selective treatment, the APA requires a reasoned decision, *see* MPA at 30-31, which the Secretary failed to provide.

**Second**, Defendants fail to explain how the Termination is consistent with Section 2 of the Executive Order. Section 2 provides that "nothing in this section shall exempt from the coverage of Chapter 71 . . . the **immediate, local employing offices** of any agency police officers, security guards, or firefighters." Silva Decl., Ex. E (Executive Order) § 2 (emphasis added). The VA is structured such that the "immediate, local employing office" of its police officers are individual facilities where thousands of other represented employees, (such as medical staff and other non-medical, non-law enforcement personnel) are employed. Mitchell Decl. ¶ 23; Wetmore Decl. ¶ 11. Defendants concede that they no longer recognize the Chapter 71 rights of these co-located employees represented by NVAC. Opp. at 55. In other words, Defendants concede that they have chosen not to follow the **plain text** of Section 2.

Defendants seek to justify their choice by asserting that they are following what they call the "plain intent" of Section 2, Opp. at 54, but this argument must be rejected. Defendants have simply read the phrase "the immediate, local employing offices" out of Section 2. This is remarkable given that the President is free to amend Executive Order 14251 (which he did in unrelated ways when he issued Executive Order 14343), yet he has not done so here. The Court should not allow Defendants to rewrite the Executive Order in this way. Defendants' related appeal to OPM guidance is yet **another** example of OPM providing a post hoc rationalization to cover for the VA. Defendants concede that the OPM FAQ they cite on p. 55 of their Opposition (and which is not in evidence) was issued on September 10, 2025. Even if OPM guidance could provide enough "gloss" to overcome the plain text of a presidential order—and Defendants offer no authority for that dubious proposition—this belated OPM guidance, issued over a month after the Termination, does not help Defendants because courts are supposed to disregard an agency's post hoc rationalization. *See Melone*, 100 F.4th at 31. Because the Termination plainly conflicts with the plain text of Executive Order 14251—such that the Secretary exceeded the boundaries of his authority set by the President—Plaintiffs are likely to succeed on their arbitrary and capricious claim.

***Finally,*** Defendants' remaining arguments are cursory, fail to respond to Plaintiffs' opening papers, and are therefore easy to dispatch.  Defendants try to avoid the implications of the April 11 Suspension by noting that they rescinded it in November.  Opp. at 55-56.  The import of the April 11 Suspension, however, is not that it is operative, but rather that it is evidence that the Secretary was picking and choosing among unions based on political considerations.  *See* MPA at 32.  As explained in Plaintiffs' opening brief, the Secretary's actions were motivated by animus.  Even Defendants' proffered pretext is inadequate; a good-government rationale is insufficient in the Section 7103(b) context given the statute's sole focus on national security.  MPA at 33. The November 7 Rescission does not make this intent evidence vanish, but merely reinforces the arbitrariness of the Secretary's decisions.  Next, Defendants fall back on a vague "courts shouldn't second guess secretaries" argument and seek deference on national security grounds.  *See* Opp. at 56.  But Plaintiffs have shown above that Defendants' litigation-inspired appeal to national security is a post hoc rationalization unsupported by the contemporaneous record, and so the Court can and should ignore it.  *Supra*, p. 24.  Defendants also attempt to defend the November 7 Rescission by claiming that they decided to order it before Plaintiffs filed suit.  Opp. at 56.  As noted above, this argument is wholly unsupported. *See supra*, p. 23 & n.15.  Defendants never claim that they had some reason other than litigation to order the November 7 Rescission, and their carefully-worded testimony suggests that the November 7 Rescission was in fact motivated by litigation concerns.  In any event, Defendants' temporal argument ignores Plaintiffs' point—that throughout this process, the Secretary has acted for political expediency and without national security in mind, as evidenced by his persistent failure to give reasons for his actions.

### 4.    Plaintiffs are likely to succeed on the merits of their APA claim challenging unconstitutional conduct.

Plaintiffs' claim under Section 706(1)(B) is actionable under the APA.  The parties agree that the result flows from the Court's resolution of Plaintiffs' First Amendment claim.  MPA at

34; Opp. at 57.  As shown above, Plaintiffs are likely to succeed on their First Amendment claim and, thus, also on their claim under Section 706(1)(B).  *Supra*, p. 20-25.

**E.    Defendants fail to rebut Plaintiffs' showing of irreparable harm.**

Defendants barely muster any argument against the myriad examples of irreparable harm detailed by Plaintiffs.

Defendants assert that the timing of Plaintiffs' request for a preliminary injunction "undercuts the[] purported need" for one.  Opp. at 58.  Nothing about the timing of events in this case demonstrates a lack of reasonable diligence.  As Defendants acknowledge, less than three months passed between the August 6 Termination and the filing of the Complaint,[16] and Plaintiffs filed for a preliminary injunction just three weeks later.  Contrary to Defendants' argument, Plaintiffs presented their preliminary injunction motion well within the bounds of what First Circuit courts deem timely.  *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 16 (1st Cir. 2012) (delay of seven and half months from alleged harm to the filing of the complaint was insufficient to justify denial of a preliminary injunction); *cf. Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (delay of more than a year to seek a preliminary injunction demonstrated a lack of diligence).  Plaintiffs' timing is particularly reasonable given the size of the VA and NVAC's membership, the nationwide effect of the Termination, Plaintiffs' need to gather evidence of the effects of the Termination (which were not necessarily immediate), Plaintiffs' need to assess the complex interplay between a dozen district court cases and related appellate proceedings, and Plaintiffs' need to understand and account for any effects of the November 7 Rescission, an event that intervened after Plaintiffs filed suit.  Courts considering preliminary injunction requests aimed at agency action do not find that timelines like those present here constitute delay.  *See, e.g.*, *City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1176 (D.N.M. 2021) (preliminary injunction granted, and delay argument rejected, where plaintiffs filed suit fourteen months after receiving notice of DOJ's

---

[16] The fact that the Executive Order was issued in March is irrelevant because, again, this case does not challenge the Executive Order itself.

action and filed for preliminary injunction four months after filing suit); *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 329 (D.D.C. 2015) (six-month delay in filing suit to challenge HHS regulations "does not justify denying the[] requested injunction").

Defendants argue that Plaintiffs' loss of collective bargaining "benefits and privileges" is not irreparable. Opp. at 58. The law is otherwise. The deprivation of due process rights, grievance procedures, and health and safety protections all constitute irreparable injuries. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("[M]onetary damages would not make the employees whole, because the value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost."); *see also New York v. McMahon*, 784 F. Supp. 3d 311, 371 (D. Mass. 2025) ("Union Plaintiffs' members rely on OCR's investigation and resolution processes, without which they will be irreparably harmed."). Defendants fail to grapple with these cases or the examples Plaintiffs put forth of bargaining unit employees suffering the here-and-now injury of facing disciplinary proceedings without any union assistance. *See* Chaves Decl. ¶¶ 13-14; Sacchi Decl. ¶ 11. Similarly, an eventual favorable ruling in this case cannot remedy protections—like lost parental leave, *see* Chaves Decl. ¶ 19; health and safety rules, *see* Burke Decl. ¶ 19; and grievances that go unaddressed, especially where they pertain to non-monetary terms of employment, *see* Wetmore Decl. ¶ 31—that are lost during the pendency of this case.

Defendants make an underdeveloped argument trying to tie the *League of Women Voters* case (which Plaintiffs had cited in arguing a different *Winter* prong) and Plaintiffs' organizational purpose. Opp. at 59. Whatever point Defendants sought to make here, "harm to [an organization's] core activities constitutes irreparable harm for purposes of a preliminary injunction." *Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*, No. 25-cv-293-LM, 2025 WL 2807652, at *24 (D.N.H. Oct. 2, 2025). The Termination has prevented the union from having a presence in the workplace, either physically through use of VA facilities or through representation and assistance to bargaining unit employees. *See* Wetmore Decl., ¶ 35; Chaves Decl. ¶¶ 18, 20; Kedson Decl. ¶¶ 10-11, 15. As a result, the union has not only been unable to carry out its

32

mission, but it has been stifled in its ability to demonstrate the efficacy of union representation to VA employees.  Courts have recognized similar circumstances to constitute irreparable harm. *See Murphy v. NSL Country Gardens, LLC*, No. 19-CV-10145-RGS, 2019 WL 2075590, at *4 (D. Mass. May 10, 2019) ("The prospect of irreparable harm to the Union from its enforced absence from the workplace is plain."); *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001) (explaining that "the disappearance of the spark to unionize" may qualify as irreparable injury).

Defendants also ignore Plaintiffs' evidence that employee speech has been chilled.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  With their opening papers, Plaintiffs present evidence that VA officials have told bargaining unit employees that they cannot wear AFGE-branded clothing or accessories to work and cannot have items in their offices that say "AFGE" or "union."  *See* Chaves Decl. ¶ 22; Mitchell Decl. ¶ 19; Sacchi Decl. ¶ 16.  VA management officials have also repeatedly tried to denigrate the union and intimidate bargaining unit employees from associating with the union by communicating that "there is no union" or "the union can't help you."  *See* Burke Decl. ¶¶ 42-43; Chaves Decl. ¶ 20; Kedson Decl. ¶ 15; Sacchi Decl. ¶ 15.  Defendants fail to acknowledge, let alone respond to, any of this evidence.  Similarly, Defendants assert that Plaintiffs' argument about membership loss is "speculative."  Opp. at 60.  Defendants again have overlooked evidence submitted with the opening papers showing a decrease in membership.  *See* MPA at 39-40.

## F.    The third and fourth *Winter* factors favor granting relief.

Defendants' arguments about the balance of equities boil down to two points. Defendants start by arguing that an injunction would interfere with the President's national security determination and with the VA's ability to serve national security.  These are arguments that Defendants recycle from their merits arguments, and Plaintiffs have already explained why they should be rejected.  This case does not challenge presidential action, and it does not impinge upon whatever contributions the VA makes to national security.  *See supra*, p. 24.  If the

3942536

Secretary sincerely believed that national security required that he terminate the Master Agreement, he provides no explanation for his failure to order the Termination between the March 27, 2025 issuance of the Executive Order and the August 6, 2025 Termination.  His delay cuts sharply against his litigation position.  Furthermore, for all of Defendants' recitation of how the VA might conceivably play some ancillary role in national security, *see* Opp. at 18-20, they make no showing that the VA is actually fulfilling any of these contingency functions at present. It is also worth noting that Defendants claim that statutes enacted in 1982 and 2002 impose national security obligations on the agency.  Opp. at 19.  In neither instance did Congress see fit to amend 5 U.S.C. § 7103(a)(3) to carve the VA out of Chapter 71's coverage, evincing a congressional understanding that the VA could fulfill any occasional national security function it might have under Chapter 71 coverage.

Second, Defendants complain about the costs of complying with the Master Agreement. This is merely the flip side of the harms and costs that Plaintiffs bear as a result of the Termination.  If the Court determines that Plaintiffs are likely to succeed on the merits, then the equitable result is to require Defendants to comply with the labor agreement ***that they bargained for*** while the case resolves.

**G.      No bond or a nominal bond is appropriate.**

Defendants' request for a $14 million bond should be rejected as it is not supported by any proof that the government will be "harmed without the bond." *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (2021).  The "costs and damages" Defendants cite—notably, also unsupported by any calculation or analysis—constitute, not the "consequential" fiscal impact to the government of complying with an injunction, but rather the costs of operating the VA as a matter of course.  Dkt. 17-1 ¶ 19; *see* 11A *Wright & Miller's Federal Practice & Procedure* § 2954 (3d ed.) (Sept. 2025 Update).  The issuance of an injunction would not affect the government's payout of staff salaries or facility costs.  The "opportunity costs" and incremental "[e]xternal costs" to the government under an injunction are speculative.  In light of the federal constitutional rights at stake and need to obtain judicial review of the government's actions

infringing on a statutory scheme "in the public interest," no bond or a nominal bond is appropriate. *See* 5 U.S.C. § 7101(a); *Nat. Resources Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971).

If the Court chooses to impose a bond, district court orders in other cases involving Executive Order 14251 may be instructive:

- *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 268 (D.D.C. 2025): $0.

- *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 273 (D.D.C. 2025): $100.

- *Am. Fed'n of Gov't Emps. v. Trump*, 792 F. Supp. 3d 985, 1006 (N.D. Cal. 2025): $10,000 per plaintiff ($60,000 in total).

- *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 103 (D.D.C. 2025): $100.

- *Am. Fed'n of Labor and Cong of Indus. Orgs. v. Trump*, No. 1:25-cv-02445-PLF, Dkt. 44 (D.D.C. Oct. 1, 2025): $100.

## CONCLUSION

The Court should grant a preliminary injunction.[17]

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

Dated: January 6, 2026    By:    */s/ Carly Beauvais Iafrate*
                                  Carly Beauvais Iafrate, #6343
                                  Law Office of Carly B. Iafrate, PC
                                  408 Broadway, 1st Fl.
                                  Providence, RI 02909
                                  (401) 421-0065
                                  ciafrate@verizon.net

---

[17] This request also includes a grant of an order for a postponement under 5 U.S.C. § 705. *See* MPA at 11 n.2.

3942536

Dated: January 6, 2026

By: _/s/ Travis Silva_____

Brook Dooley *(pro hac vice)*
Travis Silva *(pro hac vice)*
Taylor Reeves *(pro hac vice)*
JiLon Li *(pro hac vice)*
Alexandra Wheeler *(pro hac vice)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
BDooley@keker.com
TSilva@keker.com
TReeves@keker.com
JLi@keker.com
AWheeler@keker.com

*Attorneys for American Federation of Government Employees National VA Council and American Federation of Government Employees Local 2305*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2026, I electronically filed the foregoing document(s), and they are available for viewing and downloading from the Court's CM/ECF System, and that all participants in the case are registered CM/ECF users and that service will be accomplished by CM/ECF system.

/s/ Travis Silva
_____

3942536