## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305 and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS and DOUGLAS COLLINS in his official capacity as U.S. Secretary of Veterans Affairs,<br><br>      Defendants. | C.A. No. 25-cv-583-MRD-PAS |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

In 2023, the American Federation of Government Employees National VA Council ("NVAC") and the United States' Department of Veterans Affairs ("VA") entered into a three-year Master Collective Bargaining Agreement ("Master CBA"). ECF No. 14-1 at 12. The NVAC represents (and negotiates on behalf of) approximately 300,000 VA employees. ECF No. 13 at 2. AFGE Local 2305 is local to Rhode Island and represents 450 or so employees working at VA facilities within this state. ECF No. 14-1 at 12. On August 6, 2025, VA Secretary Collins terminated the Master CBA. ECF No. 13-3. The NVAC and Local 2305 are asking this Court to preliminarily enjoin the VA and VA Secretary Collins from continuing to implement

or enforce this termination.  ECF No. 13 at 36; ECF No. 14 at 2.  For the reasons explained below, the Plaintiffs' Motion for Preliminary Injunction is GRANTED.

## I.    BACKGROUND

In 1978, Congress codified federal employees' right to collective bargaining in the Federal Service Labor-Management Relations Statute ("FSLMRS"), Chapter 71 of title 5 of the U.S. Code.  The President of the United States may exclude an agency or subdivision of an agency from the reach of Chapter 71 when, according to the President, (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative or national security work," and (2) Chapter 71 "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).  In March 2025, President Trump issued Executive Order 14,251 (the "EO"), declaring that the VA, along with several other agencies, met the criteria for exclusion from Chapter 71's coverage.  EO § 1, ECF No. 13-4.  The EO made an exception to these excluded agencies from coverage for "the immediate, local employing offices of any agency police officers, security guards, or firefighters," and specifically allowed the Secretary of the VA to issue an order suspending the application of the EO to any subdivision of the VA as long as the Secretary "certifies to the President that the provisions of the [FSLMRS] can be applied to such subdivision in a manner consistent with national security requirements and considerations" and submits the certification for

publication in the Federal Register within 15 days of the EO.[1]   EO §§ 2, 4, ECF No. 13-4.

Exactly 15 days later, on April 11, 2025, Secretary Collins submitted an order to suspend the application of the EO to several unions but did not include the Plaintiffs (the "Suspension Order").[2]  Am. Compl. Ex. B, ECF No. 13-2 at 2.  On August 6, 2025, Secretary Collins sent a letter to the National Presidents of each Plaintiff announcing that, effective immediately, the Master CBA (along with any supplements to that agreement and any memoranda of understanding) between the agency and each Plaintiff were terminated.  Am. Compl. Ex. C, ECF No. 13-3 at 2–3. On the same day, Secretary Collins sent an internal memo to his "Under Secretaries,

---

[1]  Various unions are challenging the EO on constitutional and APA grounds. Most recently, the Ninth Circuit Court of Appeals vacated the preliminary injunction the Northern District of California had issued after the appellate court disagreed with the district court's conclusion that the plaintiffs' First Amendment retaliation claim was likely to succeed on the merits. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-4014, 2026 WL 534591, at *6, *8 (9th Cir. Feb. 26, 2026).  The Ninth Circuit held that, on the record before it, President Trump would have issued the EO even if the plaintiffs had not spoken out against his proposed and implemented policies. *Id.* at *6.

In the nation's capital, the D.C. District Court concluded in two challenges to the EO that the union plaintiffs in those cases were likely to succeed on the merits of their claims that the EO was an *ultra vires* act.  Two appeals from the grants of preliminary injunctive relief are currently pending before the District of Columbia Circuit Court of Appeals. *See* D.C. Cir. Case Nos. 25-5157, 25-5184.  The D.C. Circuit Court stayed each injunction. *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *4 (D.C. Cir. June 20, 2025).  The merits of each appeal has been fully briefed and argued before the same three-judge panel; an opinion on the merits of each appeal is forthcoming.

[2]  The Suspension Order was in place until November 7, 2025, when Secretary Collins rescinded it in its entirety.  ECF No. 13-7 at 2.

3

Assistant Secretaries, and Other Key Officials" announcing the termination and communicating that "[t]aking this step removes barriers in VA's ability to effectively execute its mission without delay, resulting in a more responsive and accountable workforce that better serves Veterans and safeguards American interests."[3]  Am. Compl. Ex. E, ECF No. 13-5 at 2–3.

In November 2025, the Plaintiffs commenced this litigation against the VA and Secretary Collins.  In the amended (read, operative) complaint, the Plaintiffs assert that the termination of the Master CBA was in fact retaliation for their speech and conduct in opposition to the Trump presidential campaigns and Trump administrations in violation of Plaintiffs' First Amendment rights.  ECF No. 13 at 35. The Plaintiffs also assert that the August 6 termination of the Master CBA violates the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A–C).  *Id.* at 29–35. Soon thereafter, the Plaintiffs filed a motion for preliminary injunction seeking "an order enjoining Defendants from taking any actions to effectuate the [t]ermination" of the contracts as announced on August 6.  ECF No. 14 at 2.  The motion is fully briefed and the Court heard argument on February 19.

---

[3] For those not familiar with the VA's work and responsibilities and connection to our national security, according to the VA national security is one of its primary functions—it plays a crucial role in the country's "national emergency preparedness strategy."  ECF No. 17 at 18.  Since 1982, the VA has been involved with preparing the country for national emergencies like war, terrorism, and natural disasters by working on plans and implementing actions to support local, state, and national emergency management efforts, ensuring continuity of services to veterans, coordinating with other agencies, and serving as backup for medical military personnel.  ECF No. 17-1 ¶ 4.

## II.     LEGAL STANDARD

"To be granted a preliminary injunction, a plaintiff 'must establish' that: (1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) 'an injunction is in the public interest.'" *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors are considered together when the Government is the opposing party. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## III.     DISCUSSION

The Plaintiffs seek preliminary injunctive relief on its claims that the termination of the Master CBA is (1) in retaliation for their speech and conduct thereby constituting viewpoint discrimination in violation of the First Amendment, and (2) arbitrary and capricious agency action in violation of the APA. The Plaintiffs ask this Court to preliminarily enjoin the Defendants from "taking any action to effectuate the Termination." ECF No. 14 at 2.

### A.     JURISDICTIONAL DEFENSES

Before reaching the preliminary injunction factors, the Court must consider two jurisdictional defenses that the Defendants raise in their opposition to the motion.

#### 1.     Claim Channeling

Chapter 71 created the Federal Labor Relations Authority ("FLRA"), 5 U.S.C. § 7105, to review agency actions and disputes related to the federal workforce. As

described by the D.C. Circuit Court of Appeals, the FLRA is "a three-member agency charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (citing § 7105(a)). "In negotiability disputes, the FLRA determines whether agencies and unions must bargain over certain subjects." *Id.* (citing §§ 7105(a)(2)(E), 7117(c)(1)). "In unfair labor practice proceedings, the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *Id.* (citing §§ 7105(a)(2)(G), 7116(a), 7118). "The FLRA's decisions in such disputes are subject to direct review in the courts of appeals." *Id.* (citing § 7123(a), (c)).

The Defendants assert that the FSLMRS deprives district courts of jurisdiction to review Plaintiffs' claims relative to the terminated Master CBA because Congress exclusively "channeled" these claims to the FLRA. ECF No. 17 at 31. The Defendants suggest that Plaintiffs should simply file a petition with the FLRA and request that this body clarify Plaintiffs' right to represent employees at the VA. *Id.* at 33. If the FLRA dismisses the petition for lack of jurisdiction (given the EO's pronouncement that the VA is no longer protected by the FSLMRS), then the Plaintiffs may appeal that decision to the Circuit Court. *Id.*

The Plaintiffs' responses to this threshold jurisdictional defense strategy are compelling. When it comes to removing agencies from Chapter 71 protection, they contend that the FLRA has a long history of concluding that it lacks jurisdiction over challenges to executive action. ECF No. 19 at 17. And they note that federal courts

have repeatedly ruled against the Federal Government on this jurisdictional argument. *Id.* at 17, 19–21. As a practical matter, the Plaintiffs convincingly detail why and how the grievance and complaint structure at the FLRA would not allow their claims to reach the FLRA on the merits. *Id.* at 23–24.

Generally, when courts are asked to decide whether claims related to agency action have to be reviewed within the framework set up by a federal statute, there are three factors to consider: (1) would "precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?"; (2) "is the claim 'wholly collateral' to the statute's review provisions?"; and (3) "is the claim 'outside the agency's expertise'?" *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–213 (1994)). While the Court acknowledges this formal framework and the parties' arguments pertaining to these factors, there are several relevant considerations that the Court finds persuasive. For the following reasons, the Court concludes that, in this case, all factors weigh against channeling Plaintiffs' claims to the FLRA.

Notably, the EO expressly excludes the VA from FSLMRS coverage, which the Office of Personnel Management ("OPM") explicitly recognized in a Memorandum[4] issued the same day as the EO. Therefore, the FLRA is not actually available as a tribunal the Plaintiffs can utilize for the claims pending before this Court. In the Court's view, any attempt by Plaintiffs to use the FLRA as the forum for its claims is

---

[4] U.S. OPM Memorandum, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, March 27, 2025, https://perma.cc/3N4T-DCQE.

futile.  This finding rests on the FLRA's history of declining to exercise jurisdiction over challenges to executive orders and the actions flowing therefrom, as well as on the Defendants' tacit admission that the FLRA is likely to dismiss on jurisdictional grounds any petitions challenging an excluded agency's action.  Relatedly, the Defendants represent in the declaration submitted in support of their opposition to the motion for preliminary injunctive relief that they have asked the FLRA to either stay or hold in abeyance all of their matters currently before the FLRA.  *See* Therit Decl. ¶ 16(a), ECF No. 17-1.  If the FLRA is likely to dismiss for lack of jurisdiction, then it will not evaluate the Plaintiffs' claims on the merits which will, in turn, fail to create an opportunity for the Circuit Court to review the adjudication of these claims on the merits.  Because the Circuit Court's review would be limited to the record created at the FLRA, which would likely be limited to a jurisdictional question, the substantive claims would not have been considered or adjudicated and therefore not ripe for the federal appellate court's review.

Second, the Defendants also point out that Therit's declaration provides several examples of grievances the NVAC has filed with the VA related to the implementation of the EO and termination of the Master CBA.  ECF No. 17 at 32–33.  However, Therit's description of grievances suggests that the NVAC is challenging the effects of the termination and not the lawfulness of the actual termination itself.  *See* ECF No. 17-1 ¶ 17.  In addition, Therit's examples indicate the NVAC filed the grievances with the VA, and not with the FLRA.  *See id.*  Indeed, Therit only mentions the FLRA twice; first as having certified AFGE as the

recognized representative for VA employees, and second (as mentioned above) to state that to implement the EO the VA asked the FLRA to stay or hold in abeyance all FLRA matters "pending the outcome of the litigation related to EO 14,251." *Id.* ¶ 16(a).  The Plaintiffs' engagement with the grievance process at the VA is not a compelling argument for why the claims pending here should be channeled to the FLRA.

Third, as Plaintiffs argue, the Defendants' channeling argument does not have a winning track record as it has defended against challenges to the implementation of various Trump Administration policies.  *See, e.g.*, *New York v. Kennedy*, 789 F. Supp. 3d 174, 197 (D.R.I. 2025).   Hyper relevant to the EO governing the administrative action challenged here, the Ninth Circuit recently rejected this channeling argument, in part because "the FLRA has regularly found that it lacks jurisdiction to hear cases brought by a union against an agency excluded from FSLMRS coverage under § 7103(b)(1)" and in part because the VA (along with other agencies) initiated "affirmative litigation against unions in federal district courts over" this EO which signaled that the government believes "district courts have jurisdiction to decide cases involving agencies excluded from Chapter 71 coverage." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-4014, 2026 WL 534591, at *5 (9th Cir. Feb. 26, 2026).[5]  This Court finds both points persuasive.  The Defendants

---

[5] The "affirmative litigation" to which the Ninth Circuit referred is a case that the VA and several other agencies filed in Texas against various unions on the same day that the EO issued.  *See* W.D. Tex. 6:25-cv-119, ECF No. 1.  The federal agencies sought a declaratory judgment that it could, pursuant to the authority in the EO, terminate a slew of CBAs.  *See id.*, ECF No. 72 at 2.  AFGE filed a motion to dismiss

have cited no case where a court has channeled this sort of action to the FLRA and this Court has no interest in breaking new ground here.

For all these reasons, the Court concludes it is not required to decline jurisdiction over the Plaintiffs' claim in favor of the FLRA.

### 2.    Claim Splitting

The Defendants also argue that this case impermissibly splits the Plaintiffs' instant claims from the claims raised in the Northern District of California challenging the EO itself.   ECF No. 17 at 26–29.   The principle against splitting claims between different courts says that all claims pertaining to the same, single transaction or a series of related transactions between the same parties need to be adjudicated together, as part of the same case.   *See Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998).   The Defendants consider the VA Secretary's act of terminating the Master CBA as one part of a series of connected actions which began with the issuance of the EO.   ECF No. 17 at 27.   The Plaintiffs respond that the August 2025 termination of the Master CBA is a different transaction than the March 2025 issuance of the EO and could not, as a practical matter, be part of the California case because the preliminary injunction sought and granted (though now vacated) against the EO was adjudicated by the district court

---

for lack of standing and improper venue, and acknowledged that if the court was not inclined to grant the motion then it should transfer it to California so the district court (which was then fielding the head-on challenge to the propriety of the EO) could adjudicate this case as well.   *Id.*, ECF No. 41.   The district court agreed with the unions that the agencies lacked standing and dismissed the case.   *Id.*, ECF No. 72 at 2.

and appealed to the Ninth Circuit before the VA terminated the Master CBA. ECF No. 19 at 9, 11, 16.

The Plaintiffs have the better argument. The challenged actions in each case, though ultimately executed by the Federal Government, were undertaken by different individuals and entities within the Government. Secretary Collins had no role in the issuance of the EO, and the Plaintiffs' claims only pertain to Secretary Collins' and the VA's actions. The Master CBA termination occurred after the Plaintiffs (and others) had secured preliminary injunctive relief with respect to the implementation of the EO and while the California district court's decision was on appeal at the Ninth Circuit (depriving the district court of jurisdiction for the duration of the appeal). Moreover, the eventual final resolution of the challenges to the EO in California and D.C. may not resolve the Plaintiffs' claims docketed here in Rhode Island because the Plaintiffs are in fact challenging a separate action to the issuance of the EO. If the EO is ultimately struck down, then Plaintiffs' claims become moot. But a final judgment in either case challenging the EO could be years away and the Plaintiffs need not wait to adjudicate the Secretary's distinct, discrete action of termination the Master CBA.

\* \* \*

With the resolution of the two jurisdictional arguments the Defendants raise in place, the Court proceeds to consider the "*sine qua non* of the preliminary injunction analysis." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (Selya, J.).

### B.    LIKELIHOOD OF SUCCESS ON THE MERITS

From the outset, the Court wants to be clear that it is deeply mindful of the lane it is in and will stay in.  This case is not about the constitutionality of the EO.  The motion before the Court is about whether the Defendants' termination of the Master CBA is unconstitutional as a violation of the Plaintiffs' First Amendment rights and/or the APA as well as in violation of the APA as an arbitrary and capricious administrative action.  With this clear mission in mind, the Court first examines the Plaintiffs' First Amendment retaliation claim.

### 1.  First Amendment Retaliation

To establish a First Amendment retaliation claim, the Plaintiffs ultimately would need to prove that: (1) they "engaged in constitutionally protected conduct," (2) they were "subjected to an adverse action by [the Defendants]," and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Massachusetts*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe on behalf of Doe*, 44 F.4th 23, 47 (1st Cir. 2022)).  The U.S. Supreme Court has clarified that this element is actually a "but-for" cause showing, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

The Defendants do not dispute the Plaintiffs' contention that they have engaged in speech and conduct protected by the First Amendment.  *See* ECF No. 17 at 42.  The Plaintiffs provide several examples of their conduct and speech as both

vocal opponents of Trump Administration policies and avid supporters of the Biden and the Harris campaigns. ECF No. 14-1 at 13. AFGE has actively litigated against the Trump Administrations. For example, it filed suits in February 2025 against (1) the "Fork in the Road" early termination incentive program; (2) the dismantling of USAID; and (3) the mass termination of probationary employees. *Id.* at 14-15. NVAC has been publicly supportive of all the litigation and has filed a lot of national grievances against the VA. *Id.* at 14. The Defendants also do not dispute that the termination of the Master CBA is an adverse action for the Plaintiffs. *See* ECF No. 17 at 42; ECF No. 14-1 at 24. The focus for this claim, therefore, is whether the Plaintiffs have demonstrated a likelihood of success on the merits of the third element: whether the VA terminated the Master CBA because of the Plaintiffs' speech and conduct (taking into consideration whether the Defendants would have terminated the Master CBA in the absence of the Plaintiffs' conduct and speech challenging the various labor policies). *See Nieves*, 587 U.S. at 399.

In support of this element, the Plaintiffs point to a variety of published statements or actions. First, a Fact Sheet[6] published on the White House webpage the same day as the EO issued explicitly criticizes unions that have worked against the Trump Administration's efforts:

> The President needs a responsive and accountable civil service to protect our national security. Certain Federal unions have declared war on President Trump's agenda. The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block

---

[6] The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Agreements*, March 27, 2025, https://perma.cc/G8N4-U8SB.

> Trump policies. . . . President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

ECF No. 14-1 at 24–25. The Plaintiffs assert this statement corroborates the Defendants' motive behind the Master CBA termination. ECF No. 19 at 30. Second, Plaintiffs highlight statements made by a representative of the VA soon after the termination letters. *Id.* at 25. In an article published on August 18, 2025, the representative said:

> The unions in the exempted units have posed no or minimal hinderance to VA operations . . . They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency.

Silva Decl. Ex. H, ECF No. 14-2 at 87. Third, Plaintiffs point to Secretary Collins' statement in a VA Press Release issued August 6 (the same day as the termination): "Too often, unions that represent VA employees fight against the best interest of Veterans while protecting and rewarding bad workers . . . we're making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform." Silva Decl. Ex. I, ECF No. 14-2 at 89. Fourth, Plaintiffs point to an email attached as an exhibit to a declaration from a VA physical therapist in Indiana who serves as President of the local AFGE chapter in which a union member received formal notice from the VA employer that indicated how restricted the VA was in its labor practices while the Master CBA was in place:

> Terminating the [CBAs] will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

Burke Decl. Ex. L, ECF No. 14-4 at 103. Fifth, Secretary Collins favored some unions over others when he issued the April 11 Exemption Order and named a few specific unions but not others. ECF No. 19 at 30.

The Defendants respond that the only motivation for terminating the Master CBA was the authorization through the EO and that none of the President's potential animus toward the Plaintiffs can be imputed to the Defendants. ECF No. 17 at 43, 44. The Defendants contend that their statements were simply expressions of national security concerns, and that the termination is unrelated to the Plaintiffs' speech or conduct. *Id.* at 45, 48–49. During oral argument on the pending motion for preliminary injunction, the Defendants repeatedly emphasized the timing of the termination letters and asks this Court to place significant weight on the fact that the termination letters issued days after the Ninth Circuit Court of Appeals granted the government's application for a stay pending its appeal of the Northern District of California's grant of injunctive relief. Hr'g Tr. at 27:8–21, 37:3–10, ECF No. 29. While timing is important, the Court cannot ignore the ample support the Plaintiffs provide to show that the Defendants' termination of the Master CBA was motivated by retaliation for the Plaintiffs' advocacy on behalf of their membership. The Defendants have provided little counterevidence to indicate the termination was not

retaliatorily motivated and/or would have occurred in the absence of the Plaintiffs' grievances, litigation conduct, and advocacy. The comments described above demonstrate that the Defendants' laser focus was on the ways the VA perceived employee unions as frustrating the work and purpose of the VA and how much better the VA could operate without the unions. *See, e.g.*, Silva Decl. Ex. I, ECF No. 14-2 at 89. Absent from both the August 6 press release and internal memo to the Under Secretaries, etc. was any mention that terminating the Master CBA would advance or support the nation's security interests. *See id.*; Am. Compl. Ex. E, ECF No. 13-5 at 3. The only explanation for the announced agency action was that "[t]aking this step removes barriers in VA's ability to effectively execute its mission without delay, resulting in a more responsive and accountable workforce that better serves Veterans and safeguards American interests." ECF No. 13-5 at 3.

The Plaintiffs also point to the explicit OPM guidance that agencies should refrain from terminating any CBAs until the litigation challenging the EO itself concluded.[7] And, if there was any ambiguity as to what OPM intended to instruct, OPM issued a memo on February 12, 2026 explaining that: "For various reasons, including litigation, implementation of these Executive Orders at certain agencies and agency subdivisions has been delayed. The [OPM] now advises agencies and

---

[7] In the OPM's Frequently Asked Questions pertaining to the EO, the clear, direct response to the first question – "What do agencies need to do to terminate applicable CBAs?" – is "Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016)." Silva Decl. Ex. L, ECF No. 14-2 at 101.

agency subdivisions covered by E.O. 14251 and EO 14343 that they should proceed to terminate or modify CBAs in order to fully comply with those [EOs] . . . ."  ECF No. 22-1 at 5.  In all, the Defendants' emphasis on the date of the termination as separated in time from the April 11 Exemption Order works against them when the OPM guidance and this recent memo are added into the mix.  The Defendants terminated the Master CBA days after the Ninth Circuit expressed a likelihood of success on the merits of the appeal and issued a stay of the preliminary injunction order, but this was far from the conclusion of this litigation and far earlier than the guidance from the OPM indicated was appropriate.

Turning to the single document the Defendants provided to counter the Plaintiffs' argument and show that the Master CBA was going to be terminated regardless of the Plaintiffs' past speech and conduct, Therit's declaration states the following:  The Master CBA "interfered with the VA's ability to execute and implement the President's initiatives related to national security" when the initiatives conflicted with the CBA and the Plaintiffs were unwilling to negotiate with the VA over the implementation of the initiative.  ECF No. 17-1 at 8 ¶ 13.  And the CBA "obstruct[ed] the VA's ability to address employees with performance or conduct issues," citing, as an example, the VA's inability to "quickly terminat[e] employees with performance or conduct issues" after an arbitrator concluded the VA had "improperly implemented" a federal statute and the VA "was forced to enter into a settlement agreement with Plaintiff NVAC that was costly to the VA."  *Id.* at 10 ¶ 15, 12 ¶ i.

Taking all of these statements and documents into consideration, the Plaintiffs have established a likelihood of success on the merits of their First Amendment retaliation claim because the termination of the Master CBA on August 6 seems substantially motivated by the Plaintiffs' history and frequency of vocally opposing changes to labor policies. *See Gattineri*, 58 F.4th at 514. That the Defendants (1) accepted the EO's invitation to exempt entities from the EO by naming several unions (other than Plaintiffs) rather than subdivisions of departments as actually authorized by section 4 in the EO and then (2) took action to terminate the Master CBA days after the Defendants learned an appellate court was likely to rule in its favor on the merits of the constitutionality of the EO are certainly strong indications of the Defendants' focus for the exemption vs. termination decisions. Other than the one, vague, post hoc statement about national security that appears in Therit's declaration, there is zero indication from the Defendants that the termination decision would have been made or implemented without the retaliatory motive. *See Nieves*, 587 U.S. at 399. This is a crucial factor in the injunctive relief calculus and its absence weighs in the Plaintiffs' favor.[8]

---

[8] The Plaintiffs also seek preliminary injunctive relief on their alternative First Amendment claim—that the Master CBA termination constitutes impermissible viewpoint discrimination because the VA is punishing the Plaintiffs for their "views and positions" advanced "in its public advocacy, grievances, and lawsuits that oppose the Administration politically." ECF No. 14-1 at 27; ECF No. 19 at 33. Because the Court concludes the Plaintiffs have shown a likelihood of success on the merits of their First Amendment retaliation claim, the Court need not reach this claim at this time.

The Plaintiffs also briefly state that, because the Master CBA termination is in violation of the First Amendment, the Court may set aside this action pursuant to

## 2. APA - Arbitrary and Capricious[9]

Agency action is arbitrary and capricious in violation of 5 U.S.C. § 706(1)(A) if it is not reasonable and reasonably explained. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures

_____

5 U.S.C. § 706(1)(B) (that the agency's action is contrary to a constitutional right) as well. ECF No. 14-1 at 34. The Defendants respond that this claim fails for the same reason as the substantive First Amendment claims. ECF No. 17 at 57. Because the Court concludes the Plaintiffs have shown a likelihood of success on the merits of the First Amendment retaliation claim, Plaintiffs have also shown a likelihood of success on the merits of this claim.

[9] The Defendants do not protest that the termination constitutes a final agency action subject to judicial review under the APA. *See* 5 U.S.C. § 704. The Court does not linger here because, as the Plaintiffs write, the August 6 termination letters are the end result of the Defendants' decisions to implement the EO by terminating the Master CBA and this termination stripped Plaintiffs' ability to carry out their missions as well as their members' bargained-for rights. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (defining final agency action that will be subject to judicial review under the APA). ECF No. 14-1 at 29.

The Defendants do, however, challenge this Court's ability to review the administrative action taken here because, they say, the decision to terminate the Master CBA was well within their discretion and 5 U.S.C. § 701(a)(2) shields such decisions from judicial review. ECF No. 17 at 51–52. The Plaintiffs respond that the Supreme Court has read this part of the APA extremely narrowly and in circumstances different from those presented here. ECF No. 19 at 35. The Plaintiffs have the better argument here. As recently recognized by a colleague in this court, "a key tenet of the APA . . . is that the statute 'establishes a basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Rhode Island State Council of Churches v. Rollins*, No. 25-CV-569, 2025 WL 3111213, at *6 (D.R.I. Nov. 6, 2025) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020)). The Supreme Court instructs that the agency discretion provided in the APA is an exception to the presumption that applies in "rare circumstances" not present here "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019)).

that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action can be "arbitrary and capricious when the agency relies on improper factors, fails to consider pertinent aspects of the problem, offers a rationale contradicting the evidence before it, or reaches a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023) (citation omitted) (cleaned up).

The Plaintiffs provide several reasons why the Master CBA termination is arbitrary and capricious.  First, the Defendants did not reasonably explain either in the termination letter issued to each plaintiff or in the internal memo circulated to the "Under Secretaries, Assistant Secretaries, or Other Key Officials" the same day, *see* ECF No. 13-5, why they decided to terminate the Master CBA.  This is especially significant in the face of the explicit guidance from the OPM instructing agencies to refrain from terminating CBAs until the litigation challenging the EO had concluded, *see* Silva Decl. Ex. L, ECF No. 14-2 at 101.  ECF No. 14-1 at 31.  The Defendants respond that the only justification it needs is that it was authorized by the EO to terminate the Master CBA.  ECF No. 17 at 53–54.

Second, the Plaintiffs argue that the Master CBA termination runs afoul of the EO's Section 2.  The Court understands the Plaintiffs to read this section to plainly exempt from the EO's reach all bargaining unit employees who work in a "local

employing office" that employs "police officers, security guards, or firefighters," which means that if a local employing office that appoints police officers, etc. also appoints and supervises employees not in police, security, or fire positions then all of the employees appointed by that local employing office are beyond the reach of the EO. ECF No. 14-1 at 31–32; ECF No. 14-8 ¶ 23; Hr'g Tr. at 17:12–18:20, ECF No. 29. For example, within a local medical facility, the medical director is at the top of the org chart and the police officers within that local employing office ultimately work for that medical director (as do the doctors, nurses, cleaning staff, etc.). ECF No. 14-1 at 31–32. And, assert Plaintiffs, the Defendants do not seem to disagree with this interpretation because, in their opposition to the motion, the Defendants quote from an OPM FAQ issued on September 10, 2025 (but not provided as an exhibit to a declaration) in which the OPM explains the meaning of Section 2 by acknowledging that the local employing office may include "administrative staff." ECF No. 17 at 55; ECF No. 19 at 37. This argument highlights that the meaning of Section 2 of the EO may not be crystal clear, but the Court need not resolve any ambiguity on this record because, for the reasons set forth below, it concludes the Plaintiffs have shown a likelihood of success on the merits of this APA claim regardless of the actual scope of Section 2.

Moving on, the Plaintiffs argue that the Master CBA termination is inconsistent with the EO's Section 4 because (as alluded to earlier) Chapter 71 coverage decisions can be made on an agency or subdivision basis and not union by union, as the Defendants did here with the April 11 Suspension Order and the

termination.  ECF No. 14-1 at 32.  The Plaintiffs point to an absurd effect that, by terminating some union contracts and not others within the VA, similarly situated VA workers have different rights depending on the union to which they belong.  *Id.* For one example, at one facility nurses are still covered but nurse practitioners are not.  *Id.*

Fourth, the Plaintiffs assert that the Secretary rescinding the April 11 Suspension Order days after Plaintiffs initiated this litigation shows that national security was not front of mind, that the termination was retaliatory, and the rescission a litigation strategy.  *Id.* at 34.  The Defendants contend that they made the decision to rescind the Suspension Order before this case was filed in this Court and because they are committed to compliance with the EO.  ECF No. 17 at 55–56.

Fifth, the Plaintiffs argue there is no indication from the Defendants that the decision to terminate the Master CBA was the result of a national security concern. Instead, the Defendants repeatedly cited efficiency and management decisions, which are not what the EO or the FSLMRS authorizes.  ECF No. 14-1 at 33.  The Defendants respond that this argument is simply the Plaintiffs' opinion and that the Plaintiffs are asking this Court to substitute its judgment for that of the Defendants, which is not allowed.  ECF No. 17 at 56.  The Court notes again that neither the press release nor the internal Memo released on August 6 mention national security concerns or interests, highlighting instead the cost to the VA of its employees' union-representation as well as the difficulty the VA has had rewarding high performing employees and holding poorly performing employees accountable.  Silva Decl. Ex. I,

ECF No. 14-2 at 89; ECF No. 13-5.  Without any mention of the basis authorized by the FSLMRS and the EO for terminating coverage of Chapter 71 protections and therefore the collectively bargained agreements between unions and agencies or subdivisions, the Court concludes that the reasons on which the Defendants relied in August to explain the termination and the perceived benefits thereof cannot be a reasonable explanation for this agency action.  *See Fed. Commc'ns Comm'n*, 592 U.S. at 423 (explaining how courts consider whether an agency action is reasonable or reasonably explained); *Littlefield*, 85 F.4th at 643 (listing indicators of arbitrariness and capriciousness).

The Court also notes that the single mention of national security in Therit's declaration (quoted above during the Court's discussion of the First Amendment retaliation claim) does not persuasively counteract the same-day statements the Defendants made when announcing the Master CBA termination.  The Supreme Court and First Circuit have clearly explained that "[j]udicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) (order of court) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (citation modified)).  "[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation." *Id.* (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022)).  "Although agencies may later 'elaborate' on the reasons initially provided to justify agency action, they may not provide altogether new reasons after-

the-fact." *Id.* (citing *Regents of the Univ. of Cal.*, 591 U.S. at 21). The Defendants have not provided this Court with any statements they issued or made at the time of the termination that specifically highlights or explains national security as a basis for the termination decision.

Overall, the Plaintiffs' arguments summarized above as well as the Defendants' statements made contemporaneously with the termination letters have persuaded this Court that the Plaintiffs are likely to succeed on the merits of their § 706(1)(A) arbitrary and capricious claim. In addition to the Defendants' statements are their actions, including their decision to terminate the Master CBA rather than remove specific subdivisions from Chapter 71 coverage as authorized by the EO and terminating the Plaintiffs' contract but not that of other unions at the same time, which convinces this Court that the agency action was neither reasonable nor reasonably explained.

## C.    IRREPARABLE HARM

Moving on now to consider the next factor in the preliminary injunction test. Plaintiffs seeking preliminary relief must demonstrate that "they are '*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Trump*, 157 F.4th at 80 (quoting *Winter*, 555 U.S. at 20). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

The Plaintiffs contend they and their members have been harmed in myriad ways since the August 6 termination of the Master CBA and they provide several declarations from various local chapter presidents to support their contentions. *See* ECF No. 14-1 at 35–40, ECF Nos. 14-3 – 14-8. For example, Plaintiffs' members and officers may no longer perform their duties or any core union functions during the workday or in space within the VA previously designated for this work; the VA has halted the entire grievance process; VA employees no longer have disciplinary process protections or safeguards, including a right to a union representative to assist throughout the process. Benefits have already been altered, such as a decrease in parental leave time from 16 weeks to 12 weeks, and there are repercussions for employees who are knowingly associating with their union. ECF No. 14-1 at 35–40. The Plaintiffs assert that the termination of the Master CBA's protections have "undermined confidence in the union's functionality" and so "union membership is rapidly declining." *Id.* at 39.

The Defendants counter with a contention that the Plaintiffs have not asserted any irreparable injuries. The loss of collective bargaining benefits, they say, can be reinstated through the FLRA if the Plaintiffs ultimately prevail in this action. ECF No. 17 at 58. The alleged chilling of pro-union speech is simply not true, the Defendants contend, and the loss of membership is speculative and therefore insufficient to meet this factor.[10] *Id.* at 60.

---

[10] The Defendants also contend that the harm here can't be imminent because the Plaintiffs waited three months after the termination of the Master CBA to initiate this case. ECF No. 17 at 58. The Plaintiffs respond by pointing out that the First

Starting with the latter counterargument, the Plaintiffs provide support that union membership has been in decline since August by attaching an email to one declaration in which a member wrote to the union in October 2025 to cancel their membership "due to the fact that I am not being represented by the union anymore" and no longer wishes to pay the biweekly dues.  ECF No. 14-5 Ex. A at 9.  The Defendants' first counterargument is also a nonstarter; there are benefits from the Master CBA the loss of which cannot be adequately rectified later if the Plaintiffs ultimately prevail in this case.  Disciplinary processes, once concluded, have an immediate and irreparable effect on the employee(s) in question.  Parents cannot turn back the clock to have more time with an infant prior to returning to work once they have missed the early formative weeks of development and their own recovery time.

The Court concludes that the Plaintiffs have shown they and their members are likely to be irreparably injured in the absence of an injunction in this case.

### D.    BALANCE OF THE EQUITIES/PUBLIC INTEREST

The combined consideration of balancing the equities and the public interest requires the Court to weigh "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)),

---

Circuit has considered an almost 8-month gap between agency action and filing a complaint to be just fine. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 16 (1st Cir. 2012).  ECF No. 19 at 39.  The Court is not persuaded that the timing of the motion for preliminary injunction should preclude the relief the Plaintiffs seek at this time.

"pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction," *id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).   The Plaintiffs argue that the prevention of constitutional violations is always in the public interest and that there is no public interest in allowing unlawful agency action to stand.   ECF No. 14-1 at 40–41.   The Defendants argue that if an injunction is put in place then "the extensive actions to implement the [EO]" will have to be reversed to return the VA's labor management operations to the status quo pre-CBA termination.   ECF No. 17 at 62–63.   The Defendants claim this includes preventing the VA from complying with the EO and other instructions from the President, directing the payroll service provider to restart collecting dues, and reissuing space and resources to the union reps.[11]  *Id.*; Therit Decl. ¶ 18, ECF No. 17-1.

The Court acknowledges that the changes resulting from the termination of the Master CBA are significant and that reversing these changes will have associated costs of time and resources for the VA.   But the significant injury to the Plaintiffs from the loss of status as representatives of many VA employees and to their members from the revocation of the protections and benefits of the Master CBA weighs more heavily at this juncture.   As to the public's interest, the Court is mindful

---

[11] The Defendants also respond that an injunction here would harm the public and President Trump because an injunction would interfere with the discretion to make decisions about the national security issues with which Congress entrusts the President.   ECF No. 17 at 60–61.   This point seems more appropriate for the opposition to a motion for injunctive relief in a case challenging the EO directly.   The Court again notes that the action under review here is not the EO issued by President Trump, but the VA's and Secretary Collins' termination of the Master CBA.

that the First Circuit has been clear that "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Because the Plaintiffs have sufficiently demonstrated their likelihood of success on the merits of their claims and the likely irreparable nature of their injuries in the absence of a preliminary injunction, the Court concludes these last factors also weigh in favor of granting the relief requested.

### E.    BOND

The parties disagree over whether the Plaintiffs should be required to post a bond. ECF No. 14-1 at 41; ECF No. 17 at 64–65. While Fed. R. Civ. P. 65(c) instructs the district court to require security posted by the moving party, the First Circuit has stated "that the provisions of Rule 65(c) are not mandatory" and that the district courts have "substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991). In the face of litigation challenging the current presidential administration's policies and implementation thereof, the district courts in this Circuit have either required a nominal bond or waived bond in its entirety. *See, e.g.*, *New York v. Kennedy*, 789 F. Supp. 3d 174, 214 (D.R.I. 2025) (requiring $100 bond); *Maine v. United States Department of Agriculture*, 778 F. Supp. 3d 200, 238 (D. Me. 2025) (requiring $1,000 bond); *Barbara v. Trump*, 790 F. Supp. 3d 80, 104 (D.N.H. 2025) (requiring $1 bond); *Colorado v. United States Department of Health and Human Services*, 788 F. Supp. 3d 277, 315 (D.R.I. 2025) (waiving bond entirely). The Court

has no reason in this case to deviate from this pattern and ORDERS the Plaintiffs to post a nominal bond in the amount of $1,000.

## IV.    ORDER

The Plaintiffs' Motion for Preliminary Injunction (ECF No. 14) is GRANTED. The Defendants shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA.


IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge


March 13, 2026