# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305;<br><br>     Plaintiffs;<br><br>          *v.*<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs;<br><br>     Defendants. | Civil Action No.<br>25-CV-583-MRD-PAS |

**DECLARATION OF MARK ENGELBAUM**

Pursuant to 28 U.S.C. § 1746, I, Mark Engelbaum, declare as follows:

1.      I am the Assistant Secretary for Human Resources and Administration in the Department of Veterans Affairs (VA), and I have served in this role since February 13, 2025. In my current role, I lead the development and oversight of human capital strategies, policies, and practices across the nation. This portfolio includes Administration, Human Capital, Labor-Management Relations, Senior Executive Management, Employee Development, and Manpower Management.

1

2.      I have reviewed the Memorandum and Order entered by this Court on March 13, 2026, and the Order entered by this Court on March 27, 2026 (collectively referred to as Orders).  I provide this declaration in support of Defendants' emergency motion for stay of the preliminary injunction and enforcement order pending appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

## I.      Executive Order 14,251

3.      On March 27, 2025, President Trump issued Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (EO 14,251 or EO). Section 1 of the EO determines that the agencies and agency subdivisions set forth in Section 2 of the EO have a primary function of intelligence, counterintelligence, investigative, or national security work. Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14553 (Apr. 3, 2025). Section 2 of the EO addresses additional national security exclusions and specifically excludes the VA from the coverage of Chapter 71 of Title 5, United States Code, the Federal Service Labor-Management Relations Statute (FSLMRS), subject to two exceptions. *Id.* First, the "immediate, local employing offices of any agency police officers, security guards, or firefighters…" are excluded from EO 14,251's coverage and, as such, are still subject to coverage under the FSLMRS. *Id.* Second, Section 4 of the EO delegated to the Secretary of Veterans Affairs (Secretary) authority to issue orders "suspending the application" of the EO

2

"to any subdivision[] of the department[] [he] supervise[s], thereby bringing such subdivisions under the coverage of the [FSLMRS]," if the Secretary made certain certifications to the President and such certification was submitted for publication in the *Federal Register* within 15 days of the date of the EO. *Id.* § 4.

4.      On April 11, 2025, Secretary Douglas A. Collins submitted an Order to the *Federal Register* suspending the application of EO 14,251 for VA employees represented by the following local unions: Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals, Veterans Affairs Staff Nurse Council (WFNHP) Local 5032 at the VA Medical Center Milwaukee, WI; International Association of Fire Fighters (IAFF-99) at the VA Medical Center, Little Rock, AR; United Nurses Association of California/Union of Healthcare Professionals (UNAC) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI. 90 Fed. Reg. 16,427 (Apr. 17, 2025) (collectively, "local unions"). While the Secretary initially determined that the VA could suspend the application of the EO for the local unions covered by the Federal Register Order, on November 13, 2025, the VA published a notice in the *Federal Register* rescinding the April 11, 2025, Order in its entirety. 90 Fed. Reg. 50,950 (Nov. 13, 2025). There are no further suspension orders currently in effect.

## II.    VA's National Security Functions

5.    The VA has national security work as a primary function, as the President determined in EO 14,251. The VA's emergency response capabilities have evolved since the 1980s. Prior to that time, the VA focused on just three primary missions: to deliver clinical care to veterans; to conduct research benefiting veterans and all Americans; and to educate future health professionals. In 1982, the VA/Department of Defense (DoD) Health Resources Sharing and Emergency Operations Act (Public Law 97-174) assigned the VA a fourth primary mission: to improve the nation's preparedness for national emergencies, including war, terrorism, and natural disasters ("Fourth Mission"). Today, the VA's four missions include: (1) delivering comprehensive healthcare; (2) administering benefits and transition support; (3) providing burial honors and memorial services; and (4) supporting national emergency preparedness. (Information on the VA's four missions is available on the VA's website: https://department.va.gov/about/.)

6.    The VA's "Fourth Mission" is to improve the Nation's preparedness to respond to war, terrorism, national emergencies, and natural disasters by developing plans and taking actions to ensure continued service to Veterans, as well as to support national, state, and local emergency management, public health, safety and homeland security efforts. The VA's work in furtherance of that mission includes the following:

a.    Emergency Preparedness: The VA works to improve the nation's overall readiness to respond to various threats, including natural disasters,

4

terrorist attacks, and conflicts;

b.      Supporting Emergency Management: The VA actively supports national, state, and local emergency management efforts by providing resources and personnel;

c.      Continuity of Service: The VA aims to ensure its mission-critical services for Veterans can continue operating during emergencies and disasters;

d.      Collaborations: The VA works with other federal agencies, state and local governments, and private organizations to coordinate preparedness and response efforts;

e.      Specific to wartime operations, the VA plays a crucial role in supporting the Department of War,[1] serving as a key backup medical system for military personnel and their families, including:

i.      Primary Medical Backup: The VA/DoD Health Resources Sharing and Emergency Operation Act (Public Law 97-174) designates the VA as the principal backup to the military health care system during and after a war or national emergency involving armed conflict;

ii.      Shared Resources: Public Law 97-174 provides for the sharing of healthcare resources, including facilities, equipment, and personnel, between the two agencies, even during peacetime;

---

[1] By Executive Order issued in 2025, President Donald J. Trump determined that the Department of Defense should once again be known as the Department of War. Exec. Order No. 14,347, *Restoring the United States Department of War*, 90 Fed. Reg. 43893, (Sept. 10, 2025).

iii.      Wartime: The VA provides medical care to military personnel, including those injured in combat, and their families during wartime; and

iv.      Priority for Care: Battlefield casualties are given priority for care in the VA's facilities.

7.      The VA's Fourth Mission is accomplished by the following four primary vehicles:

a.      VA / Department of War contingency: Public Law 97–174, passed on May 4, 1982, gives the VA its Fourth Mission, which is to serve as the primary backup for any health care services needed by the Department of War in the event of war or national emergency that involves armed conflict;

b.      National Response Framework (NRF): A guide on how the nation responds to all types of disasters and emergencies. (The guide is available to the public on FEMA's website at https://www.fema.gov/emergency-managers/national-preparedness/frameworks/response.) Coordinated by the Federal Emergency Management Agency (FEMA), the NRF includes Support Annexes, which are the essential processes and considerations for most emergency incidents, and Emergency Support Functions, which provide the structure for coordinating Federal interagency support for a federal response to an emergency incident;

6

c. National Disaster Medical System (NDMS): NDMS is a federally coordinated health care system and partnership of the United States Departments of Health and Human Services, Homeland Security, Defense and Veterans Affairs. (Information about the NDMS is available on the Department of Health and Human Service's website at https://aspr.hhs.gov/NDMS/Pages/default.aspx.) The VA's responsibilities under the NDMS are to:

i. Coordinate the receipt and distribution of medical care, and the handling of civilian casualties through Federal Coordinating Centers (FCCs); and,

ii. Coordinate receipt, distribution, and medical care of prioritized military casualties in support of the VA-DoD Contingency Plan during armed conflicts or national emergencies.

d. Other humanitarian assistance: VA Medical Center Directors and Veterans Health Administration (VHA) facility services have the authority to provide health care to civilians on a humanitarian basis if necessary.

8. The VA's four missions are all related and interconnected. Obstruction of one mission necessarily interferes with the VA's ability to execute the others. The reverse is also true: improving the VA's ability to more effectively execute its primary mission (care for Veterans), leaves it with more time and resources to devote to its other three missions.

7

9.      In Executive Order 14,251, the President determined that applying the FSLMRS to the VA is inconsistent with national security requirements and considerations. The VA's ability to carry out its national security functions (as described in paragraphs 5, 6, and 7) is hindered by the requirement that it comply with the FSLMRS.

**III.    The VA's Implementation of EO 14,251 and Related Litigation**

10.     The following information regarding the VA accurately reflects the actions the VA directed at the national level to implement EO 14,251 prior to the above-referenced Orders and the litigation that has occurred related to EO 14,251 and the VA's implementation thereof:

    a.      On April 3, 2025, the VA's national unions, including the American Federation of Government Employees (AFGE), filed a complaint for declaratory and injunctive relief in the U.S. District Court, Northern District of California, against, among others, the President and the Secretary, regarding the issuance of EO 14,251 (N. Cal. Complaint);

    b.      On or about April 4, 2025, in response to orders issued by the Federal Labor Relations Authority (FLRA) regarding the applicability of EO 14,251, the VA began requesting all FLRA matters be stayed or held in abeyance pending the outcome of the litigation related to EO 14,251;

    c.      On or about April 10, 2025, the VA began requesting all grievance and arbitration proceedings be stayed or held in abeyance until the litigation regarding EO 14,251 was resolved. However, as of August 6, 2025,

the VA requested grievance and arbitration proceedings be stayed or held in abeyance only if the underlying matter was not clearly limited to employees exempted from EO 14,251's coverage (i.e., police officers, firefighters, and security guards) and the union who filed the grievance failed or refused to so limit the matter;

d.   Effective as of the April 25, 2025, pay period, the VA terminated dues deductions for all AFGE bargaining unit members subject to EO 14,251's coverage;

e.   On June 24, 2025, Plaintiffs in the N. Cal. Complaint filed a motion for a preliminary injunction. On July 7, 2025, the Ninth Circuit Court of Appeals issued an order granting the Defendants' request for an administrative stay pending a ruling on the emergency motion for a stay pending appeal. On August 1, 2025, the Ninth Circuit issued an order granting a request for a stay of the preliminary injunction pending appeal; on February 26, 2026, the Ninth Circuit issued its opinion vacating the district court's preliminary injunction;

f.   On August 6, 2025, following the Ninth Circuit's grant of a stay pending appeal, the VA terminated all its national contractual bargaining agreements,[2] including the above-referenced CBA, except to the extent those agreements applied to police officers, firefighters, and security guards, in

---

[2] Specifically, the VA terminated the agreements held with: AFGE; National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses United (NNU); and Service Employees International Union (SEIU).

accordance with Sections 2 and 6 of EO 14,251;

g.     On or about August 6, 2025, the VA began advising representatives of AFGE, NVAC, and locals affiliated with AFGE/NVAC, as applicable, that, pursuant to EO 14,251 and the CBA termination, the VA would not engage in grievance and arbitration proceedings if the proceedings related exclusively to employees covered by EO 14,251 (i.e., employees who, pursuant to EO 14,251, are no longer subject to the FSLMRS);

h.     On or about August 6, 2025, the VA began reclaiming government resources and space previously allocated to NVAC and local unions and, on or about this same date, began repurposing the resources and space to meet the VA's mission needs. To the extent a local union represented employees excluded from EO 14,251's coverage, the VA had already begun the process of reissuing Agency resources and space, consistent with the CBA and commensurate with the local union's updated representational needs;

i.     As of August 6, 2025, the VA began denying requests for taxpayer funded union time if the request came from a union representative who was also an employee subject to EO 14,251's coverage;

j.     As noted above, on November 13, 2025, the VA published a notice in the *Federal Register* rescinding the April 11, 2025, Order in its entirety. The effect of this rescission was that the local unions who had previously been exempted from EO 14,251's coverage pursuant to the April Federal Register Order were now covered by EO 14,251 and, resultingly,

10

their members were excluded from the FSLMRS. 90 Fed. Reg. 50,950 (Nov. 13, 2025). Pursuant to the November 13, 2025, Federal Register Order recission and consistent with EO 14,251, effective November 13, 2025, the VA terminated all its local collective bargaining agreements, except to the extent those agreements applied to police officers, firefighters, and security guards, in accordance with Sections 2 and 6 of EO 14,251. Accordingly, as of November 13, 2025, the VA had terminated all its contractual bargaining agreements, except to the extent they covered police officers, firefighters, and security guards who were specifically excluded from the coverage of EO 14,251 by Section 2 of the EO;

k.    On March 13, 2026, the AFGE CBA was reinstated pursuant to the Court's order; however, the Court later clarified the VA was not prevented from re-terminating the CBA "in a lawful manner" and, on March 26, 2026, pursuant to EO 14,251, the VA re-terminated the AFGE CBA in such lawful manner. That is, as the Secretary explained in the termination letter, the CBA became impossible to perform once the VA was excluded from the FSLMRS. Therefore, the Secretary terminated the CBA; and

l.    On March 27, 2026, pursuant to the Court's March 13, 2026, and March 27, 2026, orders, the VA clarified that the entirety of the VA-AFGE Master Collective Bargaining Agreement as well as any amendments, local supplemental agreements, and memoranda of understanding (collectively referred to as CBA) were reinstated in both form and substance to the extent

11

they cover Plaintiffs.

**IV.    Harms Resulting from Implementation of the Court's Orders**

11.    The VA is suffering and will continue to suffer the following harms if it does not obtain a stay of the district court's Orders requiring the VA to return to the status quo that existed before the March 27, 2025 issuance of the EO:

a.    The VA would be required to either risk district-court enforcement, including contempt proceedings, or reissue Agency space and government resources to Plaintiffs' union representatives. In August 2025, post-CBA termination, the VA reclaimed over 180,000 square feet of office space, worth approximately $5.4 million, and 2,000 pieces of information technology (IT) equipment, worth approximately $600,000, that had previously been provided to VA unions free of charge. The space and resources formally used by union representatives was quickly repurposed by VA facilities, many of whom already lack sufficient space for their operational needs, and much of it was used for mission-related work, including expanding administrative and clinical services in facilities across the country to provide and facilitate Veteran care. It will be difficult, if not impossible, to require facilities to immediately surrender the critical space and resources they are using for administrative and clinical services and surrender it to Plaintiffs for their use. Because many facilities already lack sufficient space for their operational needs, it is unclear how they can immediately rescind use of this space and relinquish it outside entities for non-mission related uses.

Ultimately, requiring facilities to surrender this vital space and resources to union representatives will result in impacts to Veteran care and other mission-related work. Furthermore, the VA will immediately incur costs associated with repurposing the space so it compliant with the VA's contractual requirements and appropriate for use by the unions.

b.      The VA would have to either risk district-court enforcement, including contempt proceedings, or to return approximately 1,961 employee union representatives to their previous taxpayer funded union time allocations (with 308 employees spending 100 percent of their duty hours on taxpayer funded union time and another 124 employees spending between 50 and 99 percent of their duty hours on taxpayer funded union time), thus removing them from performing work on behalf of the VA and its mission. The VA returned these employee union representatives to their position of record after the August 6, 2025, CBA termination. Of the 1,961 employees who were returned to their position of record after the August 6, 2025, CBA termination, more than 1,000 were serving Veterans in direct patient-care roles. Reverting these employees back to full or part-time union work pursuant to the Court's Orders would result in an annual total of 569,000 patient care hours lost based on prior taxpayer funded union time allocations (approximately 11,000 patient care hours lost per week or 1,600 patient care hours lost per day). Reverting these employees back to full or part-time union work will also be disruptive to the facilities who relied on these employees to

13

accomplish mission-related duties and will have no one immediately available to replace them when they return to their taxpayer funded union time allocations. Reverting employees back to full or part-time union work will also be costly for the VA as the VA spent approximately $39.75 million dollars in 2024 allowing the employee union representatives to spend nearly 750,000 hours working on behalf of their union, rather than in their VA-assigned job (costing the VA approximately $765,000 dollars per week or approximately $110,000 dollars per day).  The VA anticipates that reverting such employees now will incur similar daily and weekly costs.

c.    The VA would have to direct the payroll service providers to restart collecting union dues for Plaintiffs or risk district-court enforcement, including contempt proceedings. However, the VA cannot restart dues automatically for all former union members because Plaintiffs have been promoting the use of an internal dues collection system called e-Dues.  The VA does not have information on which employees are now paying their membership dues directly to Plaintiffs. As a result, restarting automatic payroll deductions for all impacted employees could harm those employees who incur the double payment of dues and harm the VA, which could be held financially responsible for the employees' double payment of dues. Additionally, the VA will incur substantial administrative costs in determining which employees must have union dues deducted, processing requests to forego deductions because the employee is already paying e-Dues

14

to the union, and investigating and resolving employee claims that they are double paying dues. It is estimated that the VA will require approximately 2,573 staff hours in the first 6 months following the Court's Orders (for an estimated cost of approximately $71,000) just to restart union dues. These administrative costs must be expended now due to the Court's preliminary injunction and enforcement order.

d.    The VA would be prevented from complying with multiple other Executive Orders without first complying with statutory and contractual bargaining requirements prior to implementing the President's initiatives. For example, the VA would be forced to either risk a claim that it was violating the CBA or negotiate over initiatives—such as return to in-person work, changes to probationary employee requirements, changes to the performance management system, and possible reductions in force. If the VA were required to bargain over reorganization plans, such as the reorganization of VHA,[3] which are currently occurring and designed to result in fundamental, systematic changes that will improve efficiency, operations and preparedness, that requirement would directly impact the VA's ability to implement necessary changes for the advancement and vitality of the administration, thereby jeopardizing the VA's ability to execute its national security mission and the efficiency of the organization. Specifically, VA and

---

[3]    *See* https://www.usmedicine.com/non-clinical-topics/policy/massive-va-restructuring-would-cut-number-of-visns-reduce-high-level-leadership/, which details the VA's reorganization of VHA.

15

VHA's efficiency and effectiveness as an organization, to include the provision of medical care, are directly related to its operations, which includes national security functions. The VA is reorganizing VHA to increase efficiency effectiveness and improve operations, which will directly increase the VA's capability for peacetime, emergency, and national security missions. If the VA is prevented and delayed in doing so, it will have a negative effect on its missions, including its national security mission.

e.      The VA would also risk district-court enforcement, including contempt proceedings, or bargaining with Plaintiffs over changes to Plaintiffs' bargaining unit employees' conditions of employment, even when the initiative or change has a direct impact on services to Veterans and/or the VA's national security functions. Notably, Plaintiffs' CBA requires multiple layers of negotiations, which cause significant delays before the VA can make most changes, including changes directly impacting the VA's ability to fulfill its mission and national security functions such as the VA's ongoing initiative to onboard employees within 30 days. Insomuch as the VA's resources are used to support and fund its four missions, any negative impact on the VA's readiness and day-to-day efficiencies has an impact on all four missions, including its national security mission.

f.      One notable example of how past negotiations with Plaintiffs negatively impacted the VA's national security mission occurred when, despite a national emergency, Plaintiff NVAC sought to delay and stymie the

16

VA's efforts to mobilize clinical staff to assist with COVID-19 efforts and carry out Fourth Mission responsibilities. Specifically, in response to President Trump's March 13, 2020, proclamation declaring the COVID-19 pandemic a national emergency, the VA required Veterans Health Administration (VHA) clinical staff to enroll in the Disaster Emergency Medical Personnel System (DEMPS). DEMPS is a database which serves as the primary mechanism whereby active VHA personnel can register, in advance, for deployment requests in support of internal emergencies affecting the VA, or external support as might be requested under various Federal plans and authorities such as the NRF. VHA clinical staff were required to enroll in DEMPS to gauge the VA's deployment capabilities in response to the COVID-19 national emergency. Plaintiff NVAC immediately filed a national grievance in response. The grievance declared that regardless of the emergency, the VA was first required to bargain the implementation of DEMPS, and as a remedy, Plaintiff NVAC demanded employees be allowed to opt-out of DEMPS and that the VA rescind any disciplinary actions taken against employees who refused to enroll. Plaintiff NVAC attempted to and did directly interfere with the VA's efforts to accomplish its Fourth Mission and delayed emergency response efforts.

g.      Additional examples of initiatives delayed or stymied because of protracted negotiations with Plaintiff NVAC include: the realignment of bargaining unit employees to clinical contact centers (CCC); implementation

17

of the Mandatory Influenza Vaccination Directive 1192.01; implementation of the Promise to Address Comprehensive Toxics (PACT) Act of 2022, Pub. L. No. 117-168, 36 Stat. 1759, section 603; implementation of VHA Directive 1167, Mental Health Environment of Care Checklist; and the use of Telesitters Technology in VHA facilities.

h.      The VA would have to either risk a claim that it was violating the CBA in contempt of a court order or restrict its ability to address employees with performance or conduct issues. Examples of CBA provisions materially impacting the VA's ability to operate effectively and efficiently in executing its mission, including its Fourth Mission, include:

i.      Article 12, Section 1(C), which requires the VA to provide a minimum of 10 days' advance notice to the local union before effectuating a temporary detail;

ii.      Article 13, Section 5, which requires the VA to provide 30-days' advance notice to the local union and bargain prior to effectuating an administrative reassignment/involuntary reassignment mandated by the VA's valid operational needs;

iii.      Article 14, Section 1, which requires the VA to apply the heightened "just and sufficient cause" standard to all disciplinary actions (as opposed to the standard used in the Merit System Protection Board (MSPB), which requires the VA to show the action was taken "only for such cause as will promote the efficiency of the

18

service");

iv.      Article 22, Section 2(D), which requires the VA to give advance notice to the local union when a bargaining unit employee is the subject of an investigation or inquiry, thus risking the integrity of the investigation. Furthermore, once the investigation is allowed to proceed, union officials often impede the VA's ability to conduct an investigation by attempting to stop the investigation and/or advising the employee not to respond to the VA's questions. Obtaining information in a timely manner is crucial to ensuring appropriate steps are taken and employees are held accountable for misconduct. These delayed investigations impede the VA's ability to ensure staff are held accountable and can delay or impede the VA's ability to execute its mission, including its national security functions;

v.      Article 22, Section 2(E), which prohibits, "except in very rare and unusual circumstances," the VA from questioning an employee pursuant to an investigation if, during the employee interview, the employee requests local union representation. This contract provision results in investigations being delayed from occurring expeditiously;

vi.      Article 23, which specifies the requirements for Title 5 and Title 38 Hybrid vacancy announcements and postings, including mandating the number of days the VA must leave a vacancy

19

announcement open, leading to delays in hiring mission critical positions, including those that provide direct patient care;

vii.        Article 27, Section 2(E), which mandates a 90-day minimum appraisal period, which is inconsistent with the VA's Office of Personnel Management-approved performance rating system that only requires a minimum 30-day appraisal period. This burdensome requirement means an employee must be under a performance plan for at least 90 days' before the employee can be placed on a performance improvement plan, which, as noted below, must last for a minimum of 90 days. Consequently, in some instances, it can take up to 6 months before the VA can issue a performance-based action against an employee. Although the VA attempted to negotiate out of this requirement during the last CBA negotiation, Plaintiff NVAC refused to make changes;

viii.       Article 27, Section 10, which requires the VA to place an employee with performance deficiencies on a performance improvement plan lasting at least 90 calendar days. The VA is required to comply with this contractual provision notwithstanding the statutory authority Congress gave the VA under 38 U.S.C. § 714 to dismiss poor performers without such performance improvement plan periods;

ix.        Article 44, which addresses Arbitration and requires the

20

VA to expend government resources on arbitration hearings, even though arbitrators are often unfamiliar with the federal sector or VA operations and the normal review and enforcement mechanism (i.e., through the FLRA) is not currently functioning. Specifically, federal sector arbitrators overseeing VA grievance arbitrations are randomly selected by a process of elimination required by the CBA wherein the VA and NVAC alternatively strike potential arbitrator names until one name remains. This process often results in inexperienced arbitrators misapplying the law and costing taxpayers millions of dollars. Additionally, the FLRA is currently holding all matters in abeyance if the matter involves an agency covered by EO 14,251. This means arbitrators are issuing arbitration awards, but the FLRA will not consider any exceptions to the award or involve itself in the enforcement of the award. This places the VA in the confusing position of being forced to participate in arbitrations and being subject to arbitration awards but having no meaningful way to dispute those awards. The filing of exceptions with the FLRA currently means the VA does not have to comply with the award but must accept any additional accruing harm that may result while waiting for the FLRA's decision. It is also unclear, based on the Court's Orders, whether the VA would be in contempt of court if it refused to implement an arbitration award and/or whether the Court would attempt to enforce

21

that award, which would be untethered from the statutory scheme.

Furthermore, even when the FLRA was reviewing exceptions filed by

the VA (i.e., when the VA was not excluded from the FSLMRS), the

FLRA is limited in the types of personnel actions and exceptions it can

consider (for example, agencies cannot appeal arbitration awards

regarding adverse employment actions, e.g., dismissals, demotions,

reductions in pay, or suspensions 14 days or longer) and the FLRA has

opted to limit the scope of its review by considering exceptions with

tremendous deference towards the arbitrator's decisions and findings.

Examples of grievance settlements and arbitration decisions resulting

in harm to the VA include:

(1)     Agency Use and Implementation of 38 U.S.C. § 714:

After an arbitrator ruled the VA improperly implemented the

statutory authority Congress gave the VA under 38 U.S.C. §

714, the VA entered into a settlement agreement with NVAC in

lieu of implementing an even more onerous arbitration award.

The settlement obligated the VA to reinstate more than 100

former employees who had been terminated for misconduct and

pay nearly $134 million dollars to approximately 1,700 former

VA employees who were terminated for misconduct. Examples of

the misconduct that resulted in employees' terminations

included medication theft, creating a hostile work environment,

22

drug use, and threats of violence to coworkers; notably, these employees were reinstated or given financial compensation because of the VA's failure to negotiate the use and implementation of § 714, not because the employee was absolved of wrongdoing. The settlement also resulted in the VA discontinuing use of the § 714 authority for any AFGE bargaining unit employee, thereby hindering the VA's national security functions by preventing the VA from quickly terminating employees with performance or conduct issues;

(2)     Agency Smoking Shelters: After the VA converted to a smoke-free facility, consistent with other private health-care systems, Plaintiff NVAC grieved the VA's implementation of the policy, forcing the VA to retain smoking shelters on its campuses, even if in decay or being used to support mission-related services, due to ongoing litigation. The VA was ultimately ordered to reinstate the smoking shelters; and

(3)     Timekeeping for Union Representatives: The VA attempted to require union representatives to enter and track their taxpayer-funded union time into the VA's timekeeping system. Plaintiff NVAC grieved this change and obtained an arbitration decision, wherein the arbitrator held the topic was covered by the CBA, the CBA only allowed for mid-term changes

23

on any topic covered by the contract if the parties agreed by mutual consent, and Plaintiff NVAC did not have to bargain with the VA over whether the union representatives had to enter their taxpayer funded union time in the VA's timekeeping system, even though that mid-term change was not a subject of bargaining during term negotiations. Consequently, the VA's timekeepers and supervisors are forced to continue entering union representatives' taxpayer funded union time into the VA's timekeeping system. This task is timely and takes supervisors and timekeepers away from other roles and responsibilities and often results in errors to employees' timecards, which the VA is responsible for correcting. Furthermore, Plaintiff NVAC has used this arbitration decision to prevent the VA from making any changes it does not agree with if the change is even a generally covered topic in the CBA but was never a subject of bargaining during term negotiations.

x.       Article 45, Section 3, which specifies the VA's obligations regarding union dues and mandates the VA expend significant time and resources to collect dues on AFGE's behalf, a task most other voluntary membership organizations are required to do without government assistance. As noted above, pursuant to the Court's Orders, the VA will have to expend considerable resources determining

24

which employees must now have their dues restarted and restarting those dues deductions pursuant to the CBA;

xi.    Article 47, Section 4, which requires the VA to negotiate the local effect of changes agreed to in national negotiations, requiring extensive negotiations and delays before the VA can make changes to working conditions;

xii.    Article 48, which permits VA employees to spend up to 100 percent of their on-duty hours on union matters, rather than performing the duties of their position of record. As noted above, pursuant to these contractual obligations, the VA spends approximately $765,000 dollars per week or approximately $110,000 dollars per day allowing employee union representatives to work on behalf of their unions, rather than in their VA-assigned job; and

xiii.    Article 51, which requires the VA to use taxpayer funds to provide AFGE with office space, computers, printers, and other supplies, equipment, and government resources. As noted above, the office space provided to unions is worth approximately $5.4 million, while the IT equipment provided to unions free of charge is worth approximately $600,000,

25

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28, 2026.

_Mark Engelbaum_
Mark R. Engelbaum